FREDERICK M. BOSS
Deputy Attorney General
NICK M. KALLSTROM  #050023
SAMUEL A. KUBERNICK  #045562
RAFAEL A. CASO #073612
Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4794
Email:  Nick.M.Kallstrom@doj.state.or.us
        Samuel.A.Kubernick@doj.state.or.us
        Rafael.Caso@doj.state.or.us

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK E. GABLE, | Case No. 3:07-cv-00413-AC |
| Petitioner, | RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION |
| v. | |
| MAX WILLIAMS, | |
| Respondent. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ........................................ 2

        A.      Historical Facts and Trial Proceedings ................................................ 2

                1.      Michael Francke's murder and the crime scene ....................... 2

                2.      Eyewitness accounts ................................................................. 4

                        a.      Wayne Hunsaker ........................................................... 4

                        b.      Cappie Harden ............................................................... 4

                        c.      Jodie Swearingen ........................................................... 6

                        d.      Earle Childers ................................................................ 8

                3.      Testimony of petitioner's close associate (Mark Gesner) and wife
                        (Janyne Vierra) ......................................................................... 9

                4.      Petitioner's statements to other associates and acquaintances ................. 12

                        a.      Linda Perkins ............................................................... 12

                        b.      John Kevin Walker ....................................................... 13

                        c.      Daniel Patrick Walsh .................................................... 15

                        d.      Childers ........................................................................ 16

                        e.      Gesner .......................................................................... 17

                5.      Petitioner's statements to police ............................................ 18

                6.      Petitioner's defense at trial, the verdict, and the sentence ........................ 30

        B.      Direct Appeal ..................................................................................... 31

        C.      Post-Conviction Relief (PCR) proceedings—first trial and first appeal .............. 32

        D.      Post-Conviction Relief Proceedings—Remand and Second Appeal .................... 33

        E.      Current federal habeas proceedings .................................................. 36

III.    PETITIONER HAS NOT MET HIS BURDEN OF PROOF ON THE
        UNARGUED CLAIMS ................................................................................. 37

IV.     PETITIONER'S CLAIMS ALLEGING TRIAL COURT ERROR UNDER
        *CHAMBERS v. MISSISSIPPI* ARE PROCEDURALLY DEFAULTED AND
        WITHOUT MERIT.  (Grounds Two and Seven) ........................................ 38

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

A.    Johnny Lee Crouse's Statements to Police ........................................... 38

    1.    February 15, 1989 ..................................................... 39

    2.    April 4, 1989 ............................................................ 41

    3.    April 5, 1989 ............................................................ 43

    4.    April 6, 1989 ............................................................ 45

    5.    April 9, 1989 ............................................................ 45

    6.    April 11, 1989 .......................................................... 46

    7.    April 13, 1989 .......................................................... 46

    8.    June 15, 1989 ........................................................... 47

    9.    November 30, 1989 .................................................. 49

B.    State Court Proceedings Related to Petitioner's *Chambers* Claim ...................... 50

C.    Petitioner's *Chambers* Claim is Procedurally Defaulted ..................... 53

D.    Petitioner's *Chambers* Claim is Without Merit ................................. 55

    1.    *Chambers v. Mississippi* .......................................... 55

    2.    The exclusion of Crouse's unsworn hearsay statements pursuant to state evidentiary rules did not violate petitioner's due process rights because, unlike the statements at issue in *Chambers*, Crouse's statements did not bear "persuasive assurances of trustworthiness" .................................................. 60

E.    Any Error in Excluding Crouse's Statements was Harmless.............................. 70

V.    THE MAJORITY OF PETITIONER'S CLAIMS ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL ARE PROCEDURALLY DEFAULTED AND ALL CLAIMS ARE WITHOUT MERIT........................................................ 71

    A.    The *Martinez* exception provides no basis to excuse any default........................ 71

        1.    The *Martinez* decision............................................. 72

        2.    Post-conviction counsel (Ken Hadley) was not constitutionally ineffective ............................................ 73

        3.    Trial counsel (Abel and Storkel) were not constitutionally ineffective ............................................ 74

    B.    Petitioner's claims relating to the violation of the *ex post facto* clause (Grounds Four and Fifteen (subpart "P")) are either procedurally defaulted or lack merit ............................................. 75

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

1.  Ground Four ................................................................. 75

2.  Ground Fifteen (P) ...................................................... 77

C. Even if there were some basis to excuse the default of petitioner's
Grounds Fifteen (E) and Sixteen (B), the claims lack merit ................................ 81

  1.  Trial counsel did not perform deficiently by not presenting federal
law (*Chambers v. Mississippi*, 410 U.S. 284 (1973)) in support of
admission of evidence of third party guilt, and, in any event,
petitioner was not prejudiced (Ground 15(E)) ......................................... 81

  2.  Appellate counsel did not perform deficiently by not raising the
*Chambers* issue, and, in any event, petitioner cannot show
prejudice (Ground 16(B)) ........................................................ 84

D. Petitioner's claims or subclaims regarding trial counsel's "failure to
investigate" are not substantial (Ground 15(A)) .................................... 85

E. Failure to call or adequately examine witnesses (Randy Studer and Jodie
Swearingen) (Ground Fifteen (subparts J and K)) ................................ 90

  1.  Counsels' decision not to call Studer as a defense witness (Ground
Fifteen, subpart J) .............................................................. 90

  2.  Counsels' alleged failure to 'effectively' use Swearingen as a
defense witness (Ground Fifteen, subpart K) ............................. 93

  3.  Alleged failure to provide an effective closing argument (Ground
Fifteen, subpart P) ............................................................ 99

VI. PETITIONER HAS FAILED TO DEMONSTRATE ACTUAL INNOCENCE ........... 101

A. The affidavits that petitioner presents, in which some witnesses recant
their trial testimony, are not credible ................................................ 102

  1.  Janyne (Gable) Vierra ...................................................... 103

    a.  Petitioner has not established that he was at his apartment
at the time of the murder, such that no reasonable juror
would vote to convict him ................................................ 104

    b.  Petitioner's statements to Vierra, which were not presented
to the jury, further inculpate petitioner in Francke's murder ...... 110

  2.  Jodie Swearingen ........................................................... 113

  3.  Cappie Harden ............................................................... 121

  4.  Earl Childers ................................................................. 125

  5.  John Kevin Walker .......................................................... 129

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

6.    Dan Walsh.................................................................................. 132

7.    Randy Studer and Teresa Ross ................................................ 135

8.    Michael Keerins ....................................................................... 141

B.    Raskin's affidavit does not bolster the affidavits of the recanting witnesses, such that those affidavits constitute new reliable evidence upon which no reasonable juror would vote to convict petitioner............................. 143

C.    The evidence that petitioner advances of third-party guilt is not new reliable evidence upon which no reasonable juror would vote to convict petitioner ................................................................................................... 154

1.    John Lee Crouse.................................................................... 154

2.    Timothy "Rooster" Natividad ................................................ 154

3.    Samuel "Navarro" Cornejo ................................................... 160

D.    Petitioner has not met his burden of proving that, in light of the entire record, no reasonable juror would vote to convict him ....................... 162

VII.    CONCLUSION.................................................................................. 167

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

# TABLE OF AUTHORITIES

## Cases

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) ........................................................ 103

*Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir. 1997) .................................................... 153

*Aparicio v. Artuz*, 269 F.3d 78 (2d Cir.2001) ............................................................... 84

*Baldwin v. Reese*, 541 U.S. 27 (2004) ........................................................................... 54

*Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015)........................................................ 83

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)................................................................... 70

*Brown v. Attorney General of California*, 292 Fed. Appx. 674 (9th Cir. 2008).......................... 89

*Brown v. Ornoski*, 503 F.3d 1006 (9th Cir. 2007 ........................................................... 100

*Burt v. Titlow*, 134 S.Ct. 10 (2013)................................................................................ 78

*Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013)............................................................ 77

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ............................................ 101, 102, 134, 140

*Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004) ................................................................ 54

*Chambers v. Mississippi*, 410 U.S. 284 (1973)........................................................... passim

*Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010)...................................................... passim

*Clark v. Lansford*, 191 So.2d 123 (Miss. 1966)................................................................ 58

*Coleman v. Thompson*, 501 U.S. 722 (1991)............................................................. 72, 76

*Comstock v. Humphries*, 786 F.3d 701 (9th Cir. 2015) ..................................................... 78

*Cooper-Smith v. Palmateer*, 397 F.3d 1236 (9th Cir. 2005) ............................................... 64

*Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012)........................................................... passim

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)................................................................... 64

*Denham v. Deeds*, 954 F.2d 1501 (9th Cir. 1992) ............................................................ 89

*Dennis v. United States*, 384 U.S. 855 (1966) ................................................................. 98

*Dobbert v. Wainwright*, 468 U.S. 1231 (1984)........................................................ 102, 103

*Duncan v. Henry*, 513 U.S. 364 (1995) .......................................................................... 54

*Estelle v. McGuire*, 502 U.S. 62 (1991).......................................................................... 55

Page v

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*Fairchild v. Norris*, 51 F.3d 129 (8th Cir. 1995) ..................................................... 102

*Frazier v. Cupp*, 394 U.S. 731 (1969) ................................................................. 152

*Fry v. Pliler*, 551 U.S. 112 (2007) ..................................................................... 70

*Gable v. State*, 203 Or. App. 710, 726, 126 P.3d 739, *rev den*, 341 Or. 216 (2006).................... 33

*Harrington v. Richter*, 131 S.Ct. 770 (2011) ........................................................... 78

*Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011) .......................................................... 100

*Herrera v. Collins*, 506 U.S. 390 (1993) ........................................................... passim

*Hiivala v. Wood*, 195 F.3d 1098 (9th Cir. 1999) ........................................................ 54

*Holland v. Jackson*, 542 U.S. 649 (2004) ............................................................... 64

*Holloway v. Gower*, 225 Or. App. 176, 200 P.3d 584 (2009) .............................................. 84

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ......................................................... 55

*House v. Bell*, 547 U.S. 518 (2006) ............................................................... 102, 111

*Hurles v. Ryan*, 752 F.3d 768 (9th Cir.), *cert den*, 135 S.Ct. 710 (2014) ............................. 79

*James v. Borg*, 24 F.3d 20 (9th Cir. 1994)............................................................. 82

*Johnson v. Pollard*, 559 F.3d 746 (7th Cir. 2009) ..................................................... 152

*Jones v. Barnes*, 463 U.S. 745 (1983)................................................................. 74

*Jones v. Taylor*, 763 F.3d 1242 (9th Cir. 2014)................................................... passim

*Keiper v. Cupp*, 509 F.3d 238 (9th Cir. 1975) ........................................................ 152

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................................................... 70

*Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) ............................................. 144, 149, 150

*Lindh v. Murphy*, 521 U.S. 320 (1997)................................................................. 79

*Lockyer v. Andrade*, 538 U.S. 63 (2003) .............................................................. 78

*Lopez v. Ryan*, 678 F.3d 1131 (9th Cir.), *cert den*, __U.S.__, 133 S.Ct. 55 (2012) ................... 72

*Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) .............................................. passim

*Marshall v. Lonberger*, 459 U.S. 422 (1983) ...................................................... 55, 79

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012) ........................................................ passim

*Mayes v. Premo*, 766 F.3d 949 (9th Cir. 2014), *cert den*, 135 S.Ct. 978 (2015)........................ 77

Page vi

*Merolillo v. Yates*, 663 F.3d 444 (9th Cir. 2011) ................................................. 70

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ....................................................... 79

*Moen v. Peterson*, 312 Or. 503, 824 P.2d 404 (1991) ....................................... 35

*Montana v. Egelhoff*, 518 U.S. 37 (1996) .................................................... 55, 61

*Moormann v. Ryan*, 628 F.3d 1102 (9th Cir. 2010) ......................................... 85

*Murray v. Carrier*, 477 U.S. 478 (1986) ........................................................ 101

*New v. Armenakis*, 156 Or. App. 24, 964 P.2d 1101 (1998) ............................ 47

*Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013) .............................................. 84

*Nitschke v. Belleque*, 680 F.3d 1105 (9th Cir.), *cert den*, 133 S.Ct. 450 (2012) ............. 75, 76, 77

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ................................................. 54

*Ortiz v. Uribe*, 671 F.3d 863 (9th Cir. 2011) ......................................... 152, 153

*People v. Cudjo*, 863 P.2d 635 (1993) ........................................................... 68

*Premo v. Moore*, 131 S.Ct. 733 (2011) ........................................................ 81

*Renderos v. Ryan*, 469 F.3d 788 (9th Cir. 2006) ............................................ 37

*Schlup v. Delo*, 513 U.S. 298 (1995) ..................................................... passim

*Sexton v. Cozner*, 679 F.3d 1150 (9th Cir. 2012), *cert den*, 133 S.Ct. 863 (2013) ........... 72, 73, 92

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ............................................ 38

*Slack v. McDaniel*, 529 U.S. 472 (2002) ..................................................... 100

*Smith v. Murray*, 477 U.S. 527 (1986) ........................................................ 84

*Sophanthavong v. Palmateer*, 373 F.3d 859 (9th Cir. 2004) .......................... 79, 81

*State ex rel Johnson v. Roth*, 276 Or. 883, 557 P.2d 230 (1976) ...................... 98

*State v. Gable*, 127 Or. App. 320, 873 P.2d 351 (1994) ................................. 31

*State v. Lyon*, 304 Or. 221, 744 P.2d 231 (1987) ......................................... 154

*State v. McDonnell*, 329 Or. 375, 987 P.2d 496 (1999) ................................. 35

*Stewart v. Smith*, 536 U.S. 856 (2002) ....................................................... 76

*Stokely v. Ryan*, 659 F.3d 802 (9th Cir. 2011) ............................................. 64

*Strickland v. Washington*, 466 U.S. 668 (1948) ..................................... 73, 79, 92

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*Tatarinov v. Premo*, 533 Fed. Appx. 778 (9th Cir. 2013)...........................................................76

*Taylor v. Illinois*, 484 U.S. 400 (1988) .................................................................................55, 159

*United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003) ...................................................152

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)......................................................152

*United States v. Procter & Gamble*, 356 U.S. 677 (1958)......................................................98

*United States v. Red Star*, 241 Fed. Appx. 401 (9th Cir. 2007)...........................................152

*United States v. Scheffer*, 523 U.S. 303 (1998) .......................................................................55

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ................................................................................54

*Walker v. Martin*, 131 S.Ct. 1120 (2011) ...............................................................................76

*Weaver v. Attorney General of Montana*, 597 F.Supp. 2d 1126 (D. Mt. 2008), *aff'd*, 370
    Fed. Appx. 869 (9th Cir. 2010)....................................................................................150

*Weaver v. Palmateer*, 455 F3d 958 (9th Cir. 2006).................................................................83

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................................78

*Woodford v. Visciotti*, 537 U.S. 19 (2003)...............................................................................79

## Statutes

ORS 135.855...............................................................................................................................98

ORS 138.071...............................................................................................................................54

ORS 163.150...............................................................................................................................31

ORS 40.255.........................................................................................................................11, 111

## United States Code

28 U.S.C. § 2248 .......................................................................................................................37

28 U.S.C. § 2254.....................................................................................................................1, 76

28 U.S.C. § 2254(b)(1) .............................................................................................................54

28 U.S.C. § 2254(d) ............................................................................................................54, 77

28 U.S.C. § 2254(d)(1) .............................................................................................................78

28 U.S.C. § 2254(d)(2) .............................................................................................................79

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

28 U.S.C. § 2254(e)(1)................................................................................ 68, 79, 106

28 U.S.C. § 2254(e)(2)................................................................................ 64


**Other Authorities**

OEC 801(4)(a)(A) ................................................................................ 92

OEC 803(3)(c) ................................................................................ 51

OEC 804(3)(c) ................................................................................ 51, 59, 64


**Rules and Regulations**

ORAP 5.45(1) ................................................................................ 76


**Other**

C. McCormick, Evidence s 38, pp. 75-78 n. 7 (2d ed. 1972) ...................... 58

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

I.      INTRODUCTION

Petitioner filed an Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his convictions on six counts of Aggravated Murder and one count of Murder. In his Amended Petition, petitioner raised twenty grounds for relief, some of which contained several sub-claims. (Clerk's Record ("CR") 61). In his *Brief in Support of Amended Petition for Writ of Habeas Corpus*, petitioner does not pursue several of those claims. In his brief, petitioner argues two claims of trial-court error, several claims of ineffective assistance of trial counsel, and one claim of ineffective assistance of appellate counsel.

This response first describes much of the evidence of petitioner's guilt presented at petitioner's trial. Petitioner's claims are then addressed. The only claim that petitioner properly exhausted was his claim against trial counsel for not objecting on *ex post facto* grounds to the sentencing options presented to petitioner's jury. However, that claim was rejected by the Oregon Supreme Court in a reasonable application of federal law. As discussed below, the rest of petitioner's claims are procedurally defaulted and without merit.

Finally, this brief addresses the evidence that petitioner presents in this proceeding in support of his claim of "actual innocence" under *Schlup v. Delo*, 513 U.S. 298 (1995), including the affidavits of trial witnesses who now recant portions of the testimony they gave under oath at petitioner's trial in the summer of 1991. As discussed below, the recantation evidence presented by petitioner is not reliable, and this Court should reject petitioner's showing of "actual innocence" without an evidentiary hearing. However, to the extent that this Court intends to rely upon petitioner's recantation evidence, an evidentiary hearing should be held, where the credibility and demeanor of the recanting witnesses could be assessed by this Court and the claims in their affidavits could be subjected to adversarial testing.

In sum, because petitioners' claims are without merit and because his evidence of actual innocence is not credible, such that all reasonable jurors would decline to convict him in light of

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

his newly presented evidence, petitioner's claims should be denied and his habeas petition should be dismissed with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Historical Facts and Trial Proceedings.

Michael Francke was stabbed to death on the evening of January 17, 1989. At the time of his death, Francke was the director of the Oregon Department of Corrections. On April 5, 1990, following an extensive investigation conducted by multiple law-enforcement agencies, the State indicted petitioner on six counts of Aggravated Murder and one count of Murder. (Ex. 103). Robert Abel and John Storkel were appointed to represent petitioner. The case proceeded to a jury trial, which lasted approximately four months, beginning in March 1991 and ending in July 1991. At the conclusion of those proceedings, the jury unanimously found petitioner guilty on all counts, and the trial court sentenced to petitioner to life imprisonment without the possibility for parole. (Ex. 104). The following evidence was presented at petitioner's trial.

#### 1.    Michael Francke's murder and the crime scene.

On January 17, 1989, Michael Francke attended a meeting at the Dome Building, which then housed the administrative offices of the Oregon Department of Corrections. (Tr. 7075). After the meeting ended, Francke met with several of his co-workers in his office until approximately 6:30 PM. (Tr. 8878). Francke was last seen alive by one of his co-workers just before that coworker left for home at approximately 6:50 PM. (Tr. 7080). Francke had stated that he was going to call his wife before heading home. (Tr. 8878). When that coworker left, he walked by Francke's car, but did not notice anything unusual. (Tr. 7080, 8882-84).

At approximately 7:07 PM, five people going to a group counseling meeting passed by the front of the Dome Building and noticed a white car parked in front with its door standing open. (Tr. 6922, 6927). At approximately 7:15 or 7:20 PM, two more of Francke's co-workers left for home, but noticed as they left that the dome light was on in Francke's car. (Tr. 6940-41). On further inspection, they realized that his car door was standing open and they went back in

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

the building to look for him.  (Tr. 6942-46).  They were not able to find him, and Francke did not return their calls to his pager.  (Tr. 6945).  The two co-workers then called security.  (Tr. 6946).

The next morning, at approximately 12:42 AM, Francke's body was found on the north portico of the Dome Building by a security guard.  (Tr. 5956).  His body could not be seen until the security guard actually climbed the steps to the north-portico entrance.  (Tr. 5956).  The blood spatter and other physical evidence showed that, after having been stabbed, Francke had climbed the steps of the north portico, had unsuccessfully attempted to open the locked door by breaking a pane of glass in the door, and then died on the porch.  (Tr. 6516-45).  Francke was dressed in dark clothes, including a black overcoat.  (Tr. 6401-02).

The subsequent investigation and autopsy revealed that Francke died from a stab wound to his heart.  The evidence showed that the assailant had thrust the knife at Francke three times.  One knife thrust missed Francke, but slashed his overcoat.  A second knife thrust passed through Francke's left bicep as he held his arm closely to his chest.  (Tr. 6415).  That second thrust then slightly penetrated Francke's chest after passing through business cards in his front shirt pocket.  (Tr. 6415).  A third knife thrust, which was the fatal blow, entered the left side of Francke's chest and passed through his heart.  (Tr. 6411-13).  The fatal wound passed through Francke's chest from left to right at a downward angle (i.e., from "above to below").  (Tr. 6417).  Francke also had irregular, jagged tears to the skin on his right hand, consistent with his punching through the glass to the door of the Dome Building.  (Tr. 6411, 6416).  Although Francke had some scrapes around his left eye and on his forehead, there was no significant blunt force trauma associated with those injuries.[1]  (Tr. 6406-08).

The crime scene itself did not indicate who committed (or did not commit) the murder.  The evidence at trial accordingly centered on eyewitness testimony; circumstantial evidence linking petitioner to the murder; petitioner's admissions to police; and petitioner's admissions to

---

[1] At least one of the injuries to Francke's head was apparently caused when Francke's body was being transported for the autopsy.  (Tr. 6367-68).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

acquaintances, most of whom were part of a loose network of people who used and/or sold methamphetamine in the Salem area.

### 2. Eyewitness accounts.

At petitioner's trial, there was evidence that three people witnessed a confrontation between two men in front of Dome Building at approximately 7:00 PM on January 17, 1989.

#### a. Wayne Hunsaker.

The first eyewitness was Wayne Hunsaker, a state custodian. Hunsaker testified that he left work at approximately 7:00 PM. (Tr. 6869). As he walked in front of the Dome Building, he "heard some sound of somebody being hurt." (Tr. 6881). It sounded as if a person had "had their breath knocked out"—a kind of hurt or surprised sound. (Tr. 6881). After hearing the sound, Hunsaker turned and saw two men facing each other, at most two feet apart. (Tr. 6881-82). He watched them separate. One of the men, in a "darker trench coat" walked hurriedly toward the Dome Building. (Tr. 6883-84). The other man, dressed in a beige trench coat, "took off running at full speed" in the other direction. (Tr. 6886-87). He ran west behind a generator, through some dumpsters behind one of the buildings in the area, and was lost from sight. (Tr. 6887-88).

#### b. Cappie Harden.

Cappie Harden testified that he also observed the altercation. At that time, Harden testified that he made his living by buying and selling cars and by selling methamphetamine. (Tr. 8056). Harden knew Gable, having met him at Johnny Bender's home on Hyacinth Street (also referred to in testimony as "the Hyacinth house"). (Tr. 8058-60). Harden stated that he had seen Gable at the Hyacinth house a couple of times, and that Gable had given him a ride from that house in the past. (Tr. 8058). On the day of Francke's murder, Harden stated that Jodie Swearingen had called, asking him to pick her up at her parents' house in Dundee, Oregon. He stated that he eventually dropped her off at the Hyacinth house and saw Gable in his car across the street from the home as he did so. (Tr. 8059-61).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Later in the day, Harden stated that Swearingen had called him twice, asking him to pick her up at the state-hospital grounds, which surround the Dome Building. (Tr. 6064). He left to do so at approximately 6:30 or 7:00 PM. (Tr. 6064). Harden pulled into a parking lot at the Dome Building and waited a couple of minutes before Swearingen approached the car and got in. (Tr. 8065-66). After she got into the car, Harden stated that he "kind of bitched" at her for having him come pick her up at night. (Tr. 8066). At that point, Harden noticed the interior light of a car parked at the Dome Building come on. (Tr. 8068). He then saw petitioner get into the car, and decided to "[s]tick around and see what [petitioner] was up to." (Tr. 8068). Petitioner closed the car door behind him, and the interior light of the car went off. (Tr. 8069). He then saw another person, who "[l]ooked like a businessman[,]" approach the car. (Tr. 8069). Harden testified:

> "He walked up to the car then and that's when I heard him yell, you know, 'Get out.' 'Hey, what are you doing in my car.' And he started running towards the car."

(Tr. 8070). After the man started yelling, Harden testified: "That's when I seen [petitioner] come out of the car and stab the man one time in the chest. And that's all I seen." (Tr. 8070). Harden explained that he had not observed anything after the stabbing because he "was busy starting my car [a task accomplished by hot wiring it] and getting out of there." (Tr. 8070). He took Swearingen to his house, and told her "to shut up and forget what she ever seen." (Tr. 8071).

When asked why he did not report the incident to the police, Harden stated simply, "I don't call the police." (Tr. 8071). Harden admitted that he lied repeatedly when interviewed by police several months later in November 1989 and January 1990, explaining that he was "not a rat" and did not want to tell the police he was at the scene of a murder. (Tr. 8072, 8124). On cross examination, the defense brought out several of Harden's inconsistent statements to police over the course of several police interviews. Harden conceded that he had lied to police, candidly acknowledging that "[a]nything I told the police at that time wouldn't surprise me."

Page 5 -    RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(Tr. 8105). However, Harden stated that the police eventually "provided enough evidence in my eyes to let me know that they weren't lying and they knew that I was[,]" thereby prompting him to tell the police about what he had seen. (Tr. 8131). Harden explained: "I had lied a lot about what I did, but not about what I seen that night. I did see Frank Gable stab Michael Francke." (Tr. 8124). At the time of his testimony, Harden did not have any charges pending against him, was not given any "deals" to testify, was not given any money by police, had retained his own private counsel, and did not have any agreement with the State in regards to any charges arising out of the Francke homicide. (Tr. 8072-76, 8146).

### c.    Jodie Swearingen.

Swearingen testified at trial as petitioner's witness. On direct examination, Swearingen testified that she had not seen petitioner break into anyone's car and that she had not seen petitioner stab Francke. (Tr. 9329). On cross examination, however, Swearingen made a series of admissions that discredited that testimony.

On cross examination, Swearingen confirmed Harden's testimony that she had called Harden on January 17, 1989, to pick her up from her parents' home in Dundee, and she conceded that she eventually ended up at the Hyacinth House later that night. (Tr. 9340-41). Swearingen agreed that she had previously told the grand jury—under oath [2]—that "Shorty [Harden] brought [her] over to the Benders [i.e., the Hyacinth House] that night and dropped [her] off and [she] hooked up with Frank Gable at the Benders and ultimately wound up at the Dome Building that night[.]" (Tr. 9367). Swearingen told the grand jury that she "drove in Frank Gable's car over to the Dome Building," and that "he was there to get snitch papers[.]" (Tr. 9367). She explained that her job was to "keep a lookout," that she watched a "big tall man walk down the steps [of the Dome Building] and across the grass and approach this white car[,]" and that she "saw Frank Gable get into a struggle with this big tall man near that white car that night[.]" (Tr. 9368-69).

---

[2] Swearingen's prior testimony under oath to the grand jury was not hearsay and came in as substantive evidence. OEC 801(4)(a)(A).

Page 6 -    RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Swearingen told the grand jury that Harden arrived in his car at some point and that "the last time [she] saw Frank Gable basically that night [he] was running away from the Dome Building while [she] and Shorty [Harden] were driving away[.]" (Tr. 9369). Thus, she told the grand jury that she was "present at the time that Michael Francke was killed[.]" (Tr. 9367).

During the course of her testimony, although Swearingen admitted that she had told police she "saw Frank Gable kill Michael Francke[,]" she testified that she had been pressured by police to make that statement. (Tr. 9360-61). Again, however, Swearingen made a series of admissions that discredited that testimony.

Swearingen agreed that police first interviewed her concerning the Francke homicide in September 1989. (Tr. 9334). During that first interview, Swearingen testified that she did not tell police that she saw Gable kill Francke. (Tr. 9335, 9360). Later that month, Swearingen stated that she hired an attorney, Tom Collins, who negotiated an immunity agreement on her behalf. (Tr. 9334). Swearingen testified that her attorney sought an agreement under which the State of Oregon would agree not to prosecute her as an accomplice to the murder of Michael Francke. (Tr. 9337). Such an agreement was signed on December 8, 1989.[3] (Tr. 9336-37).

However, prior to that agreement being signed, Swearingen acknowledged that she repeatedly told other people that she had witnessed Francke's murder. (Tr. 9347-55). In September 1989, Swearingen absconded from parole. She was returned to Hillcrest School a month later, in October 1989. She told Laura Vorderstraffe, the woman who drove her back to Hillcrest, "[B]oy, I'm really nervous this time[,]" explaining that she was "nervous because [she] was either an accomplice or an accessory to a murder[.]" (Tr. 9352).

After she got back to Hillcrest, Swearingen told Vorderstraffe "that the murder happened in Salem and that Michael Francke was the murder victim." (Tr. 9353). After becoming upset at another person at Hillcrest, Gary Jensen, Swearingen began to yell: "No, no, Mr. Jensen. That's not fair. You don't understand. This time I'm in as an accomplice for murder." (Tr. 9352-53).

---

[3] The letter setting out the agreement is contained within Respondent's Exhibit 254.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Swearingen agreed that she had explained to Jensen that "Frank Gable killed Michael Francke[,]" and that she "was nearby, possibly in a car." (Tr. 9348). Swearingen acknowledged that she told another person at Hillcrest, Marie Collar, that she "had something to do with the Michael Francke homicide case[.]" (Tr. 9350). Swearingen told another person at Hillcrest, Ann Marie Hagemann, that she was about fifty feet away from the car where Michael Francke was killed, that the car door was ajar, that there were two men on the scene in addition to Michael Francke, that one of the men stabbed Francke although Swearingen did not see him use the knife, and that after she saw the bloody knife, "they split." (Tr. 9350-51).

Thus, during the course of her testimony, Swearingen admitted that she made several statements to Hillcrest employees that were consistent with her grand jury testimony before she ever gave similar statements to police investigators or submitted to any police polygraph examinations.[4]

Approximately a year later, in September 1990, Swearingen admitted that she again absconded. (Tr. 9353). This time, Swearingen went to Colorado, where she stayed with her friend, George Russel Talley. (Tr. 9353). While in Colorado, Swearingen agreed that she told Talley "that some hot shot got killed and that [she] witnessed it[.]" (Tr. 9354). Her statement to Talley was a statement made to a private party apart from any sort of custodial setting.

### d.    Earle Childers.

One last eyewitness, Earle Childers, put petitioner near the scene of the murder. Childers stated that he knew petitioner because petitioner would help him procure methamphetamine.

---

[4] As noted above, Swearingen's statements to the Hillcrest employees occurred in October 1989. The first polygraph examination conducted by police was held on November 7, 1989. (Pet. Ex. E, pp. 356-359). Both Swearingen's attorney and a polygraph examiner hired by her attorney attended that polygraph examination and took part in the formulation of the questions that were asked of Swearingen. At that polygraph examination, Swearingen signed the following statement: "I was on the Dome Building grounds, and saw Frank Gable stab Michael Francke." (Pet. Ex. E, p. 358). Swearingen was then asked two questions: (1) "Did you lie in the statement you just wrote?" and (2) "Regarding the statement you just wrote, did you lie about any part of it?" (Pet. Ex. E, p. 358). Swearingen answered "no" to both questions, and the polygraph examiner concluded that Swearingen "was being truthful in her responses to those relevant questions." (Pet. Ex. E, p. 358).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(Tr. 7746).  Childers explained that Gable would take Dilaudids that Childers had obtained and

trade them for methamphetamine, making at least one such trade at the Hyacinth House.

(Tr. 7747).  Childers stated that as a condition of his parole he attended an Alcoholics

Anonymous group that ended at 6:30 PM.  He stated that he would walk home, typically passing

the state-hospital grounds on his route home at approximately 7:00 PM.  (Tr. 7749-51).

    On January 17, 1989, Childers stated that as he was walking home, he saw petitioner

driving away from the state-hospital grounds between 6:30 and 7:30 PM.[5]  (Tr. 7754-55,

7798-99).  He recognized petitioner's car (identifying it as "a gold Supra with black louvers on

the back window"), saw that petitioner was alone in the car, and saw that petitioner was wearing

sunglasses, noting that it was not unusual for petitioner to wear sunglasses at night, as he "wore

them all of the time[.]"[6]  (Tr. 7755, 7798-99).  Childers tried to get petitioner's attention because

he had some Dilaudids that he wanted to trade for methamphetamine.  (Tr. 7756).  Childers

stated that he "waived and yelled and whistled at him[,]" but that petitioner "just continued on

going."  (Tr. 7756).  When Childers saw petitioner a day or two later, he asked why he had not

stopped and given him a ride.  Petitioner did not respond to the question.  According to Childers,

petitioner "just said forget I ever saw him there.  Just forget it.  So I forgot it."  (Tr. 7757).

### 3.    Testimony of petitioner's close associate (Mark Gesner) and wife (Janyne Vierra).

    Another of petitioner's associates, Mark Gessner, also tied petitioner to the murder.

Gessner had introduced petitioner to Childers, and the two shared the same network of friends.

(Tr. 7974-77).  Gessner sold weapons and methamphetamine to petitioner, and the two had

---

[5] Childers remembered the date because the day after he saw petitioner his wife, who worked on
the state-hospital grounds, was upset because she had to walk to her car at night near the location
where Francke had been killed.  (Tr. 7749, 7756).

[6] As discussed below, after Childers reported recognizing petitioner with sunglasses on,
petitioner told Detective Fred Ackom:  "'Hey Fred, I'll tell you one thing, if anyone would have
seen me that night, I would have been wearing dark sunglasses.  I always wore dark sunglasses,
day or not.'"  (Tr. 7569-70; Pet. Ex. E, p. 31).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

disposed of equipment used to manufacture methamphetamine in the past.  (Tr. 7976-77, 7982-83).

On January 18, 1989, Gessner learned from a news flash on television that Francke had been killed outside the Dome Building.  (Tr. 7984).  Gessner recalled that on the previous night petitioner had arrived at his house as he worked in his garage.  Gessner testified:  "[Petitioner] drove up to the house, the garage door was open . . . and [petitioner] got out of the vehicle, came up and asked if I could get rid of something for him.  And he said where no one else could find it.  And I said, yeah, sure.  No biggie, you know."  (Tr. 7986).  Gesner explained that petitioner then retrieved a bag from his car:  "He went back out to the car and brought in a bag, a plastic bag.  And I said just set it in the corner and I'll take care of it in the morning.  And I said what is it?  And he said don't worry about it, I'll tell you later."  (Tr. 7987).  Gessner recalled that petitioner appeared to be "[a] little nervous" and "sweaty," and that he took off "very fast[,]" which was unusual:  "[H]e left right away.  Usually, he sticks around for awhile, but he was in a hurry, apparently, and left right away."  (Tr. 7988).

When petitioner dropped the bag off, Gessner assumed that it contained "meth stuff again, stuff we're destroying from the laboratory."  (Tr. 7987).  However, after learning that Francke's body had been discovered near the Dome Building, a location in close proximity to where petitioner frequently picked up his wife from work, petitioner's "nervous attitude made [Gessner] think, well, what is it in the bag."  (Tr. 7990).  Gesner was concerned enough that he put on gloves to avoid leaving fingerprints on the bag and went out to check it.  (Tr. 7990).  He could tell from lifting the bag that it was not glassware.  Rather, it felt like "cloth through [the bag], you know, something cloth."[7]  (Tr. 7990).  Gesner ultimately decided to throw the bag in a river at a nearby park.  (Tr. 7991).

_____

[7] Petitioner's wife, Janyne Vierra Gable, testified that petitioner carried a change of clothing with him "[m]ost of the time" because he would sweat a lot when he used methamphetamine. (Tr. 7694).  Petitioner was using methamphetamine in late 1988 and early 1989.  (Tr. 7692-93).

Page 10 -    RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
            NMK/6912532-v1

When he got to the park, Gesner opened the bag and put some rocks in the bag to weigh it down. (Tr. 7991). He did not inspect the contents of the bag, and could not recall what he saw when he opened the bag to place the rocks inside, other than "some type of a shirt maybe[.]" (Tr. 7992). However, when he tried to squeeze the air out of the bag, it felt like the cloth was wrapped around some cylindrical object that would not bend. (Tr. 7992). Gesner described it as "basically, like something rolled around something hard[.]" (Tr. 7991). He threw the bag into the river, and left after he saw the bag go under water. (Tr. 7993). The following day, petitioner asked Gesner whether he had gotten rid of the bag, and Gesner told him that he had. (Tr. 7995). Gesner said that he did not ask petitioner anything more at that time. (Tr. 7995).

The testimony of petitioner's wife also circumstantially linked petitioner to Francke's murder.[8] On the night that Francke was killed, petitioner's wife, Janyne Vierra Gable ("Vierra"), did not recall petitioner being at home. Vierra testified that she worked as a nurse at the Oregon State Hospital, and that petitioner would drive her to and from work each day. (Tr. 7684, 7702). On January 17, 1989, Vierra was not feeling well and left work at noon. (Tr. 7727-28). Petitioner gave her a ride home. (Tr. 7727). She stated that she slept that afternoon, and awoke just before dark and made dinner. (Tr. 7729). Vierra remembered that she was upset with petitioner the next morning (i.e., January 18, 1989) because she was worried she was going to be late for work, as petitioner had their car and she had not seen him since he drove her home the previous day. (Tr. 7728-29). He eventually arrived to take her to work at 6:25 AM. (Tr. 7730). When they drove past the Dome Building where police were investigating Francke's death, Vierra stated that petitioner "was nervous[,]" noting that there was "a high concentration of police in the area." (Tr. 7731).

---

[8] Petitioner filed a pretrial motion to exclude his statements to Vierra, asserting marital privilege under ORS 40.255. (Ex. 220). Shortly before Vierra testified, petitioner's trial counsel asked to be "heard on the issues of marital privilege outside the presence of the jury." (Tr. 7640). At petitioner's trial, Vierra did not testify regarding admissions that petitioner made to her concerning the Francke homicide. However, as discussed below, petitioner made several incriminating statements to his wife.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Approximately a month before Francke was killed, Vierra recalled that petitioner gave her a list of names and asked her to access the computer system at the hospital to determine "whether any of the people on this list of names were informants or classified in any particular way." (Tr. 7723). Vierra testified that she ultimately declined to do so because of the security measures needed to gain access to the information. (Tr. 7724). Similarly, as noted above, Swearingen told the grand jury that the reason petitioner was going to the Dome Building on the night Francke was killed was to try to find "snitch papers." (Tr. 9367).

Finally, Vierra testified that petitioner would frequently carry knives, "[a]nything from kitchen knives down to old timer pocket knives."[9] (Tr. 7709). She stated that he would carry them either "[u]p his coat sleeve or down the back of his pants." (Tr. 7712). Indeed, Vierra would often find her kitchen knives missing, and "tried to talk [petitioner] into taking my cheap kitchen knives instead of my good kitchen knives." (Tr. 7711). Eventually, she gave him a six-inch utility knife manufactured by Chicago Cutlery. (Tr. 7711-12). Such a knife shared the general class characteristics as the knife that killed Francke. (Tr. 8333-34).

### 4.      Petitioner's statements to other associates and acquaintances.

In addition to the eyewitness testimony and circumstantial evidence, petitioner either admitted committing the murder or made incriminating statements to five associates who testified at trial. The admissions began the day after the murder and continued over the course of the next several months.

### a.      Linda Perkins.

Petitioner made the first statement to Linda Perkins on January 18, 1989, the morning after Francke was murdered. Perkins was the mother of one of petitioner's friends, Theresa Ross. (Tr. 7946). Ross was the live-in girlfriend of Randy Studer, the brother of Vierra and

---

[9] Several of petitioner's associates agreed that petitioner frequently carried knives. (Tr. 8161-62).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

petitioner's brother-in-law.  (Tr. 7946-47).  Perkins drove Ross from her apartment to work each

morning.  (Tr. 7949).

On January 18, 1989, Perkins arrived at Ross's apartment to drive her to work.

(Tr. 7949).  About fifteen minutes after she arrived, petitioner arrived, appearing "extremely

nervous."  (Tr. 7950-51).  Although he was typically "nice and neat[,]" he looked "out of the

ordinary" that morning, dirty, unshaven, and with his hair uncombed.  (Tr. 7951).  Perkins

explained:  "[H]e was shakey, just jerking, and nervous acting.  And kept looking out the

window like every sound he heard or even in between sounds that he heard, he kept looking out

the window as if—I got the impression he was afraid someone was chasing him or following

him."  (Tr. 7951).  Ross asked petitioner what was wrong, and petitioner responded, "'Nothing.'"

(Tr. 7952).  When Ross persisted, petitioner responded:  "'I fucked up. . . . I fucked up big time

this time.'"  (Tr. 7952).  When Perkins asked petitioner what he meant, petitioner responded:

"'Well, I'll put it you like this, you will be reading about it in the papers.'"  (Tr. 7952).

Later that morning, as she drove Ross to work, Perkins heard on the radio that Francke's

body had been discovered.  (Tr. 7953).  When Perkins asked whether petitioner had been talking

about Francke, Ross discounted that possibility, telling Perkins that petitioner was "full of

bullshit."  (Tr. 7967-68).  However, approximately a week later, Perkins testified that she spoke

with petitioner on the phone.  During that conversation, Perkins stated that petitioner "told me

that if I opened my mouth I was a dead mother fucker."[10]  (Tr. 7953).

**b.    John Kevin Walker.**

John Kevin Walker also testified that petitioner admitted to murdering Francke.  At the

time, Walker was a methamphetamine dealer who frequently sold methamphetamine to

petitioner.  On the night that Francke was murdered, Walker recalled listening to his police

scanner at a friend's house and heard about "some stuff go[ing] down over by the State Hospital

---

[10] This was not the first confrontation between petitioner and Perkins.  Perkins also recalled a
"rather heated discussion" with petitioner because she was aware that he had been providing her
daughter with illegal drugs.  (Tr. 7967).

Page 13 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

grounds[.]" (Tr. 8167-69). He recalled "[a]nd that was the only night that I can recall ever hearing that much radio traffic at once." (Tr. 8169).

The next day, January 18, 1989, petitioner called Walker, sounding agitated. (Tr. 8171). Walker went to petitioner's apartment later that night to sell petitioner some methamphetamine. (Tr. 8172). When Walker arrived, they went into petitioner's bedroom to conduct the transaction. Once in the bedroom, Walker testified as to the following exchange:

> "[Petitioner] asked me if I had heard the news, and I said what news? And he said, 'About that guy over there at the State Hospital grounds.' And I said, 'Yeah, he got shot or something.' And [petitioner] said, 'Well, that's not exactly what happened, but it's close enough. I stuck him.'"

(Tr. 8173). After that exchange, Walker stated that petitioner threatened him: "And then he was like, you know, tweaked or something and the he realized what he said he just goes, you know, kind of in a sad way, I'm sorry, you know, if you tell on me, I'm going to have to kill you and your family." (Tr. 8175-76).

Initially, Walker stated that he took petitioner's threat with "a grain of salt" because it "wasn't characteristic of [petitioner] to do something like that to me." (Tr. 8176). However, Walker noticed a change in petitioner's behavior after the murder, noting that he became "[r]eal edgy. Like I say, on edge. Like a tweaker's edge." (Tr. 8177). Walker became more concerned, explaining, "As time goes on more and more things get found out. And the more I found out, the—the less I wanted to be around him." (Tr. 8176). Walker acknowledged that when he was first questioned by police, he did not tell police about petitioner's admissions, citing his fear of some of the people that petitioner was associated with and "the fact of the rat jacket that gets attached any time you talk to the police about anything." (Tr. 8179). After Walker testified before the grand jury, Walker testified that he was "labeled a rat" and was assaulted while incarcerated, resulting in a "broken cheek bone" and a "broken eye bone" that required surgical repair.[11] (Tr. 8182).

_____

[11] A defense witness, Dennis Dean Gause, confirmed that Walker was assaulted while incarcerated because he spoke with police about petitioner's involvement in the Francke homicide. (Tr. 8867).

Page 14 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

c.    **Daniel Patrick Walsh.**

Daniel Patrick Walsh also testified that petitioner admitted to killing Francke.  Walsh lived in the same apartment complex as Studer and Ross, and made his living selling methamphetamine.  (Tr. 7931-32).  In February or March of 1989, Walsh testified that, as he was sticking a knife into a tree, petitioner told him that he had killed Francke with the knife.  (Tr. 7934).  At the time, Walsh did not take petitioner seriously:  "I just kind of laughed because he was pretty strung on drugs then and stuff, and so was I, and I didn't pay any attention about it really all that much."  (Tr. 7934).

However, after Walsh allowed petitioner and his wife (i.e., Vierra) to move in to his apartment, petitioner again stated that he had killed Francke.  (Tr. 7935-36).  During the course of describing an argument that he was having with Doug Scritchfield, petitioner made the comment that he was going to kill Scritchfield.  (Tr. 7936).  Walsh  stated that he "snickered" when petitioner made that comment, and petitioner's "exact words" in response were:  "'Well, you remember Michael Francke.'"  (Tr. 7936).  Walsh stated that petitioner then described how he had stabbed Francke:

> "He had said that he had been jockey-boxing and the car had the car door open,
> and that he was laying across the seat and that Mr. Francke come up along to—up
> on him, and he had lunged out into Mr. Francke.  Didn't say whether he was out
> of the car or in the car, lunged into his body and stuff stabbing him repeatedly and
> that he had fled across the parking lot."

(Tr. 7937).  Walsh stated that after petitioner described the stabbing, he threatened Walsh:  "[H]e grabbed my chin and said if you ever say a word of this to anybody, I'll kill you and your family."  (Tr. 7937).

Walsh acknowledged that he did not initially tell police about petitioner's statements, stating that he feared for his family and "didn't want to have a snitch jacket on me."  (Tr. 7938).  However, after he had first spoken with police, he had moved to Ohio with relatives and was no longer using drugs or living within the drug community.  (Tr. 7939).  Although the State provided him with "some money for a couple weeks for food and lodging" when he moved back

Page 15 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

from Ohio, he was not given anything further and no criminal charges against him were reduced or dismissed. (Tr. 7940).

### d.    Childers.

Petitioner also admitted to Childers that he killed Francke. As noted above, Childers had seen petitioner driving away from the state hospital grounds on January 17 at approximately the same time that the custodian, Hunsaker, had witnessed the altercation in front of the Dome Building.

A couple of months later, petitioner and Childers were talking about a woman, Shelli Thomas, with whom petitioner had a "close associat[ion]." (Tr. 7759). Her "boyfriend was coming back from California and he had a habit of beating her up." [12] (Tr. 7759). Childers testified that petitioner then stated "that if he had any problem with [the boyfriend] he would just stick him." (Tr. 7759). According to Childers: "And I asked him why would you do that and [petitioner] said, well, it won't be the first time. And we let it go at that." (Tr. 7759).

Childers was arrested in May 1989 for stealing a car and possessing a controlled substance. (Tr. 7759-60). After serving some time in prison, he was transitioned to a minimum-security release center. (Tr. 7760). Childers testified that he walked away from that release center in July 1989 and went to stay at Gesner's house until he was arrested again two weeks later. (Tr. 7761-62). Sometime during those two weeks, Childers stated that petitioner visited Gesner's house. (Tr. 7763). Gesner was not home when petitioner arrived, but petitioner and Childers "started hashing over old times" and doing methamphetamine together. (Tr. 7764). Petitioner told Childers that police "questioned him on the Francke investigation and then

---

[12] Dennis Dean Gause testified for the defense and confirmed that he was the boyfriend of Shelli Thomas, that he had taken a trip to California, and that he had returned to Salem sometime in March 1989. (Tr. 8846-47). Petitioner confirmed that he had a close relationship with Shelli Thomas, explaining to police: "I mean, we was in fact, where I would have left my wife for Shelli at one time, but then Dennis came around and she started going back towards Dennis." (Ex. 304, p. 63).

Page 16 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

subsequently released him because they had nothing on him."[13]  (Tr. 7764).  Childers then

testified:

> "We just kind of bantered it back and forth while we were waiting for [Gesner].
> And at one point when I came out of the bathroom after doing the crank I asked
> him if he had done it, and he just kind of gave me a smile he gets on his face and
> didn't say yes or no, kind of insinuated more yes than more not—no."

(Tr. 7765).

Once Gesner arrived home, Childers stated that he, along with petitioner, Gesner, and

Gesner's girlfriend, walked over to look at a house that they believed "was ripe for a burglary[.]"

(Tr. 7765).  They ultimately decided not to burglarize the home, and walked back to Gesner's

house.  (Tr. 7765).  Once back at Gesner's house, Childers asked petitioner if he could borrow

some clothes, explaining that he did not have any because he was "on escape status" and

Gesner's clothes did not fit him. (Tr. 7766).  Petitioner agreed to loan Childers some clothes, and

as they walked to petitioner's apartment to get the clothes, they again began to discuss the

Francke homicide:

> "We just kind of talked about things and the subject came up again about the—the
> Francke killing, and we bantered it back and forth and I asked him again if he did
> it and he told me he had done it.  He said that he killed him.  And I asked him,
> well, why?  And he said that he was burglarizing the car, going through some cars
> and he was in Francke's and he got caught and he ended up sticking the guy.  And
> I told him, I said, you're shitting me, you stuck him over a car burglary?  He said
> he was going to take me in and I didn't want to go back to prison."

(Tr. 7767).  Petitioner told Childers that he "stuck him three or four times" in the chest and stated

that Francke "was a cock sucker and now he would always be a cock sucker."  (Tr. 7767).

### e.    Gesner.

Finally, petitioner also admitted to Gesner that he had killed Francke.  As noted above, on

the night of the murder, petitioner had asked Gesner to dispose of a bag.  While on the walk to

look at a house they were considering burglarizing (as discussed by Childers), Gesner asked

petitioner about that bag:

---

[13] Petitioner was questioned briefly regarding the Francke homicide in May 1989, and petitioner
told police that he slept the whole day on January 17, 1989.  (Tr. 7166-71).

Page 17 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"We were basically talking about this house going there, but in the course of the conversation I think I brought up, well, what was in the bag? You said you would tell me later. And he said it was the stuff that I was wearing the night of the murder. And I said what murder? And he said the Michael Francke murder. And I dropped it right there because then [Gesner's girlfriend] and [Childers] were starting to get close enough they could hear us talking again, so I stopped talking about it."

(Tr. 7999). Petitioner and Gesner returned to the issue later. Petitioner was over at his house again, and petitioner "was bragging about, you know, saying I killed Michael Francke, and I said don't even talk about that kind of stuff." (Tr. 8000). Petitioner made that statement in front of Gesner's girlfriend, and Gesner told petitioner, "[D]on't tell anybody that even if you didn't do it or did do it, don't tell anybody that. Don't talk about something like that. That's how you get busted." (Tr. 8000).

<strong>5.    Petitioner's statements to police.</strong>

In addition to the eyewitness testimony, the circumstantial evidence, and petitioner's incriminating statements to his associates, petitioner spoke extensively with police about the murder. Throughout his statements to the police, petitioner gave the police inconsistent alibis, corroborated certain aspects of the testimony of his associates, and reacted to questioning in ways that were consistent with his guilt.

Police first spoke with petitioner in May 1989 after receiving a tip that petitioner knew something about the Francke homicide.[14] (Tr. 7165-67). When asked whether he remembered anything about the Francke homicide, petitioner replied that he first learned about the murder on January 18, 1989, when he drove his wife to work at the Oregon State Hospital. (Tr. 7170). He said that he did not know who had killed Francke. (Tr. 7171). On the day of the murder, petitioner reported that "he was sleeping the whole day." (Tr. 7171).

---

[14] In attempting to contact petitioner, the police first spoke with petitioner's wife, Vierra. (Tr. 10244). When petitioner learned that police had contacted her, Vierra testified during the penalty phase of the trial that petitioner "held me by my throat" and he "told me not to tell [the officer] that he was there and he didn't want to talk to him." (Tr. 10244). Vierra told police that petitioner "told me if I said anything to the cops about him that he'd kill me." (Pet. Ex. E, p. 247).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Approximately a month later, in June 1989, petitioner spoke with police again after he had agreed to work as an informant for the Keizer police.  (Tr. 7229-31).  Petitioner had been arraigned on unrelated charges in Coos County, and a Keizer police officer drove him from Coos County back to Keizer.  (Tr. 7232).  As they drove back, they discussed, among other things, the Francke homicide.  (Tr. 7234-35).  The Keizer police officer commented that petitioner looked like the composite drawing of the suspect that had been printed in the newspaper, and petitioner responded that the police had already questioned him a "couple days" after the murder because "he was on the grounds the day it happened."  (Tr. 7235).  He told the officer that the police had ruled him out as a suspect.  (Tr. 7235).

Continuing to follow up on the previous tip they had received, police contacted petitioner again for an additional interview regarding the Francke homicide.  Although petitioner missed the first scheduled interview, he agreed to meet with police on September 13, 1989 in Coos County.  (Tr. 7255-56).  He was picked up at his step-father's residence in Coos County, and driven to the police station.  (Tr. 7256, 7258).  At the police station, petitioner spoke with Detective Fox with the State Police.  When Fox first told petitioner that he wanted to discuss the Francke investigation, petitioner's "initial reaction were words to the fact [sic: effect] of I wondered when you sons of bitches were going to try to hang this on me."  (Tr. 7269).  Fox explained to petitioner that it was his choice whether to speak with him, and that he would not be punished if he declined to do so.  (Tr. 7269).  Fox asked petitioner whether he had ever told anyone that he was involved in the homicide, and petitioner stated that he had not.  (Tr. 7270).  However, he did tell Fox that "he was running with a couple by the name of John and Kelly," and had "pointed out the Dome Building and said that's where Michael Francke was killed."  (Tr. 7270-71).  Petitioner stated that he did not know where he was the night of the murder.  (Tr. 7271).  Petitioner requested another interview.  (Tr. 7271).

Two days later, on September 15, 1989, Detective Bain and Detective Berning drove to petitioner's step-father's house to speak with petitioner.  When the officers drove up, petitioner

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

said, "'Well, I knew you guys were coming.'"  (Tr. 7281).  He asked if there were more officers

and jokingly said that he thought the officers "were going to take me down at gunpoint."

(Tr. 7281).  The officers explained that they were not going to take him down; they just wanted

to speak with him if that was all right.  (Tr. 7281).  Petitioner agreed and they drove to the Coos

Bay Police Department to talk with him.  (Tr. 7284).

 Petitioner first spoke with Detective Fred Ackom after being advised of his *Miranda*

rights.  Petitioner told Ackom that he did not stab Francke and did not have any information

about the Francke homicide.  (Tr. 7291).  Ackom then asked petitioner what he was thinking

when Ackom asked him certain questions.  (Tr. 7293).  When asked what he was thinking when

asked whether he stabbed Francke, petitioner replied:  "'I was thinking I was joking around with

my wife and told her I killed Michael Francke.'"  (Tr. 7293).  When asked what he was thinking

when asked whether he was involved, petitioner replied:  "'I was thinking that people in the joint

would think I was a big guy.  I wasn't even around at the time.  I was home with my wife and

friends at the time.  I swear to God on a stack of bibles that I didn't do it."  (Tr. 7293).

 Petitioner stated that he needed to use the restroom.  (Tr. 7294).  When he left for the

restroom, petitioner told Detective Bain that "he liked Detective Ackom better than he liked

Detective Fox[,]" and Bain thought that petitioner "appeared to be in a good mood."  (Tr. 7284).

However, when petitioner returned from the bathroom, he leaned against a wall "and began to

weep openly, sobbing, making sounds."  (Tr. 7294).  He then "slid down the wall until he was in

a fetal position on the floor."  (Tr. 7294).  Ackom put his hand on petitioner's back and told

petitioner:  "Frank, it's all right.  Get it out. Whatever it is.'  He just kept saying over and over, 'I

just know they're going to roast me or fry me for this.'"  (Tr. 7294).

 Later that evening, at approximately 9:00 PM, Bain spoke with petitioner further.

(Tr. 7303).  At that point, petitioner appeared upset, "like he had been crying."  (Tr. 7303).  Bain

asked petitioner whether he was still willing to talk, and petitioner stated that he was.  (Tr. 7303).

Petitioner was again advised of his *Miranda* rights.  (Tr. 7304-05).  Bain initially tried to calm

Page 20 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
  NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

petitioner down and spoke with him about his background.  (Tr. 7307).  He then asked petitioner

whether he remembered where he had been on the night of the murder.  Petitioner stated that he

had picked up his wife from work at 3:30 PM on January 17 and then "stayed with his wife that

night all evening."  (Tr. 7309).  He said that "in fact, they had a party at the apartment, and there

were approximately between twenty and thirty people at this party."  (Tr. 7309).  Bain told

petitioner that was good and that he was "going to go back and check with your wife, make sure

that she can verify your story[.]"  (Tr. 7309).  He also asked petitioner for the names of any of

the persons at the party.  (Tr. 7309).  Petitioner was unable to give a single first name, telling

Bain "[w]e don't use names like you do."  (Tr. 7309).

    Petitioner's wife, Vierra, was being interviewed simultaneously.  (Tr. 7312).  At around

10:00 PM, Bain left to speak with the detective interviewing Vierra, and noted that there were

"conflicts" between what she was telling police and what petitioner was saying to them.

(Tr. 7311-12).  After speaking with the detective interviewing Vierra, Bain went back into the

interview room and asked petitioner:  "'Well, Frank, did you ever tell anybody that you killed

Michael Francke?'"  (Tr. 7313).  Petitioner responded:  "'I don't think I ever told anybody I

killed Francke.'"  (Tr. 7313).  Based on his conversation with the detective interviewing Vierra,

Bain placed petitioner under arrest for Assault. [15]  (Tr. 7317).

_____

[15] Vierra had an extensive interview with police.  (Pet. Ex. E, pp. 230-53).  During that interview, Vierra recalled that petitioner was not at home on the night of the murder, but picked her up the next morning for work.  (Pet. Ex. E, p. 246).  When he drove her to work, he became nervous when he saw all of the police at the Dome Building, and didn't want to come back to her work for a week or so thereafter.  (Pet. Ex. E, p. 246).  Vierra told police:  "[Petitioner] has never said to me that he killed Francke.  He has said that he knows what really happened.  He made this statement twice.  Once only with me, and the other time in front of other people."  (Pet. Ex. E, p. 241).  The first time petitioner made that statement was approximately two weeks after the murder.  (Pet. Ex. E, p. 242).  Sometime during March or April 1989, Vierra stated that petitioner told her "that he had something to do with the death of someone, then stopped."  (Pet. Ex. E, p. 242).  Vierra stated that "this statement was made around the same time as the comment about [petitioner] killing a cop."  (Pet. Ex. E, p. 242).  Vierra stated that "the night in April when [petitioner] referred to the Francke case and the cop that got shot, during that same night he mentioned that he knew what it was like to see somebody die, to watch them gasping for their last breath of air."  (Pet. Ex. E, p. 248).  Around that same time, petitioner told Vierra that he was leaving for South Dakota:  "He told me that I didn't have any idea of all the things he'd been involved in and he kept saying he needed to leave.  Early this same evening he mentioned that he knew what really happened to Michael Francke.  I didn't question that or go into it with him."

Page 21 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

While being transported to the Coos County Jail, petitioner talked about killing himself. (Tr. 7338). After learning that petitioner had discussed killing himself, Ackom decided to re-contact petitioner and left for the jail at approximately 12:30 AM on September 16, 1989. (Tr. 7342). Petitioner was again advised of his *Miranda* rights and he again agreed to speak with police. (Tr. 7343-44). When Ackom told petitioner he was there because he had heard that petitioner was contemplating suicide, petitioner "gave out a light chuckle and said that he wasn't really contemplating suicide." (Tr. 7346). Ackom told petitioner that he was just as interested in finding out that petitioner did not commit the murder as he was in finding out that he did. (Tr. 7348). To that end, Ackom again asked petitioner about possible alibis for that night, and petitioner stated that he was with his friend, Kris Warilla, or he was at home with his wife and friends. (Tr. 7349-50). At one point during the conversation while they were discussing possible locations of the knife that killed Francke, petitioner responded: "'Hey man, whenever you ask me a question about this,' he says, 'My mind keeps saying you did it, you did it, you did it, and all of the time I know I didn't.'" (Tr. 7351-52).

Ackom explained that he did not understand. He asked, "You mean that part of you is saying you did it? You killed Michael Francke, and the other part is saying you did it—didn't." Petitioner replied, "'Yeah, it's like the back part of my brain' –gestures with his right palm to the back of his head—'says I did it, and front part of my brain says I didn't.'" (Tr. 7352). When Akcom told petitioner that if he did it, he would remember it, petitioner stated: "'It doesn't matter if I said yes I did it or no I didn't. They're going to fry me for this.'" (Tr. 7352).

___

(Pet. Ex. E, p. 247). When police contacted Vierra regarding the Francke homicide, petitioner "pinned me against the wall and told me if I said anything to the cops about him that he'd kill me." (Pet. Ex. E, p. 247). She stated that petitioner became very agitated after he was questioned by police. (Pet. Ex. E, p. 243). Vierra explained: "I think that [petitioner] believes that he either killed Francke or that the case against him is so strong that he wouldn't be able to defend himself." (Pet. Ex. E, p. 243). Vierra stated that "[t]hroughout the day he made statements like he didn't need money on death row." (Pet. Ex. E, p. 243). Of course, petitioner's extreme agitation occurred well before many of the witnesses against him had provided any information to police.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

When Ackom asked petitioner whether he thought the State had enough evidence to charge him, petitioner responded: "[Y]eah, they probably do. I don't know, man. It doesn't matter. I will stick to this story until the end. I know you want me to make a great big hero out of you'—there was a large smile on his face, 'but I just can't. I can't, man. I don't think they have anything.'" (Tr. 7352).

Petitioner and Ackom discussed how God would view the murder, and petitioner believed that God would forgive the murderer. (Tr. 7353). Then petitioner added, "Yeah, but I'm not saying I did it. I'll go to the end of the trial saying that, Fred [Ackom]. There are only two people who know who killed Francke, Francke and God." (Tr. 7353). Ackom reminded petitioner that Francke was dead. "And [petitioner]—with a puzzled look on his face like he was thinking about what I said, he said, 'Well, there are only two people who know Francke—yeah, me and God.'" (Tr. 7353). Then petitioner "puts his arms on the table in front of him like this, he leans forward like he realized what he had said, put his face down on his arms like this, he turns and talks out—looks out of the corner of his eye at me. I was on the left side of him, he says, 'Yeah. Yeah. Me and God.'" (Tr. 7353-54). When Ackom told petitioner he had made a Freudian slip, petitioner disagreed and stated: "I'm going to the end of the trial saying I didn't do this. I'll be talking to God all the way. I'll go to heaven saying it and all those mother fuckers will go to hell for lying." (Tr. 7354).

The interview ended when another officer entered the room, asking petitioner to consent to the search of his mother-in-law's house where it was believed petitioner had stored some of his belongings. (Tr. 7356). Petitioner withheld his consent, explaining: "'My mother-in-law hates me. She will probably say every fucking knife in the place belongs to me so they can pin this on me.'" (Tr. 7356). Petitioner stated he did not want to talk to police any further and that he wanted a lawyer. (Tr. 7356). His request was honored.

Later that day, petitioner was taken to a local hospital to have blood and hair samples taken pursuant to a search warrant. (Tr. 7364). The doctor who was going to take the samples

Page 23 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

remarked to a nurse "that he wanted to follow the procedure closely or some attorney would get the guy—and the only guy around being [petitioner]—off." (Tr. 7365-66). Immediately after the doctor said that, petitioner said, "'No lawyer in the world could get me off.'" (Tr. 7366). Shortly after that, the doctor remarked to the nurse that petitioner was up for murder, and petitioner corrected him, stating "'I wasn't fucking arrested for murder.'" (Tr. 7366). Approximately a minute later, petitioner started "crying, very much, uncontrollably and turned very pale." (Tr. 7366).

As noted above, petitioner had invoked his *Miranda* rights at the conclusion of his interview on September 16, 1989. However, petitioner requested to speak with Detective Bain or any of the other detectives on November 3, 1989, contending that "he had information concerning the Francke case." (Tr. 7454, 7457). Bain, Ackom, and Sergeant Salle went to the Coos County Jail where petitioner was incarcerated and spoke with petitioner for approximately five and one-half hours. (Tr. 7505).

Petitioner wanted to discuss a newspaper article in which it was reported that Mike Keerins had stated that petitioner had admitted to him that he had killed Francke. (Tr. 7460). Petitioner stated that "this isn't what happened, that the opposite was what had happened." (Tr. 7460). Petitioner "thought that Mike Keerins was a smart guy and that he came forward to the police and made statements about [petitioner] prior to [petitioner] coming to the police and making statements about his suspicions of Mike." (Tr. 7528).

Petitioner stated that he had thought more about the night of January 17, 1989, and he initially told police that he was "positive" he was with Kris Warilla. (Tr. 7464, 7466; Ex. 304, p. 6). He stated that he and Warilla had sold methamphetamine at the "AM/PM store" and then went to dig through dumpsters for clothing and antiques (referring to that activity as "dipsy dumpstering"). (Tr. 7465; Ex. 304, p. 8). He stated that they then stayed at Warilla's home, until he picked up his wife for work the next morning.[16] (Tr. 7465). At one point during the

---

[16] Petitioner stated that he remembered he was "dipsy dumpstering" on the night of the murder because his wife told him that she had been questioned by police, and he was relieved that she

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

interview, Bain told petitioner that Warilla had "made the statement to police that [petitioner] had stabbed the guy."[17]  (Tr. 7513; Ex. 304, p. 54).  Thereafter, perhaps sensing that Warilla would not be a strong alibi witness, petitioner told police he was less certain that he was with Warilla on the night of the murder, instead telling police that he could have been with Shelli Thomas, at home, or up in Portland.  (Tr. 7529).

During the interview, petitioner confirmed that he had made statements to his friends that related to Francke's murder.  He denied that he had told his friends that he had stabbed Francke, but he acknowledged, "'I might have made some stupid statements.  I might have been involved in some funky statement that may have been perceived wrong.'"  (Tr. 7487).  He stated that he hoped to work with police to clear those statements up.  (Tr. 7487).  For example, he stated that he could not remember whether he told his wife that he knew what happened to Francke. (Tr. 7470).  He said, however, that if he had made such a statement, he was merely offering his opinion on what happened.  (Tr. 7470).

At certain points during the interview, petitioner stated that he did not believe that any of his associates had told police that he had admitted to committing the murder to them, at one point stating that he believed the only person that had made such statements to police was his wife, Vierra.[18]  (Tr. 7512; Ex. 304, p.51).  At other points, however, petitioner appeared concerned that his associates were talking with police.  He started to cry at one point during the interview.  When asked why he was crying, he stated that he was grieving for his wife.  Then he said:  "I got

---

did not tell police he was "dipsy dumpstering," explaining:  "You know, that would be kind of embarrassing, you know I'm driving a $12,000 sport car out digging in the dumpster.  I remember making that statement to her[.]"  (Ex. 304, p. 6).

[17] Warilla had told police in October 1989 that that petitioner admitted to stabbing a person in a parking lot:  "[Petitioner] said he got into a struggle and stabbed a guy in a parking lot.  He said he stabbed the guy in the abdomen or chest and [petitioner], when falling, he stabbed the guy in the arm or leg.  [Petitioner] said he was either in the guy's car or was breaking in the guy's car." (Ex. 280).

[18] Petitioner told police that he believed that his wife was "out to get" him because he had broken her arm and sliced her leg.  Petitioner explained, "She's scared of me.  I know that.  There's no question in my mind."  (Ex. 304, p. 61).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

to face facts.  You know I could eat this, because people are saying stupid stuff or they're being

vindictive and this guy Keerins.  Man, it's like he told that shit to me man."  (Tr. 7490; Ex. 292,

p. 29).  When later asked to name associates that may have told police that petitioner admitted

that he killed Francke, petitioner named several people including Randy Studer (i.e., petitioner's

brother-in-law), speculating that Studer might implicate him in the murder because he had beaten

Studer up as a result of a dispute over drug money.[19]  (Tr. 7530; Ex. 304, p. 71).

During the course of the interview, petitioner stated that he owned a tan trench coat that

he found while "dipsy dumpstering."[20]  (Tr. 7536).  He stated that "if someone mentioned

[petitioner] in a trench coat that that's the coat they would have been talking about because he

wore it all around."  (Tr. 7536).

Petitioner also confirmed his relationship with several of the witnesses that would later

testify against him.  When asked to name a good male friend that he had at the time of the

murder, petitioner named Gesner, noting that Gesner was his main connection for

methamphetamine.  (Tr. 7533-34).  He explained that Walker introduced him to Gesner during

the course of a drug deal.  (Tr. 7470).  Petitioner described Childers as a "pretty good guy" and

that "he wouldn't talk to the police if he knew some information about [petitioner]."  (Tr. 7535).

Petitioner claimed that he did not know Swearingen until July 1989, but acknowledged that she

---

[19] Contrary to petitioner's belief, Studer had not yet implicated petitioner in Francke's murder at the time of petitioner's November 3, 1989 interview.  In a September 1989 interview, Studer had confirmed that petitioner had assaulted him in a dispute over drug money, breaking Studer's ribs and causing trauma to his face.  (Pet. Ex. E, p. 153).  During that interview, Studer noted that he was afraid of Gable.  (Pet. Ex. E, p. 155).  In October 1989, Studer corroborated certain aspects of Linda Perkins's eventual testimony, telling police that petitioner arrived at his residence early in the morning in January 1989, shortly after Perkins had arrived to take her daughter, Teresa Ross, to work.  (Pet. Ex. E, p. 157).  However, it was not until February 1990, that Studer reported that on the morning after the murder petitioner had told him:  "'I really fucked up bad last night.  I killed someone.'"  (Pet. Ex. E, p. 163, 185).  Thus, petitioner apparently knew that Studer possessed incriminating information well before that information was shared with police.

[20] As noted above, Hunsaker saw a man running from the Dome Building grounds in a tan trench coat on the night of Francke's murder.  (Tr. 6886-87).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

may have known him earlier and that he may have even given her a ride in his car.[21]
(Tr. 7557-58; Ex. 304, pp. 95).  He stated that Swearingen could have seen him on January 17,
1989, volunteering some new locations that he could have been that night, including "the Jackpot
Market, Jerry Paul's, Rick[']s, Randy [Studer's], [or] Shelli [Thomas's]."  (Tr. 7556).

        At the conclusion of the interview on November 3, 1989, petitioner agreed that police
could come back and talk with him again, and asked the police to check on his wife for him, as
he had not heard from her.  (Tr. 7561).

        Ackom next spoke with petitioner on December 22, 1989.   After advising petitioner of
his *Miranda* rights, Ackom asked petitioner whether various people could have seen him stab
Francke in front of the Dome Building.  (Tr. 7564).  Ackom started by naming a list of seven
people, one of whom was Jodie Swearingen.  (Tr. 7565-66).  Ackom noted that petitioner had a
"big toothy grin" during this process until he named Swearingen.  (Tr. 7566).  After naming
Swearingen, petitioner "kind of leaned back in his chair, he crossed his arms, he looked down,
his pupils looked down and to the left."  (Tr. 7566).  As Ackom started naming people from a
second list, petitioner interrupted Ackom midway through the list, stating:  "'That Jodie gal, the
bitch is saying she saw me run from the scene, isn't she?'"  (Tr. 7566).

        Ackom and petitioner then returned to the subject of his whereabouts on January 17,
1989.  During the course of that conversation, petitioner confirmed that he knew "a John and
Kelly" who lived on Hyacinth Street.  (Tr. 7567).  Ackom asked petitioner whether he could
have been at that house on January 17:  "[Petitioner] said he was going there every night, four or
five nights in a row over the 17th.  He very well could have been there on the night of the 17th.
He was taking dope deals to the Hyacinth Street house.  He would drive up and park out front."[22]
(Tr. 7567).  He stated that Swearingen could have been at that house on the 17th, but again

_____

[21] As discussed above, when police interviewed petitioner on November 3, 1989, Swearingen
had recently reported to Hillcrest employees (in October 1989) that "Frank Gable killed Michael
Francke[,]" and that she "was nearby, possibly in a car."  (Tr. 9348).

[22] Petitioner's statement thus corroborated Harden's trial testimony that he saw petitioner at the
Hyacinth House when he dropped Swearingen off on the afternoon of January 17.

Page 27 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
        NMK/6912532-v1

claimed that he did not meet her until July 1989.  Petitioner then stated that he could have met

Swearingen earlier, in February or March 1989, recalling that the police took his information at

Shelli Thomas's house around that time, and that Swearingen may have been present.

(Tr. 7569).  Petitioner also confirmed that "Shorty" (i.e., Harden) was at the Hyacinth House

frequently.  (Tr. 7570).

At one point during the interview, "out of the clear blue[,]" petitioner stated:  "'Hey, Fred

[Ackom], I'll tell you one thing, if anyone would have seen me that night, I would have been

wearing dark sunglasses.  I always wore dark sunglasses, day or not.'"[23]  (Tr. 7569-70).

When Ackom returned the next day, December 23, 1989, he and petitioner discussed

petitioner's wife, Vierra, as petitioner expressed concern about her at the conclusion of the

interview on November 3, 1989.  (Tr. 7574-75).  Ackom testified:  "[Petitioner] wanted to know

what [Vierra] was saying about him.  She keeps telling us things, that he killed Michael Francke,

that it's just not true."  (Tr. 7575).  Petitioner also returned to the subject of Swearingen, again

stating:  "'I know it's that Jodie gal, isn't it?  She is saying she saw me running from the scene,

isn't she?'"  (Tr. 7576).  Petitioner also stated that he used to work at a warehouse near the Dome

Building, and that he knew where Francke's office was located.  (Tr. 7576).

Ackom spoke with petitioner again on January 21, 1990.  (Tr. 7576).  Ackom told

petitioner that two people had told police they observed him at the scene of the murder.

(Tr. 7578).  At that point, petitioner became "very nervous and popping his neck," stated that the

witnesses against him were "a bunch of zeros," and then left the room.  (Tr. 7579).

Petitioner was arrested at the Coos County jail on April 8, 1990, for the murder of

Francke.  (Tr. 7594-95).  At the time of his arrest, he was advised of his *Miranda* rights and was

provided with a copy of the indictment, which included a list of witnesses who appeared before

the grand jury.  (Tr. 7595-96, 7603).  While in route to the Marion County jail, the police

---

[23] As noted above, approximately a month earlier, on November 27, 1989, Childers had told police that he recognized petitioner driving from the hospital grounds on January 17, 1989, explaining:  "I recognized [petitioner] wearing sunglasses."  (Pet. Ex. E, p. 31).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

stopped at a patrol office in Florence and at the Lane County jail.  Petitioner spoke with police at both locations.  When petitioner again denied that he was involved in Francke's murder, Detective Glover told petitioner:  "'[D]o you realize that we have a witness that can place you at the scene?  That saw you drive away from the scene on to D Street and then head up to Park Street and turn left?"  (Tr. 7604).  Petitioner then stated:  "Oh, Earle [Childers] told you that, didn't he."  (Tr. 7604).  When asked why he named Childers, petitioner initially stated that he named Childers because he knew Childers' "wife worked over there at the hospital."  (Tr. 7604).  When asked later in the interview how he picked Childers name from all of the names on the witness list (which exceeded 150 people), petitioner responded:  "'Well, just lucky, I guess.'"  (Tr. 7613; Ex. 103).

Petitioner also confirmed the meeting described by both Childers and Gesner during which petitioner admitted to both of them that he had killed Francke.  In describing the meeting, petitioner's account was largely consistent with that of both Childers and Gesner.  Petitioner told police that Childers had just walked away from the Corrections Division Release Center; that petitioner met with Childers at Gesner's residence; that he and Childers took a "hit of dope" before Gesner arrived home; that Gesner eventually arrived at his residence; that he, Childers, Gesner, and Gesner's girlfriend then walked from Gesner's house to a house that they were considering burglarizing; and that they ultimately decided not to burglarize the home. (Tr. 7604-06).  Petitioner further confirmed that after they walked back to Gesner's residence, he and Childers walked to petitioner's residence to get some clothing for Childers.  Petitioner explained:  "'He needed a shirt.'"  (Tr. 7606-07).  However, contrary to the accounts of both Childers and Gesner, petitioner denied that he admitted to killing Francke during the course of that meeting.  (Tr. 7607).

Towards the end of the interview, an officer told petitioner that he believed that petitioner killed Francke.  Petitioner responded:  "[M]aybe so, maybe not."  (Tr. 7613).  Another officer asked petitioner:  "'You're going to take this to the grave with you aren't you?'"  (Tr. 7613).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Petitioner responded: "'You bet I am.'" (Tr. 7613). Petitioner requested an attorney shortly

thereafter. (Tr. 7613).

Petitioner was arraigned the following day, on April 9, 1990. Before his hearing,

petitioner waited in the basement of the Marion County Courthouse. (Tr. 7629). Ackom was

with petitioner for two or three minutes, but did not ask him any questions. (Tr. 7629-30).

Petitioner, however, spoke to Ackom:

> "[Petitioner] was shaking his head from side to side, he said, 'You've got the
> wrong guy, Fred. I don't know why these people are saying these things about
> me. I wish I could tell you I could say things about them. I wouldn't do that. I'm
> not a rat. The best I can do for you, Fred, is I might have been driving by that
> night and Jodie and Shorty saw me."

(Tr. 7630).

### 6.    Petitioner's defense at trial, the verdict, and the sentence.

At his trial, petitioner's main defense strategy was to impeach the credibility of the

State's witnesses, including Cappie Harden, Earle Childers, Mark Gesner, John Kevin Walker,

and Janyne (Gable) Vierra by showing that they were drug users, liars, and had various motives

to frame him. Petitioner also presented the testimony of his apartment manager, who testified

that she served an eviction notice on petitioner and his wife on January 18, 1989, because of the

noise and traffic level the previous night. Petitioner also presented testimony that he was on the

telephone with Shelli Thomas and Viki Boyd between 6:30 and 7:00 PM on the night of the

murder. As noted above, Swearingen testified for the defense, claiming that she was not on the

grounds of the Dome Building the night of January 17, 1989, and that she did not see petitioner

burglarizing Francke's car or stabbing him. On cross-examination, however, she acknowledged

that she had testified before the grand jury that she was at the Dome Building on the night of the

murder, and saw petitioner running from the scene. She also admitted she had made statements

inculpating petitioner to several persons besides police investigators. He also presented

testimony from two expert witnesses, Richard Fox and Dr. Werner Spitz. Fox testified that there

was no physical evidence connecting petitioner to the murder scene, and Dr. Spitz testified that

Page 30 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

none of the knives examined, including the Chicago Cutlery knife, was compatible with the wounds on Francke's body.  (*See generally* Ex. 345, pp. 37-50 (summarizing petitioner's defense)).

The trial court instructed the jury on June 26, 1991, and the jury returned a unanimous guilty verdict on all counts the next day.  The State had sought a sentence of death, and the penalty phase of the proceedings began on July 2, 1991.  The jury answered the first three questions under ORS 163.150 in the affirmative, but answered the fourth question in the negative, thus rejecting the death penalty.  The jury also answered in the negative the question of whether there were sufficient mitigating circumstances to warrant life imprisonment with the possibility of parole, and the trial court imposed a sentence of life imprisonment without the possibility for parole.  (Ex. 104).

> **B.     Direct Appeal.**

Petitioner, represented by attorney John Daugirda, directly appealed from the trial court's judgment.  (Exs. 105, Court of Appeals Case Register, 106, Appellant's Brief).  As relevant here, he assigned error to the trial court's exclusion of "evidence of Johnny Lee Crouse's out-of-court confessions that he killed Michael Francke."  (Ex. 106, p. i).  As petitioner acknowledges in his *Brief in Support*, petitioner's state-court briefing on that issue relied on state law, and did not cite to the United States Constitution, *Chambers v. Mississippi*, 410 U.S. 284 (1973), or any other federal authority.  (Ex. 106, pp. 97-126).[24]  Following the conclusion of briefing, the Oregon Court of Appeals affirmed the trial court's judgment of conviction and sentence in a written opinion.  (Ex. 111, Court of Appeals opinion in Case No. A71159, *State v. Gable*, 127 Or. App. 320, 873 P.2d 351 (1994)).  In its written opinion, the Court of Appeals did not discuss the

---

[24] Appellate counsel also assigned error to the trial court's provision of a "life without parole" sentencing option instruction during the penalty phase, and to the trial court's retroactive application of "the 1989 amendments to ORS 163.105 and 163.150 in sentencing [petitioner] to life imprisonment without the possibility of parole."  (Ex. 106, pp. 126-27).  The Court of Appeals concluded that that "claim of error is unpreserved," and it declined to address it. (Ex. 111, p. 12).

Page 31 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

assignment of error relating to the trial court's exclusion of the Johnny Lee Crouse evidence. (Ex. 111). Ultimately, the Oregon Supreme Court denied petitioner's petition for review. (Ex. 115).

### C.    Post-Conviction Relief (PCR) proceedings—first trial and first appeal.

Following the conclusion of petitioner's direct appeal, he sought post-conviction relief (PCR) in Marion County Circuit Court, eventually filing a Third Amended PCR Petition through counsel Kenneth Hadley. (Ex. 155). As relevant here, the operative PCR petition contained a number of claims of ineffective assistance of trial counsel, including a claim that trial counsel failed to "[o]bject on the grounds of Ex Post Facto[to] the Court's submitting to the jury in the penalty phase of the trial the possibility of the petitioner being sentenced to life without the possibility of parole." (Ex. 155, p. 4). The PCR trial court held a three-day trial in May 2000, and, following submission of the parties' post-trial closing memoranda, issued a 104-page judgment on January 2, 2001, denying all relief. (Ex. 345).[25] In its "Overall Conclusion of Law," the PCR trial court concluded that petitioner had not demonstrated that trial counsel performed in a constitutionally deficient manner, that counsels' "efforts on Petitioner Gable's behalf were reasonable," and that, in any event, petitioner failed to demonstrate prejudice. (Ex. 345, pp. 103-104).

On appeal from the PCR trial court's judgment, petitioner argued, among other things, that the PCR trial court erred by finding that trial counsel "was not ineffective and that the petitioner had waived his *ex post facto* rights by a totality of the circumstances." (Ex. 357, p. i). Following additional briefing from petitioner and respondent the State of Oregon, the Court of Appeals concluded that the PCR trial court had erred "in finding that petitioner had waived any objection, based on *ex post facto* protections, to the submission of the 'true life' sentencing option to the jury." (Ex. 363, p. 11 (*Gable v. State*, 203 Or. App. 710, 726, 126 P.3d 739, *rev*

---

[25] The PCR trial court's judgment contained detailed and extensive findings, many of which are relevant to—if not dispositive of—petitioner's current claims for relief. Those findings will be discussed in response to petitioner's specific claims for relief.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*den*, 341 Or. 216 (2006)).  Relatedly, the Court of Appeals concluded that trial counsel had "failed to exercise reasonable professional skill and judgment" by "failing to confer with petitioner regarding any waiver of the *ex post facto* objection" to the "true life" sentence option. *Gable*, 203 Or. App. at 726.

However, the court explained that that conclusion did not "compel the allowance of post-conviction relief." *Id*.  Rather, because the PCR trial court "never determined whether petitioner was prejudiced by his attorneys' default," the Court of Appeals vacated the PCR trial court's judgment, and remanded for the PCR trial court to make a finding on that issue in the first instance. *Id*. at 727, 735.  It rejected all of petitioner's other assignments of error. *Id*. at 712. [26] The Oregon Supreme Court subsequently denied petitioner's petition for review.  (Ex. 366).

### D.    Post-Conviction Relief Proceedings—Remand and Second Appeal.

On remand, the PCR trial court held a limited hearing on the issue of whether petitioner was prejudiced by trial counsels' failure to advise him of his "*ex post facto* right and in failing to raise an *ex post facto* objection to submission of the 'true-life' option to the jury."  (Ex. 371). That court then entered a five-page "Judgment on Remand from Court of Appeals," explaining that petitioner's theory for why he would have insisted on forcing "the jury to choose between a sentence of life with the possibility of parole or death" was that petitioner believed that, because he was "innocent," if the jury "only had the options of death or life with parole, everyone * * * would have paid closer attention to his case and would therefore somehow reach the conclusion that he is innocent."  (Ex. 371, pp. 2-3).  The PCR trial court further explained in its judgment on

---

[26] In his *Brief in Support*, petitioner notes that, during the first post-conviction appeal, he assigned error to the post-conviction trial court's issuance of its decision denying relief without "await[ing] the results of DNA testing the court had authorized."  (*Brief in Support*, p. 18). Before this Court, petitioner does not appear to develop any argument on this issue—contained in Ground Twenty of his amended petition—and he has not moved this Court for an order of discovery asking for authorization for further DNA testing.  In any event, for the reasons provided in defendant-superintendent's Respondent's Brief from the first post-conviction appeal (Ex. 359), petitioner failed to show that the post-conviction trial court abused its discretion by ruling without awaiting the results of DNA testing, or that further testing would have been relevant.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

remand that, although petitioner believed "that a potential death penalty would have resulted in greater scrutiny, the "death penalty was always a possibility in the case." (*Id.*, p. 3). Moreover, the death penalty option "could not have been reached, in any event, unless the jury first concluded that Petitioner was guilty of the murder of Michael Francke. Petitioner's hypothetical reason for wanting to reject the 'true life' option doesn't make much sense under a rational[] analysis." (*Id.*). The court declined to engage in "speculation" about whether "some sort of prejudice resulted from the 'true-life' option being sent to the jury." (*Id.*, p. 4).

Regarding the evidence of prejudice—which consisted of petitioner's PCR trial testimony—the court found that

> Petitioner Gable was not a credible witness during trial of this matter and is *not* a credible witness with respect to this issue. Petitioner's position on the "true-life" issue appears to simply be one more example of a false bravado which is a part of the character of the Petitioner and which led Petitioner to create a part of the evidence which led to his original conviction in the first instance.

> Without resorting to speculation, no evidence (Petitioner's testimony is *not* credible) of prejudice resulting from the "true-life" option being presented to the jury has been shown by the Petitioner. Petitioner Gable has failed to carry his burden by a preponderance of the evidence. There is no evidence other than the Petitioner's testimony, and the testimony is simply not credible.

(Exhibit 371, p. 4 (emphasis in original)). The PCR trial court denied all relief, and entered judgment in favor of defendant superintendent. (*Id.*, p. 5).

On appeal from the PCR trial court's judgment, petitioner filed a *Pro Se* Supplemental Appellant's Brief, arguing that the PCR trial court erred in concluding that petitioner had failed to prove prejudice resulting from the "true life" sentencing option being presented to the jury. (Ex. 374, pp. 3-5).[27] The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court granted petitioner's request for review. (Exs. 377, 378).

In a written decision issued in June 2013, the Oregon Supreme Court rejected all of petitioner's arguments. (Ex. 384). In doing so, that court explained that, one of the questions

---

[27] Counsel for the second PCR appeal filed a brief assigning error to the PCR trial court's denial of petitioner's request for a postponement of the hearing on remand. (Ex. 373).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

was whether petitioner had persuaded the post-conviction court that, if trial counsel had asked him whether he would agree to waive his *ex post facto* rights, petitioner would have refused to do so, and would have insisted on the sentencing options of either death or life with the possibility of parole. (Ex. 384, p. 12). On that issue, the Oregon Supreme Court noted that "the post-conviction court expressly, and repeatedly, found that petitioner was not a credible witness on that point," and that, on Supreme Court review, petitioner did not "contend that the [post-conviction] trial court lacked a basis in the record to make such a finding." (*Id*.). According to the Oregon Supreme Court, that finding was dispositive. (*Id*.).

The court also rejected petitioner's argument that it was "inappropriate even to inquire about what he would have done had he received proper advice from criminal trial counsel." (Ex. 384, p. 13). In particular, it reasoned that petitioner's argument

> that he was obviously prejudiced because of the unlawful sentence that resulted amounts to question-begging; it assumes the very issue in contention, namely, whether the receipt of correct advice would have made a difference to petitioner - - that is to say, whether he would have waived his *ex post facto* objection anyway.

(*Id*.). However, the court explained that "that question cannot be assumed away," as it is a "critical issue in any post-conviction case when the claim of inadequate assistance turns on the propriety of trial counsel's advice; the court always must determine whether the receipt of correct advice would have made a difference." (*Id*.). In petitioner's case, there were "many reasons why petitioner might have wanted to waive his *ex post facto* rights under the circumstances of this case." (*Id*., citing *State v. McDonnell*, 329 Or. 375, 381-82, 987 P.2d 496 (1999)). As such, the controlling question—as in a directly analogous case, *Moen v. Peterson*, 312 Or. 503, 824 P.2d 404 (1991)—was "whether the receipt of correct advice about a possible *ex post facto* objection would have made a difference to petitioner in this case." (Ex. 384, p. 14). As noted above, the only evidence before the post-conviction trial court on that point was "petitioner's assertion that he would have insisted on exercising his *ex post facto* rights and have the jury instructed on only two sentencing options." (*Id*., p. 15). However, the post-conviction trial court "did not believe petitioner," and there was "no suggestion that the post-conviction

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

court lacked a basis in the record for making that finding as to petitioner's credibility." (*Id.*).

Rather,

> [t]o the contrary, throughout the course of the post-conviction proceeding, the
> court detailed inconsistencies in petitioner's testimony that led it to conclude - -
> repeatedly - - that petitioner simply was not credible.  That ends the matter.

(*Id.*).    Ultimately, the Oregon Supreme Court affirmed the Court of Appeals decision and the

post-conviction relief trial court's "Judgment on Remand from Court of Appeals."  (Ex. 384,

p. 15).

### E.    Current federal habeas proceedings.

Petitioner now seeks habeas relief from this Court, alleging twenty different grounds for

relief in his Amended Petition for Writ of Habeas Corpus.  Due to the length of those allegations,

the allegations are included in an attachment to this Response (Attachment A).  Among other

grounds, petitioner asserts a number of claims of ineffective assistance of trial and appellate

counsel, trial-court error, prosecutorial misconduct, and due process and other constitutional

violations.

As noted above, this Court should deny relief on all of petitioner's claims.  He has failed

to meet his burden on the unargued claims.  As to the claim that was fairly presented in state

court, regarding trial counsel error in the handling of the *ex post facto* sentencing issue, the state

court's denials of relief were not objectively unreasonable.  With respect to the procedurally

defaulted claims, petitioner has not demonstrated that he is "actually innocent" under *Schlup*, or

that the *Martinez* exception provides any basis to excuse any default.

This Court should also deny petitioner's request for an evidentiary hearing, because,

based on this record—including the affidavits of "recanting" witnesses and the report and

opinions from Dr. David Raskin—petitioner does not demonstrate "actual innocence."  As

respondent argues further below, "'recantation testimony is properly viewed with great

suspicion.'"  *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) (quoting *Schlup v. Delo*, 513

U.S. 298, 332 (1995)).  The recantation evidence, along with Dr. Raskin's report and opinion, do

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

not meet the high threshold for "actual innocence." Accordingly, this Court could—and should—deny relief without holding an evidentiary hearing. However, respondent also argues that this Court should not *grant* relief without holding an evidentiary hearing, where the credibility and demeanor of recanting witnesses could be assessed, and their claims could be subjected to adversarial testing. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) (explaining that motions for new trial "based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.").

Ultimately, and as argued below, this Court should deny all relief and dismiss this action with prejudice.

## III. PETITIONER HAS NOT MET HIS BURDEN OF PROOF ON THE UNARGUED CLAIMS

As noted above, in his *Brief in Support*, petitioner provides argument on a number of specific claims or grounds for relief; respondent will address the argued claims below. However, petitioner does not provide briefing or argument on any of the other claims for relief. In particular, petitioner does not provide any argument on: Ground One, Ground Five, Ground Six, Grounds Eight through Fourteen, most subparts of Ground Fifteen, one subpart of Ground Sixteen (Sixteen (B)(1)), and Grounds Seventeen through Twenty.[28] Because petitioner has not met his burden of demonstrating why he is entitled to relief on the unargued claims, this Court should deny relief on those claims. *See* 28 U.S.C. § 2248 ("[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true"); *see also Renderos v. Ryan*, 469 F.3d 788, 800 (9th Cir. 2006) (counsel

---

[28] Regarding the specific subparts of Ground 15, petitioner's *Brief in Support* includes argument on, as best as respondent can tell, subparts A, E, I, J, K, L, and P of Ground 15. Although petitioner states that the analysis in his brief "supports relief individually or cumulatively, on Grounds 2, 3, 5, 6, 8, 7, 15 (A)-(L), and 16, 17, and 20 of the Amended Petition," he does not actually provide any argument on, or otherwise develop, a number of those claims. (*Brief in Support*, p. 133).

Page 37 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

for petitioner waived claims in petition for writ of federal habeas corpus, where counsel did not attempt to set forth the legal standards for such claims or attempt to meet them); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner bears the burden of proof).

IV.    **PETITIONER'S CLAIMS ALLEGING TRIAL COURT ERROR UNDER** ***CHAMBERS v. MISSISSIPPI*** **ARE PROCEDURALLY DEFAULTED AND WITHOUT MERIT.  (Grounds Two and Seven)**

In his second and seventh grounds for relief, petitioner alleges that he was denied his rights under the Fifth, Sixth, and Fourteenth Amendments "when the trial court excluded evidence of third party guilt[,]" and he was denied "a meaningful opportunity to present a complete defense and to defend against the State's accusations."  In arguing these claims in his brief, petitioner maintains that the trial court violated his due process rights as described in *Chambers v. Mississippi*, 410 U.S. 284 (1973) by "mechanistically" applying Oregon evidentiary rules to exclude hearsay statements made by Johnny Lee Crouse that petitioner contends bore "persuasive assurances of trustworthiness."  (CR 74, p. 148).

As an initial matter, these claims are procedurally defaulted, and petitioner does not contend otherwise.  They should be denied on that basis because, as discussed below, petitioner has failed to demonstrate "actual innocence" or any other basis to excuse the default.  Moreover, as discussed below, the hearsay statements made by Crouse that petitioner sought to introduce at trial did not bear "persuasive assurances of trustworthiness."  Therefore, the exclusion of those statements did not violate petitioner's due process rights, and petitioner's arguments to the contrary are without merit.  In any event, as discussed below, the exclusion of Crouse's statements was harmless.  Accordingly, the claims should be denied.

A.    **Johnny Lee Crouse's Statements to Police.**

During the course of several interviews that took place from February 1989 through November 1989, Johnny Lee Crouse gave varying accounts regarding his purported involvement in the Francke murder.  At first, he indicated that he was a witness to the murder, and had chased

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

one of the suspects for 3 ½ miles.  Later, he stated that he was the perpetrator.  He gave various

motives for having committed the murder:  because he had been hired by "Juan" to kill Francke

for $300,000; because Francke would not give him state records from the Dome Building; and

because he had been caught breaking into Francke's car.  When Crouse claimed to be the

perpetrator, the details of the murder repeatedly changed, and law enforcement was unable to

corroborate several significant aspects of Crouse's varying accounts.  At one point, Crouse

recanted his confession.  Shortly thereafter, Crouse recanted his recantation, again claiming that

he was the perpetrator.  Later, Crouse again denied that he was the perpetrator, claiming that he

had declined repeated offers by high-ranking prison officials to pay him $10,000 in cash to kill

Francke.  Still later, Crouse claimed that he knew the actual perpetrator and had helped that

perpetrator conceal the murder.  Again, police were unable to corroborate Crouse's claims.  In

the end, Crouse denied any involvement in Francke's murder and denied any knowledge as to

who committed the murder, acknowledging that he had told police several stories, but did not

know why he had done so.[29]

### 1.    February 15, 1989.

Two detectives first interviewed Crouse on February 15, 1989, after Crouse had informed

his parole officer that he had information concerning the Francke homicide.  (Ex. 179, p. 13).

Crouse told the detectives that on January 17, 1989, he visited his parole officer and left for

home a little after 6:00 PM.  (Ex. 179, p. 21).  As he was walking home, Crouse said that he

observed "a commotion" by the Dome Building.  (Ex. 179, p. 27).  Crouse said he saw "four or

five guys together" and "[t]hen I stood there for a minute and like one guy spotted me or

something, then I just seen 'em drop some guy and went—four went that way and the other guy

---

[29] Apparently, Crouse was not the only person to falsely implicate himself in Francke's murder.
One of the investigators for Gable's defense team testified at the post-conviction trial that he had
conducted "an investigation of the eight or ten or so people who had confessed to the crime."
(PCR Tr. 119).  The overarching theme of petitioner's brief is that police "latched on to Gable"
in response to political pressure.  Of course, if police were going to "latch on" to a suspect due to
political pressure—as opposed to the evidence—it would have been much easier for the police to
latch on to one of the persons that confessed to the crime.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

went that way." (Ex. 179, p. 31). When asked where the guy fell, Crouse could not "really say exactly where he fell at[.]" (Ex. 179, p. 32). However, he stated that after the commotion, four men went towards some vehicles (a white Chevy Malibu and a green Ford LTD), and another of the men took off running. (Ex. 179, p. 27). The man that took off running was a Mexican, and Crouse stated that he threw something in a parking lot as he ran: "I didn't know whether it was a knife or a pistol or anything." (Ex. 179, p. 31). Crouse told the officers that he chased the man for three and half miles, but was unable to catch him. (Tr. 9535-36).

When asked why he did not provide information to police earlier, Crouse stated that he had once reported a murder in Nebraska, and was later arrested for that murder. (Ex. 179, p. 37 38). When asked whether he had ever thought about committing a murder, Crouse stated, "Yeah, I killed my sister, Katie." (Ex. 179, p. 42). However, when asked whether he was involved in Francke's death, Crouse denied involvement, explaining that he did not know Francke. (Ex. 179, p. 39).

Crouse stated that he had spoken with a newspaper about the Francke murder and knew that Francke had been killed with a knife, because he had "heard about that."[30] (Ex. 179, pp. 38, 43). He also knew that Francke had been the head of the corrections department in New Mexico prior to moving to Oregon, and recalled that when he was previously in prison, he had overheard two Mexicans from New Mexico ("Antonio" and "Juan") who said that "their people" would

---

[30] By the time Crouse spoke with police, the media had reported extensively on Francke's death, providing several of the circumstances under which it had occurred. For example, on January 25, 1989, the *Statesman Journal* had reported that Francke "was attacked near his car, which was parked in a lot in front of his office building, known as the Dome Building[.]" The article stated that the time of the crime was approximately 7:00 PM. The article noted that the suspect "ran west" and provided a diagram demonstrating both the suspected site of the attack and the escape route of the assailant. The diagram is at page 28 of petitioner's brief. The article explained that Francke "died from a stab wound to the heart[,]" but that "no murder weapon was found." The article noted that Francke suffered other injuries, but explained that investigators declined to provide those details to the media. The article noted that "the investigation continues to focus on robbery and revenge as the prime motives." However, the article also indicated that "as time goes by, more emphasis may be placed on other states, including New Mexico, where Francke worked in the criminal justice system for about 11 years before coming to Oregon in 1987[.]" (Pet. Ex. D, pp. 16-18). The prosecutor made note of this article during the "Rule 104 hearing" concerning the admissibility of Crouse's statements. (Tr. 9503).

Page 40 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"kill his ass." (Ex. 179, p. 39). Crouse stated that he had been "out every night" attempting to catch the man that he had chased from the Dome Building and had gone to "[w]here most of the Mexicans hang out." (Ex. 179, p. 44). Crouse told the detectives that he had a knife in his bedroom and consented to the detectives searching his room. (Ex. 179, p. 45).

**2.    April 4, 1989.**

Crouse was interviewed again on April 4, 1989, by Randy Martinak, a DOJ investigator, and Detective Pecyna. Crouse had just been arrested on an assault charge. Crouse again talked about the five assailants for the first hour of the interview. (Tr. 9537). However, when Martinak told Crouse he did not believe his account about the five assailants, Crouse gave a new account. (Tr. 9525, 9537). This time, Crouse stated that he had been approached by "Juan" to "take care of Francke for $300,000." (Ex. 179, p. 51).

Crouse stated that Juan had first approached him on the 11th, 12th, or 13th of January 1989 outside of his parole officer's office. (Ex. 179, pp. 51-52). Crouse described Juan as a "well dressed man, Mexican[,]" who wore a dark three-piece suit, sunglasses, a gold watch, a bright onyx ring, and had his black hair combed straight back. (Ex. 179, pp. 52, 55-56). Juan drove a rental car. (Ex. 179, p. 52). According to Crouse, Juan asked him how he felt about corrections, and Crouse responded that he "didn't like people in high places[.]" (Ex. 179, p. 51-52). Crouse stated that Juan told him they would meet again in a few days, and that "he might have me do something." (Ex. 179, pp. 51, 57).

Crouse said that on January 17, 1989, he coincidentally ran into Juan at a gas station. (Ex. 179, p. 51; Tr. 9538). According to Crouse:

> "[Juan] [a]sked me if I'd take care of Francke for $300,000.00. He gave me $1,500.00 and I told him I'd take care of it. He told me the Dome Building's just down the streets, and he told me, after he read it in the papers that Michael Francke was taken care of that he'd meet me at the Chumaree within the first two weeks of April of 1989 to finish paying me off."

(Ex. 179, p. 51). Crouse stated that he stood across the street from the Dome Building and waited for Francke for "quite awhile," smoking "quite a few" cigarettes. (Ex. 179, p. 62, 64).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

When Francke exited the Dome Building and was getting into his car, Crouse stated that he

stabbed Francke "once or twice[.]"  Crouse gestured that he stabbed Francke with his left hand in

an upward motion.  (Tr. 9540-41).    During the course of the interview, Crouse indicated on an

aerial photograph of the Dome Building that Francke's car was parked in a location that was

inconsistent with what police knew from their investigation.  (Tr. 9542).

After he stabbed Francke, Crouse stated that he initially ran east from the scene of the

crime.  However, he then decided to return to the scene of the crime, push Francke up against his

car, and then run west towards his apartment.  (Tr. 9541).  Crouse explained:

> "After I stabbed him once or twice, I can't remember it, I started taking off and I
> got behind the car I started running towards Park Street [i.e., to the east of the
> Dome Building], and I decided I'd get back to the Monteray [i.e., Crouse's
> apartment complex].  As I was coming back, he was strugglin' around the car and
> I pushed him back up against the car and I took off running behind, across the
> parking lot."

(Ex. 179, p. 51).

Crouse stated that he was wearing a green jacket, blue jeans, a hat, and cowboy boots

when he killed Francke.  (Ex. 179, p. 64).  He said that the State Police had seized the green

jacket and the knife he used to kill Francke, obtained during the search that Crouse consented to

at the conclusion of his prior interview in February 1989.  (Ex. 179, pp. 67, 71; Tr. 9529).

Crouse claimed that he did not get any of Francke's blood on the green jacket, but that he did get

Francke's blood on the flannel shirt he wore underneath his jacket.  (Ex. 179, p. 67).  He stated

that he burned the flannel shirt.  (Ex. 179, p. 70).

Crouse said that he was waiting to meet Juan to collect the rest of the money when he

"grabbed a woman, and she screamed for help, and I took off running."  (Ex. 179, p. 58).  When

asked why he grabbed the woman, Crouse responded:  "Can't say.  I really don't know."

(Ex. 179, p. 59).  When Martinak told Crouse that he did not believe him, Crouse responded that

he did not feel comfortable talking about the incident and would feel more comfortable if he

could go back to his cell and write down what happened.  (Tr. 9526).

Page 42 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

### 3. April 5, 1989.

On the next day, April 5, 1989, Crouse agreed to another interview, and was again interviewed by Martinak and Pecyna. He gave two more accounts. Crouse first stated that he had attempted to get his records from the Dome Building. (Tr. 9522). He stated that he stabbed Francke "because I was tired of being a prisoner and I was tired of—of not feeling like I was out of jail and so I went down and I personally confronted Michael Francke when he came out of the building and told him, all right, you're going to go back in there and give me my records back and I'm leaving the state." [31] (Tr. 9543).

Next, Crouse stated that he used a wire to unlock a parked car. (Ex. 179, p. 94). Crouse claimed that Francke came up to him while he was in the car, grabbed him, and told him to "come with me[.]" (Ex. 179, p. 94). Crouse explained: "Then I tried to jerk away from him, and then he hit me, then I told myself that I had to do something quick. So, I grabbed for my knife and I was stabbing at him." (Ex. 179, pp. 94-95). Crouse stated that he used his left hand to stab Francke because "I kept my right hand free for the power, in case I had to hit him." (Ex. 179, p. 95). Crouse stated that he stabbed Francke "in the stomach and I think I cut him on his arms and hands[.]" (Ex. 179, p. 95). Crouse explained that he stabbed Francke on "the upper forearm." (Ex. 179, p. 96). At one point during the confrontation, Crouse stated that he dropped his knife, and Francke punched him in the back of the head. (Ex. 179, p. 96). Eventually, Crouse stated he was able to stab Francke in the heart: "Then, finally when I went for his chest he hit my arm when I, as I was coming at him with the knife, and I hit in his heart." (Ex. 179, p. 95). Martinak asked Crouse: "At what position were you coming at him?" Crouse

---

[31] Crouse described a similar encounter in writing. Apparently referring to his parole supervision, he wrote that he was "sick of being told what to do every day[.]" He stated that he confronted Francke, and "told him that he will go in and get everything on me that they have." Crouse stated that Francke hit him in response, but then Crouse "went at him with the knife in my hand and I hit him in the arm with the knife[,] I hit him in the stomach[,] then I stabbed him about 3 more times before I stabbed Mike F. in the heart[.]" (Ex. 179, p. 93).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

lo

responded: "At a down position." (Ex. 179, p. 95). According to Crouse, Francke then stated: "'I won't die and you won't get away with this.'" (Ex. 179, p. 77).

After Crouse described the confrontation, Martinak asked: "Now, you went, you ran you said away to the west, across back through the hospital, down around some apartments and over to 17th?" Contrary to the route he described in his previous interview, Crouse agreed that was the route he used to flee from the scene.[32] (Ex. 179, p. 96-97).

Later in the interview, Crouse added a new detail. Crouse stated that he had initially punched Francke when Francke confronted him at the car: "I hit him in his face, then he hit me and I almost went out, and I told myself I have to do something with this guy and I gotta do it quick." (Ex. 179, p. 99). Crouse could not recall whether Francke had glasses on, stating "that's one of the biggest parts of this that's puzzling me. Did he have glasses, or did he not have glasses?" (Ex. 179, p. 99).

After he returned to his apartment, Crouse stated that he looked up at a clock and signed a piece of paper "for [his] own record" demonstrating that he returned at 8:15 PM.[33] (Ex. 179, p. 104). Crouse said that he cleaned the knife, took a shower, washed his boots, soaked his pants in some water, and burned his shirt in the back alley. (Ex. 179, p. 100). Crouse stated that he then went upstairs and bought $20 of cocaine from another man known only as "Juan." (Ex. 179, p. 101).

---

[32] When Crouse agreed with Martinak as to the route he fled the scene, he was not only contradicting his statement from the previous day, but he was also contradicting statements he had made earlier that same day. On April 5, 1989, prior to the recorded interview, Crouse had told police he fled towards Park Street (towards the east) after he had stabbed Francke. (Ex. 179, p. 77). Crouse stuck with that story when Pecyna and Martinak took him to the Dome Building: "While at the scene, writer noted that Crouse started talking of how he ran up toward Park Street. This was the opposite direction in which he had earlier stated he ran. Writer further observed that it appeared Crouse was trying to lead officers away from the direct area of where the crime was known to have occurred. At this point, writer advised Crouse that he was not telling the truth and he became very angry." (Ex. 179, p. 77). It was only after that confrontation at the Dome Building that Crouse changed his story in the recorded interview, and agreed with Martinak that he ran to the west after stabbing Francke.

[33] It is not clear why Crouse would sign a piece of paper to memorialize when he got home after having committed a murder. In any event, respondent has not located that piece of paper within the state-court record.

Page 44 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

At the end of the interview, Crouse stated that he later "washed everything he had on except for the shirt[,]" including his pants and the green jacket that had previously been seized by the police. (Ex. 179, pp. 97, 107). He said that he also scrubbed the sheath that carried the knife with a toothbrush. (Ex. 179, p. 108).

### 4.    April 6, 1989.

The next day, April 6, 1989, Crouse summoned Martinak and Pecyna because he wanted to discuss a "flashback" he had while in his cell. (Ex. 179, p. 111). Crouse stated that he had "seen more of myself in the flashback and remember what I had on." (Ex. 179, p. 111). In describing his clothing, Crouse stated that "the piece I missed is a dark blue, almost black, sweatshirt that I had on that night. I had blood on it and I didn't wash, wash the sweatshirt off." (Ex. 179, p. 111). He said the blood was on the left-hand sleeve. (Ex. 179, p. 112). Crouse said he "didn't worry" about the blood, explaining that "the blood dried and I seen it and I said ah heck[.]" (Ex. 179, p. 112). Crouse said that he gave the sweatshirt to his roommate. (Ex. 179, p. 111-12).

In addition to describing the sweatshirt, Crouse also made for the officers a replica of the wire he claimed he had used to break into Francke's car. (Ex. 179, p. 113-14). Finally, he told the officers that the hunting knife that had been seized from his apartment was the knife he had used to kill Francke. (Ex. 179, p. 116).

### 5.    April 9, 1989.

Crouse requested to speak with Martinak and Pecyna again on April 9, 1989, in an apparent attempt to provide them with more evidence. He explained to them that "I want to state for a fact I did it." (Ex. 179, p. 137). He also wanted to tell them that a woman he had been living with had told him he had been talking in his sleep: "One morning we woke up and she said, 'You know, you was doing a lot of talking in your sleep last night.['] And, she looked at me sort of funny but never said nothing else." (Ex. 179, p. 137). Crouse also wanted to tell them that he had two sheaths for the knife he claimed was the murder weapon. He said that he

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

switched between the sheath that was seized by police and the second sheath "every few days[.]" (Ex. 179, p. 138).  He volunteered that "the last stab wound and confrontation I had with the victim, at the time I was behind the car about eight feet[.]"  (Ex. 179, p. 137).  Although Crouse had earlier stated that he was wearing a hat on the night that he stabbed Francke, he now stated that he could not recall whether he was wearing a hat.  (Ex. 179, p. 140).

### 6.    April 11, 1989.

Two days later, on April 11, 1989, Crouse was interviewed by Detective Glover. (Tr. 9547).  During that interview, Crouse recanted his prior confessions and denied that he had killed Francke.  (Tr. 9547).

### 7.    April 13, 1989.

Two days later, on April 13, 1989, Crouse requested to speak with Martinak and Pecyna to recant his recantation.  Crouse stated that when Glover had asked him whether he had killed Francke, he had "just lied my way out of it, gave him another story."  (Ex. 179, p. 146).  Pecyna told Crouse that they had been unable to find the wire he claimed to have used to break into Francke's car or the second sheath for the knife that Crouse claimed to have used to kill Francke. (Ex. 179, p. 149).  They were not where Crouse said they would be.  Concluding the interview, Crouse told the officers that the only other person that he had told about Francke's murder prior to speaking with police was his brother:  "I told him I killed a man and I was gonna take off and go to Denver." [34]  (Ex. 179, p. 153).  He said that he did not tell his brother who the victim was, but stated that the victim was "a big guy in corrections."  (Ex. 179, p. 153).

_____

[34] In a phone call on April 5, 1989, that Crouse knew was being taped by police, Crouse asked his brother leading questions in an attempt to get his brother to recall such an admission:

> [Crouse]:  [Rem]ember, after I called you and I told you that I was investigated by the state police for murder?
>
> [Brother]:  Un huh, I remember that.
>
> [Crouse]:  Okay, then I call, kept calling you?
>
> [Brother]:  Um huh.
>
> [Crouse]:  and talking to you about it, and I, and one night you asked me if I did it and I told you yes, that I was gonna take off on the run?

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

8.        June 15, 1989.

Crouse was next interviewed at his request on June 15, 1989.  Crouse's attorney was present for the interview.  During this interview, Crouse claimed that prison officials paid to have Francke killed.  Although Crouse claimed to have played a role in concealing Francke's murder, he denied that he had killed Francke.

Crouse said that Arminicus, who Crouse believed was the security manager at the Oregon State Penitentiary, approached him in prison in December 1988 before he had been released on parole.  (Ex. 179, pp. 158, 161-62).[35]  He said that Arminicus asked him whether he "wanted to make a bunch of money" upon his release.  (Ex. 179, pp. 162).  "And I told him no I wanted to get out and lead a clean life.  And he got all pissed off at me."  (Ex. 179, p. 162).  Crouse said that after he was released on parole, he "ran into" Arminicus in downtown Salem.  Arminicus again asked him whether he wanted to make some money and told him, "'There's a guy I need to, I need you to take care of.'"  (Ex. 179, p. 165).  Crouse said that Arminicus then "slipped" and said that he was talking about Michael Francke.  (Ex. 179, p. 165).  Crouse said that he just walked away.  (Ex. 179, p. 165).

Sometime in January 1989, Crouse stated that Arminicus and Moss (the Superintendent at OSP) arranged a meeting with him through his probation officer.  (Ex. 179, p. 180, 212).  Crouse went and met with Arminicus and Moss in front of the Oregon State Penitentiary.  Crouse said that Arminicus and Moss pulled up in a dark car and "they said, 'Do you want to make $10,000?'  I said, 'For what?'  They said, 'Kill Michael Francke.'"  (Ex. 179, p. 182).  According to Crouse:

---

[Brother]:  No.

(Ex. 179, p. 83-84).  Crouse returned to the subject later in the conversation and again tried to get his brother to confirm a previous admission to committing murder.  However, his brother responded similarly:  "You see, I don't remember that part."  (Ex. 179, p. 87).

[35] Although the transcribed interview of Crouse refers to the security manager as "Arminicus," respondent believes that the correct spelling of that name is actually "Armenakis."  *See*, *e.g.*, *New v. Armenakis*, 156 Or. App. 24, 964 P.2d 1101 (1998).

Page 47 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"I just looked in on the window 'cause one of 'em popped a brief case up and said, 'Here's $10,000 cash right here. Do you want it? You take it. And this is what we want you to do.' And I said, 'No.' I said, 'Get lost.'"

(Ex. 179, p. 182).

Although Crouse stated that he did not take the prison officials up on their $10,000 offer, he stated that he knew the man that did, explaining, "I associated with this guy a lot[.]" (Ex. 179, p. 197). Crouse said that he knew "exactly what happened to the knife that was used and everything[,]" explaining that the knife "was grinded down after it was all over with." (Ex. 179, p. 197-98). Following the murder, Crouse said "the guy was nervous, and said get me out of town for a couple of days, I took him out of town." (Ex. 179, p. 198).

Crouse wanted the officers interviewing him to let him out of prison for a number of hours so he could help them solve the murder. He stated that he knew the location of the clothes that the man wore on the night of murder: "I'm telling you and I can bring you the clothes that was used with the blood on it and the person they belonged to[.]" (Ex. 179, p. 201). He said that he was present when clothes were hidden, and described them as a tan "below-the-waist length" jacket and dark pants. (Ex. 179, p. 215).

Although Crouse later hedged, stating that he could not "guarantee" that the clothes were still at the location, the police drove Crouse to the location nevertheless. (Ex. 179, p. 214-15). Once they arrived at the location, Crouse showed the officers where he and the man buried the clothes. (Ex. 179, p. 224). Crouse explained that they used a shovel, but did not "dig real deep[.]" (Ex. 179, p. 225). The state police subsequently rented a backhoe and dug in the area that Crouse identified, but did not locate any clothing. (Tr. 9549, 9565).

While Crouse and the officers were out looking for the clothes, Crouse stated that the man that he had been talking about was a person that had already been investigated by police, Buck Burgess. (Ex. 179, p. 226-28). Crouse stated that Burgess had called him the night of the murder, had told Crouse that he had "got paid to do Francke[,]" and told Crouse that he needed to bury his clothes. (Ex. 179, p. 243). Crouse said that Burgess showed him the money he received for the murder, which was in "small bills." (Ex. 179, p. 243-44).

Page 48 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

9.       November 30, 1989.

Crouse gave a final interview to police on November 30, 1989.  The interview was conducted primarily by Detective William Pierce, who advised Crouse at the beginning of the interview that "we've never met before, but I've been on this case since it started clear back in January and when you would have occasions to make other statements and we would obtain information on that, I'm the guy that would go out and run around and follow up on those things."  (Ex. 179, p. 249).

During this interview, Crouse stated that he did not kill Francke.  (Ex. 179, pp. 268).  He stated that his prior statements concerning his involvement in Francke's death were "false statements," that he had "no involvement" in Francke's death, and that he learned several of the circumstances of Francke's death only during the course of his interviews with Martinak and Pecyna, including the location of Francke's car, the location at the Dome Building where Francke was stabbed, and the location of the stab wounds on Francke's body.  (Ex. 179, p. 268-69).

Crouse also denied any knowledge as to who killed Francke.  (Ex. 179, p. 277).  He acknowledged that he had "nothing concrete" to indicate that Buck Burgess had killed Francke, other than that Burgess had acted nervous after he was interviewed by police and his own belief that "Buck would stab the son-of-a-bitch in a minute."  (Ex. 179, p. 287).

Crouse maintained that, at some point, he saw a fight between several individuals in front of the Dome Building:  "I seen a guy fall.  I seen one guy run one way and two guys running and jumped in cars and took off."  (Ex. 179, p. 278).  However, he no longer stated that he chased one of the persons involved in that fight, and stated that he could not remember which night the fight occurred.  (Ex. 179, p. 30).  He could not recall stating that five persons were involved in the fight, and stated that he made the fight "bigger than what it was."  (Ex. 179, p. 287).

At one point during the interview, Crouse acknowledged that he had told the police "stories," but he did not know why he had done so:

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"[Pierce]:  You know how some guys, you know, tell a good fishing story and the fish keeps getting bigger.  Have you ever told those kinds of stories to us where they keep getting better?

"[Crouse]:  Yeah.

"[Pierce]:  Why?

"[Crouse]:  I don't know."

(Ex. 179, p. 286).

### B.    State Court Proceedings Related to Petitioner's *Chambers* Claim.

At trial, petitioner sought to admit the hearsay statements of Crouse as statements against Crouse's penal interest.  To do so, petitioner had the burden of demonstrating, *inter alia*, that Crouse was "unavailable" to testify and that "corroborating circumstances clearly indicate[d] the trustworthiness of [Crouse's] statement[s]."  OEC 804(3)(c).  The trial court held a "Rule 104 hearing" for the purpose of determining the relevancy and admissibility of Crouse's hearsay statements.

At the hearing, defense counsel called Crouse to testify and asked him:  "In January 17, 1989, did you kill Michael Francke?"  (Tr. 9487).  Crouse answered: "No."  Defense counsel then asked Crouse about statements he made on April 4, 1989 (during which Crouse had stated he had killed Francke in exchange for $300,000), April 5, 1989 (during which Crouse stated he had killed Francke because Francke would not give Crouse his records and, later, because Francke had caught Crouse breaking into his car), and April 6, 1989 (during which Crouse stated, among other things, he had a "flashback" that he was wearing a sweatshirt that got blood on it).  (Tr. 9487-89).  As to defense counsel's questions about statements he made on those three dates, Crouse invoked his Fifth Amendment privilege against self-incrimination.  (Tr. 9487-89).

Following Crouse's testimony, the prosecutor argued that Crouse was available to testify because he testified when asked whether he had killed Francke "and then he didn't start invoking that privilege until we got to the concern that he has always had which is making false statements to begin with and prosecution for hindering prosecution."  (Tr. 9491-92).  Although both counsel for Crouse and defense counsel argued that Crouse did not understand defense counsel's

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

question, the trial court rejected that argument, explaining: "[Crouse] knew what the question was, and he answered it. He didn't invoke his Fifth Amendment privilege." (Tr. 9500). Thus, as to the subject matter of the hearsay statements that defense counsel sought to admit (i.e., whether Crouse had murdered Francke), the trial court found that Crouse was available to testify.[36]

Defense counsel then stated that it was his intent to have the officers that interviewed Crouse testify as to his prior statements to the officers, arguing that "the testimony I want to elicit is material and relevant for impeachment purposes[.]" (Tr. 9506). The prosecutor disagreed, arguing:

> "Basically, if [Crouse] is testifying as he did today under oath and as he has in the past under oath, that he did not kill Michael Francke, it's not relevant evidence to go to the jury because if you allow the Court or allow [defense counsel] to bring in the other statements to impeach, the jury cannot rely on that impeachment as substantive evidence. The trier of fact cannot rely on that as substantive evidence to render a verdict in this case, therefore, you have somebody testifying I did not kill Michael Francke, it's not relevant to the—these proceedings and, therefore, not admissible."

(Tr. 9508). The trial court agreed, ruling as follows:

> "I think the first thing that I have to rule on is whether or not Mr. Crouse is available or not based on Rule—the 104 Rule hearing we had yesterday morning. And given his answer to the first question that he was asked, I find that he is available as a witness.
>
> "Thereafter, having found that based again on the evidence at the hearing the answer to the question that he was asked would be irrelevant to this jury. Given that I find that the answer is irrelevant, there won't be any testimony presented to the jury so there won't be any need to impeach his testimony, he didn't give any testimony to the jury, the trier of fact."

(Tr. 9511).

_____

[36] In his brief, petitioner argues that had the trial court found Crouse unavailable, his statements would have been admitted as statements against penal interest under OEC 803(3)(c). (CR 74, p. 153). Petitioner is incorrect. As noted above, under OEC 804(3)(c), "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." As discussed below, the circumstances did not "clearly indicate the trustworthiness" of Crouse's statements. The trial court would have had to read that explicit requirement out of the rule to allow the admission of Crouse's statements as statements against penal interest.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Following the trial court's ruling, defense counsel made an offer of proof, in which he called Martinak to testify. On direct examination, Martinak largely summarized the various accounts that Crouse gave during his interviews. (Tr. 9515-9532). When asked what portions of Crouse's statements were consistent with the crime scene, Martinak cited Crouse's claim that he had punched Francke, Crouse's claim that he had stabbed Francke in the chest and the arm, and one of the routes that Crouse claimed he took to flee the scene of the crime. (Tr. 9551). When asked to cite any further examples, Martinak was unable to do so. (Tr. 9551).

On cross examination, Martinak explained that several of Crouse's claims could not be corroborated. He agreed that the clothing that Crouse claimed to have worn was "totally different" from the clothing described by Hunsaker, and that no blood was found on any of Crouse's clothing. (Tr. 9552, 9556-57). The locations of the stab wounds on Francke were inconsistent with Crouse's claims that he had stabbed Francke in the forearm and stomach. (Tr. 9552-53). Both Crouse's claim that he stabbed Francke with an upward motion and his claim that he used his left hand were also inconsistent with the wounds to Francke. (Tr. 9553, 9558). Martinak agreed that the knife that Crouse claimed he had used to kill Francke did not share the "general class characteristics" of the knife that was used to kill Francke. (Tr. 9554-55). Martinak noted that Crouse described at least two different routes he used to flee the scene of the crime, which were in the opposite directions from each other. (Tr. 9555). Crouse stated that he had smoked cigarettes near the scene of the crime; Martinak was unable to find any cigarette butts. (Tr. 9557). Crouse stated that he used a wire to break into Francke's car; multiple detectives were unable to break into Francke's car using a similar method. (Tr. 9553-54). At one point, Crouse said that he knew the location of the perpetrator's clothes; police dug up the area and were unable to find the clothes. (Tr. 9549).

In addition to Martinak's testimony, petitioner stipulated to several additional instances in which Crouse's claims could not be corroborated. (Tr. 9564-66). Among other things, petitioner stipulated that the Oregon State Police Crime Laboratory processed "Crouse's boots and pants

Page 52 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and jacket and sweatshirt [which Crouse had claimed had Francke's blood on it] and found no evidence of any blood on any of the items." (Tr. 9564). Petitioner stipulated that Crouse's hair and fingerprints did not match any hair or fingerprints located at the crime scene. (Tr. 9564-65). Petitioner stipulated that the Crime Laboratory processed the knife that Crouse claimed to have used to kill Francke, found no blood on it, concluded that it was "not consistent with the class characteristics of the knife they identified as the weapon that killed Michael Francke[,]" and concluded that the "knife was not consistent with the clothing or the stab cuts in the business cards." (Tr. 9565). Petitioner stipulated that "the pictures from the autopsy do not substantiate Mr. Crouse's version of five stab wounds including the right forearm, the stomach, and wounds on both arms and hands." (Tr. 9566).

As part of the offer of proof, the State offered and the trial court admitted several of Crouse's recorded interviews, which were discussed above. (Tr. 9562-63).

Following his conviction, petitioner appealed the trial court's ruling, arguing that the trial court erred in not admitting Crouse's hearsay statements to police. Specifically, he argued that the statements were admissible under both OEC 806 for the purposes of rehabilitating a hearsay declarant (i.e., Crouse) and OEC 804(3)(c) as statements against Crouse's penal interest. (Ex. 106, pp. 97-126). The Oregon Court of Appeals rejected petitioner's arguments without discussion, and the Oregon Supreme Court denied review. (Exs. 111, 115).

### C.    Petitioner's *Chambers* Claim is Procedurally Defaulted.

In this federal habeas proceeding, petitioner now argues that the trial court violated his federal due process rights under *Chambers* when it ruled that Crouse's unsworn hearsay statements were inadmissible under state evidentiary rules. Petitioner did not present a similar argument during the course of his state-court proceedings, instead arguing that the trial court misapplied *state* evidentiary rules. Because petitioner cannot present his *Chambers* claim to the state courts now, the claim is procedurally defaulted.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

To obtain federal habeas relief, a petitioner must show that the state court's decision violated *federal* law.  28 U.S.C. § 2254(d).  Under 28 U.S.C. § 2254(b)(1), an application for a writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State[.]"

To pursue a federal claim in a federal habeas proceeding, the petitioner first must "fairly present" the claim to the state courts, "to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*).  To "fairly present" a federal claim to the state courts, a petitioner must "alert the state courts to the fact that he [is] asserting a claim under the United States Constitution."  *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999); *see also Duncan*, 513 U.S. at 365-66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  As part of that requirement, a petitioner is obligated to "present[] the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby affording the state courts a meaningful opportunity to consider allegations of legal error."  *Casey v. Moore*, 386 F.3d 896, 915-16 (9th Cir. 2004) (citing *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986)).

To properly exhaust a federal claim, the claim must be fairly presented to the state's highest court.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  If a federal habeas petitioner failed to fairly present his federal claim to the state's highest court, and can no longer do so under state law, the claim is procedurally defaulted because the state-court remedies were not and cannot be properly exhausted.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

Here, petitioner did not present his federal due process claim under *Chambers* at any point during his state-court proceedings.  He may not properly do so now.  *See e.g.*, ORS 138.071 (requiring that direct appeals be filed not later than 30 days after the judgment or order appealed from was entered into the register).  Thus, the claim is procedurally defaulted.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Petitioner does not contend otherwise, but argues that the default should be excused because he has demonstrated "actual innocence." As discussed below, petitioner has failed to make that extraordinary showing. Accordingly, the claim should be dismissed as procedurally defaulted.

### D.    Petitioner's *Chambers* Claim is Without Merit.

Even if petitioner had fairly presented his *Chambers* claim during the course of his state-court proceedings, the claim would have been properly rejected as meritless.

As the Supreme Court has explained, "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (an accused does not have an "unfettered right" to present any evidence he or she wishes). Petitioner has not asserted a claim that the trial court erred in applying state evidentiary rules, nor could petitioner obtain relief on that basis. *See e.g., Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Instead, petitioner contends that the exclusion of Crouse's unsworn hearsay statements pursuant to state evidentiary rules violated his due process rights under *Chambers*, arguing that "there is no meaningful way to distinguish this case from *Chambers*." (CR 74, p. 134). As explained below, petitioner is incorrect.

### 1.    *Chambers v. Mississippi*.

In *Chambers*, the Court explained that it was "establish[ing] no new principles of constitutional law[,]" and that its holding was "under the facts and circumstances of this case[.]" *Chambers*, 410 U.S. at 302-03. After issuing its decision in *Chambers*, a plurality of the Supreme Court described *Chambers* as "an exercise in highly case-specific error correction." *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996) (plurality opinion); *see also Christian v. Frank*, 595

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

F.3d 1076, 1085 (9th Cir. 2010) (noting that *Chambers* was "an opinion that was explicitly

tailored to 'the facts and circumstances of [that] case[.]'" (quoting *Chambers*, 410 U.S. at 303)).

Because *Chambers* was a case that was explicitly tailored to the facts and circumstances of that

case, it is necessary to describe at length the specific circumstances that led to the Court's

decision.

      Leon Chambers was convicted of murder by a jury in Mississippi state court.  The murder

happened near a bar that two police officers had entered to arrest a man.  *Chambers*, 410 U.S. at

285.  As the two officers attempted to arrest the man, a crowd of 20 or 25 men intervened and

wrestled the man free.  *Id.*  The arrest of the man was again attempted after three more law

enforcement officers arrived on the scene.  *Id.* at 286.  The officers were again attacked by the

assembled group of men.  *Id.*  During the commotion, a police officer (*i.e.*, the victim) was shot

in the back repeatedly by someone in the crowd.  *Id.*  The shots appeared to have come from an

alley.  *Id.*  Before he collapsed, the victim officer fired both barrels from his shotgun into the

alley.  *Id.*  The first shot was "wild and high," but with the second shot the officer "appeared . . .

to take more deliberate aim[,]" striking Chambers in the back of the head and neck as he ran

down the alley.  *Id.*  Chambers was rushed to the hospital by three of his friends and ultimately

survived.  *Id.* at 286-87.  The police officer died, and a subsequent autopsy showed he had been

hit by four .22-caliber bullets.  *Id.*

      On the night of the shooting, Gable McDonald was in the vicinity of the crime.

McDonald was one of three people who had driven Chambers to the hospital that night.  *Id.*

Shortly after the shooting, McDonald left his wife and moved from Mississippi to Louisiana.  *Id.*

at 287.  At the request of a man known as Reverend Stokes, McDonald returned to Mississippi.

*Id.*  After meeting with Reverend Stokes, McDonald met with Chambers' attorneys and signed a

sworn confession that he had shot the police officer using his own pistol, a .22 caliber revolver

that he discarded shortly after the shooting.  *Id.* at 287-88.  McDonald was then arrested for the

murder.  *Id.* at 288.

Page 56 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
        NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

One month later, at a preliminary hearing, McDonald recanted his confession. *Id.*
McDonald acknowledged that he was in the vicinity of the crime, having taken Chambers to the
hospital shortly after the shooting. He also acknowledged that he had once owned a .22-caliber
pistol, but claimed he had lost it before the shooting. *Id.* However, he stated that he was not the
shooter and confessed to the shooting only because Reverend Stokes had told him he would not
go to jail and would share in the proceeds of an eventual lawsuit brought by Chambers. *Id.* At
the time of the murder, McDonald stated that he was drinking beer at a café with his friend,
Berkley Turner. *Id.* Based on his recantation, McDonald was set free and "[t]he local authorities
undertook no further investigation of his possible involvement." *Id.*

Chambers was tried for the murder. At his trial, Chambers presented two lines of
defense. First, he attempted to show that he did not commit the murder. Conflicting evidence
was introduced: one officer testified that he saw Chambers shoot the officer; another witness
stated that "he was looking at Chambers when the shooting began, and that he was sure that
Chambers did not fire the shots." *Id.* at 289. Three officers assumed that the victim officer
intended to shoot his attacker; however, the officers never "examined Chambers to see whether
he was still alive or whether he possessed a gun." *Id.* No weapon was recovered from the scene
and there was no evidence that Chambers had ever owned a .22-caliber weapon. *Id.*

Second, Chambers attempted to show that McDonald had committed the murder. To that
end, a "lifelong friend" of McDonald testified that he saw McDonald shoot the officer. *Id.*
Another witness testified that he saw McDonald immediately after the shooting with a pistol in
his hand. *Id.*

To bolster that eyewitness testimony, Chambers called McDonald to the stand and
introduced his prior sworn confession into evidence. *Id.* at 291. However, on cross examination,
McDonald again testified that he had confessed to the murder only because of the promises made
to him by Reverend Stokes. *Id.* Again, McDonald testified that he had been drinking beer with
Berkley Turner at the time of the murder. *Id.* Chambers moved the court to allow him to

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"examine McDonald as an adverse witness." *Id.* The trial court denied Chambers' motion to

further question McDonald, citing Mississippi's common law "voucher rule," a rule resting "on

the presumption—without regard to the circumstances of the particular case—that a party who

calls a witness 'vouches for his credibility.'"[37] *Id.* at 295 (citing *Clark v. Lansford*, 191 So.2d

123, 125 (Miss. 1966)).

Chambers also attempted to call three witnesses to whom McDonald had admitted that he

had shot the officer. The first witness, Sam Hardin, would have testified that McDonald told him

he had shot the officer as Hardin gave him a ride home on the night of the murder. *Id.* at 292.

The second witness was Berkley Turner, the man who McDonald had claimed to be

drinking beer with on the night of the murder. Turner was permitted to testify that he had not

been in the café nor had he been drinking beer with McDonald on the night of the murder,

thereby undercutting McDonald's alibi. *Id.* However, if permitted, Turner also would have

testified that, as he and McDonald drove Chambers to the hospital, McDonald admitted he shot

the officer. *Id.* He would have further testified that McDonald warned him a week later not to

"mess him up." *Id.*

The third witness, Albert Carter, was McDonald's neighbor and friend of 25 years.

Carter would have testified that, the day after the murder, McDonald admitted to shooting the

officer and discarding the .22-caliber pistol. *Id.* at 293. According to Carter, McDonald bought

another .22-caliber pistol to replace the one he had discarded. *Id.* The business records of a gun

dealer corroborated Carter's testimony, demonstrating that McDonald had purchased a .22-

caliber revolver approximately one year before the murder and three weeks after the murder. *Id.*

at 293 n. 5.

---

[37] In criticizing the "voucher rule," the Court stated that it "bears little present relationship to the
realities of the criminal process[,]" noting that it had "been condemned as archaic, irrational, and
potentially destructive of the truth-gathering process," and rejected entirely by the then newly-
proposed Federal Rules of Evidence. *Chambers*, 410 U.S. at 296 n. 8 & 9 (citing C. McCormick,
Evidence s 38, pp. 75-78 n. 7 (2d ed. 1972)).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

The testimony of Hardin, Turner, and Carter was excluded as hearsay. *Id.* at 298. The Court noted that although Mississippi recognized an exception to its rule against hearsay for declarations against interest, it did so only as to declarations against *pecuniary* interest.[38] *Id.* at 299. The Court explained that Mississippi "recognizes no such exception for declarations, like McDonald's in this case, that are against the penal interest of the declarant." *Id.*

The Court recognized that "[t]he hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Id.* at 298. However, the Court explained that "[t]he hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. The Court cited several factors that demonstrated the reliability of McDonald's hearsay statements:

> "First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest."

*Id.*

Given the extent to which McDonald's hearsay statements could be corroborated, the Court concluded that their exclusion, when coupled with the trial court's refusal to permit Chambers to cross examine McDonald under the "voucher rule," violated the due process rights of Chambers. The Court held:

---

[38] The Court noted that, when the opinion was written in 1973, a number of states had discarded the "materialistic limitation on the declaration-against-interest hearsay exception," as had the "newly proposed Federal Rule of Evidence." *Chambers*, 410 U.S. at 299. Of course, Oregon has no such "materialistic limitation" to the hearsay exception for statements against interest. OEC 804(3)(c).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

"We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. *In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial*."

*Id.* at 302-03 (emphasis supplied).

> **2.    The exclusion of Crouse's unsworn hearsay statements pursuant to state evidentiary rules did not violate petitioner's due process rights because, unlike the statements at issue in *Chambers*, Crouse's statements did not bear "persuasive assurances of trustworthiness."**

As noted above, petitioner argues that "there is no meaningful way to distinguish [his] case from *Chambers*." (CR 74, p. 134). As discussed below, Crouse's statements are significantly less reliable than those at issue in *Chambers* for a number of different reasons.

In *Chambers*, McDonald confessed to the murder of the police officer to three different close friends or acquaintances in separate settings. Each of those confessions was within a day of the crime. More importantly, each of those confessions was *consistent*. Each of those confessions was also consistent with the sworn statement he subsequently gave to Chambers' attorneys. His confession to Carter included the detail that he had discarded of the .22-caliber pistol used in the murder, a detail that was corroborated both by his sworn confession and the business records of a gun dealer. Even in his recantation, McDonald conceded that he had owned a .22-caliber pistol. It was never disputed that McDonald was in the vicinity at the time of the murder, as he took Chambers to the hospital immediately after the crime had been committed. And though McDonald's confessions could be corroborated, his recantation was suspect. McDonald's only alibi—that he had been drinking beer with Turner at the time of the

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

murder—was refuted by Turner.  Most significantly, eyewitness testimony corroborated McDonald's confession.  One eyewitness, a "lifelong friend," testified that he saw McDonald shoot the officer, and another eyewitness saw McDonald with a gun shortly after the murder.

It was "under the facts and circumstances" described above that the Court found that McDonald's out-of-court confessions "bore persuasive assurances of trustworthiness," such that their exclusion pursuant to state evidentiary rules (anachronistic rules that had been abandoned by other jurisdictions) violated the due process rights of Chambers.  *See Egelhoff*, 518 U.S. at 53 (explaining that "the holding in *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defense is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.").

Here, Crouse's statements did not bear similar "persuasive assurances of trustworthiness."  Unlike the statements at issue in *Chambers*, Crouse's statements were not consistent.  As noted above, Crouse's first statement to police came after there had been extensive media coverage.  In that initial statement, Crouse claimed he had killed his sister, but he did not make a similar claim with respect to Francke, instead telling police that he observed an altercation involving five people and chased one of the suspects on foot for over three miles.[39] Next, he stated that he killed Francke in exchange for $300,000 from a man he had met coincidentally, known only as "Juan."  Next, Crouse stated that he confronted Francke in an effort to obtain records from the Dome Building.  Next, Crouse stated that he killed Francke during the course of breaking into his car.  Next, Crouse recanted.  Next, Crouse recanted his recantation.  Crouse then explored other avenues in an attempt to persuade officers he was somehow involved in Francke's murder.  Crouse stated that he declined a $10,000 offer from high-ranking prison officials to kill Francke.  Next, Crouse stated that he helped the actual killer conceal the murder.  When his claims could not be corroborated, he eventually denied any

---

[39] There is no indication in the record that Crouse actually killed his sister.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

involvement in Francke's death, acknowledging that his prior statements to police had been false. Unlike in *Chambers*, there was not eyewitness testimony identifying Crouse as the murderer. Instead, the only eyewitness testimony identified petitioner as the murderer. Contrary to petitioner's assertion, the hearsay statements of Crouse are substantially less reliable than the statements at issue in *Chambers*.

In arguing that Crouse's statements possessed persuasive assurances of trustworthiness, such that application of Oregon's evidentiary rules to exclude those unsworn hearsay statements would result in a due process violation under *Chambers*, petitioner focuses on Crouse's claim that he killed Francke during the course of burglarizing a car, ignoring the accounts that Crouse provided both before and after his car-burglary account. Even the car-burglary account, however, could not be corroborated.

Crouse identified the knife he claimed to have used to stab Francke, but the knife did not share the "general class characteristics" of the knife that killed Francke. (Tr. 9554-55). Crouse stated that he stabbed Francke with his left hand, but Francke's wounds were not consistent with a left-handed stabbing. (Tr. 9558). Regarding the stab wound to the chest, Crouse initially indicated that he stabbed Francke in an upward motion; later, he indicated that it was a downward motion. (Tr. 9540-41; Ex. 179, p. 95). Crouse stated that he stabbed Francke in the forearm and stomach, but Francke was not stabbed in the forearm or the stomach. (Tr. 9552-53). Crouse stated that he cut Francke on his arms and hands, but Francke was not cut with a knife on his arms and hands. (Tr. 9566).

Regarding the route he used to flee from the crime scene, Crouse initially stated that he fled to the east and then turned back to the west so that he could push Francke against his car. Eventually, he stated that he simply fled to the west. (Tr. 9541; Ex. 179, pp. 51, 96-97). Crouse stated that he used a wire to break into Francke's car; however, that method of gaining access to Francke's car could not be duplicated. (Tr. 9553-54). The clothes that Crouse stated he wore were "totally different" from the clothing described by Hunsaker. (Tr. 9552). After having a

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"flashback," Crouse remembered an additional item he was wearing that night—a blue
sweatshirt that had Francke's blood on it.  Contrary to Crouse's claim, there was no blood on that
sweatshirt or any of his other clothing.  (Tr. 9564).

Petitioner points to Crouse's claim that he hit Francke with a "roundhouse right,"
contending that the claim was supported by the autopsy findings.  (CR 74, p. 158).  However, the
medical examiner explained that although Francke had some scrapes around his left eye and on
his forehead, there was no significant blunt force trauma associated with those injuries.[40]
(Tr. 6406-08).  Petitioner points to Crouse's claims that he stabbed Francke with a downward
motion and then fled to the west, noting that those claims were consistent with other evidence.
(CR 74, p. 158-59).  But petitioner ignores the fact that, at other points, Crouse made claims that
were diametrically opposed, telling police that he stabbed Francke with an upward motion and
initially fled to the east.  (Tr. 9541; Ex. 179, pp. 51, 96-97).  The few accurate details that Crouse
reported—e.g., that Francke was stabbed in the heart, that Francke's car was parked at the Dome
Building, or that Francke was attacked near his car—could have all been gleaned from the
newspapers, and Crouse told officers he had discussed the murder with reporters.  (Ex. 179,
pp. 38, 43; Pet. Ex. D, pp. 16-18).

Petitioner also cites documents located in Petitioner's Exhibit H that were not presented
to the trial court, contending that those documents corroborate Crouse's claims to police.
(CR 74, p. 136-37).  As an initial matter, petitioner has not attempted to explain why those
documents should be considered in support of his claims in this habeas proceeding.  When a
habeas petitioner presents a claim before a federal habeas court that was not presented during the
state-court proceedings, "'the discretion of federal habeas courts to consider new evidence' . . . is
. . . cabined by the requirement in § 2254(e)(2) that the petitioner must have attempted 'to
develop the factual basis of [the] claim in State court.'"  *Stokely v. Ryan*, 659 F.3d 802, 808 (9th

---

[40] As noted above, at least one of the injuries to Francke's head was apparently caused when
Francke's body was being transported for the autopsy.  (Tr. 6367-68).

Page 63 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
        NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Cir. 2011) (quoting *Cullen v. Pinholster*, 131 S.Ct. 1388, 1401 (2011)). That evidence could only be considered in this proceeding if petitioner "was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004). The documents in Petitioner's Exhibit H predate petitioner's trial, where petitioner had the same motive to demonstrate that Crouse's unsworn hearsay statements were reliable and trustworthy. *See* OEC 804(3)(c) (providing that hearsay statements against penal interest are "not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."). Further, the documents have bates stamps indicating that they were provided to petitioner by the State in discovery. *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) ("The failure to investigate or develop a claim given knowledge of the information upon which the claim is based, is not the exercise of diligence."). Under these circumstances, petitioner has not met his burden under § 2254(e)(2) to have the new evidence considered in this proceeding in support of his claims.[41]

In any event, even if this Court were to consider the new evidence that petitioner cites, the new evidence provides minimal corroboration to Crouse's claims. Petitioner contends that Crouse told his brother, mother, and girlfriend that he killed Francke. (CR 74, p. 136). However, to the extent that he did so, each of those confessions occurred *after* Crouse had provided various accounts to police.[42] That Crouse made unsubstantiated claims to friends or

---

[41] In support of his *Chambers* claim, petitioner also relies heavily on a report drafted by his investigator that purports to relay statements of Randy Martinek. (Pet. Ex. C, pp. 64-68). As with the other new evidence submitted by petitioner, he has not attempted to explain why this report could be considered in this habeas proceeding, making no effort to explain its admissibility under 28 U.S.C. § 2254(e)(2). Even if the report were admissible under § 2254(e)(2), it is unsworn hearsay relayed by an advocate for petitioner. Respondent objects to its consideration as evidence in this habeas proceeding.

[42] As noted above, despite Crouse's leading questions, Crouse's brother stated he could not remember Crouse ever telling him that he had committed a murder prior to their telephone conversation on April 5, 1989. (Ex. 179, pp. 83-84, 87). In that same conversation, Crouse asked his brother not to tell their mother about his involvement in the case, indicating that he had not yet done so. (Ex. 179, p. 86). Crouse also told his brother that he had not yet told his girlfriend about his involvement. (Ex. 179, p. 89).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

family members after he made multiple unsubstantiated claims to police does not render those unsubstantiated claims trustworthy.

Petitioner also notes that Crouse confessed to two inmates.  At least one of those confessions further undercuts the trustworthiness of Crouse's claims.  According to the inmate, Crouse initially stated that he killed Francke.  (Pet. Ex. H, p. 210).  Crouse never described in detail how he killed Francke, but told the inmate that it was *not* a knife that killed Francke.  (Pet. Ex. H, p. 210).  Crouse later pulled back, telling the inmate:  "'I won't tell you whether I did it or not, but I know more about the case than anybody.'"  (Pet. Ex. H, p. 210).

Petitioner cites to a police report indicating that Crouse's parole records showed that he signed in at 4:40 PM with his parole officer on the date of Francke's murder.  (CR 74, p. 136 (citing Pet. Ex. H, p. 83)).  Although that evidence is not inconsistent with any version of events provided by Crouse, it is not highly corroborative either, as Francke's murder occurred nearly 2-½ hours later.

Petitioner cites to Crouse's criminal history.  (Pet. Ex. H, p. 137).  Although extensive, Crouse's criminal history does not corroborate his various claims as to his involvement in the Francke homicide any more than it corroborates Crouse's claim that he killed his sister.

Petitioner contends that Crouse's hospital records confirm statements by Crouse that he became ill with stomach pains after Francke's murder because he had learned Francke's identity.  Although petitioner cites to the hospital records that demonstrate that Crouse went to the hospital for stomach pains on January 19 (two days after Francke's murder on January 17), he does not cite to evidence showing that Crouse linked his stomach pains to learning of Francke's identity.  (CR. 74, p. 136 (citing Pet. Ex. H, pp. 13-18)).  In fact, when detectives asked Crouse about the hospital records, Crouse provided a different explanation for his stomach pains, explaining that the pains started after he had eaten a meal prepared by Lucinda Cooley on the night of January 18.  (Ex. 179, p. 250).

Page 65 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Finally, petitioner cites to a statement that a woman gave to police, in which the woman states that Crouse told her he was moving out of his apartment because "something heavy was going down."  Petitioner further contends that Crouse's parole records demonstrate that he "went on the run shortly after the murder[.]"  (CR 74, p. 136).  Petitioner is incorrect.

First, Crouse's parole records demonstrate that the reason Crouse moved out of his apartment was not because "something heavy was going down," but because an elderly woman had offered him a place to stay approximately two weeks after the Francke murder, and Crouse decided to take her up on her offer.  (Pet. Ex. H, p. 99).  Second, the parole records demonstrate that after Francke's death, Crouse continued to have contact with his parole officer.  To be sure, the parole records show that Crouse called in sick for his appointment on January 19 (as noted above, he was at the hospital), but he made his very next appointment and showed his parole officer the medication he had received from the doctor.  (Pet. Ex. H, p. 98).  He had several contacts with his parole officer thereafter, including bringing the elderly woman who had offered him housing into the parole office to meet with his parole officer.  (Pet. Ex. H, p. 102).  In short, the parole records do not, as petitioner contends, demonstrate that Crouse "went on the run" after Francke's death.  Indeed, it was only because Crouse later told his parole officer that he had information about the Francke case that he became involved in the investigation at all.[43]

In support of his *Chambers* claim, petitioner relies on two Ninth Circuit opinions, *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) and *Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012), both of which were issued approximately two decades after petitioner's trial.

In *Lunbery,* a woman who was convicted of killing her husband had been prevented at her trial from submitting evidence that her husband was killed in their home because he was

---

[43] Similar to the first version of events that Crouse provided the detectives, Crouse told his parole officer that he observed a commotion involving five Mexicans and one other person, saw the other person drop to ground, watched four of the Mexicans run to cars, and chased the fifth Mexican on foot.  (Pet. Ex. H, pp. 103-07).  In addition to chasing the apparent assailant, Crouse also told his parole officer:  "'You know Stan[,] I've stopped 11 rapes around here because I'm out and about at night and I know what to look for.'"  (Pet. Ex. H, p. 105).  There is no indication in the record that Crouse ever intervened during the course of a rape.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

mistakenly believed to be a drug dealer who had occupied their home shortly before they had moved in. At the time of the murder, the woman and her husband had lived in their home for only two weeks. *Lunbery*, 605 F.3d at 756. Frank Delgado, a "known drug dealer," had lived in the home before them. *Id.* at 757. Delgado had been seen in the home with Henry Garza, in possession of "dope" worth $40,000. *Id.* at 757. A car linked to Garza had been seen in front of the home a few hours before the murder. *Id.* at 757, 761. A confidential informant had told police that the murder had been a mistake, explaining that "[t]he intended victim had been Delgado because he had 'ripped off several people in town over drug dealings.'" *Id.* at 757. Shortly after the murder, Garza had approached an acquaintance in a restaurant and stated: "That's a bummer. My partners blew away the wrong dude." *Id.* However, Garza's statement was excluded at trial as hearsay because the state court concluded, among other things, that Garza's statement that his partners had killed the wrong person was not against his penal interest. *Id.* at 759. Noting that "the murder evidence was completely consistent with Garza's out-of-court statement[,]" *id.* at 761 n. 3, the Ninth Circuit concluded that Garza's statement was, in fact, against Garza's interest and "bore persuasive assurances of trustworthiness," such that its exclusion was inconsistent with *Chambers*. *Id.* at 761-62.

Here, unlike in *Lunbery*, the murder evidence was not "completely consistent" with Crouse's unsworn hearsay statements. Furthermore, the hearsay declarant in *Lunbery* did not give multiple inconsistent accounts of the murder, as Crouse did here. The hearsay declarant in *Lunbery* gave one account, which was "completely consistent" with the other evidence presented in the case.

The Ninth Circuit's decision in *Cudjo* is also distinguishable. In *Cudjo*, the habeas petitioner had been convicted of murdering a woman, but the petitioner's brother had confessed to committing the murder to a cellmate. *Cudjo*, 698 F.3d at 755-56. The California Supreme Court found that the brother's confession was "'probably true'" because it was given "'under circumstances providing substantial assurances that the confession was trustworthy.'" *Id.* at 758

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(quoting *People v. Cudjo*, 863 P.2d 635, 649 (1993) (en banc) (per curiam)). Based on that finding, the California Supreme Court concluded that the trial court had erred when it did not admit the brother's confession at trial as a statement against penal interest. *Cudjo*, 698 F.3d at 758. However, the California Supreme Court did not find constitutional error and upheld the conviction, finding that the state evidentiary error under was harmless under California's more lenient harmless-error test. *Id.* at 758-59.

Following the state-court proceedings, the petitioner asserted a claim under *Chambers* in his federal habeas petition, but the District Court denied the claim, finding that the testimony of the cellmate was not reliable. *Id.* at 760-61. The Ninth Circuit reversed: "Because the California Supreme Court's factual findings have not been rebutted by clear and convincing evidence, the district court was required to give a presumption of correctness to the California Supreme Court's conclusions regarding the facts. [Citation omitted]. The district court's failure to do so was error." *Id.* at 763; *see also* 28 U.S.C. § 2254(e)(1) (providing, among other things, that state-court findings are "presumed to be correct"). The Ninth Circuit explained that, in light of the California Supreme Court's factual findings, its conclusion that there was no constitutional error was contrary to *Chambers*:

> "[T]he California Supreme Court determined that this confession, if it came about as [the cellmate] claimed, 'was *probably true*,' and was given 'under circumstances providing *substantial assurances that the confession was trustworthy*.' [citation omitted]. That is almost precisely the conclusion of the Supreme Court in *Chambers*."

*Id.* at 766 (emphasis in original).

Here, in contrast to *Cudjo*, there is no state-court finding entitled to a presumption of correctness under § 2254(e)(1) that Crouse's hearsay statements are "probably true." Indeed, had such a finding been made, it would have been objectively unreasonable given Crouse's multiple accounts and the inability of police to corroborate Crouse's varying claims. In short, to the extent that petitioner may rely on Ninth Circuit opinions issued nearly two decades after his trial in support of his claims, *Lunbery* and *Cudjo* do not provide him with relief.

Page 68 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Petitioner does not cite the Ninth Circuit's decision in *Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010), although it shares some underlying factual similarities to this case.  In *Christian*, the victim was stabbed to death when the victim interrupted a person breaking into a car parked outside of the victim's house.  *Id.* at 1078.  Christian was charged with the murder, and attempted at his trial to introduce the hearsay statements of a man named Burkhart, who had admitted to a cellmate and to a person with whom he used drugs that he had committed the murder.  *Id.* at 1079.  Christian offered evidence to corroborate Burkhart's two confessions, including evidence that Burkhart owned a knife and that Burkhart was supposed to visit the victim's neighbor on the night of the murder but never showed up.  *Id.*  Although Burkhart exercised his Fifth Amendment right against self-incrimination and was unavailable at trial, the trial court did not permit Christian to submit the hearsay statements of Burkhart to the jury as statements against penal interest, concluding that there was insufficient corroboration to render the statements trustworthy.  *Id.* at 1080.

Christian argued to the Hawaii Supreme Court that the trial court had violated his rights under *Chambers* when it excluded Burkhart's hearsay statements, but the court rejected that argument, distinguishing *Chambers*.  The Hawaii Supreme Court reasoned that "unlike in *Chambers*, no eyewitnesses linked Burkhart with the scene of the crime[,]" there were fewer confessions than were present in *Chambers*, and there was a "dearth of other corroborating evidence linking Burkhart to the crime."  *Id.* at 1083-84.  The Ninth Circuit concurred:  "Given the fact that the Hawaii Supreme Court faced, in *Chambers*, an opinion that was explicitly tailored to 'the facts and circumstances of [that] case,' the Hawaii Supreme Court's distinguishing conclusion was reasonable."  *Id.* 1085.  The Ninth Circuit further explained:  "The distinguishing analysis was especially appropriate given the fact that the Supreme Court of the United States so heavily stressed that it was the 'trustworthiness' of the evidence at issue in *Chambers* that compelled its admissibility."  *Id.*

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Here, Crouse did not simply give one account that was insufficiently corroborated, as was the case in *Christian*. Rather, Crouse gave several different accounts that could not be corroborated. Because Crouse gave multiple versions of events, and police were unable to corroborate Crouse's varying claims, Crouse's unsworn hearsay statements did not possess "persuasive assurances of trustworthiness," such that the Due Process Clause compelled their admissibility, despite their inadmissibility under state evidentiary rules.

At a minimum, the state has a valid interest in preventing unsworn hearsay that does not fit within any hearsay exception and does not otherwise possess assurances of trustworthiness from being presented to the jury. That interest was vindicated by the exclusion of Crouse's statements at petitioner's trial. Petitioner's claims under *Chambers* should be denied.

### E.    Any Error in Excluding Crouse's Statements was Harmless.

"Even where constitutional error is found, 'in § 2254 proceedings a court must [also] assess the prejudicial impact of constitutional error' under the *Brecht* standard." *Merolillo v. Yates*, 663 F.3d 444, 454-55 (9th Cir. 2011) (citing *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) and *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations and internal quotations omitted). Indeed, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38 (invoking the harmless error test in *Kotteakos v. United States*, 328 U.S. 750 (1946)) (internal quotation marks omitted).

Here, petitioner cannot demonstrate that the exclusion of Crouse's statements had a substantial and injurious effect or influence in determining the jury's verdict. Detective Bain testified that Crouse had been a suspect and had confessed to killing Francke. (Tr. 7478). Bain also testified that Crouse's confessions could not be corroborated, and that Crouse recanted. (Tr. 7479). The abbreviated form in which this information was presented to the jury permitted

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

the jury to learn that a person other than petitioner had confessed to murdering Francke, but prevented the jury from learning how truly incredible Crouse's claims were.

To be sure, had Crouse's hearsay statements been admitted, the jury would have heard Crouse's confessions in more detail.  However, that detail would have included that Crouse initially claimed to be a witness to the murder who chased the assailant for 3-½ miles; then claimed to have been hired to kill Francke for $300,000; then claimed to have killed Francke to obtain his records from the Dome Building; then claimed to have killed Francke after he was caught burglarizing his car; then recanted; then recanted his recantation; then claimed to have rejected a $10,000 offer to kill Francke from high-ranking prison officials; then claimed to have helped the actual murderer conceal the murder; and then, finally, stated that he had no involvement in Francke's death and that all his prior statements had been false.  Even under Crouse's s car-burglary version of events, the jury would have learned that the details were continually shifting and that much of the physical evidence flatly contradicted his statements.

Under these circumstances, even if it was error to exclude Crouse's unsworn hearsay statements, petitioner cannot demonstrate that the exclusion of those statements had a substantial and injurious effect in determining the jury's verdict.

## V.    THE MAJORITY OF PETITIONER'S CLAIMS ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL ARE PROCEDURALLY DEFAULTED AND ALL CLAIMS ARE WITHOUT MERIT

With a few exceptions, petitioner's claims of ineffective assistance of trial and appellate counsel are, as petitioner acknowledges, procedurally defaulted, as they were not fairly presented in state court.  Petitioner asserts that either *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), or "actual innocence"—or both—provide an exception to any default.  Even if this Court were to reach the merits of any of petitioner's defaulted claims, relief should be denied, as the claims lack merit.

### A.    The *Martinez* exception provides no basis to excuse any default.

Petitioner acknowledges that the majority of his claims of ineffective assistance of trial counsel and appellate counsel are procedurally defaulted, but seeks to excuse the default based

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

on *Martinez v. Ryan*, 132 S.Ct. 1309, which, in limited circumstances, may provide a basis for federal habeas courts to review the merits of procedurally defaulted claims. However, *Martinez* does not excuse the default of any of petitioner's claims.

1.      The *Martinez* decision.

As noted above, in *Martinez v. Ryan*, 132 S.Ct. (1309), the United States Supreme Court announced a narrow exception to the general rule in *Coleman v. Thompson*, 501 U.S. 722 (1991), that post-conviction counsel's actions cannot constitute "cause" to excuse a procedural default: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial. *Martinez*, 132 S.Ct. at 1315. In particular, the United States Supreme Court held in *Martinez* that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S.Ct. at 1320.

To overcome the default and qualify for the limited exception announced in *Martinez*, a petitioner must show that post-conviction counsel "was ineffective under the standards of *Strickland v. Washington*," and also that the underlying ineffective-assistance-of-trial-counsel claim is a "substantial" one, which is to say that the claim "has some merit." *Id*. at 1318. Thus, *Martinez* requires that a petitioner's claim of cause to excuse a procedural default be rooted in "a potentially legitimate claim of ineffective assistance of trial counsel." *Id*. at 1315. *Accord*, *Lopez v. Ryan*, 678 F.3d 1131, 1137-38 (9th Cir.), *cert den*, __U.S.__, 133 S.Ct. 55 (2012). As *Martinez* made clear, "a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial counsel is substantial, and whether there is prejudice." *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012), *cert den*, 133 S.Ct. 863 (2013). In addition, if the record establishes that underlying trial counsel was not ineffective under *Strickland v.*

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*Washington*, 466 U.S. 668 (1948), PCR trial counsel "could not have been ineffective for failing to raise the ineffective assistance of counsel claim in state court." *Sexton*, 679 F.3d at 1161. If a petitioner can satisfy the above three prongs of *Martinez*, his procedural defaults may be excused, and the Court may review the merits of the defaulted ineffective assistance of trial counsel claims.

Because neither trial counsel nor post-conviction counsel provided constitutionally ineffective assistance, and because none of the omitted claims are "substantial," *Martinez* provides no basis to excuse any of petitioner's defaulted claims.

### 2.    Post-conviction counsel (Ken Hadley) was not constitutionally ineffective.

First, it cannot be said that post-conviction counsel, Ken Hadley, provided constitutionally ineffective assistance. Hadley ultimately filed a Third Amended Petition for Writ of Habeas Corpus, alleging multiple claims of ineffective assistance of both trial and appellate counsel, trial-court error, and other constitutional violations. (Resp. Ex. 155). Hadley deposed both of petitioner's trial attorneys, as well as Karen Steele, an attorney petitioner married between the guilt and penalty phases of his trial. (Resp. Exs. 174, 175, 176). Hadley submitted numerous exhibits, and represented petitioner during the course of a three-day post-conviction trial. (Trial Tr., Part O). At the post-conviction trial, Hadley called a number of witnesses on petitioner's behalf, including several of the defense investigators from the underlying trial (such as Thomas McCallum, Thomas Nisbet-Lance, Richard Cummins, and Roger Harris). Hadley also called witnesses—in particular Kevin Francke and Elizabeth Godlove Francke—in an attempt to develop the theory that Timothy Natividad killed Francke. (Trial Tr., Part O, pp. 49-74).

Hadley also called petitioner as a witness, and petitioner testified extensively about, among other things, his whereabouts or "alibi" on the night of Francke's murder. (Trial Tr., Part O, pp. 200-63, 291-370). In addition, Hadley vigorously cross-examined defendant superintendent's witnesses, including the prosecutors Tom Bostwick and Sarah Moore Bostwick,

Page 73 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

and petitioner's trial attorneys (Abel and Storkel).  Hadley submitted numerous exhibits on

petitioner's behalf, and, following the three-day post-conviction trial, submitted an extensive trial

memorandum.  (Ex. 172).  This is in stark contrast to the petitioner's post-conviction counsel in

*Martinez*, who presented *no claims* to the state court and, thus, the record was wholly

undeveloped.  *See Martinez*, 132 S.Ct. at 1314 ("Despite initiating [the state collateral

proceeding], counsel made no claim trial counsel was ineffective and later filed a statement

asserting she could find no colorable claims at all.").  Ultimately, Hadley was entitled to focus on

the claims that he believed had the greatest probability of success, and the fact that he did not

raise every claim that petitioner now believes should have been raised does not mean that

Hadley's representation was constitutionally ineffective.  *Cf. Jones v. Barnes*, 463 U.S. 745,

751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the

importance of winnowing out weaker arguments on appeal and focusing on one central issue if

possible, or at most on a few key issues").

### 3.    Trial counsel (Abel and Storkel) were not constitutionally ineffective.

In any event, as evidenced by the record, trial counsel (Abel and Storkel) were not

ineffective.  The record reflects generally vigorous, zealous advocacy.  Counsel vigorously

cross-examined a number of state's witnesses, questioning those witnesses extensively about

statements implicating petitioner in Gable's murder, and impeaching a number of those

witnesses.  Counsel also presented a significant defense, arguing that all of the evidence linking

petitioner to Francke's murder was circumstantial, with no physical evidence linking him to the

murder or the crime scene, and that various witnesses had various reasons for implicating

petitioner.  The post-conviction trial court's thorough letter opinion includes a number of

findings regarding all of the efforts trial counsel—and their large team of investigators—

performed on petitioner's behalf, including efforts to develop a solid alibi for petitioner.

(Ex. 345).  On this record, this Court should conclude, as a general matter, that petitioner's trial

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

attorneys performed in a constitutionally adequate manner, and that, in any event, petitioner was not prejudiced by any alleged deficiency.

Moreover, as argued further below, none of petitioner's procedurally defaulted claims are "substantial." For all of those reasons, *Martinez* does not excuse any of the defaults.

**B.      Petitioner's claims relating to the violation of the *ex post facto* clause (Grounds Four and Fifteen (subpart "P")) are either procedurally defaulted or lack merit.**

**1.      Ground Four.**

In Ground Four, petitioner asserts that his sentence (life without the possibility of parole) violates the *ex post facto* clause. Respondent does not dispute that the law in effect at the time that petitioner murdered Michael Francke in January 1989 provided only two sentencing options for aggravated murder: life with the possibility of parole ("ordinary life"), or death, but that, by the time of petitioner's trial in 1991, the legislature had amended the relevant statutes to make the presumptive sentence for that crime life without the possibility of parole ("true life"). (*Brief in Support*, pp. 174-75). Respondent likewise acknowledges that, during the penalty phase of petitioner's criminal trial, the trial court instructed the jury under the new law, such that the jury had three sentencing options: life with the possibility of parole, life without the possibility of parole, or death. As the Court is aware, the jury chose life without the possibility of parole.

Contrary to petitioner's assertion, however, Ground Four was not properly exhausted in state court. At trial, petitioner did not object to the trial court instructing the jury on the life without parole, or "true life" sentence option. Although, as noted above, petitioner raised the "*ex post facto*" claim on direct appeal, the Oregon Court of Appeals concluded that the "claim of error [was] unpreserved," and it "decline[d] to address it." (Ex. 111, p. 12). Given that procedural posture, Ground Four was decided on independent and adequate state grounds, and this Court is barred from reviewing its merits. *See Nitschke v. Belleque*, 680 F.3d 1105, 1112 (9th Cir.), *cert den*, 133 S.Ct. 450 (2012) ("[B]ecause the Oregon Court of Appeals did not explicitly or implicitly reach the merits of Nitschke's *Apprendi* claim, and clearly and expressly

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

based its decision on state-law grounds, its decision was independent of federal law and we are barred from reviewing Nitschke's *Apprendi* claim").

As part of the procedural default doctrine, a federal court cannot review a claim presented in a 28 U.S.C. § 2254 proceeding if the state court denied relief on that claim based "on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see also Nitschke*, 680 F.3d at 1109.  In particular, if the state court denied relief on the claim for procedural reasons, a federal court cannot review the claim if the procedure invoked by the state court (a) was "firmly established and regularly followed," and (b) did not depend on an antecedent ruling of federal constitutional law.  *Walker v. Martin*, 131 S.Ct. 1120, 1127-28 (2011) (state procedural rule is "adequate" to bar federal habeas review if rule is "firmly established and regularly followed"); *Stewart v. Smith*, 536 U.S. 856, 860 (2002) (state procedural rule is "independent" if does not rest primarily on a ruling on the merits of the federal claim); *see generally Coleman*, 501 U.S. at 729-35.

As applied here, the Oregon Court of Appeals declined to address petitioner's *ex post facto* claim because, at trial, there was no objection to the life without parole jury instruction, or to the sentence that was ultimately imposed.  As such, the claim of error on that issue did not comply with Oregon's preservation requirements. *See* Oregon Rules of Appellate Procedure (ORAP) 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error of law apparent on the record").  Oregon's "plain error" rule is an independent and adequate state ground.  *See Tatarinov v. Premo*, 533 Fed. Appx. 778, 779 (9th Cir. 2013) (so explaining).  Because Oregon's appellate courts declined to review the merits of the claim underlying petitioner's current Ground Four based on such independent and adequate state grounds, federal habeas review of Ground

Page 76 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Four is barred.  *See Nitschke*, 680 F.3d at 1113 (because the petitioner's sentencing claim was procedurally defaulted, federal court was "barred from reviewing his habeas petition").[44]

### 2.    Ground Fifteen (P).

Respondent acknowledges that Ground Fifteen (P), petitioner's claim that trial counsel provided constitutionally ineffective assistance by not objecting on *ex post facto* grounds to the trial court instructing the jury on the life without parole or "true life" sentencing option, was fairly presented in state court.  However, the state courts' denial of relief on that claim—on the basis that petitioner had failed to prove prejudice from any deficient performance—was not objectively unreasonable.  Because, as detailed above, the Oregon Supreme Court issued a reasoned, written decision on that claim, that is the decision this Court reviews in analyzing petitioner's Ground Fifteen (P).  *See Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir. 2013) (in conducting its review of claims before it, federal habeas court looks to "last reasoned" state-court decision) (internal citations omitted).

As described above, on this claim the state courts concluded that trial counsel performed in a constitutionally deficient manner by not conferring with petitioner "regarding any waiver of the *ex post facto* objection" to the trial court's submission of the "true life" sentencing option to the penalty-phase jury.  (Ex. 363, p. 11).  Respondent does not challenge that conclusion here.  However, the Oregon Supreme Court, in affirming the post-conviction trial court's judgment on remand, concluded that petitioner had failed to prove that he was prejudiced by counsels' performance in that regard.  (Ex. 384, pp. 13-15).  That decision was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent, and is entitled to deference from this Court.  *See Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014), *cert den*, 135 S.Ct. 978 (2015) (under 28 U.S.C. § 2254(d), writ of habeas corpus may be issued only if state-court adjudication "resulted in a decision that was contrary to, or involved an

---

[44] As argued above, petitioner has not demonstrated any basis to excuse the procedural default of this claim.  He has not demonstrated that he is "actually innocent," and the *Martinez* exception does not apply to claims of trial-court error.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States").

In addressing the deference requirements in 28 U.S.C. § 2254(d)(1), the Court has made a number of findings.  First, the phrase "clearly established Federal law" refers to the holdings, as opposed to the dicta, of Supreme Court decisions.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), *citing*, *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786-77 (2011).  *See also Burt v. Titlow*, 134 S.Ct. 10, 15 (2013) ("AEDPA likewise imposes a highly deferential standard for reviewing claims of legal error by state courts:  A writ of habeas corpus may issue only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by this Court").  Additionally, the Court has determined that the "contrary to" and "unreasonable application" clauses of AEDPA have independent meanings.  *Williams*, 529 U.S. at 404.

The "contrary to" clause permits a federal court to grant habeas relief only if the state court "applies a rule that contradicts the governing law set forth in [its] cases," or, if the state court "confronts a set of facts indistinguishable from [one of its decisions] and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-06.  The Court also held that, under the "unreasonable application" clause, a federal court could only grant habeas relief if the state court correctly identified a governing principle of the Supreme Court but applied the principle to the facts of the petitioner's case unreasonably.  *Id.* at 413.  This standard requires that "the state court's application of clearly established law must be objectively unreasonable," not merely "incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  When applying the AEDPA standard, this Court reviews the "last reasoned state court decision." *Comstock v. Humphries*, 786 F.3d 701, 707 (9th Cir. 2015) (internal citation omitted).

Page 78 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In addition, deference must be provided to factual determinations.  Under 28 U.S.C. § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  AEDPA sets out a "highly deferential standard for evaluating state court rulings," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2003) (*quoting*, *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997)), that "demands state-court decisions be given the benefit of the doubt."  *Woodford*, 537 U.S. at 24. Factual findings of the state courts are entitled to deference, and petitioner has the burden of refuting them by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  When a state court holds an evidentiary hearing during state post-conviction relief proceedings, as the PCR trial court did in this case, the federal court is "required to defer to the state court's credibility findings."  *Sophanthavong v. Palmateer*, 373 F.3d 859, 867-68 (9th Cir. 2004) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Ineffective assistance of counsel claims, such as petitioner's Ground Fifteen (P) have two components; first, the petitioner must show that counsel performed deficiently; and second, the petitioner must show that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The second part of the test, which is the only part of the test at issue in petitioner's case, requires the petitioner to demonstrate prejudice—that is "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome."  *Id.*  Moreover, this Court need not resolve both prongs of the *Strickland* test if a decision on one prong will dispose of the claim at issue.  *See Strickland*, 466 U.S. at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * *.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *Hurles v. Ryan*, 752 F.3d 768, 782 (9th Cir.), *cert den*, 135 S.Ct. 710 (2014)

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(rejecting relief on claim of ineffective assistance of trial counsel, based on counsel's "failure to conduct an adequate guilt phase investigation," where "[t]hough counsel's performance likely proved deficient, [the petitioner] has not established prejudice").

As previously noted, on remand from the Oregon Court of Appeals, the PCR trial court determined that petitioner had not proven that he was prejudiced by his trial attorneys' failure to confer with him regarding a possible waiver of any *ex post facto* challenge to the life without parole (or "true life") sentencing option.   According to that court, the only evidence of prejudice was petitioner's own testimony that he would have refused to allow the "true life" sentencing option to be presented to the jury.  (Ex. 371, p. 4).  As explained above, the PCR trial court—having had the opportunity to observe petitioner and hear his testimony at the first PCR trial in 2000, and hearing his telephonic testimony again in November 2006 at the remand hearing—did not find petitioner to be a credible witness on that point, or generally on any point.  (Ex. 371, p. 4).[45]  As such, the PCR trial court concluded—and the Oregon Supreme Court agreed—that petitioner did not meet his burden of proving prejudice.  That decision was not objectively unreasonable.

Much like a habeas petitioner who alleges that he or she pleaded guilty at trial based on inaccurate advice or information from trial counsel must prove that he or she would have proceeded to trial if given accurate advice, petitioner here must prove that, had Storkel and Abel adequately advised him about the *ex post facto* sentencing issue, he would have refused to allow the jury to be instructed on the "true life" option.  *Cf. Premo v. Moore*, 131 S.Ct. 733, 743-44

---

[45] In that regard, the post-conviction trial court described petitioner's testimony during the initial PCR trial as follows:

> [a]nd just as Mr. Gable did with law enforcement officers and various associates before trial, Mr. Gable speaks with assurance that, just as his mouth allowed him to handle anything he encountered before the murder of Michael Francke, his mouth will set him free in these [post-conviction relief] proceedings.  What Mr. Gable has instead accomplished is that he has added yet another version of events on January 17th, 1989, which although more elaborate tha[n] many of his past versions is still full of holes.

(Ex. 345, p. 82).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(2011) (to establish prejudice in the context of a guilty plea case, a habeas petitioner must "demonstrate a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial") (internal citation omitted). The Oregon Supreme Court's conclusion that petitioner had not met that burden—based on the post-conviction trial court's determination that petitioner's testimony on that point lacked credibility—was not objectively unreasonable. This Court should defer to the state courts' decision on the claim underlying Ground Fifteen (P), including the state courts' express credibility findings. *See Sophanthavong*, 373 F.3d at 867-68 (federal habeas court defers to state court's credibility findings, if evidentiary hearing was held in state court) (internal citation omitted). Accordingly, this Court should deny relief on Ground Fifteen (P).

> ### C. Even if there were some basis to excuse the default of petitioner's Grounds Fifteen (E) and Sixteen (B), the claims lack merit.

Grounds Fifteen (E) and Sixteen (B) relate to, respectively, trial and appellate counsel's alleged failures to "present appropriate legal support, including citation to federal law, in support of the admission of evidence of third party guilt," and to "raise as error the exclusion of proffered defense evidence, including * * * evidence of third party guilt[.]" (Pet., pp. 10-11). Petitioner acknowledges that the claims are procedurally defaulted, as they were not fairly presented in state court and can no longer be properly presented. Even if there were some basis to excuse any default, the claims lack merit.

> ### 1. Trial counsel did not perform deficiently by not presenting federal law (*Chambers v. Mississippi*, 410 U.S. 284 (1973)) in support of admission of evidence of third party guilt, and, in any event, petitioner was not prejudiced (Ground 15(E)).

In Ground Fifteen (E), petitioner asserts that trial counsel failed to present appropriate legal support in support of the admission of evidence of third party guilt—in particular, evidence of Johnny Lee Crouse's various statements implicating himself in Francke's murder. As argued above in response to petitioner Grounds Two and Seven, and as explained in the "Factual Background" section, counsel argued vigorously for admission of Crouse's statements, and made

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

an offer of proof to preserve the state law evidentiary issue for appeal.  (Tr. 9515).[46]  Although

trial counsel did not cite to *Chambers* or other federal law to support the request for admission of

that evidence, that did not amount to constitutionally deficient performance, and petitioner was

not prejudiced.

 As argued in detail above in response to petitioner's Grounds Two and Seven, in

*Chambers*, the United States Supreme Court concluded that, "under the facts and circumstances

of this case," the petitioner had been denied a fair trial, based on the "aggregate" of evidentiary

exclusions.  *Chambers*, 410 U.S. at 302-03.  The particular facts and circumstances of *Chambers*

are described in detail above.  What is key is that *Chambers* was "an opinion that was explicitly

tailored to the facts and circumstances of [that] case."  *Christian v. Frank*, 595 F.3d 1076, 1085

(9th Cir.), *cert den*, 562 U.S. 1007 (2010) (citing *Chambers*, 410 U.S. at 303; alterations in

original).  Given that the circumstances surrounding the evidence of third-party guilt in

*Chambers* are readily distinguishable from the circumstances of Crouse's various confessions,

retractions, and other statements, reasonable trial counsel could have decided that arguing for

admission of Crouse's statements—despite their inadmissibility under state law—would have

been futile.  For that reason, trial counsel did not perform deficiently by not relying on federal

law to advocate for admission of that evidence.  *See James v. Borg*, 24 F.3d 20, 27 (9th Cir.

1994) (counsel's "failure to make a futile motion does not constitute ineffective assistance of

counsel") (internal citations omitted).

 To the extent that petitioner may argue that counsel performed deficiently by not citing

either *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010), or *Cudjo v. Ayers*, 698 F.3d 752 (9th

Cir. 2012), or both,  in support of his argument that the trial court should have admitted evidence

of Crouse's statements, that argument lacks merit.  As described above, those cases are readily

---

[46] On direct appeal, appellate counsel—relying on state law—assigned error to the trial court's
exclusion of "evidence of Johnny Lee Crouse's out-of-court confessions that he killed Michael
Francke."  (Ex. 106, p. i).  The Oregon Court of Appeals rejected that assignment of error
without discussion.  (Ex. 111, p. 12).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

distinguishable from petitioner's case, because the evidence of third-party guilt in those cases was much stronger than the evidence at issue here.  Furthermore, and as noted above, both *Lunbery* and *Cudjo* were decided approximately two decades after petitioner's trial, and also long after his direct appeal.  Neither trial counsel nor appellate counsel can be faulted for not citing these Ninth Circuit cases applying *Chambers*.  *Cf. Weaver v. Palmateer*, 455 F3d 958, 966 (9th Cir. 2006) ("In assessing prejudice, we do not ask what a defendant might have done had he benefitted from clairvoyant counsel") (internal citations omitted).

In any event, even if petitioner could show that counsel performed in a constitutionally deficient manner by not alerting the trial court to any federal due process argument in support of admission of the Crouse evidence, he cannot show prejudice.  That is, he cannot demonstrate that, even if he had argued—based on *Chambers*—that exclusion of the evidence would violate his federal Due Process rights, the trial court likely would have admitted the evidence.  Given the lack of "persuasive assurances of trustworthiness" of Crouse's various statements, as thoroughly detailed above, it is not reasonably likely that additional arguments trial counsel may have made in support of admission of those statements would have caused the trial court to allow admission. *See Bemore v. Chappell*, 788 F.3d 1151, 1170 (9th Cir. 2015) (California Supreme Court's rejection of the petitioner's claim that counsel provided ineffective assistance by not presenting mental health defense not "objectively unreasonable application of *Strickland*," where the petitioner had "not shown a reasonable likelihood that the result of the guilt phase would have been different but for counsel's errors").  Furthermore, for the same reasons that the trial court's exclusion of Crouse's hearsay statements was harmless, petitioner cannot show that there is a reasonable probability that the admission of Crouse's hearsay statements would have changed the outcome of petitioner's trial.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

      **2.**      **Appellate counsel did not perform deficiently by not raising the *Chambers* issue, and, in any event, petitioner cannot show prejudice (Ground 16(B)(1)).**

Just as trial counsel did not perform deficiently by not arguing that exclusion of the evidence of Crouse's statements violated his due process rights, appellate counsel likewise performed reasonably by declining to raise the issue on direct appeal.[47]

First of all, since, as petitioner acknowledges, the *Chambers*/due process issue was not preserved at the trial court level, appellate counsel would have had to raise the issue as "plain error." Appellate counsel is not ineffective for not raising an unpreserved issue. *See Aparicio v. Artuz*, 269 F.3d 78, 96 (2d Cir.2001); *see also Holloway v. Gower*, 225 Or. App. 176, 184, 200 P.3d 584 (2009) ("Ordinarily, where an issue is not preserved at trial and is not reviewable as plain error, appellate counsel's performance is not deficient by reason of failing to assign the issue as error on appeal") (internal citations omitted).

Moreover, on direct appeal, appellate counsel assigned error to a number of the trial court's rulings, including the trial court's denials of petitioner's motions to suppress statements, and the trial court's exclusion of evidence of Crouse's statements. (Ex. 106).[48] Appellate counsel (Daugirda) was not required to raise every conceivable issue on appeal. Rather, "the winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotations and citations omitted). Appellate

---

[47] Respondent notes that, in *Martinez*, the Supreme Court limited the newly created procedural default exception to defaulted claims of ineffective assistance of *trial* counsel. *See Martinez*, 132 S.Ct. at 1319 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at *trial*") (emphasis added). Nevertheless, respondent recognizes that the Ninth Circuit—in contrast to every other federal circuit court of appeals that has addressed the issue—has held that the *Martinez* exception can apply to defaulted claims of ineffective assistance of appellate counsel. *See Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013) (so holding).

[48] The assignment of error regarding the exclusion of Crouse's statements was, as previously described, presented as a claim of state-law error.

Page 84 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

counsel's decision not to raise the unpreserved federal due process/*Chambers* issue did not constitute deficient performance.

Deficient performance aside, petitioner cannot demonstrate prejudice on this claim.  To do so, he would have to show a "reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal." *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (internal citations omitted).  In light of the fact that the federal due process argument in support of admission of Crouse's statement was unpreserved, and that, as described in detailed above, *Chambers* is readily distinguishable from petitioner's case, petitioner cannot make that showing.  Therefore, even if this Court were to reach the merits of petitioner's Ground Sixteen (B), it should deny relief.

### D.    Petitioner's claims or subclaims regarding trial counsel's "failure to investigate" are not substantial (Ground 15(A)).

In Ground Fifteen (A), petitioner generally alleges that trial counsel failed to "investigate."  (Pet., p. 9).  His argument on this claim focuses on counsel's alleged failure to "adequately investigate evidence to establish an alibi at trial."  (*Brief in Support*, p. 158).  As petitioner appears to acknowledge, Ground Fifteen (A) is procedurally defaulted, because it was not exhausted in state court, and can no longer be properly exhausted.  Even if he could establish some basis to excuse the default—either through "actual innocence" or through the *Martinez* exception—this Court should deny relief.  Petitioner does not demonstrate what additional evidence counsel would have discovered through further investigation, or a reasonable likelihood that the result of his trial would have been different with further investigation of the "alibi" issue.

In his *Brief in Support*, petitioner asserts that counsel should have uncovered the "eviction notice" that the Gables' landlady served on them on the morning after Francke's murder, telephone records from his apartment from the night of the murder, and information about interviews with petitioner's neighbors (Scott and Anise Dowd).  (*Brief in Support*, pp. 102-108).  However, much—if not all—of that information was known to trial counsel, and

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

either presented to the jury, or discussed at length by the PCR trial court, or, in some instances, both.

As trial counsel Abel testified at the initial PCR trial, the criminal defense team was aware of phone records from the Gables' apartment from the night of the murder, but Abel didn't think "that the phone records specifically would have established that [petitioner] was there when they [the phone calls] came in." (Trial Tr., Part O, p. 523).[49] Abel remembered that the Dowds—petitioner's neighbors—witnessed the "plate-throwing thing," and may have been involved in it. (*Id*.). The defense investigators were also able to confirm that the Gables' landlady served the Gables with an eviction notice on the morning of January 18, 1989. (*Id*.). In that regard, the landlady of the "Chandelle Park Apartments" where the Gables lived at the time of Francke's murder, Lavonne Spencer, testified as a defense witness at petitioner's criminal trial. (Trial Tr., Part L, pp. 8651-52). Ms. Spencer confirmed that she served the Gables with an eviction notice on January 18, 1989, based on "too much noise, traffic in and out, the night before," which was the night of January 17, 1989. (*Id*., p. 8653). The complaints were based on "a lot of noise coming from the Gable apartment," along with "a lot of people, cars in and out, slamming doors, running up and down the stairs." (*Id*., pp. 8653-54). Thus, the jury was aware of the issue of a lot of noise and activity coming from the Gable apartment on the night of the murder. Trial counsel was aware of the issue, and presented that evidence to the jury.[50] Even during closing argument, trial counsel reiterated that Ms. Spencer had testified that she was "very sure" that the noise on the night of January 17, 1989 was coming from the Gables' apartment, and that that was what led her to serve the eviction notice on January 18, 1989. (Trial Tr., Part N, p. 9977). Ultimately, petitioner has not shown that further investigation of the eviction notice issue likely would have led to a different result.

---

[49] The PCR trial transcript has been submitted in this proceeding as "Part O" of the transcript designation.

[50] The PCR trial court discussed that issue in its Judgment, explaining that Ms. Spencer in fact testified at the criminal trial, as both a State and defense witness, "that the eviction was due to too much noise * * * the night of January 17, 1989." (Ex. 345, p. 83).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Likewise, the trial defense team was aware of the Gables' neighbors, the Dowds, and the suggestion that a fight between Scott and Anise Dowd was the cause of the excessive noise on the night of January 17, 1989. (Ex. 345, p. 83). As the PCR trial court described, a defense investigator (Cummins) spoke with Scott Dowd before trial, and to that court, it appeared that the reason Mr. Dowd thought the fight with his wife was on January 17, 1989 was that the defense investigator suggested as much. (*Id.*; *see also* Pet. Ex. G, pp. 9-10). The PCR trial court's finding that "the date of the Dowd argument is far from settled" was not unreasonable in light of the evidence before it. (Ex. 345, p. 83).

Regarding the contention that trial counsel failed to use phone records from the Gables' apartment to attempt to establish that petitioner was at home on the evening of January 17, 1989, petitioner cannot show that such a tactic likely would have succeeded. As Janyne Vierra stated in an affidavit, in January 1989, the apartment she shared with petitioner was "in a constant state of turmoil with drug users visiting at all hours of the night." (Ex. 386, p.1). Vierra (formerly Janyne Gable) believed that she and petitioner had "drug-using visitors or parties from five to seven times per week during that time period." (*Id.*, pp. 1-2). Sometimes petitioner was present during those parties, sometimes he was not, but, according to Vierra, petitioner "spent very little time at our apartment in January 1989." (*Id.*, p. 2). While she acknowledged that phone records may have shown that calls were made to and from her apartment on the evening of January 17, 1989, she stated that "there were often other people at our residence as well. [She did] not know whether other people might have spoken to [John Kevin] Walker on the telephone on January 17, 1989." (*Id.*). She averred that the testimony she gave at trial was truthful. (*Id.*).

Thus, contrary to petitioner's argument, confronting Vierra with the eviction notice and telephone records would not likely have led to different testimony from Vierra, or a different outcome at trial. Again, evidence of the eviction notice was presented at trial. The PCR trial court found credible trial counsel Abel's testimony that the defense team ultimately decided not to recall Vierra, because Abel reinterviewed Vierra and "decided against recalling her because it

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

was apparent that she was going to remain firm in her testimony." (Ex. 345, p. 78). Whether or not phone calls were made to or from the Gables' apartment on the evening of January 17, 1989, that does not prove that petitioner was home that evening, and the defense team did not believe that the phone records "establish[ed] the presence of petitioner," given the circumstances of the Gable household in January 1989. (*Id.*). People were in and out of the Gables' apartment during that time period, and it was the site of regular "drug parties." As Vierra stated in her affidavit, if Walker in fact called her apartment that evening, she or other visitors could have talked with him.[51] Ultimately, petitioner cannot show what additional information counsel would have learned through additional investigation of a possible alibi for petitioner on the night of Francke's murder, or that any information learned through additional investigatory efforts likely would have produced a different result at trial.

In addition, as the PCR trial court explained in detail in its judgment, petitioner's "alibi" has evolved over time. As that court stated, petitioner "gave many different versions of his whereabouts on January 17th, 1989, including an ongoing inability to recount his whereabouts, as noted in the statements taken by law enforcement officers." (Ex. 345, p. 82).[52] Similarly, "statements taken by [petitioner's] Defense Attorneys also involved the same inability to recount his whereabouts with any sort of specificity." (*Id.*). The PCR trial court implicitly—if not explicitly—found petitioner's statement that "he didn't know his whereabouts at the beginning of trial, [but] as the trial developed he finally realized where he was" not credible, as petitioner had told the news media, as early as February 1990, that "he had three (3) witnesses who could prove exactly where he was on 1/17/89 at the time of the murder." (*Id.*). Even at the time of the PCR

---

[51] Moreover, it was reasonable for counsel to proceed with caution with respect to Vierra. As described in Vierra's affidavit, petitioner made several damaging statements to her, including that "he knew what really happened regarding the Francke murder," and that he knew "what it's like to watch someone die, someone bleeding, gasping for their last breath of air." (Affidavit of Vierra, p. 3). The State did not elicit such statements at trial, likely due to the marital privilege. Had such testimony somehow been presented at trial, it could have been very damaging to petitioner's defense.

[52] Petitioner's various explanations of where he was on the night of Francke's murder are described in the *Factual Background* section above.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

trial, while petitioner's purported alibi or "timeline" had "more details" than the information

petitioner provided at the time of trial, his explanation of where he was on the night of Francke's

murder was far from clear.  (Ex. 345, pp. 83-84).  In that regard, the PCR trial court credited trial

counsel Abel's PCR trial testimony that "there was nothing credible" from petitioner that

"warranted raising [an alibi] defense," and the trial team was "never, ever * * * able to put

something together that we could say he was here and he did this, this and this."  (Ex. 345,

p. 84).

Ultimately, and as the PCR trial court concluded when considering petitioner's related

claims of ineffective assistance of trial counsel, petitioner cannot show that counsel provided

ineffective assistance in their efforts to establish an alibi defense, or that he was prejudiced as a

result of any deficient performance.[53]  That is, he has not established that any of the other

evidence he now points to regarding his alleged alibi—which, again, mostly reiterates what was

already either presented to the jury or known by trial counsel at the time of trial—likely would

have produced a different outcome at trial.  *See Denham v. Deeds*, 954 F.2d 1501, 1505-06 (9th

Cir. 1992) (counsel does not perform ineffectively by not calling potential alibi witnesses, where

there were "glaring inconsistencies" in the proposed witness testimony); *Brown v. Attorney

General of California*, 292 Fed. Appx. 674, 675 (9th Cir. 2008) (rejecting ineffective assistance

of trial counsel claim based on counsel's alleged failure to investigate and present alibi defense,

where the petitioner "has not shown that further investigation of his alibi would have produced

anything significant, or that a different presentation of the defense would have been more

convincing") (internal citation omitted).

---

[53] As one of the investigators who worked with petitioner's defense team (Bruce Cummins)
testified at the post-conviction trial, the defense team was not able to find corroboration for
petitioner's eventual belief that he was at the Salem Memorial Hospital on the night of Francke's
murder.  (Trial Tr., Part O, pp. 154-56).  Another defense investigator, Cynthia Hamilton,
testified that, although there may have been "some success" in corroborating petitioner's
whereabouts, that corroboration came from "maybe one or two people" from the drug culture,
and Hamilton didn't know about "the validity of their statements."  (Trial Tr., Part O, p. 276-77).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

**E.** **Failure to call or adequately examine witnesses (Randy Studer and Jodie Swearingen) (Ground Fifteen (subparts J and K)).**

Next, petitioner argues that trial counsel provided ineffective assistance by not calling Randy Studer—Vierra's brother—as a defense witness, and by not effectively using Jodie Swearingen as a defense witness. (*Brief in Support*, pp. 160-161). But petitioner cannot show that counsel performed deficiently in either respect, or that he experienced any prejudice. Thus, these claims—which appear to fall under petitioner's Ground 15 (subparts J and K)—are not substantial.

**1.** **Counsels' decision not to call Studer as a defense witness (Ground Fifteen, subpart J).**

Studer, Vierra's brother (Pet. Ex. A, p. 29), testified at petitioner's grand jury proceedings, implicating petitioner in Francke's murder based on statements petitioner made to Studer, Studer's girlfriend at the time, Teresa Ross, and Ms. Ross's mother, Linda Perkins. (Ex. 102; Pet. Ex. A, pp. 29-31). Studer also made a number of statements to the police about the Francke murder, eventually telling Oregon State Police officers that "on the morning of January 18, 1989, [petitioner] had confessed to murdering someone the previous evening." (Pet. Ex A., pp. 30-31). Neither party called Studer as a witness at petitioner's trial.

Petitioner now contends that counsel should have called Studer as a witness, to testify about, among other things, his "pre-trial recantation," the police's "interrogation tactics" that Studer claims led to some of his statements, and Studer's assertion that he lied "both to the Oregon State Police and under oath in his testimony to the Grand Jury." (*Brief in Support*, pp. 160-62). For a number of reasons, petitioner cannot show that trial counsel was ineffective in not calling Studer as a witness, or that using Studer as a witness likely would have produced a different outcome at trial.

For one thing, counsel would have had to contend with all of Studer's prior convictions—including robbery, harassment, menacing, animal abuse, and first-degree sodomy. (Ex. 301, p. 1). In addition, like many of the other trial witnesses, Studer was a heavy drug user, and also

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

sold drugs with Gable. (Ex. 302, pp. 14, 21, 24, 36, 67, 74, 99-100). Counsel also may have had to confront information that Studer was into "ripping off cars" with petitioner. (Ex. 302, p. 35). Studer also gave a number of statements to police officers, at times stating that both petitioner and petitioner's friend "Munchie" told him that petitioner had killed Francke, but at other times denying that petitioner had made such statements to him.[54] (Exs. 302, pp. 510-13). Some of Studer's statements were given in the presence of Studer's counsel. (Ex. 302, pp. 97-98).

Furthermore, had counsel called Studer as a witness, counsel would have had to confront Linda Perkins' testimony and police statements, primarily her statement and testimony that, on the morning of January 18, 1989, she was present at the home her daughter, Teresa Ross, shared with Studer, when Gable stopped by. (Ex. 302, p. 65). According to Perkins, Gable "walked in the door without knocking and began looking out the window in all directions as though he was being followed and acting very nervous." (*Id.*). At that point, Ross asked petitioner what was wrong, and petitioner stated that he "fucked up." (*Id.*). When Ross asked for more details, petitioner told her that she'd "be reading about it in the paper." (*Id.*). Perkins then overheard petitioner talking with Studer, and heard him ask Studer if he had "heard of the Francke case." (*Id.*, pp. 65-66). Perkins was very certain that this interaction took place on the morning of January 18, 1989, and "would not waver" from that fact. (*Id.*, p. 66).[55]

In addition, trial counsel would have had to confront the fact that Studer testified before the grand jury, apparently testifying—consistent with some of the statements he gave to police— that petitioner came to his and Ross' home on the morning of January 18, 1989, acting paranoid and talking about having killed someone the night before. (Pet. Ex. E, pp. 440-44). Had trial counsel called Studer as a witness, Studer—like Swearingen—would have been impeachable

---

[54] "Munchie" is a nickname for Doug Scritchfield. (Ex. 302, p. 97).

[55] Perkins also told police—and testified—that, after she took Ross to petitioner and Vierra's apartment for what appeared to be a drug transaction, petitioner called her several times, and would say "Listen, Bitch, if you open your mouth, you're a dead mother fucker." (Ex. 302, p. 67). Perkins' trial testimony was similar to what she reported to the police. (Trial Tr., pp. 7949-53).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

with his grand jury testimony, and the jury would have been permitted to consider the substance of his prior grand jury testimony as substantive evidence.[56]

For all of the above-explained reasons, trial counsel (Abel and Storkel) would have faced substantial—if not insurmountable—difficulties if they had called Studer as a defense witness. Trial counsel did not perform in a constitutionally deficient manner by not calling him as a witness, and it is not reasonably likely that the result of petitioner's trial would have differed if Studer had been called as a witness. Because underlying trial counsel was not constitutionally ineffective by declining to use Studer as a defense witness, PCR trial counsel was not constitutionally ineffective in not raising a claim specifically based on the failure to call Studer as a defense witness. For that reason alone, *Martinez* does not excuse the default of this portion of Ground 15(A). *See Sexton v. Cozner*, 679 F.3d 1150, 1161 (9th Cir. 2012), *cert den*, 133 S.Ct. 863 (2013) ( if the record establishes that underlying trial counsel was not ineffective under *Strickland v. Washington*, 466 U.S. 668 (1948), PCR trial counsel "could not have been ineffective for failing to raise the ineffective assistance of counsel claim in state court"). Likewise, the claim regarding trial counsels' decision not to call Studer is not "substantial," because, in light of all of the circumstances described above, such a claim would not be meritorious. *See Martinez v. Ryan*, 132 S.Ct. 1309, 1318 (2012) (to overcome the default and qualify for the limited exception announced in *Martinez*, a petitioner must show, among other requirements "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit") (internal quotations omitted).

---

[56] Petitioner acknowledges as much in his *Brief in Support*, with respect to the State's cross-examination of Swearingen regarding her grand jury testimony. (*Brief in Support*, pp. 13-14). *See also* OEC Rule 801(4)(a)(A) (statement not hearsay if "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is," among other things, "inconsistent with the testimony of the witness and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding[.]").

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

### 2.    Counsels' alleged failure to 'effectively' use Swearingen as a defense witness (Ground Fifteen, subpart K).

As part of his argument on Ground 15, petitioner asserts that counsel "failed to effectively use Jodie Swearingen as a defense witness." (*Brief in Support*, p. 162). In that regard, he contends that counsel "failed to use the cross-examination of Harden in tandem with the testimony of Swearingen to show how their two stories were riddled with inconsistencies, but, through numerous interrogations, slowly progressed toward a largely consistent story." (*Id.*). However, petitioner cannot show that trial counsel performed unreasonably with respect to the use of Swearingen as a defense witness, or a reasonable probability that the use of any other tactics would have led to a different outcome. Thus, post-conviction trial counsel was not ineffective for asserting this particular claim, and the claim is not "substantial."

First of all, respondent notes that trial counsel did not want to use Swearingen as a defense witness at all. In particular, Abel testified at petitioner's PCR trial that petitioner wanted the defense team to call Swearingen "as a witness on his behalf," but that Abel did not think it was a good idea. (Trial Tr., Part O (PCR Trial Tr.), p. 486). However, Abel "accede[d] to [petitioner's] requests," because it was petitioner's case. (Trial Tr., Part O, p. 486). Similarly, John Storkel, Abel's co-counsel, who actually questioned Swearingen, also testified in the course of the PCR proceedings that he and petitioner "had a discussion that [Swearingen] could be a pivotal witness, and that that was a risk, I want to call it, and the bottom line is that [petitioner] very definitely wanted her called, and we called her." (Ex. 175, pp. 30-31).

Ultimately, and as explained above, Swearingen did testify as a defense witness, testifying on direct examination that, among other things, she never called Cappie Harden from the Dome Building on the night of the murder (January 17, 1989), that she was not on the Oregon State Hospital (OSH) grounds on that day, that she did not see petitioner burglarize a car on OSH grounds that day, that she never saw petitioner stab Francke, and that petitioner never told her he killed Francke. (Trial Tr., Part M, pp. 9325-31). She also testified that Harden, who previously testified as a State's witness that Swearingen called him from the Dome Building on

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

January 17, 1989, had a reputation as being "very untruthful," and that, based upon her personal relationship with Harden, she had an opinion that he was untruthful.  (Trial Tr., Part M, pp. 9327-28).  Swearingen also claimed that, before she testified at grand jury, she and Harden had the opportunity to meet and get their "stories straight."  (*Id*., pp. 9326, 9330-31).

On cross-examination, Swearingen acknowledged that this "meeting" between her and Harden took place in a small room, with two police officers present, that the officers told the two of them not to discuss the case, that she was represented by an attorney at the time (Tom Collins) who was also present, and that she and Harden were never left alone.  (Trial Tr., Part M, pp. 9332-33).  Swearingen also acknowledged that the attorney (Collins) "would not allow the district attorney's office to elicit any information from [her] about [her] knowledge of the Michael Francke homicide unless and until he negotiated an immunity agreement on [Swearingen's] behalf."  (*Id*., p. 9334).  In particular, Swearingen agreed that she had refused to provide any "interviews or any information to the District Attorney's office about [her] knowledge of the Frank Gable and Michael Francke homicide unless and until the State of Oregon agreed not to prosecute [her] as an accessory to the murder, as an accomplice to the murder of Michael Francke[.]"  (*Id*., p. 9337).

Swearingen also acknowledged that, around the time of Francke's murder (late 1988 and early 1989), she was a drug user, using methamphetamine intravenously, and she described herself as someone who doesn't "obey the law."  (Tr., Part M, pp. 9343-45).  Regarding her feelings about Cappie Harden, Swearingen admitted that she had told defense investigators, who interviewed her several times, that she felt that Harden had "fucked [her] off" or "did [her] wrong" at some point in time.  (*Id*., p. 9347).  Swearingen also recalled telling Gary Jensen, who worked at the Hillcrest School, that she knew that petitioner had killed Francke, and that she was "nearby, possibly in a car."  (*Id*., p. 9348).  Swearingen recalled telling Jensen those things in October 1989, but claimed it was just "[a]nother lie."  (*Id*.).  In addition, Swearingen acknowledged making similar statements to other Hillcrest employees, including Marie Collar

Page 94 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and Ann Marie Hagemann, but claimed that those statements were just more lies.  (*Id.*, pp. 9349-51).  On cross-examination, Swearingen also admitted that she told another Hillcrest worker, Laura Vonderstraffe, who transported her to Hillcrest in October of 1989 after she was arrested, that Swearingen was "really nervous" because she was "either an accomplice or an accessory to murder," but brushed that statement off as "[j]ust another one of those lies."  (*Id.*, pp. 9351-52).[57]  Swearingen also acknowledged that, although she had testified on direct that she did not meet petitioner until the summer of 1989, she told defense investigators that she may have actually met him in early 1989.  (*Id.*, p. 9349).

Regarding additional statements she made to others, Swearingen agreed that she told a friend in Colorado, George Russel Talley, with whom she stayed when she was "on the run and out of state," about the Francke murder.  (Trial Tr., Part M, p. 9353).  She acknowledged that Talley did not know that Swearingen was a material witness, and was "on the run basically from the authorities in the State of Oregon at this period of time."  (*Id.*, p. 9354).  Rather, Talley was a friend who, "[took Swearingen] in and [gave her] a place to live," and did not threaten her in any way.  (*Id.*).  While staying with Talley in Colorado in September of 1990, Swearingen told him that "some hot shot got killed and [Swearingen] witnessed it."  (*Id.*).

On re-cross, Swearingen acknowledged that, although she had already talked to the police before she made statements to Hillcrest staff members (including Mr. Jensen and Ms. Vonderstraffe), she had not yet told police officers that she was "an eye witness to the Michael Francke homicide."  (Trial Tr., Part M, p. 9363-64).  When Vonderstraffe picked her up and drove her from juvenile detention to the Hillcrest facility, and told Vonderstraffe and other Hillcrest employees about being a witness, accessory, or "accomplice" to murder, that was before she "ever [told] the State Police anything about being a witness to [Francke's] murder or knowing anything about [petitioner] killing Michael Francke."  (*Id.*, pp. 9363-65).  Swearingen

---

[57] Swearingen admitted that, a few days later, she had another conversation with Vonderstraffe, and told her that "the murder happened in Salem and that Michael Francke was the murder victim," but testified that that was "[a]nother lie."  (Trial Tr., Part M, p. 9353).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

also admitted, during re-cross examination by the prosecutor, that, during her interviews with Oregon State Police investigators, she would not even "beg[i]n to talk about any knowledge of the Michael Francke homicide, let alone that [she was] an eye witness to the Michael Francke homicide" until she had negotiated an immunity agreement with the Marion County District Attorney's office (with the assistance of her attorney, Tom Collins).  (*Id.*, pp. 9365-66). Swearingen further admitted that, even after the signed immunity agreement was in place, she continued to "tell varying stories to the State Police about what [her] knowledge of the Michael Francke homicide" was.  (*Id.*, p. 9366).

During the re-cross examination, the prosecutor also questioned Swearingen about her grand jury testimony.  (Trial Tr., Part M, p. 9366).  In that regard, Swearingen acknowledged that, in April of 1990, she testified before the grand jury regarding her knowledge of the Francke homicide.  (*Id.*).  Her attorney (Collins) was present at that time.  (*Id.*).  Among other things, Swearingen admitted that, before the grand jury, she had testified that she was with Gable at the Dome Building on the night when Francke was killed, that she had met Gable at the Benders' home, that "Shorty" (Cappie Harden) dropped her off at the Benders' house that evening, and that she "hooked up with [petitioner] at the Benders and ultimately would up at the Dome Building that night."  (*Id.*, at 9367).  She admitted that she had provided that testimony to the grand jury, but claimed all of that testimony was "lies."  (*Id.*).[58]

The prosecutor further questioned Swearingen about her grand jury testimony, with Swearingen testifying that petitioner's reason for being at the Dome Building was to get "snitch papers," that the two of them parked petitioner's car west of the Dome Building, in the medical center area near the hospital, and left the car there.  (Trial Tr., Part M, pp. 9367-68).  Swearingen explained that she had told the grand jury that she and petitioner then "walked across the street,

---

[58] During closing argument, the prosecutor highlighted the various statements that Swearingen made, and the sequence in which those statements were made.  The prosecutor also discussed the fact that Swearingen would not admit to any knowledge of Francke's murder until she had an immunity agreement, and also discussed Swearingen's grand jury testimony.  (Trial Tr., Part N, pp. 9870-82).

Page 96 -   RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

across the grassy area, and approached the Dome Building," and that Swearingen's job that evening was to "hold jigs" or "keep a lookout." (Trial Tr., Part M, p. 9368). According to Swearingen, she testified before the grand jury that petitioner had "disappeared and left [her] basically standing in front of a tree that was immediately in front of the north portico porch area," and, while standing there, she heard the door of the north portico porch open up, and saw a "big tall man walk down the steps and across the grass and approach this white car that was in the parking circle that night." (*Id.*, pp. 9368-69). Swearingen acknowledged that she had testified that saw petitioner "get into a struggle with this big tall man near that white car that night," that "Shorty" (Harden) showed up at some point, and that when Shorty showed up, Swearingen "r[a]n over, g[o]t in his car," and she then took off with Shorty. (*Id.*, p. 9369). Finally, Swearingen admitted that her grand jury testimony was that "the last time [she] saw [petitioner] basically that night was running away from the Dome Building while [Swearingen] and Shorty were driving away." (*Id.*).[59]

Ultimately, although petitioner now argues that trial counsel should have "more effectively" used Swearingen, and tried to explain how the shifting of her statements and stories over time was due to police pressure, the record does not bear out the assertion that police pressure was the reason that Swearingen implicated petitioner. Given the numerous statements Swearingen volunteered to Hillcrest staff and to her friend George Talley in Colorado, and the fact that she would not talk to the police or the district attorney's office about any knowledge of the Francke murder without an immunity agreement, it is hard to see what more trial counsel could have done to "more effectively" utilize her as a witness. Indeed, Swearingen could not have convincingly testified that police coercion caused her to admit that she was present when petitioner killed Francke because she first made those admissions to persons who were not police investigators.

---

[59] Swearingen described all of the grand jury testimony discussed in this paragraph as "lies." (Trial Tr., Part M, pp. 9367-70).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

To the extent that petitioner argues that counsel should have tried to obtain the notes of Swearingen's grand jury testimony, petitioner's argument fails. First, it is not known whether there are notes or other records of her testimony. Second, there is no indication that anything helpful to petitioner's defense would have been derived from Swearingen's grand jury testimony. To the contrary, all indications suggest that she corroborated Harden and implicated petitioner while testifying under oath before the grand jury. In any event, such materials, if they do exist, are not generally discoverable under state law. In contrast to other types of materials from the underlying criminal proceedings, both the Oregon Supreme Court and the United States Supreme Court have historically recognized the "long-established policy that maintains the secrecy of the grand jury proceedings." *State ex rel Johnson v. Roth*, 276 Or. 883, 885, 557 P.2d 230 (citing *United States v. Procter & Gamble*, 356 U.S. 677, 681 (1958)). When disclosure of notes or other materials from grand jury proceedings is permitted, disclosure must be done "discretely and limitedly." *Procter & Gamble*, 356 U.S. at 683. *See also Dennis v. United States*, 384 U.S. 855, 870-71 (1966) (a court may order disclosure of grand jury materials where criminal defendant has shown "particularized need").[60] Thus, it is unlikely that, even if trial counsel had moved for production of notes or other records of Swearingen's grand jury testimony, the trial court would have authorized such disclosure. For that reason, in the event that petitioner's argument that counsel failed to effectively question Swearingen—or otherwise effectively use

---

[60] In Oregon, the secrecy of grand jury proceedings is codified at Or. Rev. Stat. (ORS) 135.855. Subsection (1)(c) of that provision states:

> "1)  The following material and information shall not be subject to discovery under ORS 135.805 to 135.873: ***
>
> (c)  Transcripts, recordings or memoranda of testimony of witnesses before the grand jury, except transcripts or recordings of statements made by the defendant."

Disclosure of grand jury witness *testimony* is permitted in extremely limited circumstances. *See State ex rel Johnson v. Roth*, 276 Or. 883, 557 P.2d 230 (1976) (describing circumstances). One of those circumstances is when "the testimony of a witness at a criminal trial may be inconsistent with his testimony before the grand jury." *Id.*, at 886-87 (internal citations omitted).

Page 98 -  RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

her as a defense witness—hinges on the alleged failure to request grand jury records, that argument would lack merit.

In sum, petitioner cannot show that trial counsel performed in a constitutionally deficient manner in the way that counsel handled Swearingen's testimony, or that he was prejudiced by any failure to handle her testimony in a different manner.

### 3. Alleged failure to provide an effective closing argument (Ground Fifteen, subpart P).

Petitioner also appears to argue that trial counsel failed to provide an effective closing argument. As part of that argument, petitioner appears to suggest that trial counsel should have responded to inaccurate statements made by the prosecutor, Sarah Moore, in the State's closing argument. However, petitioner does not point to any specific statements that he believes to have been inaccurate. Thus, there are no factual inaccuracies to which trial counsel could have responded in closing argument.

In addition, petitioner suggests that trial counsel performed ineffectively during closing argument by pointing out that, in trial counsels' view, law enforcement did a poor job of securing the crime scene, and making the argument that "we will never know what" other evidence may have been at the crime scene before police secured the area. (Trial Tr., Part N, p. 9944). Trial counsel also contended that "the issue is what happened to potential critical physical evidence that could have been saved if the initial Salem Police Officers would have done their job." (*Id.*, p. 9943). However, in the context of petitioner's overall closing argument, this approach is well within the range of reasonableness. Counsel made the argument that there was "[n]ot one single shred of physical evidence that link[ed] [petitioner] to the murder of Michael Francke," and "other pieces of evidence that we don't know answers to." (*Id.*, p. 9948). With that lack of physical evidence, counsel asked the jury whether the State had met its burden "[b]eyond a reasonable doubt? I don't think so." (*Id.*). The defense's closing argument also included the assertion that one of petitioner's defense experts, criminalist Richard Fox, had testified that it

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

would be "highly unusual" for there to be "no physical evidence linking [petitioner] to the crime." (Trial Tr., Part N, p. 9978-79).

Ultimately, counsel's overarching argument was simply that no physical evidence linked petitioner to the crime. The suggestion that the initial law enforcement responders to the scene may have been responsible for the lack of evidence easily could have suggested to the jury that, had law enforcement done a better job of initially securing the crime scene, evidence that another person killed Francke may have been discovered. Thus, trial counsel's choice of what to focus on during closing argument could easily be considered a matter of strategy, and is entitled to a presumption that choices made regarding closing argument fell within the wide range of reasonable professional assistance. *See Strickland*, 466 US at 689-90 (to prove constitutionally deficient performance, petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy") (internal citation and quotations omitted); *Brown v. Ornoski*, 503 F.3d 1006, 1013 (9th Cir. 2007) ("Although [trial counsel's] decision to put [expert witness] on the stand came with some risks, it came with some benefits to Brown as well, in an attempt to explain the genesis of his behavior and portray him as more human and sympathetic to the jury. These benefits were available only if [expert] were called."). Petitioner cannot show that any claim regarding trial counsel's alleged failure to deliver a more effective closing argument is "substantial." Thus, *Martinez* does not excuse any default of this portion of Ground 15.[61]

---

[61] Petitioner also alleges in his Amended Petition that he was denied "due process * * * as a result of cumulative errors during his trial" (Ground Three), and in the *Brief in Support*, that relief is supported "cumulatively." (*Brief in Support*, p. 133). Petitioner did not fairly present any "cumulative error" claim in state court, and, in any event, since there was no single or individual error of constitutional magnitude, there can be no cumulative error. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (*citing Slack v. McDaniel*, 529 U.S. 472, 482 (2002)) (when no single constitutional error exists, nothing can accumulate to the level of a constitutional violation.)

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

## VI.    PETITIONER HAS FAILED TO DEMONSTRATE ACTUAL INNOCENCE

As discussed above, the majority of petitioner's claims have been procedurally defaulted, and petitioner does not contend otherwise.  To excuse the default, petitioner has attempted to demonstrate that he is "actually innocent" of the crimes of Murder and Aggravated Murder under the familiar test set out in *Schlup v. Delo*, 513 U.S. 298 (1995).  As discussed below, petitioner has failed to make the necessary showing to excuse the procedural default of his claims.[62]

Under *Schlup*, the actual innocence exception requires the petitioner to demonstrate a fundamental miscarriage of justice by showing that "'a constitutional error probably resulted in the conviction of one who is actually innocent.'"  *Id.* at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial." *Schlup*, 513 U.S. at 324.  In assessing the reliability of the petitioner's new evidence, "the reviewing court 'may consider the how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"  *Jones v. Taylor*, 763 F.3d 1242, 1247 (9th Cir. 2014) (quoting *Schlup*, 513 U.S. at 332).

---

[62] Petitioner has also asserted a freestanding claim of actual innocence.  The Supreme Court has not resolved whether such a claim is cognizable in a federal habeas corpus proceeding.  In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  This is because federal habeas courts "sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."  *Id.*  However, the Supreme Court left open the question of whether the *execution* of an actually innocent person would violate the Constitution if there were no state avenue to present the claim. *Id.* at 417.  The Ninth Circuit has also not yet resolved whether a freestanding actual innocence claim is cognizable in the non-capital context.  *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014).  However, in assuming that such a claim is cognizable, the Ninth Circuit has explained that the habeas petitioner asserting such a claim must "'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent[,]'" describing the standard as "'extraordinarily high.'"  *Id.* (quoting *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)).  As discussed below, the new evidence that petitioner presents in this proceeding fails to meet the standard set out in *Schlup*, let alone the "extraordinarily high" threshold required to establish a freestanding claim of actual innocence under *Herrera*.

Page 101 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

To meet the *Schlup* standard, it is not sufficient merely to show that a reasonable doubt exists in the light of new evidence. *See House v. Bell*, 547 U.S. 518, 540 (2006) (explaining that "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses[.]"). Rather, the burden is on the petitioner to prove that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327; *see also Fairchild v. Norris*, 51 F.3d 129, 130-131 (8th Cir. 1995) (standard not satisfied where "at least one juror, acting reasonably and properly instructed," would have convicted the petitioner).

In short, in order to pass through the actual innocence gateway, a petitioner's case must be "truly extraordinary." *Schlup*, 513 U.S. at 327. That is because habeas petitioners, many of whom—like petitioner here—have been convicted by a unanimous jury verdict, "come before the habeas court with a strong—and the vast majority of cases conclusive—presumption of guilt." *Id.* at 326 n. 42.

### A. The affidavits that petitioner presents, in which some witnesses recant their trial testimony, are not credible.

In support of his claim of actual innocence, petitioner relies heavily on affidavits in which some of the witnesses who testified at petitioner's trial recant portions of the testimony that they gave under oath. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) (explaining that "motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations."). In *Jones v. Taylor*, the Ninth Circuit recently explained that, "[a]s a general matter, 'recantation testimony is properly viewed with great suspicion.'" *Jones*, 763 F.3d at 1248 (quoting *Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting from denial of certiorari)). The court noted that "'[r]ecanting testimony is easy to find but difficult to confirm or refute'" because "'witnesses forget, witnesses disappear, [and] witnesses with personal motives change their stories many times, before and after trial.'" *Jones*, 763 F.3d at 1248 (quoting *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (Kosinski, J., dissenting)).

NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

The court further explained that recanting testimony "'is very often unreliable and given for suspect motives[.]'" *Jones*, 763 F.3d at 1248 (quoting *Dobbert*, 468 U.S. 1233-34).  As a result, "a witness' 'later recantation of his trial testimony does not render his earlier testimony false.'" *Jones*, 763 F.3d at 1248 (quoting *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005)).  Instead, "a witness' recantation is considered in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors.'"  *Jones,* 763 F.3d at 1248.

Here, the affidavits submitted by petitioner were, in most cases, signed approximately two decades after petitioner's trial.  *Cf. Christian v. Frank*, 595 F.3d 1076, 1084 n. 11 (2010) (explaining that a witness' recantation was "especially unreliable" in part because "it was made more than a decade" after his trial testimony).  As discussed below, the affidavits submitted by petitioner are unreliable for many of the reasons the Ninth Circuit recently identified in *Jones* and are not of such persuasive force that all reasonable jurors would reject the trial testimony of the witnesses—which was given under oath and subject to cross examination—and instead believe their recantations that came approximately twenty years later.

### 1.    Janyne (Gable) Vierra.

Petitioner has submitted an affidavit of Janyne (Gable) Vierra.  (Pet. Ex. A, pp. 2-4). Petitioner contends that this affidavit establishes that petitioner "was indeed at home when Francke was murdered at 7:00 p.m. on the night of January 17, 1989." (CR 74, p. 102).  When considered in conjunction with the record, however, all reasonable jurors would not draw such a conclusion.  Moreover, as outlined below, petitioner made several inculpatory statements to Vierra that were not presented to the jury.  Far from exculpating petitioner such that no reasonable juror would vote to convict, Vierra further inculpates petitioner in the murder of Francke.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

       **a.**       **Petitioner has not established that he was at his apartment at the time of the murder, such that no reasonable juror would vote to convict him.**

At trial, Vierra testified that petitioner was not at their apartment on the night of January 17, 1989. (Tr. 7729). She testified that she remembered him not being home that night because she was concerned that he would not return to the apartment in time to take her to work the next day, which started at 6:30 AM. (Tr. 7728-29). She recalled, "I was mad because I thought I was going to be late for work." (Tr. 7729).

Over twenty years later, in an affidavit signed by Vierra for the Federal Public Defender, it is stated that on the night of January 17, 1989, "a group of acquaintances showed up at our apartment around dark and stayed until 8:00 or 9:00 P.M., when the crowd, including [petitioner], went elsewhere." (Pet. Ex. A, p. 3). The affidavit states that "[i]t was a memorable night because there was a dispute between one of our guests and a neighbor that spilled out onto the stoop. This dispute was the last straw for the apartment manager and it led to the Legal Notice to Quit the next day." (*Id.*).

Given the length of time that has elapsed, not all reasonable jurors would reject Vierra's trial testimony, and credit an affidavit purporting to recall the details of a particular night over twenty years later. Indeed, since signing that affidavit, Vierra has reviewed her trial testimony and signed an additional affidavit. In that affidavit, Vierra explains: "I did not review my testimony at trial before I signed the affidavit for the Federal Public Defender. I have recently reviewed my testimony with Department of Justice investigator Mark Anderson. I testified truthfully and the events were relatively fresh in my mind when I testified. The events are not fresh in my mind now, over 25 years later." (Ex. 386, p. 2).

Moreover, the affidavit submitted by the Federal Public Defender, when considered in light of the existing record, does little to establish that petitioner was at his apartment at the time of the murder. The affidavit notes that phone calls from Cub Quick Printing were placed to the apartment of petitioner and Vierra at 4:22 PM and 5:38 PM on the day of the murder. (Pet.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Ex. A, p. 3).  Petitioner claims that he spoke with Walker during the phone calls, although Vierra noted:  "If Mr. Walker called my house on January 17, 1989, I have no memory as to who spoke with him.  I would occasionally talk with Mr. Walker when he would call our residence in an attempt to locate Mr. Gable . . . [T]here were often other people at our residence as well.  I do not know whether other people might have spoken to Mr. Walker on the telephone on January 17, 1989."  (Ex. 386, p. 2).  However, even if it were to be accepted that petitioner spoke with Walker on the phone, petitioner's participation in phone calls at 4:22 PM and 5:38 PM would not preclude his participation in the murder at approximately7:00 PM.

        According to the affidavit submitted by the Federal Public Defender, petitioner's friends "stayed until 8:00 or 9:00 P.M., when the crowd, including [petitioner], went elsewhere."  (Pet. Ex. A, p. 3).  Petitioner argues that while he was at the apartment that night, Scott Dowd threw a plate that resulted in an eviction notice that he and Vierra received the following day.  (CR 74, p. 106).  However, the landlady who served the eviction notice did not attribute the eviction to the plate or to any other noise that occurred before 9:00 PM.  In an interview with defense investigators, she attributed the eviction to noise that occurred after she went to bed at11:00 PM, explaining that "she heard people running up and down the stairs to [petitioner's] apartment all night long and that it was louder and more frequent than usual."  (Ex. 180, p. 23).

        The evidence of the "plate incident" comes from a taped phone conversation between Dowd and a defense investigator on January 2, 1991, after Dowd had moved away to Alaska. (Pet. Ex. G, pp. 3-25).  Dowd has never given testimony or submitted an affidavit.  During that conversation, the defense investigator told Dowd that petitioner had stated that the "plate incident" occurred on January 17, 1989.  (Pet. Ex. G, pp. 10-12).  Dowd simply accepted that date from the defense investigator and then recalled the details of the incident, explaining that he threw a plate into the apartment parking lot.  (Pet. Ex. G, p. 11).  Dowd did not independently tie the incident to January 17, 1989, or the eviction notice.  Thus, as the PCR court found, "the date

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

of the Dowds' argument is far from settled." (Ex. 345, p. 83). Of course, that finding is presumed to be correct in this proceeding. 28 U.S.C. § 2254(e)(1).

Moreover, even if it were accepted that the "plate incident" had occurred on January 17, 1989—i.e., the date of the murder—it happened well after 7:00 PM. In his interview with the defense investigator, Dowd recalled that it was "definitely late" when the incident occurred, explaining that it was "probably after 10:00 at night," it "could have even been after midnight[,]" and it "could have even been like 1:00 or 2:00 in the morning." (Pet. Ex. G, pp. 13-14). Thus, the "plate incident" does not support petitioner's claim that he was home at 7:00 PM—the time at which Michael Francke was killed.

Petitioner's alibi claim in this federal habeas proceeding—i.e., that he was home the night Francke was killed until he left with his friends at around 8:00 or 9:00 PM and did not return until the next morning—is merely the latest in a string of alibis that have continually shifted since petitioner was initially questioned by police in September 1989.

Among petitioner's claimed alibis, petitioner told police early on that he was at a party at his house, but was unable to provide the names of any of the persons at the party, explaining, "We don't use names like you do." (Tr. 7309). Later, he stated that he was "positive" he was with Chris Warilla, engaging in "dipsy dumpstering" on the night of the murder. (Tr. 7464-68). He even remembered being relieved that his wife had not told police that he had been "dipsy dumpstering" on the night of the murder because it would have been "kind of embarrassing[.]" (Ex. 304, p. 6). However, petitioner abandoned that alibi after he was told that Warilla had implicated him in Francke's murder. (Tr. 7464-66). As noted above, Warilla told police that petitioner claimed to have "got into a struggle and stabbed a guy in a parking lot." (Ex. 280). According to Warilla, petitioner "said he was either in the guy's car or was breaking in the guy's car." (*Id.*).

At times, petitioner told newspapers that he had three witnesses who would confirm his whereabouts on the night of the murder; other times, he would claim he couldn't remember.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(Ex. 331). In his brief, petitioner argues that the reason he was not able to remember where he was on the night of the murder was because he was never told by his attorneys that he received the eviction notice the day after the murder on January 18, 1989. (CR. 74, p. 102). That argument is incorrect. At a minimum, petitioner discussed with his attorney the eviction notice while attempting to establish his whereabouts on the night of the murder on November 2, 1990, several months before his trial began. (Ex. 306, pp. 17-18). Petitioner's attorney referenced the eviction notice, issued on January 18, 1989, and asked petitioner whether he talked about that eviction notice with anyone. Petitioner explained that he had not, explaining: "Was no thing to me." (Ex. 306, p. 18). Thus, back in November 1990, the eviction notice did not trigger petitioner's memory, such that he would fix on a consistent alibi.

At trial, petitioner attempted to demonstrate he was on the phone with Shelli Thomas and Viki Boyd shortly before the time of the murder. (Tr. 8554-56). In his PCR deposition conducted in December 1999, eight years after the trial, petitioner continued to claim that he spoke on the phone with Thomas and Boyd shortly before the time of the murder. (Ex. 253, pp. 9-10). Petitioner now concedes that this alibi is "easily refuted by phone records presented by the State showing that the defense witnesses' memories were of a different day." (CR 74, p. 160).

Petitioner also claimed in that PCR deposition that, at the approximate time of the murder, he had gone to a local hospital to inject a patient with heroin because the patient "couldn't have no drugs and he was in a bad car accident and they wouldn't allow him to have drugs and he was in a drug program." (Ex. 253, p. 10). According to petitioner, he left for the hospital between 7:00 and 7:30 on the night of the murder. (Ex. 253, pp. 11-12). He claimed that Gordon Martin and Wayne Knapper could confirm this alibi because they saw him at the hospital. (Ex. 253, p. 12-13). However, petitioner never presented any evidence to support that claim. In addition to lacking affirmative proof, this alibi was further discredited by *The Oregonian*, whose reporters interviewed Martin and Knapper. *The Oregonian* reported in 2005:

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"Both men [i.e., Knepper and Martin] said [petitioner] is wrong.

"Knepper and Martin told The Oregonian they did see [petitioner] at the hospital—on the day before the murder.  Knepper said the encounter was memorable because it happened the same day his daughter was born:  Jan. 16. Hospital officials verified the birth date for The Oregonian."

(Ex. 391, p. 13).  Apparently, petitioner no longer advances this alibi.

Finally, petitioner has claimed that he was orchestrating a drug deal on the night of the murder, an alibi claim that petitioner continues to advance.  In his deposition, petitioner claimed that he arrived at the hospital between 7:20 and 7:40 PM on the night of January 17, 1989. (Ex. 253, p. 61).  While at the hospital, petitioner stated that he had a conversation with Knepper and Martin, who asked petitioner whether he knew anyone who would buy a quarter pound of pot.  (Ex. 253, p. 13).  After checking the patient's room and learning that the patient he had intended to inject with heroin was no longer at the hospital, petitioner said he went to the home of Shelly Thomas, who asked petitioner if he could obtain a quarter pound of speed for her. (Ex. 253, p. 61).  Petitioner stated that he then called Walker in an attempt to obtain the speed, and Walker called petitioner back at some point later, asking petitioner to meet him at his apartment in approximately an hour.  (Ex. 253, p. 61).  Petitioner claimed that he took the long way home so he "wouldn't have to be in town to be around less police."  (Ex. 253, p. 14).  Once home, petitioner received a call from Robert Cornett, who asked petitioner to meet him at an arcade parking lot.  (Ex. 253, pp. 15, 62-63).  Petitioner stated that he met Cornett at the arcade, they then returned to petitioner's apartment, and Walker and Gesner eventually arrived at the apartment as well.  (Ex. 253, p. 63).  Petitioner stated that Cornett, Walker, and Gesner then left his apartment to conduct the drug deal.  (Ex. 253, p. 63).  After everyone left, petitioner stated that he spent the night at his apartment and then drove Vierra to work the following day. (Ex. 253, p. 65).

As an initial matter, even under petitioner's version of events, the participants to the supposed drug deal met at petitioner's apartment well after 7:00 PM—the approximate time of the murder.  Thus, even if petitioner could establish that a drug deal happened that night, it

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

would not provide an alibi for petitioner.  Further, the claim that he orchestrated a drug deal and then spent the night at home conflicts with Vierra's trial testimony and her affidavit, both of which indicate that he did not spend the night at home.  Finally, the proof that petitioner has offered in support of this drug deal is either suspect and/or does not support petitioner's argument.

As evidence of a drug deal occurring at petitioner's apartment on January 17, 1989, petitioner first points to an interview conducted in 1993 (two years after the trial) between Walker and an investigator that had been hired by petitioner's then-wife, Karen Steele.  (CR 74, p. 107).  In that interview, Walker states that he lied when he gave his trial testimony and that he was at petitioner's apartment on January 17, 1989, conducting a drug deal with Robert Cornett and Mark Gesner.  The investigator attempted to address the discrepancy:

> "[Investigator]:  Did you ever tell the police that?
>
> "[Walker]:  <u>No</u>.  I didn't remember that.  An' all of a sudden, it just came to me. I'm sittin' there, I'm g . . . oh . . . and this is like aft . . . after the trial had taken place, and stuff.  I mean, you know, when you're going through a trial like this, you have a tendency to <u>go over</u> it in your mind, you know, what's . . . where you were at, or where you weren't at.
>
> "[Investigator]:  How do you tie that to be the same evening, and how do you know that that, uh, event was the same evening as January 17th?
>
> "[Walker]:  Well, let's see, this is August 6th, 1993.  I'd say, oh, I've prob'ly had two years to think about it, <u>every single night</u>."

(Pet. Ex. A, p. 65 (emphasis in original)).  Subsequently in 2005, however, Walker told *The Oregonian* that the interview he gave to the investigator was not accurate.  *The Oregonian* reported:

> "Walker, now employed at a Salem warehouse, testified at Gable's trial that he didn't see Gable the night of the murder.  He repeated that claim in three recent interviews with The Oregonian.
>
> "Curiously, Walker gave a different account 12 years ago in an interview with an investigator hired by Steele, the lawyer Gable had married.  In the transcript,

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Walker described the drug deal the night of Jan. 17 almost exactly as Gable claimed—contradicting Walker's testimony.[63]

"When The Oregonian showed him the 1993 transcript, however, Walker was surprised.  He said he couldn't recall making the statement and that in any event it wasn't true.  He also said he was a heavy meth user at the time of the 1993 interview."

(Ex. 391, p. 14).

Petitioner also points to statements by Cornett and Gesner as evidence of the drug deal. According to an investigator currently working for petitioner, Cornett stated that he participated in a drug transaction at petitioner's apartment "on a night in January 1989."  (Pet. Ex. C, p. 7). Of course, even if Cornett's recent alleged claim that he was at petitioner's apartment "on a night in January 1989" were to be accepted, that claim does not establish an alibi for the night at issue—*i.e.*, January 17, 1989.  Finally, petitioner argues that Gesner "stated that he had been at Gable's house on the evening of January 17, 1989," pointing to an investigative report.  (CR 74, p. 107 (citing to Pet. Ex. G at 27)).  However, that investigative report does not mention January 17, 1989, much less support petitioner's claim that Gesner admitted to conducting a drug deal at petitioner's apartment on that date.  Like Walker, both Cornett and Gesner told *The Oregonian* in 2005 that they were not involved in a drug deal at petitioner's apartment on the night of the murder, January 17, 1989.  (Ex. 391, p. 14).

In short, like petitioner's previously asserted alibis, his latest alibi fails to check out. Contrary to petitioner's argument, he has not established that he "was indeed at home when Francke was murdered at 7:00 p.m. on the night of January 17, 1989[,]" such that no reasonable juror would vote to convict him.  (CR 74, p. 102).

> **b.    Petitioner's statements to Vierra, which were not presented to the jury, further inculpate petitioner in Francke's murder.**

Petitioner made several incriminating statements to his wife, Vierra, shortly after the death of Francke.  Petitioner filed a pretrial motion to exclude his statements to Vierra, asserting

---

[63] Petitioner described the drug deal in his PCR deposition after Walker had been interviewed by the investigator hired by his then-wife.  Thus, it is not surprising that there are some similarities between the two accounts.

NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

marital privilege under ORS 40.255, and his statements to Vierra were never presented to the jury that convicted petitioner. (Ex. 220). However, those statements may be considered in determining whether "'a constitutional error probably resulted in the conviction of one who is actually innocent.'" *Schlup*, 513 U.S. at 327; *see also House*, 547 U.S. at 538 (explaining that "*Schlup* makes plain that the habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the "rules of admissibility that would govern at trial" (quoting *Schlup*, 513 U.S. at 327-28)).

As petitioner was being interviewed in September 1989, Vierra was being interviewed as well. (Pet. Ex. E, pp. 230-53). Vierra has recently reviewed the statement she gave to police, and stands by her account. (Ex. 386, pp. 2-3).

Consistent with her eventual trial testimony, Vierra told police that petitioner was not at home on the night of the murder, but had picked her up the next morning to take her to work. (Pet. Ex. E, p. 246). She recalled that when he drove her to work the next morning, he became nervous when he saw all of the police at the Dome Building, and didn't want to come back to her work for a week or so thereafter. (Pet. Ex. E, p. 246). She would later tell a reporter: "He was freaked out after that, when we drove up and there were police lines. He would not go back on the grounds . . . He was the most paranoid man you'd ever seen." (Ex. 331).

Over the ensuing months, although petitioner never explicitly told Vierra that he killed Michael Francke, he made a series statements that were consistent with his guilt. According to Vierra, petitioner told her approximately two weeks after Francke's murder that he knew what had really happened to Francke. (Pet. Ex. E, p. 242). Vierra explained: "He has said that he knows what really happened. He made this statement twice. Once only with me, and the other time in front of other people."[64] (Pet. Ex. E, p. 241). Sometime during March or April 1989,

---

[64] Vierra stated that one of the other persons that was present when petitioner stated that he knew what really happened to Francke was possibly "Chris," who lived at 1255 Cross Street. (Pet. Ex. E. p. 238-39). Chris Warilla lived at 1255 Cross Street. (Ex. 280). As noted above, Warilla told police that petitioner stated that while he was breaking into a car, he "got into a struggle and stabbed a guy in a parking lot." (Ex. 280).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Vierra stated that petitioner told her "that he had something to do with the death of someone,

then stopped." (Pet. Ex. E, p. 242). Vierra stated that "this statement was made around the same

time as the comment about [petitioner] killing a cop." (Pet. Ex. E, p. 242). Vierra stated that

"the night in April when [petitioner] referred to the Francke case and the cop that got shot,

during that same night he mentioned that he knew what it was like to see somebody die, to watch

them gasping for their last breath of air." (Pet. Ex. E, p. 248).

At one point, petitioner told Vierra that he was leaving for South Dakota: "He told me

that I didn't have any idea of all the things he'd been involved in and he kept saying he needed to

leave. Early this same evening he mentioned that he knew what really happened to Michael

Francke. I didn't question that or go into it with him." (Pet. Ex. E, p. 247). In a recent affidavit,

Vierra again explained why she would not question petitioner regarding his incriminating

statements: "I was curious, but I did not press for further information because I was afraid of

[petitioner] and I really did not want to know more due to the seriousness of the statements."

(Ex. 386, p. 3).

In an interview with *The Oregonian*, Vierra recalled an incriminating admission by

petitioner during the course of a dispute. (Ex. 391, p. 10). In a recent affidavit she confirms that

account:

> "I recall that approximately three to four months after the death of Michael
> Francke, [petitioner] and I were in an argument about our finances. [Petitioner]
> exploded into a rage and broke my arm. After breaking my arm, [petitioner]
> apologized and told me that I did not understand the pressure he was under.
> [Petitioner] started crying and told me: 'I stuck the guy.' I then asked
> [petitioner]: 'What guy?' [Petitioner] then responded: 'The guy at the hospital.'"

(Ex. 386, p. 4). As noted above, the Dome Building was on state-hospital grounds.

When police contacted Vierra regarding the Francke homicide, Vierra told police that

petitioner had "pinned me against the wall and told me if I said anything to the cops about him

that he'd kill me." (Pet. Ex. E, p. 247). During his initial interviews with police, petitioner was

apparently concerned about statements he had made to his wife. As noted above, when asked

what he was thinking when he was asked whether he had stabbed Francke, petitioner stated: "'I

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

was thinking I was joking around with my wife and told her I killed Michael Francke.'"
(Tr. 7293).

Vierra stated that petitioner became very agitated after he was questioned by police in September 1989, explaining to Vierra for the first time "that it was just another bullshit robbery." (Pet. Ex. E, p. 243).  Vierra stated that "[t]hroughout the day he made statements like he didn't need money on death row."  (Pet. Ex. E, p. 243).  Although the witnesses that would eventually testify against petitioner had not yet provided incriminating information to police, Vierra told police in September 1989:  "I think that [petitioner] believes that he either killed Francke or that the case against him is so strong that he wouldn't be able to defend himself."  (Pet. Ex. E, p. 243).

In a recent affidavit, Vierra explained that she was not pressured into making the above statements:  "I was interviewed by police officers several times prior to [petitioner's] trial. Although I was given a polygraph examination, I was not pressured by the police officers, and they did not try to manipulate me to say things that were not true.  My statements to police were truthful."  (Ex. 386, pp. 2-3).

In sum, the new evidence from Vierra does not call into question petitioner's guilt such that "no reasonable juror" would vote to convict.  To the contrary, the new evidence from Vierra further implicates petitioner in Francke's murder.

## 2.    Jodie Swearingen.

In support of his claim of actual innocence, petitioner presents affidavits of Jodie Swearingen.  (Pet. Ex. A, pp. 21-27).  The first affidavit was prepared by petitioner's trial attorneys prior to the trial, but was not signed by Swearingen.  She subsequently adopted those statements in an affidavit signed in 2010, almost 20 years later.  (Pet. Ex. A, pp. 21-23). Swearingen signed another affidavit in 2010, stating that she never saw petitioner kill Francke, that her previous statements to police and her testimony before the Grand Jury were inaccurate, and that she was actually with Tim "Rooster" Natividad on the night of Francke's murder.  (Pet.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Ex. A, pp. 25-27).  As discussed below, Swearingen's affidavits do not constitute credible new evidence, such that "no reasonable juror" would vote to convict petitioner.

As an initial matter, the fact that Swearingen asserts in her affidavits that her pre-trial statements implicating petitioner and her testimony before the Grand Jury are inaccurate is not new evidence.  Swearingen told the jury that convicted petitioner that she lied when she gave pre-trial statements implicating petitioner and that she lied during her Grand Jury testimony. (*See* generally Tr. 9347-55, 9365-69).  The jury apparently did not find Swearingen's recantations persuasive.  As discussed below, the jury had good reason to discount Swearingen's recantations.

Petitioner's primary contention is that Swearingen's recantations are credible because her pre-trial statements that she saw petitioner kill Francke at the Dome Building and her testimony before the Grand Jury were the product of police coercion and/or polygraph examinations.  The record does not support petitioner's argument.

Swearingen was first questioned by police in connection with the Francke homicide on September 27, 1989.  During that initial interview, Swearingen told police, among other things, that she had known petitioner since between July 1988 and Christmas 1988 (*i.e.*, well before the Francke murder);[65] that she had lived with petitioner and Vierra for a period of time, including when petitioner broke Vierra's arm; and that she had been with petitioner in a park shortly after her birthday in May 1989, where petitioner threw a knife into the ground and stated to himself, "You should have known better."  (Pet. Ex. E, pp. 205-06).  Police contacted Swearingen the next day after speaking with Bill Storm, a person that Swearingen had mentioned during that initial interview.[66]  (Pet. Ex. E, p. 207).  When interviewed the next day, Swearingen stated that

---

[65] Swearingen's initial statement to police that she met petitioner well before the Francke murder is inconsistent with the statement in her affidavit, in which she states she did not meet petitioner until after the Francke murder.  Even in subsequent recantations to defense investigators, Swearingen agreed that she had met petitioner "a little bit before" Francke's death.  (Ex. 183, p. 39).

[66] According to Bill Storm, Swearingen called him after speaking with the officers and told Storm that she "was very scared that she was in danger for what she knows."  Swearingen told

Page 114 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

she had more to add to her account at the park.  She stated that petitioner had asked her whether she had heard of the Francke murder, and then told her that he had committed the murder.  (Pet. Ex. E, p. 207).  According to Swearingen, he then started mumbling to himself, "I can't believe I did it" as he threw his knife into the ground.  (Pet. Ex. E, p. 207).  The officers asked Swearingen whether she would be willing to take a polygraph concerning her statements, and she initially agreed to do so, but later declined to accompany the officers when they arrived to pick her up for the polygraph, stating that she was ill.[67]  (Pet. Ex. E., p. 207).

After those interviews, Swearingen absconded from her juvenile parole, until she was returned to Hillcrest School in late October 1989.  (Tr. 9335; Pet. Ex. E, pp. 208-11).  When she was taken into custody, she told officers that she was with petitioner on the night that Francke was killed, explaining that she was at a park with petitioner before petitioner walked towards the hospital grounds.  (Pet. Ex. E, p. 209).  During the interview, Swearingen advised the officers that she had hired an attorney, Tom Collins; the officers then contacted Collins, and terminated the interview.[68]  (Pet. Ex. E., p. 210).

As noted above, upon her return to Hillcrest School, Swearingen repeatedly told people she had witnessed Francke's murder.  She told Laura Vorderstraffe, the woman who drove her back to Hillcrest, "[B]oy, I'm really nervous this time[,]" explaining that she was "nervous because [she] was either an accomplice or an accessory to a murder[.]"  (Tr. 9352).  After she got back to Hillcrest, Swearingen told Vorderstraffe "that the murder happened in Salem and that Michael Francke was the murder victim."  (Tr. 9353).  After becoming upset at another person at

_____

Storm that she did not tell police all that she knew.  Storm asked Swearingen whether she committed the murder, and Swearingen denied doing so.  Storm then asked whether petitioner committed the murder, and Swearingen responded, "She couldn't talk about it."  "Storm elaborated that he did not know, but thought, she may have witnessed it (referring to the Francke homicide), or if not, may have some important information she is not telling."  (Ex. 299, p. 131-33).

[67] Thus, from the outset, Swearingen demonstrated an ability to refuse to participate in a polygraph examination when she did not want to participate.

[68] Again, Swearingen demonstrated her ability to terminate her encounter with police.

Page 115 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Hillcrest, Gary Jensen, Swearingen began to yell: "No, no, Mr. Jensen. That's not fair. You don't understand. This time I'm in as an accomplice for murder." (Tr. 9352-53). Swearingen agreed that she had explained to Jensen that "Frank Gable killed Michael Francke[,]" and that she "was nearby, possibly in a car." (Tr. 9348). Swearingen acknowledged that she told another person at Hillcrest, Marie Collar, that she "had something to do with the Michael Francke homicide case[.]" (Tr. 9350). Swearingen told another person at Hillcrest, Ann Marie Hagemann, that she was about fifty feet away from the car where Michael Francke was killed, that the car door was ajar, that there were two men on the scene in addition to Michael Francke, that one of the men stabbed Francke although Swearingen did not see him use the knife, and that after she saw the bloody knife, "they split." (Tr. 9350-51).

Thus, contrary to petitioner's argument, police pressure and polygraph examinations did not cause Swearingen to admit that she saw petitioner kill Francke. Instead, she volunteered that information to employees at Hillcrest School before she had ever undergone any polygraph examination conducted by police. At that point, Swearingen had no apparent motive to lie.[69]

Swearingen submitted to her first polygraph examination on November 7, 1989. (Pet. Ex. E, pp. 356-59). Her attorney, Collins, did not allow in-depth questioning during this initial polygraph, and both Collins and a polygraph examiner hired by Collins participated in formulating the questions for the examination. (Pet. Ex. E, p. 357). During that examination, Swearingen signed the following statement: "I was on Dome Building grounds, and saw Frank Gable stab Michael Francke." (Pet. Ex. E, p. 358). Swearingen was then asked two questions: (1) "Did you lie in the statement you just wrote?" and (2) "Regarding the statement you just wrote, did you lie about any part of it?" (Pet. Ex. E, p. 358). Swearingen answered "no" to both

---

[69] Petitioner argues that Swearingen lied, in part, "to protect Timothy Natividad, a friend whom she believed had been involved in the murder[.]" (CR 74, p. 51). As discussed below, that argument does not make sense because Natividad had died several months before Swearingen spoke with the employees at the Hillcrest School or was questioned in connection with the Francke investigation.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

questions, and the polygraph examiner concluded that Swearingen "was being truthful in her responses to those relevant questions." (Pet. Ex. E, p. 358).

Swearingen refused to give any further information concerning the Francke murder until she was assured that she would not be prosecuted as an accessory or accomplice to the murder. (Tr. 9337). On December 8, 1989, Collins negotiated an immunity agreement on Swearingen's behalf, in which the State agreed to prosecute Swearingen only for hindering prosecution in juvenile court in regards to her conduct on January 17, 1989, and to not seek remand of the charge to adult court. (Ex. 254).

After signing the immunity agreement, Swearingen initially recanted. During a series of polygraph examinations in January 1990—each of which was preceded by an explanation of her rights—Swearingen denied that she had seen anyone kill Francke.[70] (Pet. Ex. E, p. 361). Further, she claimed that she was not on hospital grounds at the time of the murder; claimed that she was at either the Hyacinth House or Cappie Harden's home at the time of the murder; and (inconsistently) that "she heard Shorty [Harden], Sam, and Gable were at the State Hospital grounds on the night of the murder." (Pet. Ex. E, pp. 361, 368, 371). At the conclusion of these polygraph examinations on January 19, 1990, the polygraph examiner told Swearingen that he knew when she left her parents' home for Salem and knew that she was at the Dome Building grounds when Francke was killed. (Pet. Ex. E, p. 372). Swearingen then gave a statement that was consistent with the statements that she had previously given to the employees at the Hillcrest School.

Swearingen stated that she went to the Dome Building with petitioner and Cappie Harden. (Pet. Ex. E, p. 372). She assumed that her job was to serve as a "lookout." (Pet. Ex. E,

---

[70] In the affidavit prepared by petitioner's defense team, Swearingen states that a police officer was "throwing things around" and was trying to intimidate her during an interview with police. (Pet. Ex. A, p. 23). Swearingen's self-serving report is the only evidence that such an incident occurred. Even in discussing the event with petitioner's defense investigators, however, Swearingen did not indicate that she was intimidated, stating: "He thought he was going to intimidate me. I was laughing at him." (Ex. 183, p. 64).

Page 117 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

p. 373).  She stated that petitioner was in the car, that the dome light to the car came on, and that "there was some fighting with a guy, and [petitioner] ran."  (Pet. Ex. E, p. 372).  She demonstrated how petitioner stabbed Francke, but "doesn't know how many times he (Gable) stabbed Francke."  (Pet. Ex. E, p. 372).  Swearingen stated that she and Cappie Harden left the Dome Building in Harden's car.  (Pet. Ex. E, p. 372).

To be sure, in subsequent interviews and polygraph examinations in the following weeks, some details of Swearingen's account would change, the most significant of which was Harden's level of involvement in the night's events.  Although she initially stated that Harden drove her and petitioner to the Dome Building, she later stated that Harden only picked her up at the Dome Building.  (Pet. Ex. E, pp. 382, 385).  At one point, she acknowledged that she "did not want to get Shorty [Harden] involved because he and I were there."  (Pet. Ex. E, p. 217).  That she was inconsistent as to other details of that night is not terribly surprising, given her stated desire to protect Harden, her heavy methamphetamine use, and the length of time that had elapsed since Francke's murder.  However, through her grand-jury testimony, Swearingen's account remained consistent in that she watched petitioner get into a confrontation with Francke on the Dome Building grounds, and that she and Harden quickly drove away after that confrontation as petitioner ran from the scene.  Those features of her account are consistent with the account she provided to the Hillcrest School employees—before she was ever subjected to a polygraph examination by police and when she had no apparent motive to lie.

Furthermore, after her Grand Jury testimony, Swearingen again indicated that she was at the scene of the crime.  In September 1990, Swearingen again absconded.  (Tr. 9353). Swearingen went to Colorado, where she stayed with her friend, George Russel Talley. (Tr. 9353).  While in Colorado, Swearingen admitted that she told Talley "that some hot shot got killed and that [she] witnessed it[.]"  (Tr. 9354).  Again, Swearingen had no apparent motive to lie to a private citizen in the State of Colorado.  Her acknowledged presence at the scene of the

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

murder is consistent with both her and her attorney's belief in the necessity of an immunity agreement.

That same month, September 1990, Swearingen again recanted her account in an interview with defense investigators. (Ex. 183, pp. 37-62). During that interview, Swearingen stated all of her previous statements to police had been lies. (Ex. 183, p. 48). Her recantation was not credible. When asked to explain why she had told those lies, Swearingen simply stated, "Because that's what everyone wanted me to do." (Ex. 183, p. 51). She refused to explain any further: "I don't want to go into [it] anymore because, I mean, all I want to do is say what needs to be said to let Frank Gable (sigh) off the hook and whatever, 'cause he didn't, he didn't do it." (Ex. 183, p. 51). She claimed she did not want to say "[m]ore than what needs to be said to let Frank Gable off." (Ex. 183, p. 51). When asked whether she had witnessed Francke's murder, Swearingen refused to answer: "No, I don't want to answer that." (Ex. 183, p. 56). Swearingen stated: "I just want to be left alone. That's all I want." (Ex. 183, p. 57).

As noted above, Swearingen later appeared at petitioner's trial as petitioner's witness and told the jury that her grand-jury testimony and all of her previous statements to police that implicated petitioner in the murder of Francke had been lies.

In her sworn affidavit, signed approximately twenty years later, Swearingen now states that she was actually with Tim "Rooster" Natividad on the night of Francke's murder. (Pet. Ex. A, p. 26). She states that he picked her up from the Hyacinth House, and that they went to Cappie Harden's house, where Natividad handed her a bag that she threw away in a dumpster.[71]

---

[71] This most recent account significantly differs from an account Swearingen gave to the *Portland Tribune* in 2005. In that account, she claimed Natividad drove with her to a parking lot near the Dome Building. The *Portland Tribune* reported:

> "According to Swearingen, Natividad left her in the car and walked toward the building. She said she lost sight of him, and he was gone for a long time. Suddenly, Swearingen said, Natividad came running back from the direction of the building with blood on his clothes.

> "'I could smell the blood,' [Swearingen] said."

(Ex. 394, p. 3). Of course, Swearingen did not report this version of events to police or to defense investigators after she recanted her statements implicating petitioner.

Page 119 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

(Pet. Ex. A, pp. 26-27). She states that she then returned to the Hyacinth House. (Pet. Ex. A, p. 27). However, even in her recantations to defense investigators, she did not claim she was with Natividad on the night of the murder. Instead, she claimed that she drove around Salem and did drugs with Harden on the night of the murder. (Ex. 183, p. 89, 97). Indeed, when defense investigators asked her whether she knew "Rooster," claiming that the newspapers had been "real hot" as to his involvement lately, Swearingen responded: "I don't know why you even bring that name up." (Ex. 183, p. 57-58).

If Swearingen were, in fact, with Natividad on the night of the murder, it is not clear why she would have hidden that fact from police and defense investigators. There would have been no need to protect Natividad, as he had died long before Swearingen was questioned in connection with the Francke investigation. Swearingen's belated claim that she was with Natividad on the night of the murder is simply not credible. *See Herrera*, 506 U.S. at 423 (O'Conner, J., concurring) (finding affidavits submitted on an actual-innocence claim unreliable, in part because "they conveniently blame a dead man—someone who will neither contest the allegations nor suffer punishment as a result of them.").

In short, before police ever subjected her to a polygraph, Swearingen made statements to employees at the Hillcrest School that petitioner was involved in Francke's murder and that she was present when it happened. Those statements were consistent with her attorney's desire to obtain an immunity agreement on her behalf. More importantly, those statements were consistent with other evidence in this case. The jury—which heard Swearingen recant—apparently did not find her recantation persuasive, and her latest claim that she was with Natividad on the night of the murder is not credible. Her affidavits presented in this proceeding are not new reliable evidence of petitioner's innocence, such that "no reasonable juror" would vote to convict.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

### 3.    Cappie Harden.

Next, petitioner presents an affidavit signed by Cappie "Shorty" Harden in February 2009, in which Harden claims that his testimony at trial was untrue, that he was at home on the night of the murder, that he was not a witness to the Francke murder, and that "after the police threatened me and my family I eventually adopted the false story to which I testified at Grand Jury and trial." (Pet. Ex. A, p. 19).

There is no record of Harden recanting his trial testimony until June 2005—approximately 14 years after the trial—when Harden told the *Portland Tribune* that his trial testimony was false. The *Portland Tribune* reported that prior to Harden's recantation, Harden was paid $1,000 by Michael Francke's brothers at a time when Harden was unemployed.[72] (Ex. 393, p. 3). The payment was facilitated by a man who ran a website "devoted to proving [petitioner's] innocence." (Ex. 393, p. 3). As discussed below, petitioner's recantation is not credible.

At trial, Harden testified that on the night of the Francke murder, Swearingen had called him to pick her up at the state-hospital grounds, which surround the Dome Building. (Tr. 6064). He said that he pulled into a parking lot at the Dome Building and waited a couple of minutes before Swearingen approached the car and got in. (Tr. 8065-66). After she got into the car, Harden stated that he "kind of bitched" at her for having him come pick her up. (Tr. 8066). While doing so, Harden noticed the interior light of a car parked at the Dome Building come on. (Tr. 8068). He then saw petitioner get into the car, and decided to "[s]tick around and see what [petitioner] was up to." (Tr. 8068). Petitioner closed the door behind him, and the interior light of the car went off. (Tr. 8069). He then saw another person, who "[l]ooked like a businessman[,]" approach the car. (Tr. 8069). Harden testified:

---

[72] The $1000 appears to have been influential. A month earlier, prior to receiving the $1000 payment, Harden refused to speak with *The Oregonian* about the Francke murder. *The Oregonian* reported in June 2005: "In May, [Harden] said [he] wouldn't talk because he was tired of being called a 'rat' for testifying against Gable. 'I don't want nothing to do with it,' he said." (Ex. 392, p. 3).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"He walked up to the car then and that's when I heard him yell, you know, 'Get out.'  'Hey, what are you doing in my car.'  And he started running towards the car."

(Tr. 8070).  After the man started yelling, Harden testified:  "That's when I seen [petitioner] come out of the car and stab the man one time in the chest.  And that's all I seen."  (Tr. 8070). Harden explained that he had not observed anything after the stabbing because he "was busy starting my car [a task accomplished by hot wiring it] and getting out of there."  (Tr. 8070).  He took Swearingen to his house, and told her "to shut up and forget what she ever seen." (Tr. 8071).

Petitioner argues that Harden's trial testimony should be rejected because Harden was inconsistent in his initial statements to police and his eventual testimony was coerced.  The record does not support petitioner's argument.

To be sure, when questioned by police, Harden initially attempted to deny and then downplay his involvement in the murder.  On November 20, 1989, Harden appears to have been asked general questions about both petitioner and Swearingen.  Harden acknowledged that he knew both petitioner and Swearingen, having seen them both at the Hyacinth House, but claimed he could not remember whether he had seen them together.  (Pet. Ex. E, p. 55).  On January 18, 1990, police questioned Harden again, this time more directly about the Francke murder.  Harden told police that Swearingen had "told him that she had seen Frank Gable kill someone and that she was scared[,]" but Harden denied that he was in any way involved.  (Pet. Ex. E, p. 59).

Two days later, on January 20, 1990, Harden submitted to his first polygraph examination, during which he denied that he participated in Francke's murder "in any way" or that he went to the State Hospital grounds with petitioner.  (Pet. Ex. E, p. 299-300).  After he was told that the polygraph examination indicated that he was deceptive in those responses, Harden began to cry and stated:  "Hey, dude, you're really scaring me."  (Pet. Ex. E, p. 300).  Following that polygraph examination, Harden told police the same basic account that he would later tell the jury.  That is, Harden told police that he went to the Dome Building to pick up Swearingen;

Page 122 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

while doing so, he saw petitioner enter a car in which the dome light came on; he saw a man dressed in business clothes approach the car; and he saw petitioner stab that man. (Pet. Ex. E, p. 60). That account is consistent with Swearingen's statements to the employees at Hillcrest School, including her statements that "Frank Gable killed Michael Francke[,]" and that she "was nearby, possibly in a car." (Tr. 9348).

As noted above, Harden claims in his affidavit that "after the police threatened me and my family I eventually adopted the false story to which I testified at Grand Jury and trial." (Pet. Ex. A, p. 19). Harden does not provide any detail as to the "threats" that the police allegedly made against him or his family, nor does the record disclose such threats. The record shows that, prior to submitting to a polygraph, Harden implicated both petitioner and Swearingen in a murder. Following a single polygraph examination, Harden admitted to his own involvement in the murder of Francke. As Harden explained at trial, at the time of his testimony, Harden did not have any charges pending against him, was not given any "deals" to testify, was not given any money by police, had retained his own private counsel, and did not have any agreement with the State in regards to any charges arising out of the Francke homicide. (Tr. 8072-76, 8146). Harden's belated claim that he was threatened by police is not credible.

Moreover, Harden's initial inconsistent statements to police are not new evidence in this proceeding. Indeed, Harden admitted to the jury that convicted petitioner that he had lied repeatedly when interviewed by police in November 1989 and January 1990. (Tr. 8072, 8124). Through extensive cross-examination, Harden's initial inconsistent statements to police were put on full display for the jury's consideration.[73] (*See generally* Tr. 8078-8145). Harden told the jury that he initially lied because he was "not a rat" and did not want to tell police that he was at the scene of a murder. (Tr. 8072, 8124). As Harden explained: "I had lied a lot about what I

---

[73] The jury was also able to consider the testimony of Harden's fellow inmates, who were called by the defense in an attempt to discredit Harden. To the extent that petitioner relies on that testimony, it is not "new evidence" for the purposes of an actual-innocence determination.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

did, but not about what I seen that night.  I did see Frank Gable stab Michael Francke."
(Tr. 8124).

As noted above, Harden first recanted his trial testimony in June 2005, approximately fourteen years after the trial, after receiving a $1000 payment.  Harden first told the *Portland Tribune* that he was replacing the transmission in a car on the night Francke was killed. (Ex. 393, p. 3).  A couple of weeks later, however, Harden's recantation changed.  Like Swearingen, Harden told the *Portland Tribune* a new story that suggested that Natividad had committed the murder.  (Ex. 394).  Harden stated that on the night of the murder, Natividad knocked on his window; asked to come inside Harden's apartment to clean himself; cleaned himself in a sink; asked for a bag to put some clothes in; and took that bag with him when he left. (Ex. 394, pp. 3-4).  Although Harden described Natividad as his "best friend," Harden did not ask Natividad any questions that night.  (Ex. 394, pp. 3-4).  Harden stated that he was never able to discuss the incident with Natividad because Natividad was killed shortly thereafter, on January 31, 1989.  (Ex. 394, p. 4).

If this story were true, it is not clear why Harden waited fourteen years to tell it.  There was no need to protect Natividad when Harden initially spoke with police because Natividad had already died.  More importantly, the story would have completely removed Harden from the scene of the crime, a result that Harden apparently desired.  Harden's belated claim that he was with Natividad on the night of the murder is simply not credible.

Under the circumstances, not all reasonable jurors would reject Harden's trial testimony—given under oath and subject to extensive cross examination—and instead credit Harden's belated recantation, first prompted by a $1000 payment.  Petitioner has failed to present new *reliable* evidence to make the truly extraordinary showing required to pass through the *Schlup* gateway.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

4.    **Earl Childers.**

Next, petitioner presents an affidavit that Earl Childers signed for the Federal Public

Defender.  (Pet. Ex. A, pp. 94-95).  Since signing that affidavit, however, Childers has since

explained, in a sworn affidavit, that the affidavit he signed for the Federal Public Defender does

not "accurately reflect[ ] my statements, recollections, or observations."  (Ex. 387, p. 2).

Childers explains that has his "memory was fresher when I testified, and I remember that I

testified truthfully."  (Ex. 387, p. 3).  Accordingly, Childers states:  "The testimony I gave under

oath at [petitioner's] trial was truthful and I stand by the testimony I gave under oath."  (Ex. 387,

p. 1).

As noted above, at trial, Childers testified that on the night of the murder, he saw

petitioner driving away from the state-hospital grounds with his sunglasses on in his distinctive

car, "a gold Supra with black louvers on the back window."[74]  (Tr. 7754-55, 7798-99).  Childers

stated that he attempted to flag petitioner down to trade some Dilaudids for methamphetamine,

but petitioner drove on.  (Tr. 7756).  When Childers later asked petitioner why he did not stop,

petitioner told Childers to "forget I ever saw him there.  Just forget it."  (Tr. 7757).  As noted

above, when petitioner was told by police that a person had seen him driving from the scene of

the murder, petitioner told police:  "Oh, Earle [Childers] told you that, didn't he."  (Tr. 7604).

When later asked how he picked Childers, petitioner responded:  "'Well, just lucky, I guess.'"

(Tr. 7613; Ex. 103).

During his trial testimony, Childers also described two detailed scenarios where

petitioner made incriminating statements.  Both scenarios described by Childers were consistent

---

[74] Petitioner argues that, based on "experiments" conducted by his investigators at the Federal
Public Defender's office, it would not have been possible for Childers to identify petitioner or his
car, the "gold Supra with the black louvers on the back window."  (CR. 74, p. 67).  Of course,
there are a number of variables that would impact a person's ability to identify a distinctive car at
night.  Petitioner has not offered any new evidence as to the conditions on January 17, 1989, that
would have impacted Childers ability to identify petitioner's car as he testified.  In any event,
petitioner's investigator stated that, under some circumstances, he was able to see the face of a
driver in a car that passed by and conceded that Childers could have identified petitioner's car if
he was looking intently at the car as it passed by.  (Pet. Ex. C, p. 79).

Page 125 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
       NMK/6912532-v1

with other evidence presented at trial.  First, Childers testified that petitioner, when told that Shelli Thomas's boyfriend was returning from California, stated that "if he had any problem with him he would just stick him[,]" explaining that "it won't be the first time."  (Tr. 7759). Thomas's boyfriend testified for the defense that he returned from California sometime in March 1989.  (Tr. 8846-47).

Second, Childers testified that in July 1989 he walked away from a minimum-security release center and went to the home of Gesner.  He stated that petitioner arrived at Gesner's home while Childers was there, and that they discussed how petitioner had been questioned by police in connection with the Francke murder:

> "We just kind of bantered it back and forth while we were waiting for [Gesner].
> And at one point when I came out of the bathroom after doing the crank I asked
> him if he had done it, and he just kind of gave me a smile he gets on his face and
> didn't say yes or no, kind of insinuated more yes than more not—no,"

(Tr. 7765).  Later, after Gesner arrived home, they all walked to a house they believed to be "ripe for a burglary[.]"  (Tr. 7765).  They decided not to burglarize the home.  After they returned to Gesner's home, Childers stated that he had asked petitioner if he could borrow some clothes. (Tr. 7766).  As he and petitioner walked to petitioner's apartment to get the clothes, petitioner admitted that he had killed Francke because he got caught breaking into Francke's car:

> "We just kind of talked about things and the subject came up again about the—the
> Francke killing, and we bantered it back and forth and I asked him again if he did
> it and he told me he had done it.  He said that he killed him.  And I asked him,
> well, why?  And he said that he was burglarizing the car, going through some cars
> and he was in Francke's and he got caught and he ended up sticking the guy.  And
> I told him, I said, you're shitting me, you stuck him over a car burglary?  He said
> he was going to take me in and I didn't want to go back to prison."

(Tr. 7767).  In a recent affidavit, Childers states that although he no longer recalls the precise details of his conversation with petitioner, Childers recalls that petitioner told him why he had killed Francke while Childers was on escape status and staying at the home of Gesner.  (Ex. 387, pp. 2-3).

Gesner confirmed the scenario described by Childers in which they all walked to a house they were considering burglarizing.  (Tr. 7998).  During the walk to the house, Gesner stated that

NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

he asked petitioner about the bag that petitioner had left at his house on the night of the murder, and petitioner admitted to him that he had killed Francke:

> "We were basically talking about this house going there, but in the course of the conversation I think I brought up, well, what was in the bag? You said you would tell me later. And he said it was the stuff that I was wearing the night of the murder. And I said what murder? And he said the Michael Francke murder. And I dropped it right there because then [Gesner's girlfriend] and [Childers] were starting to get close enough they could hear us talking again, so I stopped talking about it."

(Tr. 7999). Gesner has never recanted his testimony. Indeed, in 2005, Gesner told *The Oregonian* that "he stood by his testimony." (Ex. 391, p. 14). He recently told respondent's investigator that he continues to stand by his testimony. (Ex. 389, p. 2).

Furthermore, as noted above, petitioner confirmed the scenario that both Childers and Gesner described. Petitioner told police that after Childers had walked away from the minimum-security release center, he had met Childers at Gesner's home. (Tr. 7605). Petitioner confirmed that they had walked to a home they were considering burglarizing. (Tr. 7606). After returning to Gesner's house, petitioner confirmed that he and Childers walked to petitioner's home to get clothing for Childers. (Tr. 7607). In short, petitioner essentially described the same scenario to police as both Childers and Gesner described in their testimony. Of course, petitioner denied that he admitted to killing Francke, but both Childers and Gesner, in their sworn testimony, recalled that petitioner had made such statements during a meeting that petitioner independently confirmed.

Petitioner contends that Childers' testimony was coerced by police. (CR 74, pp. 67-68). Childers refutes that contention in a recent affidavit: "I was pressed by police during interviews, but no more so than during any other interview I had ever been subjected to. The officers wanted to talk to me about what I knew. I did not alter or omit any facts during [the] interview because of police pressure, and the information I ultimately provided was truthful." (Ex. 387, p. 3). To be sure, Childers did not initially tell police about petitioner's admissions. However, that is not new evidence. That evidence was presented to the jury. Moreover, Childers

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

explained to both the police and jury why he initially declined to tell police about petitioner's admissions. Childers was incarcerated when first questioned by police, wanted to avoid being labeled a snitch, had received threats, and had been in an altercation with a person accusing him of being a snitch. (Tr. 7770-71, 7777; Pet Ex. E, pp. 28-33). As Childers explained, inmates "take a very hard attitude towards anyone that they believe is a snitch. There are times where they will stab them, beat them up, they will make them kind of like an outsider in the institution, go very hard on them." (Tr. 7770).

Petitioner also contends that Childers testimony was not credible because of "the extent of the benefits he was receiving for his testimony." (CR 74, p. 68). Again, this is not new evidence. That evidence was presented to the jury as well, and, as discussed during his testimony, any benefit that Childers received was minimal.[75] (Tr. 7774-80).

In sum, Childers observed petitioner leaving the scene of the murder, and Gable later told Childers why he killed Francke. That is powerful evidence of petitioner's guilt. As discussed above, the scenario in which petitioner admitted his guilt to Childers was corroborated by Gesner's testimony, as well as petitioner's own statements to police. Neither Gesner nor Childers have recanted the testimony. Far from calling petitioner's guilt into question such that "no reasonable juror" would vote to convict him, Childers testimony, buttressed by the testimony of Gesner, precludes a finding that petitioner is actually innocent.

---

[75] Petitioner contends that Larry Kirkland provides new evidence of the benefits that Childers received for his testimony. (CR 74, p. 69). Petitioner cites an investigative report prepared by petitioner's defense in which Kirkland purportedly stated that Childers told him "all charges" would be dropped if Childers testified at grand jury. Kirkland does not reference any specific charges and his claim is inconsistent with the record. To the contrary, after Childers cooperated with police, his probation was revoked and he was convicted of an additional crime. (Tr. 7795-96). Moreover, even in the investigative report, Kirkland is not presented as a disinterested witness. Kirkland stated that he was "acquainted with [petitioner] in the Oregon State Penitentiary" and that he does not believe that petitioner killed Francke because "he believes that [petitioner] lacked the homicidal nature to kill someone." (Pet. Ex. G, p. 31).

Page 128 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

### 5.    John Kevin Walker.

Next, petitioner points to a 1993 interview of John Kevin Walker, conducted by an investigator who had been hired by petitioner's then-wife, Karen Steele.  (Pet. Ex. A, pp. 40-78). The interview was conducted over the telephone and was not for the purpose of any pending legal proceeding.  Of course, it was not under oath.  Petitioner contends that the interview demonstrates that petitioner never admitted to Walker that he killed Francke.  However, as noted above, in 2005, Walker told *The Oregonian* that he was a heavy methamphetamine user at the time of that telephone interview; that he could not remember making the statements he made in that interview; and that statements he made in that interview were not true.  (Ex. 391, p. 14). Contrary to petitioner's argument, not all reasonable jurors would credit Walker's statements in a telephone interview that Walker has since discounted, as opposed to the testimony that Walker gave at trial, under oath and subject to cross examination.

At trial, Walker testified that on the night of the murder, January 17, 1989, he attended his brother's birthday party in Corvallis, and then drove to Salem.  (Tr. 8166).  He stated that he did not arrive in Salem until 8:00 or 9:00 PM.  (Tr. 8165).  He went to a friend's house on Waller Street.  (Tr. 8167).  As he was leaving that friend's house, he stated that he turned on his police scanner and heard about "some stuff go[ing] down over by the State Hospital grounds[.]"  (Tr. 8167-69).  He then went to another friend's house and continued to listen to the police activity on the scanner, before driving back to Corvallis.  (Tr. 8169).  The next day, January 18, 1989, Walker testified that he went to petitioner's apartment to sell him some methamphetamine.  Once in petitioner's bedroom to conduct the transaction, Walker testified to the following exchange:

> "[Petitioner] asked me if I had heard the news, and I said what news?  And he said, 'About that guy over there at the State Hospital grounds.'  And I said, 'Yeah, he got shot or something.'  And [petitioner] said, 'Well, that's not exactly what happened, but it's close enough.  I stuck him.'"

(Tr. 8173).

Page 129 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In his 1993 interview with the investigator, Walker stated that he fabricated his brother's birthday party and petitioner's admissions concerning the Francke murder, at one point telling the investigator, "Pretty good imagination, huh?"[76]  (Pet. Ex. A, p. 71).

Petitioner notes that Walker did not initially implicate petitioner in Francke's murder when he was first questioned by police, but argues that Walker later fabricated petitioner's involvement due to police coercion.  (CR 74, p. 68-72).  However, during the course of his testimony, Walker explained why he did not initially implicate petitioner.  He explained that he did not initially tell police about petitioner's statements because "the rat jacket gets attached any time you talk to the police about anything."  (Tr. 8179).  In Walker's case, that concern was founded.  After Walker eventually cooperated with police, he was "labeled a rat" and was assaulted while incarcerated, resulting in a "broken cheek bone" and a "broken eye bone" that required surgical repair.  (Tr. 8182, 8203).

Even in the 1993 interview, being labeled a "rat" was Walker's overriding concern.  When asked whether he was threatened by the State with prosecution for other crimes or revocation of his parole, Walker denied the State had threatened him, explaining:

> "So, no, I was never threatened with revocation or anything like that, but by the same token, I'd already been assaulted once; had my orbital—my left orbital—fractured, and my zygoma—which is my cheekbone—fractured in two places, um, I'd been in the paper <u>numerous</u> times, um with false quotes by Steven Jackson, and, all I needed to do was go back to the penitentiary, and, hmh, you know, I might as well just slice my own <u>throat</u>."

(Pet. Ex. A, p. 55) (emphasis in original).

As evidence of police coercion, petitioner relies almost exclusively on the statements that Walker made in his 1993 interview.  Even in that interview, however, Walker does not state that police made any explicit threats, instead contending that the alleged threats were implied.  (Pet. Ex. A, p. 46).  In any event, as discussed above, even Walker has discounted statements he gave

---

[76] Walker's claim that he fabricated his brother's birthday party conflicts with petitioner's testimony at the post-conviction trial, where petitioner recalled that Walker was indeed at a sibling's birthday party on the night of the murder.  (Ex. 253, p. 9).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

during that interview, explaining that he was a heavy methamphetamine user at the time, such that he did not even remember the interview.  (Ex. 391, p. 14).

Walker was not given any benefits for his testimony either.  As Walker testified:  "I got no deals.  No consideration."  (Tr. 8183).  Even in the 1993 interview, Walker stated:  "No consideration, no promises of a reward, no promises of leniency in a sentence, um, in fact they made sure that I had got my sentence . . . . I was <u>sentenced before</u> the trial."  (Pet. Ex. A, p. 73) (emphasis in original).

Petitioner argues that Walker implicated petitioner in Francke's murder because Walker learned that petitioner had "snitched" on him, resulting in an arrest.  However, Walker's trial testimony clearly indicates that was not Walker's motivation.  Walker had told police about petitioner's statements concerning the Francke murder before petitioner had been indicted on the murder charges in April 1990.  (Ex. 103).  However, when Walker testified, he could not recall whether he learned that petitioner had worked with the Keizer Police Department before or after petitioner had been indicted on the murder charges.  (Tr. 8200).  Thus, Walker necessarily did not know whether he was even aware that petitioner was a "snitch" before he relayed petitioner's statements concerning the Francke murder to police.  Walker's testimony belies petitioner's contention that Walker implicated him in because petitioner was a "rat" who had worked with the Keizer Police Department.

In short, the interview upon which petitioner relies was conducted by an investigator that had been hired by petitioner's then-wife, and Walker has since rejected statements he gave in that interview, explaining that he could not remember giving the interview and was a heavy methamphetamine user at the time.  Under these circumstances, not all reasonable jurors would reject the testimony that Walker provided under oath and instead place weight on a telephone interview that petitioner gave after the trial, unconnected to any legal proceeding and not subject to any cross examination.  The interview that petitioner offers fails to make the "truly extraordinary" showing that must be demonstrated to pass through the actual innocence gateway.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

###### 6.    Dan Walsh.

Next, petitioner submits an affidavit signed by Dan Walsh, in which Walsh contends that petitioner "never confessed to me." (Pet. Ex. A, p. 81). However, at trial, Walsh described two detailed scenarios in which petitioner confessed to the murder. In his affidavit, Walsh does not contend that the first scenario he described was false, but instead states that he believes petitioner was joking when petitioner stated he had killed someone and—contrary to his trial testimony— says that petitioner never mentioned Francke. Walsh does contend that the second detailed scenario he described during his testimony was a lie, apparently asserting that he made it up out of whole cloth. It is simply not credible that the second detailed scenario Walsh described during his testimony is a complete fabrication, wholly created by Walsh's imagination.

At trial, Walsh testified that in February or March 1989, he was sticking a knife into a tree. (7934). Petitioner told Walsh that he had killed Francke with the knife. (Tr. 7934). Walsh told the jury: "I just kind of laughed because he was pretty strung on drugs then and stuff, and so was I, and I didn't pay any attention about it really all that much." (Tr. 7934). As noted above, Walsh confirms this account in his affidavit, again stating that he believed petitioner was joking. However, petitioner now states that petitioner merely told him that he had killed "someone" with the knife. (Pet. Ex. A, p. 81).

Walsh also testified that petitioner told him a second time that he had killed Francke. After permitting petitioner and his wife (Vierra) to move into his apartment, petitioner described to Walsh an argument he was having with Doug Scritchfield, a known associate of petitioner. (Tr. 7936). Walsh testified:

> "[Walsh]: [I]n the process of while he was staying at my house him and Doug Scritchfield were arguing and fighting back and forth. I guess Doug had shot at Franck, called Frank a snitch and a rat, and Frank had made a comment about killing Doug. I just kind of snickered about it at the moment and stuff and he went to, 'Well, you remember Michael Francke,' were his exact words, and I just kind of tried not even paying attention to him, you know, I just pretty well much was on drugs and stuff, went into about how he went about killing him and stuff.
>
> "[Prosecutor]: What did he tell you?

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"[Walsh]:  He said that that is what would happen to Doug Scritchfield.  He had said that he had been jockey-boxing and the car had the car door open, and that he was laying across the seat and that Mr. Francke come up along to—up on him, and he had lunged out into Mr. Francke.  Didn't say whether he was out of the car or in the car, lunged into his body and stuff stabbing him repeatedly and that he had fled across the parking lot.  And then he jumped—came in with the threat again towards my family—

"[Prosecutor]:  What did he say to you?

"[Walsh]:  And myself.  He said if you ever—he grabbed me by the chin and said if you ever say a word of this to anybody, I'll kill you and your family."

(Tr. 7936-37).  In his affidavit, Walsh apparently contends that the entire scenario he described during his trial testimony was a product of his imagination.

Petitioner argues that Walsh was truthful when he told police in September 1989 that he had no information concerning the Francke murder, and that he was coerced in March 1990 into telling police about the scenarios he eventually described at trial over a year later.  However, when Walsh was interviewed in March 1990, he was not asked about the scenarios he eventually described to police.  Of course, those scenarios were unknown to police until Walsh described them.  Instead, Walsh was initially interviewed in March 1990 concerning petitioner's conduct prior to Francke's death.  Walsh recalled an incident in which petitioner arrived at an apartment, started waving an assault rifle around, and ranting that he was going to kill someone.  (Pet. Ex. E, p. 270).  According to Walsh, petitioner "did not say who he wanted to kill, only that it was someone important."  (Pet. Ex. E, p. 270).  Walsh was polygraphed, and was found to be untruthful when he denied that petitioner had "ever use[d] the name Michael Francke in relation to killing someone[.]"  (Pet. Ex. E, p. 416).  After that polygraph, Walsh described the scenarios that he would later describe in his trial testimony.  (Pet. Ex. E, p. 276-77).  Thus, those scenarios were not pried from Walsh; they were offered in response to a single failed polygraph concerning an incident that was completely unrelated to his eventual testimony.

At trial, Walsh explained why he did not initially tell police about petitioner's incriminating statements, explaining that he feared for his family and "didn't want to have a snitch jacket on me."  (Tr. 7938).  Walsh further explained that, since he had initially spoken to

Page 133 -RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

police in September 1989, he had moved to Ohio and was no longer living with the drug

community with which he had associated in the past. (Tr. 7939).

In his affidavit, Walsh now claims that he "received benefits" for his testimony, noting

that the State paid for his transport from Ohio to Oregon. (Pet. Ex. A, p. 81). That is not new

evidence, as he testified to that fact before the jury. (Tr. 7940). Walsh also now claims that he

"was given immunity for past and present crimes; and the charges pending against me in Ohio

went away." (Pet. Ex. A, p. 81). However, petitioner has presented no evidence that Walsh had

any pending charges, in Oregon or Ohio, and respondent is unaware of any such charges.[77] At

trial, Walsh testified that police had not threatened him or promised him anything in exchange

for his testimony. (Tr. 7939). Instead, Walsh testified that he had come forward because "I feel

that, you know, somebody's going to go out and kill somebody should pay for their debt to

society." (Tr. 7939).

Walsh's affidavit, signed over twenty years after his testimony, is also not credible

because in interviews with respondent's investigator, Walsh demonstrated that he had very little

memory as to what actually occurred at the time of trial. *See Jones*, 763 F.3d at 1248 (noting

that "'[r]ecanting testimony is easy to find but difficult to confirm or refute'" because

"'witnesses forget, witnesses disappear, [and] witnesses with personal motives change their

stories many times, before and after trial.'") (quoting *Carriger*, 132 F.3d at 483 (Kosinski, J.,

dissenting)). Walsh told respondent's investigator that he did not recall being called to testify by

the State. Instead, he claimed that he was only called to testify by petitioner's defense counsel,

and was only asked three questions. When confronted with the trial transcripts, Walsh

responded: "I don't know who typed that or how it got there, I'm just saying it never happened

and I answered three questions." (Ex. 390, p. 4).

---

[77] Even if Walsh had been charged in Ohio with some crime, it is unclear how Oregon
prosecutors could provide any "benefits" with respect to those charges.

Page 134 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In short, it is simply not credible that the detailed scenario that Walsh described in his testimony was a complete fabrication that sprung from Walsh's imagination. All reasonable jurors would not reject Walsh's trial testimony, and instead credit Walsh's affidavit signed over twenty years later, at a time when Walsh apparently has very little memory of the events at issue. *Cf. Jones*, 763 F.3d at 1250 ("A reasonable juror could very well believe that [the victim's] memory of the abuse faded or changed in the more than thirteen years since the incident occurred and, for that reason, credit the testimony that was closer in time to the abuse.").

### 7.    Randy Studer and Teresa Ross.

Next, petitioner presents affidavits of Randy Studer and Teresa Ross, contending that those affidavits "fatally undermine" the testimony of Linda Perkins. (CR 74, p. 79). Petitioner is incorrect.

As noted above, Perkins testified that she drove her daughter, Teresa Ross, to work each morning from the apartment that Ross shared with her live-in boyfriend, Randy Studer (i.e., petitioner's brother-in-law). (Tr. 7949). Perkins recalled that on January 18, 1989, when she was picking up Ross for work, petitioner arrived at the apartment, appearing "extremely nervous." (Tr. 7950-51). Perkins explained: "[H]e was shakey, just jerking, and nervous acting. And kept looking out the window like every sound he heard or even in between sounds that he heard, he kept looking out the window as if—I got the impression he was afraid someone was chasing him or following him." (Tr. 7951). Ross asked petitioner what was wrong, and petitioner responded, "'Nothing.'" (Tr. 7952). When Ross persisted, petitioner responded: "'I fucked up. . . . I fucked up big time this time.'" (Tr. 7952). When Perkins asked petitioner what he meant, petitioner responded: "'Well, I'll put it you like this, you will be reading about it in the papers.'" (Tr. 7952).

Later that morning, as she drove Ross to work, Perkins heard on the radio that Francke's body had been discovered. (Tr. 7953). When Perkins wondered whether petitioner had been talking about Francke, Ross discounted that possibility, telling Perkins that petitioner was "full

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

of bullshit." (Tr. 7967-68). However, several months later, in October 1989, when Perkins

visited Ross in a drug-treatment facility, Ross showed her a newspaper article indicating that

Gable had been questioned in connection with the Francke murder. Perkins explained:

> "I went up for a visit with my daughter [i.e., Ross] and she had—she had the
> paper and she was looking at it and I overheard her say something to someone
> about having known him. And I said who is he, and she said, well that's Randy
> [Studer]'s brother-in-law and that's when it all clinked. I realized then that I
> knew him."

(Tr. 7967).

In an attempt to discredit that testimony, petitioner has presented the affidavit of Studer,

in which Studer claims, among other things, that petitioner never confessed to a murder and that

"Ms. Perkins was not in my home that day." (Pet. Ex. A, p. 30). He has also presented the

affidavit of Teresa Ross, in which she claims that Perkins "never heard Frank Gable confess to

the murder of Michael Francke. She got involved because she likes to have her name in the

limelight." (Pet. Ex. A, p. 33). Those affidavits are not credible in light of the record.

Studer was first questioned by police in connection with the Francke investigation on

September 18, 1989. (Pet. Ex. E, pp. 152-55). During this interview, Studer stated that

petitioner's friend "Doug" had told him "that he (Doug) had something to do with the guy that

was killed downtown." [78] (Pet. Ex. E, p. 154). Studer also noted that petitioner possessed a

number of different firearms and that "Janyne Gable had told him that [petitioner] had hurt a lot

of people and that he (Studer) was also afraid of [petitioner] and that [petitioner] would come

back on him." (Pet. Ex. E, p. 154).

A few weeks later, on October 9, 1989, Perkins reported petitioner's incriminating

statements to police. (Pet. Ex. E, pp. 99, 152-55). Thus, in Studer's initial interview, police

---

[78] On September 25, 1989, shortly after police initially questioned Studer, an inmate, Montana
Wayne Carver, reported to police that Studer had told Carver that "Frank [Gable] had bragged
one time when they were high on crank that he had killed Francke." (Ex. 302, p. 33). According
to Carver, Studer "said that another guy named Doug was also involved[,]" but that Studer "said
he wasn't going to snitch off his brother-in-law." (*Id.*). Carver subsequently submitted to a
polygraph, which determined that Carver was being truthful. (Ex. 303, pp. 460-61).

Page 136 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

would not have questioned Studer as to petitioner's statements in Studer's apartment on the morning of January 18, 1989, because police did not yet know about them.

After speaking with Perkins, the police interviewed Ross. (Pet. Ex. E, p. 156-60). Ross told police that petitioner had been her "dope supplier." (Pet. Ex. E, p. 119). She stated that during early 1989, she was "high all the time[,]" explaining that "[s]ometimes I'd go on 6 day runs or, I think the longest run I went on was a 12 day run with no sleep." (Pet. Ex. E, p. 121). Although Ross had trouble recalling the precise day, she recalled that in mid-January 1989, petitioner arrived at her apartment, but that her mother arrived at her apartment to take her to work before she could get drugs from petitioner. (Pet. Ex. E, p. 129). Ross stated that she thought petitioner was "real hyped" on that day. (Pet. Ex. E, p. 129). She also remembered that petitioner called her mother at one point and had said "he was going to kill my whole God-damned family and I called him back and told him bullshit." (Pet. Ex. E, p. 139).

On October 10, 1989, the day after Perkins reported petitioner's statements to police, the police interviewed Studer again. (Pet. Ex. E, p. 156-60). Studer recalled that in January 1989, he "wanted to get some dope[,]" and called petitioner. He recalled that petitioner came by one time early in the morning, explaining that petitioner "looked like he'd been up all night." (Pet. Ex. E, p. 159). Studer said that petitioner "was paranoid that morning but it's more noticeable when you're not high and someone else is." (Pet. Ex. E, p. 159). Studer stated, "I don't remember [petitioner] saying anything about the Francke murder or him saying anything about screwing up and that you'd read about it in the newspaper." (Pet. Ex. E, p. 159-60). However, Studer did state that he remembered Perkins was there that morning, explaining: "I know Teresa [Ross]'s mother was there because I remember her waking Teresa up that day." (Pet. Ex. E, p. 159).

Thus, although neither Ross nor Studer initially confirmed Perkins's account as to petitioner's incriminating statements, they immediately confirmed the scenario in which those statements were made. That is, they both recalled a morning in January 1989 when petitioner

Page 137 -RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

arrived early in the morning to sell them drugs while Perkins was present.  When they confirmed the scenario, they had not yet submitted to a polygraph.  Of course, Studer's early confirmation of the scenario in which petitioner's incriminating statements were made is at odds with the affidavit Studer signed over 20 years later, in which he contends, "Ms. Perkins was not in my home that day."  (Pet. Ex. A, p. 30).

The next day, October 11, 1989, Studer submitted to a polygraph after being advised of his *Miranda* rights.  The polygraph concluded that Studer was truthful when he denied that he was involved in the Francke murder, but concluded that he was untruthful when he denied that petitioner had told him he was responsible for Francke's death.  (Pet. Ex. E, p. 337).  Studer then stated that petitioner "may have told me he fucked up, but I didn't associate it with Francke's death."  (Pet. Ex. E, p. 337).  In the end, he deferred to the recollection of Ross and Perkins:  "If Theresa and her mother say [petitioner] told me that, then he did say that."  (Pet. Ex. E, p. 337).  He recalled that he and petitioner injected methamphetamine after Ross and Perkins left.  (Pet. Ex. E, p. 158).

Over the course of the next several months, the police continued to interview and polygraph Studer.  During each of those sessions, Studer's attorney was present with him.  On February 12, 1990, Ross told police that on the morning that petitioner came to their house, he stated:  "I fucked up, I've done all the time I'm going to do.  I'm not going back in (prison)."  (Pet. Ex. E, p. 142).  Shortly thereafter, on February 28, 1990, Studer told police that, consistent with his previous statements, petitioner came to his apartment while Perkins was there to pick up Ross for work.  (Pet. Ex. E, p. 162).  However, in this account, Studer told police that after petitioner spoke with Perkins and Ross in the living room for about five minutes, he came into the bedroom and told Studer:  "I really fucked up."  According to Studer, petitioner stated that he was "out with a couple of friends last night" and explained:  "I really fucked up bad last night.  I killed someone."  (Pet. Ex. E, p. 163).  Studer stated that he and petitioner then injected methamphetamine before petitioner left.  (Pet. Ex. E, p. 163).

Page 138 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Over a year later, after Studer had testified before the grand jury that indicted petitioner, Studer recanted his statements to police.  (Pet. Ex. E, p. 440-45).  In his recantation, Studer said that he had lied to police, and that petitioner had never made the statements that Studer had earlier attributed to him.  The detective interviewing Studer wrote:

> "I asked [Studer] if he remembered that he had been under oath in front of the Grand Jury with those statements and he stated that he did, but again that he had done it because his girlfriend's mother [i.e., Perkins] had given those statements and passed a polygraph regarding it."[79]

(Pet. Ex. E, p. 442).  It should be noted that, even in his recantation, Studer confirmed the scenario in which Perkins heard petitioner's incriminating statements, acknowledging that Perkins was at his apartment one morning when petitioner arrived to deliver drugs.  (Pet. Ex. E, pp. 442-43).  Thus, the affidavit presented in this proceeding, in which Studer avers that "Ms. Perkins was not in my home that day[,]" is inconsistent with his own previous recantation. (Pet. Ex. A, p. 30).

During his recantation, Studor acknowledged that he had spoken with petitioner at the Marion County Correctional Facility on "a couple of occasions," but stated that petitioner never asked him to change his statement to police.  (Pet. Ex. E, p. 441).  Studer stated that he was not afraid of petitioner and "that he only wanted out of jail and did not want to be involved in this case anymore."  (Pet. Ex. E, p. 445).  A subsequent polygraph concluded that Studer was untruthful in his claims that petitioner had not made the incriminating statements that Studer had previously attributed to him and that petitioner had not asked him to change his statements to police when they communicated on "a couple of occasions" while incarcerated.  (Pet. Ex. E, p. 444).

---

[79] For the first time, over twenty years later, Studer claims that he falsely attributed statements to petitioner because he had been charged with a "serious offense."  (Pet. Ex. A, p. 30).  To be sure, Ross had reported to police that both she and Studer had sexually abused Ross's son.  (Ex. 303, p. 466).  However, petitioner cites no evidence in the record, other than Studer's affidavit, that Studer was given a favorable sentence for that sexual abuse in exchange for the statements that he ultimately gave to police regarding petitioner.

NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Unlike Studer, Ross never recanted her statements to police, until she arguably did so in her affidavit submitted in this proceeding, over twenty years later.

In sum, Studer and Ross immediately confirmed the scenario under which Perkins heard petitioner make incriminating statements before they had ever been polygraphed. They subsequently confirmed that petitioner made incriminating statements that morning. After providing sworn testimony to the Grand Jury, Studer recanted. *See Jones*, 763 F.3d at 1248 (noting that "'[r]ecanting testimony is easy to find but difficult to confirm or refute'" because "'witnesses with personal motives change their stories many times, before and after trial.'") (quoting *Carriger*, 132 F.3d at 483 (Kosinski, J., dissenting)).

The fact that Studer and Ross—both former methamphetamine-using associates of petitioner—have again changed their accounts, does not diminish the credibility of Perkins' consistent account. Even over twenty years later, Perkins remains consistent, submitting an affidavit in this proceeding, which states in part:

> "I contacted police because I know what I overheard Frank Gable say in my daughter's residence. I understand that when talking with police, my daughter and her ex-boyfriend, Randy Studer, gave inconsistent accounts as to what Frank Gable said that morning. I don't know why they gave inconsistent accounts. I only know that they were both involved with drugs at the time, and that they were both friends with Frank Gable. Despite the inconsistent accounts provided by my daughter and Randy Studer, I stand by the testimony I gave under oath.
>
> "I have received pressure from my daughter to sign an affidavit saying that my testimony at Frank Gable's trial was not true. I will not do so because I testified truthfully at Frank Gable's trial."

(Ex. 388).

Under these circumstances, not all reasonable jurors would reject the consistent account of Perkins that she provided under oath and subject to cross examination, and instead credit the affidavits of Ross and Studer, submitted over twenty years later after providing a series of inconsistent statements to police.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

8.    **Michael Keerins.**

Petitioner presents an affidavit signed in 2012 by Michael Keerins, a person that implicated petitioner in statements to police, but was not called to testify at trial.  In the affidavit, Keerins claims that he lied when he told police that petitioner had stated that he had killed Francke while they were housed together in the Marion County Jail.  (Pet. Ex. A, p. 97).  The fact that Keerins, a person who never testified at trial, now recants statements he made to police over 20 years earlier is not new reliable evidence upon which no reasonable juror would vote to convict petitioner in light of the existing record.

On September 19, 1989, Keerins reported to police that when he had been incarcerated with petitioner earlier in the year, petitioner had admitted to him that he had killed Francke.[80] (Ex. 299, p. 79).  According to Keerins, petitioner stated that he was breaking into Francke's car, that Francke had grabbed him, that he "had to stick him and get the fuck out of there."  (Ex. 299, p. 79).  Keerins explained that, while incarcerated, petitioner was worried that his wife, Vierra, would tell the police of his involvement in the Francke murder, noting that "he told me about his old lady going to attempt to threaten to tell on him one time and he beat her up; said he broke her arm or something."[81]  (Ex. 299, p. 79; Pet Ex. E, p. 93).  Keerins also believed that he overheard a phone call that petitioner had with Vierra in which he "accus[ed] her of maybe telling on him on the Michael Francke murder."  (Pet. Ex. A, p. 92).  After being questioned by police, Keerins wrote out a signed statement, in which he stated that petitioner "went on to tell me he had fought

---

[80] Before Keerins came forward with information on the Francke murder, petitioner appears to have expressed concern that Keerins would do so.  During early questioning of petitioner concerning the Francke murder on September 15, 1989, petitioner stated:  "I bet this shit is coming from Mike Kearns, Mike was bragging about it, you know, saying shit like 'The fucking punk got what he deserved.'"  (Pet. Ex. E, p. 14).

[81] During his interviews with police, petitioner consistently expressed his concern that Vierra had implicated him in Francke's murder.  (Tr. 7293, 7470, 7512, 7575; Ex. 304, pp. 51, 61).  In that respect, Keerins's statements to police are consistent with the record.  As noted above, Vierra stated that after petitioner broke her arm, "[petitioner] apologized and told me that I did not understand the pressure he was under.  [Petitioner] started crying and told me:  'I stuck the guy.' I then asked [petitioner]:  'What guy?'  [Petitioner] then responded:  'The guy at the hospital.'" (Ex. 391, p. 10).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and stabbed Michael Francke." (Ex. 299, p. 125). Keerins submitted to a polygraph, which concluded that Keerins had been truthful in his written statement. (Ex. 299, pp. 126-28).

At the end of September 1989, Phillip Stanford with *The Oregonian* wrote Keerins a letter, asking Keerins to contact him. (Ex. 299, p. 151). Keerins told police that he called Stanford back in early October 1989, and Stanford assured Keerins that he would not put anything Keerins said in the newspaper, explaining that he was writing a book and that some movie producers were going to write a movie. (Ex. 299, pp. 144-48) Stanford asked him whether the Francke murder had "to do with Corrections people and stuff." (Ex. 299, p. 145). Keerins told Stanford that it did not have to do with "Corrections people," but confirmed that petitioner had stabbed Francke after petitioner had broken into Francke's car. (Ex. 299, p. 145). Stanford then told Keerins that he was going to report Keerins' account in the paper, and Keerins responded: "If you put it in the paper, I'm going to get killed over this."[82] (Ex. 299, p. 148). Keerins then reported his concerns to police, stating "[t]his guy's going to get me killed if he puts it in the paper." (Ex. 299, pp. 145).

Despite his concerns, Keerins did not waver in his account over the course of the next year. In January 1990, he again confirmed his statement to police. (Ex. 300, p. 607). In September 1990, he said that petitioner confronted him while in jail and told him that he had all of the witness's addresses, that there are people waiting on the streets, and that "we got someone to get you." (Ex. 300, pp. 677-78). According to Keerins, petitioner told him "he had some guy name Pete take out Walker and it was not a horseshoe but a fist." (Ex. 300, p. 678). As noted above, Walker was assaulted in jail because he was "labeled a rat," resulting in a "broken cheek bone" and a "broken eye bone" that required surgical repair. (Tr. 8182, 8203). In December

---

[82] Publicity of Keerins' account apparently even had a negative impact on his relationship with his own brother. Shortly after the newspaper reported on Keerins' account, Keerins' girlfriend wrote to his brother: "Mike needs you guys. Everyone else has ran out on him. He is your brother even though he snitched, but even our mom says [petitioner] was working for the Keizer P.O." (Ex. 199, p. 201). Keerins attempted to explain why he cooperated with police, writing to his brother that "the guy told me he killed Francke, and that's what I told them[.]" (Ex. 299, p. 203).

Page 142 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

1990, Keerins was interviewed by defense investigators and again stated that petitioner told him that he was in Francke's car, that Francke came up behind petitioner, and that petitioner "then grabbed his knife and stabbed the guy and took off running."  (Ex. 271).

Thus, the evidence related to Keerins demonstrates that, in the same year that Francke was killed, yet another person stated that petitioner admitted to killing Francke during the course of a car burglary.  As demonstrated above, his account is consistent with other evidence in this case.  There is no evidence that Keerins was coerced into making that statement, and a polygraph examination showed Keerins to be telling the truth.  To be sure, Keerins has recanted his statements in an affidavit submitted twenty years later.  But the fact that another person implicated petitioner in Francke's murder is not exonerating.  Moreover, it is not probable that all reasonable jurors, upon learning of Keerins' account, would reject the statements that he made as the matter was being investigated, and instead credit the affidavit he submitted approximately twenty years later.

### B.   Raskin's affidavit does not bolster the affidavits of the recanting witnesses, such that those affidavits constitute new reliable evidence upon which no reasonable juror would vote to convict petitioner.

Petitioner has submitted the affidavit of David C. Raskin, Ph.D., arguing that the opinions Raskin offers in that affidavit bolster the recantations that some of the witnesses have signed for submission in this case.  Raskin did not examine the credibility of the recantations discussed above.  Nevertheless, Raskin's conclusion was sweeping:

> "It is abundantly clear that the polygraph testing procedures conducted in this investigation were fundamentally and seriously flawed.  These problems were greatly exacerbated by investigators coercing examinees to create false statements by providing information to examinees regarding what they wanted them to state, telling them that they were lying when they were actually truthful by not giving the desired responses, abusive and frightening interrogations, serious threats of prosecution and prison, threats concerning their children and families, promises of rewards, and actual rewards.  As a result, the unethical and flawed polygraph testing procedures combined with improper and coercive interrogations appear to have provided the means to shape their statements in order to obtain false testimony from the examinees."

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(Pet. Ex. B, p. 16). The evidence does not support Raskin's sweeping conclusion. As discussed below, because Raskin's conclusion rests upon suspect and irrelevant information or an inaccurate understanding of the record, the opinions proffered in his affidavit are not "sufficient to pass through the *Schlup* gateway." *Lee v. Lampert*, 653 F.3d 929, 943 (9th Cir. 2011).

According to Raskin, during the interviews with witnesses, police investigators told witnesses "what they wanted them to state"; told the witnesses "that they were lying when they were actually truthful"; were "abusive and frightening"; issued "serious threats of prosecution and prison"; issued "threats concerning their children and families"; and promised rewards to the witnesses. Raskin did not explain which of the witnesses that testified at petitioner's trial were subjected to which of these alleged coercive tactics, instead making a blanket claim. From that premise, Raskin concludes that the investigators obtained "false testimony" from the witnesses that testified at petitioner's trial.

To support his generalized allegations of coercive conduct, Raskin cited very little evidence, all of which is suspect. In support of the allegations, Raskin cited only the affidavits signed by Jodie Swearingen, Shelli Thomas, and John and Kelly Bender.[83] (Pet. Ex. B, p.14 ¶ 8).

As noted above, Swearingen's affidavit was prepared by petitioner's defense team after she had recanted her previous statements to the Hillcrest School employees, George Russel Talley, and the police investigators. The affidavit was not signed, but Swearingen adopted the statements 20 years later, at the same time that she was claiming to be with Natividad on the night of the murder. (Pet. Ex. A, pp. 21-27). In that affidavit, it is alleged that one officer was

---

[83] Respondent presumes that when Raskin stated that he reviewed the affidavits of Swearingen, Shelli Thomas, and John and Kelly Bender "regarding the law enforcement interrogation tactics employed in this case," he was referring to the affidavits that petitioner submitted in this proceeding. (Pet. Ex. B., p. 2; Pet. Ex. F, pp. 1-4, 14-16). In addition to those affidavits, Raskin also stated that he reviewed portions of Kevin Walker's 1993 telephone interview with an investigator hired by petitioner's then-wife, Karen Steele. (Pet. Ex. B, p. 2). However, Raskin does not cite Walker's interview to support the generalized allegations that he makes against police investigators. (Pet. Ex. B, p. 14 ¶ 8). As noted above, Walker has since discounted that interview, claiming that he was a heavy methamphetamine user at the time of the interview; that he cannot remember giving the interview; and that statements he made in that interview were not true. (Ex. 391, p. 14).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"slamming things around" and "spitting on himself," telling her that he was going to "flush [her] down the toilet like a fucking turd." (Pet. Ex. A, p. 23). Although Swearingen's self-serving report is the only evidence supporting those allegations, Raskin accepts the allegations as true, characterizing the behavior of police investigators as "angry and sometimes violent." (Pet. Ex. B, p. 14 ¶ 8(a)). However, even when Swearingen spoke to defense investigators, she did not indicate that the officer's alleged behavior coerced her into implicating petitioner, telling the defense investigators: "He thought he was going to intimidate me. I was laughing at him." (Ex. 183, p. 64). Indeed, Swearingen voluntarily implicated petitioner to employees at Hillcrest School before the officer's alleged behavior, before she ever submitted to a polygraph, and when she had no apparent motive to lie.

Neither Shelli Thomas nor John and Kelly Bender testified on behalf of the State. Thus, even if it could be established that police used harsh interrogation practices with these three people, it is difficult to see how those practices would have resulted in the State's presentation of "false testimony," as Raskin concludes, because they did not testify on behalf of the State. In any event, those three persons were not reliable reporters of fact, their statements have never been subjected to any sort of adversarial testing, and neither Raskin nor petitioner has cited evidence that corroborates the claims made in their affidavits.

Shelli Thomas was a defense witness. As noted above, Thomas played prominent roles in several of petitioner's asserted alibis, and petitioner described her to police as "a real good friend" for whom he had considered leaving his wife. (Ex. 304, p. 63). Several witnesses noted that Thomas was a methamphetamine dealer, and petitioner recalled that, at one point, she had asked him to obtain a quarter pound of speed for her. (Ex. 253, p. 61). Given her close association to petitioner, Thomas was interviewed extensively, at one point telling police that although petitioner had admitted to having stabbed people before, he did not tell her that he had stabbed Francke. (Ex. 269). When called by the defense, Thomas initially declined to testify, invoking her Fifth Amendment privilege against self-incrimination. (Tr. 8647). For reasons that

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

are not clear, she later reconsidered, and testified in support of petitioner's claimed alibi about a phone call that petitioner made to her house. (Tr. 9397-98). Even petitioner now concedes that this claimed alibi was "easily refuted by phone records presented by the State showing that the defense witnesses' memories were of a different day." (CR 74, p. 160). Despite Thomas's obvious credibility problems, Raskin adopts the statements contained in her affidavit and treats them as established facts.[84]

John and Kelly Bender were also defense witnesses. They were residents of the Hyacinth House. The Benders explained that up to nine people lived at their residence, drugs were used or sold out of the residence, people were coming and going from the residence 24 hours a day, and that both Swearingen and Harden were frequent visitors. (Tr. 8818-19, 8823-28, 8837-38). The house was raided by police on January 20, 1989, although John Bender could not remember whether the raid occurred in January, February, March, April, or May of 1989. (Tr. 8822). Kelly Bender thought the raid was in March. (Tr. 8832). John Bender said that he first met petitioner at "Circle K" after the raid; Kelly Bender said that they had met petitioner at "Circle K" before the raid. (Tr. 8817-18, 8832). They both agreed, however, that petitioner had never been to the house until after the raid. (Tr. 8833). John Bender denied that he had ever spoken with petitioner about the Francke murder. (Tr. 8818).

In addition to being inconsistent with each other, the testimony of the Benders was inconsistent with petitioner's own statements. In an early interview with police, petitioner stated that he had, in fact, discussed the Francke murder with the Benders as they drove by the Dome Building. (Tr. 7270-71; Pet. Ex. E, p. 6). Also contrary to the Benders' account, petitioner told police that he was frequently at the Hyacinth House around the time of the Francke murder and could have been there on January 17, 1989: "[Petitioner] said he was going there every night,

---

[84] Like the affidavit of Swearingen, the affidavit prepared by petitioner's defense counsel for Thomas was not signed by Thomas. (Pet. Ex. F, pp. 15-16). The statements contained in that affidavit were adopted in a subsequent affidavit by Thomas, almost 20 years after petitioner's trial. (Pet. Ex. F, p. 14).

Page 146 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

four or five nights in a row over the 17th.  He very well could have been there on the night of the 17th.  He was taking dope deals to the Hyacinth Street house.  He would drive up and park out front."  (Tr. 7567).  Again, despite the Benders' obvious credibility deficits, Raskin adopts the statements contained in their affidavits and treats them as established facts.

The affidavits of Swearingen, Thomas, and the Benders form the foundation of Raskin's allegations that police engaged in coercive conduct, such as telling witnesses "that they were lying when they were actually truthful."[85]  And his generalized allegations of coercive police conduct—not tied to any specific witness that testified at petitioner's trial—form the foundation for his ultimate conclusion that the State "obtain[ed] false testimony."  Thus, his opinion rests on a foundation that lacks both credibility and, with respect to the affidavits of Thomas and the Benders, relevancy.

When Raskin did attempt to demonstrate specific instances of coercive conduct on the part of police investigators—as opposed to the generalized allegations discussed above—Raskin misunderstood or significantly misrepresented the record.

First, Raskin alleged that police improperly subjected petitioner to a polygraph while he "was recuperating from a series of fights the preceding weekend, wherein he suffered extensive bruising, possible broken ribs, a black eye, and had been using drugs and drinking heavily." (Pet. Ex. B, p. 11).  This allegation is apparently drawn from petitioner's claim during the pre-test interview that he had "got into eight separate fights" on the previous weekend.  (Pet. Ex. E, p. 5).  Even if it is assumed that petitioner's claim of eight separate fights in a weekend were true, respondent is unaware of evidence indicating that petitioner had extensive bruising, a black eye, or broken ribs, and Raskin does not explain the basis for his allegation.  In any event, the polygraph examination was conducted on September 13, 1989—the Wednesday following the weekend—and the polygraph examiner testified that, at the time of the testing, petitioner did not

---

[85] Raskin never explains when the various witnesses were, in his view, "actually truthful," or how he was able to make that determination.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

appear to be suffering from any physical or mental disability and did not appear to be under the influence of any drugs or alcohol.  (Tr. 7268).

Next, Raskin alleged:

"[Petitioner] was reluctant to take the polygraph test but said that he was doing so because he was told by his probation officer that if he did not take the polygraph examination he was going to get violated and sent to the penitentiary.  This is an example of the coercion that was used to get suspects and witnesses to agree to a polygraph test, even though they were not physically suitable for a test."

(Pet. Ex. B, p. 11).  However, Raskin fails to disclose that, like all of the polygraph examinees, petitioner was advised of his rights "from the prepared from which he stated he completely understood" before the polygraph examination began.  (Pet. Ex. E, p. 3).   After petitioner referenced his probation officer, the polygraph examiner "explained to him his rights concerning taking or not taking the polygraph examination, and that the polygraph test is something that a person freely and voluntarily participates in."  (Pet. Ex. E, p. 4).  The polygraph examiner testified:

"During his rights, when I first started going through them with him, he told me that his parole officer had told him if—that if he didn't talk to me, he was going to be violated and sent to the Penitentiary.  I discussed that situation with [petitioner] and told him it is my opinion that he could not do that.   That there was a misunderstanding or something because it just wasn't that way.  That's when I continued with the rights, went through them much as I did now.  And then on two separate occasions went through the rights, again.  And when I got done with the rights, I asked him if he was freely and voluntarily talking to me, willing to talk to me.  And he said he was."

(Tr. 7269).

Finally, Raskin alleges that during a subsequent polygraph examination on September 15, 1989, petitioner "was extremely distraught, crying, and assumed the fetal position *prior to* the test."  (Pet. Ex. B, p. 11 (emphasis supplied)).  Raskin's allegation is factually incorrect.  The record clearly demonstrates that petitioner used the restroom *after* the polygraph examination and that it was *after* his return from the restroom that petitioner became distraught.  (Pet. Ex. E, p. 11; Tr. 7294).

Page 148 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

To the extent that Raskin relied upon his own description of the record regarding petitioner's polygraph examinations to reach his sweeping conclusion that police investigators coerced the witnesses at petitioner's trial in order to obtain false testimony, his reliance is misplaced.[86]

In *Lee*, the Ninth Circuit concluded that an expert opinion offered by a professor of Child and Adolescent Psychiatry at Johns Hopkins University regarding "reliability of statements by key witnesses" who testified at the petitioner's trial did not meet the *Schlup* actual innocence standard. *Lee*, 653 F.3d at 943-44. That was so because the expert's (Dr. Maggie Bruck) conclusions "hinge[d] on her speculation from the trial record." *Id.*, at 944. For example, Dr. Bruck made conclusions about interviews of the victim—such as that his "statements were tainted by the time the interview began"—without seeing videotapes of those interviews or having information about some of the background leading up to those interviews. *Id.* Thus, "[g]iven these limitations of Bruck's analysis," the Ninth Circuit could not say "it is more likely than not that no reasonable juror would have convicted [Lee] in light of the new evidence." *Id.* (citing *Schlup*, 513 U.S. at 327; internal quotations omitted).

As explained above, Raskin's report and opinions suffer from similar deficiencies. As he concedes, he did not review the polygraph results, and his conclusions were based on suspect information, much of which was irrelevant, and inaccurate interpretations of the record.[87] For

---

[86] Raskin was unfamiliar with other aspects of the record as well. For example, Raskin states: "Johnny Lee Crouse, who confessed to the murder, was polygraphed by an FBI examiner who deemed his confession truthful. For unknown reasons, he was eliminated as a suspect." (Pet. Ex. B, p. 9). The reasons that Crouse was eliminated as a suspect are not unknown. As discussed above, Crouse gave varying accounts of the murder that could not be corroborated. As Raskin states in his report: "Since it is difficult to distinguish between true and false confessions or admissions, it is important for investigators to corroborate all confessions or admissions, irrespective of whether coercive techniques were used." (Pet. Ex. B, p. 8). In any event, Crouse was also determined to be truthful in a polygraph examination when he denied any involvement in Francke's murder. (Pet. Ex. H, pp. 1-2).

[87] In his petition, petitioner asserts, as part of Ground Six, that the trial court erred by not requiring the prosecution to provide the criminal defense team with "the raw data and charts underlying the numerous polygraph examinations." (Ground Six, subpart B). Petitioner's *Brief in Support* does not advance this claim, nor has he asked this Court to order the production of such materials.

Page 149 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

that reason, in addition to the other reasons provided above, this Court should conclude that

Raskin's report is not sufficient for petitioner to pass through the *Schlup* gateway.  *See Lee*, 653

F.3d at 944; *see also Weaver v. Attorney General of Montana*, 597 F.Supp. 2d 1126, 1130 (D.

Mt. 2008), *aff'd*, 370 Fed. Appx. 869 (9th Cir. 2010) (jury "could have heard [expert

toxicologist's] testimony and still found [prosecution's key witness's] testimony credible.

[Expert toxicologist's] testimony does not prove [the petitioner's] actual innocence") (alteration

added).

In sum, because the evidence that Raskin relied upon was unreliable, unrelated to the

witnesses that testified for the State in some instances, and flatly contradicted by the record in

other instances, his ultimate conclusion that the polygraph examinations "combined with

improper and coercive interrogations" produced "false testimony" is unsupported.

Furthermore, although police did use polygraph examinations as an investigative tool in

this case, and conducted numerous polygraph examinations during the course of the

investigation, both Raskin and petitioner overstate the role those polygraph examinations

played.[88]  As noted above, although Swearingen was polygraphed several times in an attempt to

determine whether she was truthful about the details of her account, she had stated that she was

present when petitioner killed Francke before she ever submitted to a polygraph.  Harden had

submitted to one polygraph before stating that he witnessed petitioner kill Francke.  Childers

stated that he saw petitioner leaving the Dome Building Grounds on the night of the murder and

that petitioner subsequently admitted to having committed the murder before he had submitted to

any polygraph examinations.  Walsh described a detailed scenario in which petitioner admitted to

---

[88] It bears repeating that the polygraph examinations were merely one tool that investigators
used, and the State did not exclusively rely on polygraph results to identify petitioner as the
person that killed Francke.  As District Attorney Dale Penn told the media, a number of people
had "inconsistencies and problems" passing the polygraph tests, but that "[t]hey are only an
investigative tool[.]"  (Pet. Ex. D, p. 108).  Penn stated that "[a] polygraph is simply another little
thing to help point us in directions we should keep pursuing or should drop."  (Pet. Ex. D,
p. 109).

Page 150 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

killing Francke after submitting to a single polygraph that was unrelated to the detailed scenario he eventually described.

Other witnesses submitted to polygraph examinations, but did not perceive them as being overly coercive. Vierra states: "Although I was given a polygraph examination, I was not pressured by the police officers, and they did not try to manipulate me to say things that were not true." (Ex. 386, pp. 2-3). Childers now states: "I was pressed by police during interviews, but no more so than during any other interview I had ever been subjected to. The officers wanted to talk about what I knew. I did not alter or omit any facts during [the] interview because of police pressure, and the information I ultimately provided to police was truthful." (Ex. 387, p. 3). Several witnesses, including Vierra, Childers, Gesner, and Perkins, continue to stand by the testimony they gave under oath at petitioner's trial. It strains reason to suggest that they all continue to operate under the coercive impact of polygraph examinations conducted over twenty years earlier.

Although Raskin believes that at least some of the testing protocols that the polygraph examiners used are now invalid, he does not indicate whether he believes they were invalid at the time they were used approximately 25 years ago. Indeed, the vast majority of the source material that Raskin cites in his affidavit was published several years after the polygraph examinations were conducted. There is no allegation that the polygraph examiners misinterpreted or misrepresented the results of the polygraph examinations.[89] Many of the examinees—including Swearingen, Harden, Childers, Gesner, and Studer—were represented by counsel when they submitted to many, if not all, of their polygraph examinations. And there is no allegation that the polygraph examiners failed to advise each of the eventual witnesses of their rights prior to conducting each of the polygraph examinations.

---

[89] As Raskin notes, he did not review the polygraph charts and data. Raskin explained that: "Without reviewing the underlying raw data, I am unable [to] assess whether the tests were accurately scored or whether the conclusions were correct." (Pet. Ex. B, p. 10).

Page 151 -RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Instead, petitioner's argument is that the polygraph examinations were improperly coercive because, when the witnesses were determined to be deceptive, they were informed of that fact. However, multiple courts have declined to accept this argument. *See e.g.*, *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) ("Whether [the police officer] confronted [the defendant] with the polygraph results makes no difference. The use of polygraph results is a reasonable means of police questioning."); *Ortiz v. Uribe*, 671 F.3d 863, 870 (9th Cir. 2011) (polygraph examiner's statements to defendant that "'if you don't tell me everything you're going to cause your own body to give it up when you're in that chair'" and "advice to [defendant] that he had to tell the truth to pass a polygraph examination, was not coercive."); *United States v. Red Star*, 241 Fed. Appx. 401, 402 (9th Cir. 2007) ("[Defendant] argues that polygraph machines are *per se* coercive. However, we have repeatedly upheld the use of polygraph machines as an interrogation method."); *Keiper v. Cupp*, 509 F.3d 238, 241 (9th Cir. 1975) ("The fact that the polygraph test was conducted in the early morning hours and that appellant was crying and emotionally upset at the time of the interview, does not in itself allow us to set aside the findings of the state trial judge . . . that all of statements made before, during and after the polygraph test were entirely voluntary.").

Indeed, even if the polygraph examiner had been mistaken or intentionally deceptive as to the results of a polygraph examination, that mistake or falsehood would not necessarily render the polygraph examination improperly coercive. *See e.g. Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that a police officer's lie to the defendant that his codefendant had already confessed to the commission of the murder was "insufficient in our view to make this otherwise voluntary confession inadmissible."); *United States v. Preston*, 751 F.3d 1008, 1026 (9th Cir. 2014) ("[I]nterrogating officers can make false representations concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced."); *Johnson v. Pollard*, 559 F.3d 746, 754 (7th Cir. 2009) ("[E]ven if we were to assume that [the detective] did not know the outcome of the polygraph examination and lied about the results to

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

[the suspect], the fact that the detective made a false or misleading statement during the course of the interrogation would not, by itself, render [the suspect]'s confession involuntary."); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997) (concluding that the "officers' misrepresentation" did not amount to coercion and explaining that "[m]isrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary."); *Ortiz*, 671 F.3d at 870 ("While [defendant] may have been deceived by [the polygraph examiner]'s comments that she was not [a police officer], this type of 'deception' is well within the range of permissible interrogation tactics necessary to secure a lawful confession by the police."). As noted above, there is no allegation here that the police investigators misinterpreted, lied, or otherwise misrepresented the results of the polygraph examinations conducted in this case.

Some of the recanting witnesses, including Swearingen, claim that the polygraph examinations indicated that they were lying when they told truth, and indicated that they were truthful when they told a lie. (Pet. Ex. A, p. 23). In essence, these witnesses claim that the polygraph examinations were always wrong, and that the errors always cut against petitioner. Such claims are made in an attempt to explain the fact that the testimony of many of the witnesses at petitioner's trial was confirmed by the results of polygraph examinations. There is nothing in Raskin's affidavit that would suggest that the polygraph examinations produced such anomalous results, and all reasonable jurors would not credit such a claim. Instead, it is probable that, when informed that much of the witness testimony inculpating petitioner was confirmed through polygraph testing, and that several of the witnesses who were polygraphed still stand by their testimony today, reasonable jurors would remain confident in petitioner's guilt and vote to convict, notwithstanding the opinions offered in Raskin's affidavit.[90]

---

[90] In addition, respondent recognizes that *Schlup* states that, in reviewing the adequacy of a petitioner's "actual innocence" showing, federal district courts "are not bound by rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327-28. However, *Schlup* also states that, for a petitioner to prove "actual innocence," he or she must show that, in light of the new evidence, "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327-28. Raskin's—or a similar expert's—testimony would not have been

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

C.    **The evidence that petitioner advances of third-party guilt is not new reliable evidence upon which no reasonable juror would vote to convict petitioner.**

In his brief, petitioner identifies three other persons—John Lee Crouse, Timothy "Rooster" Natividad, and Samuel Cornejo—contending that there is new reliable evidence that they committed the Francke murder. As discussed below, the evidence that petitioner advances is not reliable, such that it is probable that all reasonable jurors would credit the evidence and that no reasonable juror would vote to convict petitioner.[91]

1.    **John Lee Crouse.**

First, petitioner points to the confessions of Crouse. The fact that Crouse confessed and then recanted is not new evidence for actual-innocence purposes, as those facts were presented to the jury. (Tr. 7478-79). As discussed above in connection with petitioner's *Chambers* claim, Crouse told police a number of fantastic tales. The details of Crouse's varying claims were not presented to the jury. As noted above, the few accurate details that Crouse occasionally reported could have been gleaned from newspaper reports. (Pet. Ex. D, pp. 16-18). The bulk of his claims, however, could not be corroborated or were flatly contradicted by other evidence. It is not probable that all reasonable jurors would decline to vote to convict petitioner upon learning of Crouse's varying statements to police and others.

2.    **Timothy "Rooster" Natividad.**

Next, petitioner contends that "[o]ver the years, many, including members of the Francke family, have come to believe that a Keizer drug dealer named Timothy 'Rooster' Natividad killed Francke." (CR 74, p. 126). As discussed below, the evidence that petitioner presents in

---

admissible at petitioner's trial, because any such testimony would necessarily involve discussions of polygraphs and polygraph results and, under Oregon law, "polygraph test results are inadmissible as evidence . . . even when admissibility has been stipulated by the parties." *State v. Lyon*, 304 Or. 221, 223, 744 P.2d 231 (1987).

[91] Petitioner also submits a 21-page appendix to his brief in which he suggests other possible suspects, including Francke's coworkers and his wife. The appendix largely consists of speculation and innuendo derived from information that was previously investigated by police. Respondent will not respond to the varying allegations contained in the appendix unless requested to do so by this Court.

Page 154 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION
NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

support of this theory is not credible and would not cause all reasonable jurors to vote to acquit petitioner.

In his brief, petitioner argues that evidence of Natividad's involvement in Francke's murder came from two sources prior to petitioner's trial: Natividad's former girlfriend and an inmate at the Oregon State Penitentiary. Neither source provided credible evidence that Natividad was involved in Francke's murder.

As petitioner notes, shortly after Francke's death, Natividad was killed by his girlfriend, Elizabeth Godlove, in an apparent domestic dispute. (CR 74, p. 126). Petitioner's defense team prepared an affidavit for Godlove, which she signed on October 3, 1990, several months before petitioner's trial. (Pet. Ex. C, pp. 70-71). The affidavit stated that Godlove was living with Natividad in January 1989, and that Natividad had left their house in the early afternoon "on or about January 17, 1989" and returned early the next morning with a wound on his lower left leg and a bruise to his forehead. (Pet. Ex. C, p. 70). The affidavit provided that one or two days later, Natividad told Godlove that he had killed a man and, shortly thereafter, Natividad showed Godlove "a large amount of money he was carrying in his wallet." (Pet. Ex. C, p. 70). When she signed the affidavit, Godlove was dating Francke's brother, Kevin, who she later married. (CR 74, p. 126 n. 64).

Although the affidavit indicated that Natividad left their home "on or about January 17, 1989" and later returned with injuries, Godlove was consistent in interviews with police and defense investigators—both before and after she signed the affidavit—that she could not remember whether January 17, 1989, was the correct date.[92] (Exs. 313-14). Even if Godlove had remembered that January 17, 1989 was the correct date, her affidavit would have connected

---

[92] The affidavit that Godlove signed also indicated that she was shown two photos of Scott McAlister, an Assistant Attorney General, and recognized him as a man that Natividad had met in a Fred Meyer parking lot in early January 1989, suggesting that McAlister was somehow involved in Francke's death. (Ex. 312, p. 2). However, in interviews with police, Godlove was less sure, stating that on a scale of one through ten, she was a "five" in terms of her certainty that McAlister was the person Natividad had met with at Fred Meyer. (Ex. 314). Thus, in at least two respects, the affidavit overstated Godlove's account.

Page 155 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Natividad to the Francke murder only if the reader were prepared to make several unsupported, inferential leaps.  In any event, according to petitioner's trial attorney, Robert Abel, Godlove recanted prior to petitioner's trial.  (Ex. 176, p. 39-40; PCR Tr. 465-66).  Indeed, Abel was contacted by police because Godlove had accused Abel of harassing her.[93]  (PCR Tr. 466).

The inmate referenced by petitioner, Konrad Garcia, told defense investigators in October 1990 that he had spoken with Natividad in late November 1988.  (Ex. 322).  According to Garcia, Natividad stated that he could free Garcia from prison to "take out Top Man."  (Ex. 322).  The defense investigator reported:

> "At the time of the conversation, Konrad Garcia did not quite understand Tim Natividad because he was talking so cryptically.  At best, Mr. Garcia thought that Tim Natividad was talking about putting a hit on his 'bag man' or some drug supplier.  Konrad Garcia told Tim Natividad that he was not interested in the deal. Tim Natividad never spoke to him again.  In retrospect, Konrad Garcia believes that Tim Natividad was recruiting him to murder Michael Francke."

(Ex. 322).  Of course, Garcia's reinterpretation of a cryptic conversation he allegedly had with Natividad two years earlier—in which Natividad apparently claimed he had the wherewithal to spring Garcia from prison—is not credible evidence of Natividad's involvement in Francke's murder.

As petitioner notes, police investigators interviewed Natividad's family prior to petitioner's trial.  Natividad's brother, TJ Natividad ("TJ"), reported that Natividad was at the birthday party of TJ's wife's brother on January 17, 1989.  He stated that Natividad showed up between 9:30 and 10:00 PM, did not have any injuries, and "appeared fine."[94]  (Pet. Ex. H, pp. 235-36).  TJ's report to defense investigators was consistent with his report to police. (Ex. 317).

---

[93] Godlove was stopped by police on the same day she signed her affidavit (i.e., October 3, 1990).  (Ex. 314).  The police located a folding knife and a machete in her car.  She was cited for, among other things, driving while suspended and endangering a child passenger.  During the course of the stop, she accused Abel of harassing her.  (Ex. 314).

[94] A few days after the birthday party, TJ recalled that Natividad had told him that, "'Shorty and another guy, a friend, did somebody.'"  When TJ asked whether it was "the guy in the paper," Natividad responded that he assumed it was the guy in the paper.  (Pet. Ex. H, pp. 235-36).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Thus, prior to petitioner's trial, there was no evidence that credibly tied Natividad to Francke's murder.[95]  As the PCR court found, "there wasn't sufficient evidence for even a probable cause finding against Timothy Natividad, let alone an indictment and prosecution for the murder of Michael Francke."  (Ex. 345, p. 94).

Over fifteen years after the murder, however, at least three people have attempted to implicate Natividad:  Cappie Harden, Jodie Swearingen, and Greg Kellcy.  Their accounts are not credible.  *See Herrera*, 506 U.S. at 423 (O'Conner, J., concurring) (finding affidavits submitted on an actual-innocence claim unreliable, in part because "they conveniently blame a dead man—someone who will neither contest the allegations nor suffer punishment as a result of them.").

As noted above, shortly after Francke's brothers paid Harden $1000 in 2005, Harden recanted his trial testimony and told the *Portland Tribune* that Natividad came to his house on the night of Francke's murder.  (Exs. 393-94).  Harden stated that Natividad knocked on his window; asked to come inside Harden's apartment to clean himself; cleaned himself in a sink; asked for a bag to put some clothes in; and took that bag with him when he left.  (Ex. 394, pp. 3-4).  Although Harden described Natividad as his "best friend," Harden stated that he did not ask Natividad any questions that night.  (Ex. 394, pp. 3-4).

At the same time as Harden, Swearingen also came forward with information implicating Natividad in Francke's murder.  She told the *Portland Tribune* that on the night of Francke's murder, Natividad had driven her to the Dome Building.  (Ex. 394, p. 3).  The *Portland Tribune* reported:

> "According to Swearingen, Natividad left her in the car and walked toward the building.  She said she lost sight of him, and he was gone a long time.  Suddenly, Swearingen said, Natividad came running back from the direction of the building with blood on his clothes.

---

[95] Even petitioner discounted the Natividad theory in an interview with *The Oregonian* in 2005. In particular, petitioner told *The Oregonian* reporters "'I just don't see him (McAlister) going and hiring some low-level dope fiend or drug addict to go do a murder,'" explaining:  "'It don't make no sense.'"  (Ex. 391).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"'I could smell the blood,'" [Swearingen] said."

(Ex. 394, p. 3).[96]  She stated that they then drove to Harden's apartment.  (Ex. 394, p. 3).

In his brief, petitioner argues that Swearingen had previously lied about petitioner's role in Francke's murder because she was trying to protect Natividad.  (CR 74, p. 127).  As discussed above, it is not clear why Swearingen would have felt the need to protect Natividad, as Natividad had died several months before Swearingen spoke with the employees at the Hillcrest School or the police.  Similarly, Harden's belated account regarding Natividad would have completely removed him from the Francke crime scene.  If his belated account were true, it is unclear why Harden declined to give his account to police, who first questioned him several months after Natividad's death.

Petitioner has also submitted the affidavit of Gregory Allen Johnson, now Kellcy, which suggests that former prison warden Hoyt Cupp paid Natividad $20,000 in cash to kill Francke. (Pet. Ex. C, pp. 179-88).  This affidavit was signed in April 2012, over twenty years after petitioner's trial.

In his affidavit, Kellcy claims that on the night Francke was killed, he drove Natividad to the Dome Building in Natividad's brown 1974 Datsun 260Z.  Kellcy says that Natividad gave him a two-way radio, and told Kellcy that he would call him when he needed to be picked up. Kellcy stated that he went to his mother's house and then to a bar.  As he was starting his second beer, Kellcy states that Natividad radioed to be picked up.  When Natividad got into the car, Kellcy stated that Natividad was out of breath and stated "'it is not my blood.'"  Kellcy noted that Natividad's gloved hands appeared to be wet.  They then drove to an autobody shop, where they left the car, and walked to a nearby tavern.  Kellcy stated:  "I tried to ask Natividad what happened.  All he said was it will be all over the news tomorrow and to keep my mouth shut or we could both end up dead."  A few days later, Kellcy claims that he met Natividad at the Duck

---

[96] Swearingen's affidavit submitted in this proceeding glosses over this portion of Swearingen's account.  In her affidavit, Swearingen states that Natividad picked her up and that they simply "drove around" before going to Harden's home.  (Pet. Ex. A, p. 26).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Inn, where Natividad claimed he would receive a payoff. As they waited, another car with an Oregon government license plate pulled up. The passenger in the car, who Kellcy recognized as former prison warden Hoyt Cupp, handed Natividad "papers." Kellcy said that he and Natividad left together. As they drove away, Natividad counted out $20,000 in cash. (Pet. Ex. C, pp. 179-81).

There are several problems with Kellcy's affidavit. First, as noted above, it comes over 20 years after petitioner's trial, and there is no explanation for the delay. *See Taylor v. Illinois*, 484 U.S. 400, 414 (1988) ("[I]t is . . . reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed."). Second, it is simply not believable that a retired, high-ranking prison official would, for unexplained reasons, hire a drug dealer to kill another high-ranking prison official. Third, Kellcy's account is inconsistent with the accounts of Harden and Swearingen, who both claimed that they were with Natividad on the night Francke was killed. Petitioner appears to believe that Kellcy's account is more credible, but he does not explain why.

Fourth, Kellcy's account is inconsistent with his own prior statements to police. Kellcy was interviewed by police in January 1991, shortly before petitioner's trial, but after Kellcy said he had conferred with petitioner while incarcerated. (Pet. Ex. H, p. 248). Kellcy told police that on January 17, 1989, he and Natividad were at Sandy Duncan's house, before driving Natividad's blue Datsun pickup (as opposed to a brown Datsun car) to Jimmy Gun's house at around 6:00 PM or 7:00 PM. (Pet. Ex. H, p. 249). He stated that Natividad stayed at Gun's house for 15 to 30 minutes, as Gun attempted to fix the headlights in Natividad's truck. Natividad then left and returned around midnight. Upon his return, Kellcy said that "[Natividad] only talked about a van they were trying to put together. [Natividad] never talked about killing anyone and he never looked any different than he always did." (Pet. Ex. H, p. 249).

Fifth, Kellcy's affidavit is internally inconsistent. At the beginning of the affidavit, Kellcy claims that, although he testified at petitioner's trial, he "was not permitted to testify to

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

information I knew about Tim Natividad." (Pet. Ex. C, p. 179). Although he had not described his account to petitioner's defense team prior to petitioner's trial, he claims that he would have testified to the account he sets out in his affidavit had he been permitted to do so. (Pet. Ex. C, p. 179). However, at the end of his affidavit, Kellcy claims that, based on Earl Childers' description of the car he saw driving away from the Dome Building on the night of the murder, Kellcy "was very concerned that [Childers] had seen me in the vicinity of the Dome Building that night, and that I would be linked to the Michael Francke murder." (Pet. Ex. C, p. 181). Thus, although Kellcy did not want to be linked to the Francke murder, he claims that—if he had been permitted to do so—he would have testified that he drove Natividad to and from the murder scene, and later accompanied Natividad to receive the $20,000 payoff from a retired, high-ranking prison official. Even in a prepared affidavit, Kellcy's account is not consistent.

In short, the belated claims of Harden, Swearingen, and Kellcy do not withstand scrutiny. It is not probable that all reasonable jurors would credit petitioner's "evidence" of Natividad's involvement in the Francke murder and, therefore, vote to acquit petitioner.

### 3.    Samuel "Navarro" Cornejo.

Finally, petitioner discusses the police investigation of statements that Samuel Cornejo apparently made to his girlfriend.[97] On March 8, 1989, Dorothy McDonald reported to police that her cousin, Angela Myhre, had told her that, in January 1989, Cornejo stated that "he had killed some guy the night before" and "pointed out a building that he killed him in front of and drug his body inside." (Pet. Ex. H, p. 133). According to McDonald, Myhre said that Cornejo "was joking, then later said, 'I think he wouldn't do that.'" (Pet. Ex. H, p. 133).

When questioned by police a week later, on March 13, 1989, Cornejo denied that he had killed Francke or that he had any knowledge as to who had done so. He also denied that he had

---

[97] In his brief, petitioner states that Cornejo was a "dangerous drug trafficker" and that his girlfriend "told police that [Cornejo] came to her home, which was just west of the Dome Building, late on the night of the murder, drunk and wearing a beige trench coat and dirty pants." (CR 74, p. 131). Petitioner does not cite to any evidence to support those statements, and respondent has been unable to locate such evidence.

NMK/6912532-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

ever told anyone he had killed Francke.  Cornejo then submitted to a polygraph examination, which was either inconclusive or indicated deception when Cornejo denied that he had killed Francke or that he had told anyone he had done so.  (Pet. Ex. H, p. 214).

Cornejo was questioned again on March 15, 1989.  In the second interview, Cornejo acknowledged that he had been withholding information, which had caused him difficulties on the previous polygraph examination.  The polygraph examiner described the information that Cornejo had withheld:  "He said what he told [Angie] when she asked him if he killed Mr. Francke was 'Yea, so what if I did, what are you going to do, turn me in?'"  (Pet. Ex. H, p. 213).  Cornejo also acknowledged that he had pointed out where the murder had occurred, explaining that he knew the location "because the day after the murder he was riding the bus to work, and people on the bus pointed to the location where the murder took place, and there were a lot of police cars and photographers there at that time."  (Pet. Ex. H, p. 213).  After acknowledging his prior statements to "Angie," he submitted to a second polygraph examination, in which he denied that he had cut or killed Francke.  (Pet. Ex. H, p. 214).  In that second examination, Cornejo was determined to have been truthful.  (Pet. Ex. H, p. 214).

Cornejo's denial that he had killed Francke was corroborated by his live-in girlfriend, Karen Layton.  Layton reported to police that on January 17, 1989, Cornejo came home from work, went to play video games, and then returned home at around 6:00 PM, where they had tacos for dinner.  (Pet. Ex. H, p. 127).

Defense investigators questioned Cornejo over a year and a half later, on November 13, 1990.  (Ex. 309).  Cornejo's account was largely the same.  Cornejo told the defense investigators that his girlfriend, "Angie," had brought up the Francke murder, and he joked with her that he had committed the murder.  (Ex. 309).  He also recalled having observed the crime scene when he rode the bus to work.  (Ex. 309).  Cornejo recalled that during their investigation of him, the police put his house under surveillance for about 15 days and seized several items of clothing from his residence.  (Ex. 309).

Page 161 - RESPONSE TO AMENDED PETITION, AND TO BRIEF IN SUPPORT OF AMENDED PETITION

Cornejo committed suicide sometime after that interview with defense investigators. (Ex. 309). As petitioner notes, the autopsy report of Cornejo was not released to petitioner's defense team because petitioner was not entitled to that report under state law. (Ex. 309).

In sum, the evidence demonstrates that Cornejo joked with his girlfriend that he had killed Francke shortly after the murder. There was no evidence that he had actually done so, and his live-in girlfriend confirmed he was home that night. It is not probable that such evidence would cause all reasonable jurors to disregard the substantial evidence of petitioner's guilt and vote to acquit petitioner.

### D.     Petitioner has not met his burden of proving that, in light of the entire record, no reasonable juror would vote to convict him.

As noted above, having been convicted by a unanimous jury verdict, petitioner "comes before the habeas court with a strong . . . presumption of guilt." *Schlup*, 513 U.S. at 326 n. 42. To pass through the *Schlup* gateway, petitioner must demonstrate that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. Petitioner has failed to do that here.

To support his claim of innocence, petitioner primarily relies on affidavits from persons who testified under oath at petitioner's trial, but now claim that they lied under oath. These affidavits were, in most cases, signed approximately 20 years after petitioner's trial. *Cf. Christian*, 595 F.3d at 1084 n. 11 (explaining that a witness' recantation was "especially unreliable" in part because "it was made more than a decade" after his trial testimony). The statements contained in those affidavits have never been subjected to any sort of adversarial testing. *See Herrera*, 506 U.S. at 417 (explaining that "motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations."). As discussed above, the recantations that petitioner relies upon are not credible, and there continues to be substantial evidence of petitioner's guilt, such that it is probable that a reasonable juror would vote to convict him.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

To recap, both Harden and Swearingen stated that they were with petitioner at the Dome Building when he stabbed Francke. Swearingen first stated she was with petitioner when she spoke with employees at Hillcrest School, before she ever submitted to a police polygraph examination. Her statements when she had no motive to lie were consistent with her grand-jury testimony, which the jury heard and in which she detailed how petitioner was in Francke's car and how he struggled with Francke thereafter. Although Swearingen's subsequent recantation was presented to the jury, the jury convicted petitioner nonetheless. Harden implicated Swearingen and petitioner in the murder before he ever submitted to a polygraph, and then, after a single polygraph examination, admitted that he was also present at the Dome Building when petitioner stabbed Francke. He testified under oath to that account, subject to cross examination.

Approximately fifteen years after petitioner's trial, Swearingen claimed that she was near the Dome Building with Timothy Natividad on the night of the murder. (Ex. 394). After he was paid $1000, Harden claimed he was actually at home that night when Natividad stopped by to clean himself up. (Ex. 394). Even petitioner appears to disbelieve Swearingen and Harden's post-trial claims, declining to advance those claims in this proceeding. Swearingen and Harden's recantations are not credible.

Childers testified that he saw petitioner driving away from the Dome Building grounds on the night of the murder, and petitioner advised Childers to "forget" that he had seen him in that location on that night. (Tr. 7757). Childers continues to stand by the testimony he gave under oath. (Ex. 387). Gesner testified that, on the night of the murder, petitioner asked him to dispose of a bag of clothing, and that petitioner later confirmed that the bag contained the clothes he wore when he had killed Francke. (Tr. 7999). Gesner continues to stand by the testimony he gave under oath. (Ex. 389). Perkins testified that, the morning after Francke's murder, she overheard petitioner state that he had "fucked up big time" and that she would be "reading about it in the papers." (Tr. 7952). Perkins continues to stand by the testimony she gave under oath. (Ex. 388).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Both Gesner and Childers testified that petitioner later admitted to them that he had killed Francke on a night that they had walked to a house that they were considering burglarizing. (Tr. 7767, 7999).  As noted above, both Gesner and Childers continue to state that their testimony was truthful (Exs. 387, 389), and even petitioner confirmed the scenario in which these confessions occurred.  (Tr.7606-07).

Both Walker and Walsh also testified that petitioner confessed to having killed Francke. Walker recanted his trial testimony in an interview with an investigator hired by petitioner's then-wife, Karen Steele.  However, he has since discounted that interview, claiming that he was a heavy methamphetamine user at the time of the interview, does not remember giving the interview, and that statements he made during that interview were not accurate.  (Ex. 391, p. 14). Walsh recants his trial testimony for the first time, in an affidavit prepared approximately twenty years after his testimony.  Although Walsh described detailed scenarios in which petitioner had confessed to the murder—scenarios police investigators were unaware of until Walsh described them—Walsh apparently now contends that he made those scenarios up out of whole cloth. When recently confronted with his trial testimony describing those scenarios, Walsh not only denied the substance of his testimony, but also denied that he delivered the testimony at all. (Ex. 390).  Neither Walker nor Walsh's recantations are the type of *reliable* new evidence upon which no reasonable juror would vote to convict petitioner.

As discussed above, petitioner's statements to police further incriminated him. When the police first attempted to contact petitioner, they contacted his wife, Vierra.  According to Vierra, petitioner "held me by my throat" and he "told me not to tell [the officer] that he was there and he didn't want to talk to him."  (Tr. 10244).  She told the police that petitioner "told me if I said anything to the cops about him that he'd kill me."  (Pet. Ex. E, p. 247).  At that point, petitioner's concern was disproportionate to the amount of evidence the police had collected against him. When a detective first told petitioner that he wanted to discuss the Francke investigation—before any of the witnesses that would testify against him had provided information to police—

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

petitioner's "initial reaction were words to the fact [sic: effect] of I wondered when you sons of bitches were going to try to hang this on me." (Tr. 7269).

He made subsequent statements that were tantamount to a confession. At one point, petitioner stated: "'Hey man, whenever you ask me a question about this . . . My mind keeps saying you did it, you did it, you did it, and all of the time I know I didn't." (Tr. 7351-52). Petitioner told police that the back part of his brain said that he had committed the murder, while the front part of his brain said he had not. (Tr. 7352). He stated that only he and God knew who had committed the murder. (Tr. 7353-54). Again, although witnesses had yet to come forward, petitioner told police that he was going to get "fried" or "roasted" for the murder. (Tr. 7352).

Petitioner made other statements that suggested he had discussed his role in the Francke murder with other people. Petitioner told police that he "was joking around with [his] wife and told her I killed Michael Francke." (Tr. 7293). During a subsequent interview, he denied that he had told his friends that he had stabbed Francke, but he acknowledged, "'I might have made some stupid statements. I might have been involved in some funky statement that may have been perceived wrong.'" (Tr. 7487).

As the investigation proceeded, petitioner frequently attempted to gauge the strength of the State's case against him. His questions in that regard were revealing. He wanted to know what Vierra was telling police, believing that she was telling police that he had killed Francke. (Tr. 7575). He wanted to know the identity of eyewitnesses, stating, "'I know it's that Jodie gal, isn't it? She is saying she saw me running from the scene, isn't she?" (Tr. 7575-76). When told that a witness saw him driving from the scene of the crime, petitioner responded: "Oh, Earle [Childers] told you that, didn't he[,]" later explaining that his identification of Childers was "lucky, I guess." (Tr. 7604, 7613).

During the course of his interviews with police, petitioner came up with a series of alibis, none of which checked out. He stated that he was at a party with between 20 and 30 people, but could not give the first name of a single person at that party. (Tr. 7309). In one of his claimed

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

alibis, he stated he was with Kris Warilla, but Warilla was just one additional person who told police that petitioner had admitted to killing Michael Francke.  (Tr. 7464-66; Ex. 280).  At one point, petitioner stated that Swearingen and Harden could have seen him driving around on the night of the murder.  (Tr. 7630).  Since his trial, petitioner has continued to advance alibis, at one point claiming he was injecting a patient at a hospital with heroin at the time of the murder.  (Ex. 253, pp. 10-12).  In this proceeding, he claims he was at home until 8:00 or 9:00 PM, conducting a drug deal, and then was out for the night.  Again, as discussed above, the record does not support petitioner's claim.

Finally, as discussed above, petitioner made several incriminating statements to Vierra— statements that were never made known to the jury that convicted petitioner.  Among other things, petitioner told her "that he had something to do with the death of someone, then stopped." (Pet. Ex. E, p. 242).  Petitioner told her approximately two weeks after Francke's murder that he knew what had really happened to Francke.  (Pet. Ex. E, p. 242).   He told her that he was leaving for South Dakota: "He told me that I didn't have any idea of all the things he'd been involved in and he kept saying he needed to leave.  Early this same evening he mentioned that he knew what really happened to Michael Francke.  I didn't question that or go into it with him." (Pet. Ex. E, p. 247).  After being questioned by police, petitioner was agitated, explaining to Vierra "that it was just another bullshit robbery."  (Pet. Ex. E, p. 243).  During a particularly heated argument, Vierra recalled that petitioner essentially confessed:

> "I recall that approximately three to four months after the death of Michael Francke, [petitioner] and I were in an argument about our finances.  [Petitioner] exploded into a rage and broke my arm.  After breaking my arm, [petitioner] apologized and told me that I did not understand the pressure he was under. [Petitioner] started crying and told me:  'I stuck the guy.'  I then asked [petitioner]:  'What guy?'  [Petitioner] then responded:  'The guy at the hospital.'"

(Ex. 386, p. 4).  Vierra stands by these accounts.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Given the substantial evidence of petitioner's guilt, petitioner cannot demonstrate that it is probable that no reasonable juror would vote to convict him, notwithstanding the unreliable recantations that petitioner has presented in this proceeding.

**VII.    CONCLUSION**

Based on the foregoing, this Court should deny relief on all of petitioner's claims, and dismiss this action with prejudice.

DATED November   9  , 2015.

Respectfully submitted,

FREDERICK M. BOSS
Deputy Attorney General

*s/ Nick M. Kallstrom*
NICK M. KALLSTROM #050023
SAMUEL A. KUBERNICK #045562
RAFAEL A. CASO #073612
Assistant Attorneys General
Trial Attorneys
Tel (503) 947-4700
Fax (503) 947-4794
Nick.M.Kallstrom@doj.state.or.us
Samuel.A.Kubernick@doj.state.or.us
Rafael.Caso@doj.state.or.us
Of Attorneys for Respondent

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794