# APPENDIX 1

Steven T. Wax (OSB #850120)
Email:  wax@oregoninnocence.org
Aliza B. Kaplan (OSB #135523)
Email:  kaplan@oregoninnocence.org
Janis C. Puracal (OSB #132288)
Email:  puracal@oregoninnocence.org
Oregon Innocence Project
P.O. Box 40588
Portland, OR 97240
(503) 768-7321
Attorneys for *Amicus Curiae*
Oregon Innocence Project

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**FRANK E. GABLE**,

                             Petitioner,

       v.

**MAX WILLIAMS**,

                         Respondent,

Civil No. 07-CV-00413-AC

BRIEF OF *AMICUS CURIAE*
OREGON INNOCENCE PROJECT

# TABLE OF CONTENTS

I. STATEMENT OF *AMICUS CURIAE* ........................................................................... 1

II. SUMMARY OF ARGUMENT ................................................................................... 1

III. ARGUMENT ........................................................................................................... 3

    A.  Witness recantations can be reliable evidence of innocence. ...................... 3

        1.  Innocence is more than just DNA evidence.................................... 3

        2.  Cases with recantation evidence should be considered as seriously as those with DNA evidence. .................................................................. 5

    B.  Courts should consider a recantation in context when assessing its validity............... 8

        1.  Interrogation methods are a source of error known to result in false evidence and wrongful convictions. .............................................. 8

        2.  The interrogation methods, here, undermine the reliability of the initial testimony and support the reliability of the witnesses' recantations. ............. 13

IV. CONCLUSION........................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gandarela v. Johnson*,
 286 F.3d 1080 (9th Cir. 2001) ........................................................................8

*House v. Bell*,
 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)................................3

*Jones v. Taylor*,
 763 F.3d 1242 (9th Cir. 2014) .....................................................................2, 8

*Miranda v. Arizona*,
 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)..........................10, 11

*Schlup v. Delo*,
 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).................................3

*State v. Lawson*,
 352 Or. 724, 291 P.3d 673 (2012) ...............................................................12

*State v. McCallum*,
 561 N.W.2d 707 (1997) .................................................................................8

*U.S. v. Juan*,
 704 F.3d 1137 (9th Cir. 2013) .....................................................................18

**Other Authorities**

Adam Liptak, *Study of Wrongful Convictions Raises Questions Beyond DNA*,
 N.Y. Times, July 23, 2007 ............................................................................4

Alexandra Gross and Samuel Gross, *Witness Recantation Study: Preliminary Findings* (May 2013) ..........................................................................................6

Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55 (2008) ......................3

Daniel Medwed, *Up the River Without a Procedure: Innocent Prisoners and Newly Discovered Non-DNA Evidence in State Courts*, 47 ARIZ. L. REV. 655 (2005)..............................................................................................................4

Danielle M. Loney et al., *Coercive Interrogation of Eyewitnesses Can Produce False Accusations*, Journal of Police and Criminal Psychology (February 2015) .......................................................................................................9, 13

David Michael Risinger, *Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate*, 97 J. CRIM. & CRIMINOLOGY 761 (2006-07) .................................4

F.E. Inbau, J.E. Reid, J.P. Buckley, B.C. Jayne, *Criminal Interrogation and Confessions* 336-37 (2013) (5th ed.) .....................................................................................10

Gisli H. Gudjonsson, *Psychological Vulnerabilities During Police Interviews. Why are They Important?*, 15 Legal and Criminological Psychology 161 (2010)..................................................................................................................................9

Nina Martin, *Innocence Lost*, S.F. Mag., Nov. 2004 .....................................................4

*Protecting the Innocent: Proposals to Reform the Death Penalty: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 221 (2002)..........................................3

Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. CRIM. LAW & CRIMINOLOGY 523 (2005)................................................................4

Saul M. Kassin et al., *Interviewing Suspects: Practice, Science, and Future Directions*, 39 LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 15 (2010)......................9, 11, 12

Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3 (2010)......................................9, 11

Shawn Armbrust, *Reevaluating Recanting Witnesses: Why the Red-Headed Stepchild of New Evidence Deserves Another Look*, 28 B.C. THIRD WORLD L. J. 75 (2008) ......................................................................................5, 6, 7, 15

Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L.J. 1381 (1996)......................................................15, 16

Timothy E. Moore, *Shaping Eyewitness and Alibi Testimony with Coercive Interview Practices*, The Champion (October 2014).................................................... *passim*

# I. STATEMENT OF *AMICUS CURIAE*

Oregon Innocence Project (OIP) is an initiative of the Oregon Justice Resource Center. The mission of OIP is to (1) exonerate the innocent, (2) educate and train law students, and (3) promote legal reforms aimed at preventing wrongful convictions.

OIP is the only program in Oregon dedicated to securing the release of wrongfully convicted inmates. Additionally, OIP works with community partners to build support for comprehensive criminal justice reform to improve trial procedures, interrogation techniques, discovery practices, and other Oregon policies that do not serve to protect the innocent or punish the guilty.

*Amicus* OIP did not review Petitioner Gable's conviction on the merits and takes no position on his guilt or innocence. OIP, instead, appears as *amicus curiae* in this matter to urge this court to enhance the truth-seeking functions of the judicial process by considering claims of actual innocence in the context of how wrongful convictions may arise.

# II. SUMMARY OF ARGUMENT

Studies of confirmed wrongful convictions across the country have led commentators to identify a number of common errors and problems that lead to wrongful convictions. Exonerations as a result of DNA testing have garnered much of the spotlight. While DNA has been used in only a small percentage (roughly 25%) of the 1,753 registered cases of exoneration,[1] its presence has underscored the fact that wrongful convictions are produced by known sources of error, including that witnesses can, and do, testify to false information. These sources of error, including false testimony that is later recanted, exist whether or not DNA is available. It is critical for courts to focus on and analyze all sources of error known to lead to

---

[1] National Registry of Exonerations, available at: http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited March 12, 2016).

BRIEF OF *AMICUS CURIAE* OREGON INNOCENCE PROJECT
Page 1

wrongful convictions, regardless of whether the evidence offered to prove innocence comes in the form of a DNA test result, a witness recantation, or otherwise. When a convicted person offers evidence of witness recantation, courts should look for the presence of factors that are known to lead to wrongful convictions.

Psychological interrogations of defendants that involve prolonged isolation, the use of false evidence, and suggestive questioning are sources of error known to result in false testimony and wrongful convictions. When those same tactics are used on independent witnesses, courts should be equally wary. When those witnesses later recant, the court should consider the circumstances of interrogation.

The Ninth Circuit, in *Jones v. Taylor*,[2] has instructed district courts to consider the circumstances giving rise to a recantation to assess its credibility. The court did not, however, consider the circumstances giving rise to the initial testimony later asserted to be false. A court presented with recantation evidence should determine the credibility of the recantation by considering the circumstances that gave rise to the recantation, along with circumstances that gave rise to the testimony now asserted to be false.

At least seven prosecution witnesses in this case initially denied any knowledge about the murder of Michael Francke and then implicated Petitioner Gable after prolonged police interrogation that involved the use of false evidence, threats, excessive polygraphing, and incentives. All seven of those witnesses later recanted their incriminating statements. Many of the witnesses do not know each other. OIP urges this Court to consider the recantations, whether by affidavit or at an evidentiary hearing, in light of the circumstances giving rise to the recantation as well as the circumstances giving rise to the testimony now asserted to be false.

---

[2] 763 F.3d 1242, 1248 (9th Cir. 2014).

### III.  ARGUMENT

Mr. Gable asserts he is innocent of murder and, under *Schlup v. Delo*,[3] is entitled to habeas review.  To pass through the *Schlup* gateway of actual innocence, Mr. Gable must demonstrate "that more likely than not any reasonable juror would have reasonable doubt."[4]

Of the witnesses who have recanted in this case, at least seven of them initially denied any knowledge of the murder and later confirmed that their testimony incriminating Mr. Gable came only after prolonged and coercive police interrogation or offers of incentives.  The assertion of actual innocence should be considered in this context.

**A.    Witness recantations can be reliable evidence of innocence.**

**1.    Innocence is more than just DNA evidence.**

Since the first post-conviction DNA exoneration in 1989, more than 1,753 prisoners have been exonerated in the United States.[5]  Although DNA testing was used to exonerate 420 of those innocent prisoners, the vast majority (76%) were proved innocent through some other non-DNA evidence.[6]

DNA cases have grabbed the attention of the public, the legislature, and the courts.[7]  Yet, DNA evidence is not always available, or material, to establish innocence or guilt.  In 2002, Professor Barry Scheck, Co-Director of the Innocence Project and Member of New York State's Forensic Science Review Board, estimated that eighty percent of felony cases do not involve biological evidence amenable to DNA testing.[8]  Other commentators have estimated that "only

---

[3] 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

[4] *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (relying on *Schlup*, 513 U.S. at 327).

[5] National Registry of Exonerations, available at: http://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited March 12, 2016).

[6] *Id.*

[7] Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 57-58 (2008).

[8] *Protecting the Innocent:  Proposals to Reform the Death Penalty:  Hearing Before the S.*

about ten percent of criminal cases have any biological evidence."[9]  Even in cases where DNA

evidence was initially available, that evidence may become lost, destroyed, or degraded over

time.  The underlying wrongful conviction still exists despite the lack of DNA evidence to prove

it so.[10]  Yet wrongful convictions in cases where DNA is not available have "largely escaped

notice."[11]  DNA exonerations have taught us a great deal about the causes of wrongful

conviction, but those cases should not create the misconception that DNA evidence is the only

conclusive way to establish innocence.

From the study of the more than 1,753 exonerations around the country, researchers have

learned that the underlying causes of wrongful conviction are present regardless of whether DNA

exists to ultimately prove innocence.  The primary causes of wrongful conviction include false

testimony of informants, eyewitness misidentification, invalidated or improper forensic science,

false confessions, government misconduct, and ineffective assistance of counsel.[12]  These causes

are equally likely to produce a wrongful conviction in a case where exculpatory DNA exists as in

---

*Comm. on the Judiciary*, 107th Cong. 221 (2002).

[9] Nina Martin, *Innocence Lost*, S.F. Mag., Nov. 2004, at 78, 105.  *See also* Daniel Medwed, *Up the River Without a Procedure:  Innocent Prisoners and Newly Discovered Non-DNA Evidence in State Courts*, 47 Ariz. L. Rev. 655, 656-57 (2005) ("Evidence suitable for DNA testing . . . exists only in a smattering of criminal cases:  an estimated 80-90% of cases do not have any biological evidence.).  A study of all documented exonerations in the United States from 1989 through 2003 concluded that "[o]nly 19% of murder exonerations included DNA evidence (and none of the other non-rape exonerations)."  Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. Law. & Criminology 523, 531 (2005).

[10] Adam Liptak, *Study of Wrongful Convictions Raises Questions Beyond DNA*, N.Y. Times, July 23, 2007, at A1 ("[T]he same causes of wrongful convictions exist in cases with DNA evidence as in those cases that don't.");  David Michael Risinger, *Innocents Convicted:  An Empirically Justified Factual Wrongful Conviction Rate*, 97 J. Crim. & Criminology 761, 773 (2006-07) ("[I]t is extremely important to remember that the conditions that cause wrongful convictions in non-DNA cases—the vast majority of cases—remain unaffected by [the development of post-conviction DNA testing statutes].  We must [instead] use post-conviction DNA exonerations wisely to throw light on the more general problem.")

[11] Medwed, *supra* n.9, at 656-57.

[12] Innocence Project, The Causes of Wrongful Conviction, available at: http://www.innocenceproject.org/causes-wrongful-conviction

a case where DNA does not exist or is not relevant.  It is just as important to provide post-conviction relief to prisoners who have newly-discovered non-biological evidence of innocence—such as confessions by the actual perpetrator, statements by previously unknown witnesses, and recantations by trial witnesses—as it is to provide relief to prisoners who have newly-discovered DNA evidence of innocence.  The court should focus on the *causes* of wrongful conviction, as well as the evidence that later confirms that the conviction was wrongful.

2.    **Cases with recantation evidence should be considered as seriously as those with DNA evidence.**

Wrongful convictions have been discovered as a result of later witness recantations, but courts generally distrust recantation evidence.  Some courts interpret recantations as evidence of witness unreliability, rather than as accurate new testimony.[13]  Some judges compare the recanting witness's demeanor to that during the original testimony and find that a difference is indicative of lying in the recantation.[14]  Some courts fear that recantations are the product of duress, coercion, or a hidden motive to help the defendant with whom the witness may be related or familiar.[15]  Many courts fear that accepting a witness recantation in one case will open the floodgates in all cases.[16]

The concerns about recantation evidence undervalue the importance and reliability of recantations that has now been proven through exonerations around the country.  The concerns also fail to include any analysis of the circumstances under which the original inculpatory statements were made.

---

[13] Shawn Armbrust, *Reevaluating Recanting Witnesses:  Why the Red-Headed Stepchild of New Evidence Deserves Another Look*, 28 B.C. THIRD WORLD L. J. 75, 82 (2008).

[14] *Id.*

[15] *Id.*

[16] *Id.*

According to a 2013 study by the National Registry of Exonerations, of the 1,068 exonerations around the country at that time, at least 250 of them (23%) involved witness recantations.[17]  In some exoneration cases, courts initially rejected witness recantations and the prisoner was later proved innocent with DNA evidence.  In fact, the very first DNA exoneration—that of Gary Dotson—came after the court rejected a witness recantation.[18] Dotson was convicted of rape in 1977 when he was 22 years-old.  The alleged victim, Cathleen Crowell, described her assailant to a composite sketch artist and then later identified Dotson in a photo array, in a lineup, and at trial.  Dotson was convicted.  In 1985, Crowell recanted to her pastor and said she made up the rape allegation because she had consensual sex with her boyfriend the day before and feared that she may be pregnant, a fear that was never realized.  Crowell said that, at the time, she created the rape story in case she needed to explain the pregnancy to her parents.  She said she identified Dotson after police pressured her, pointing out how closely Dotson resembled the composite sketch.

When Crowell recanted, the court found Crowell's trial testimony was more credible than her recantation and affirmed Dotson's conviction.  Dotson made several further attempts to prove his innocence, pointing to perjured forensic testimony and prosecutorial misconduct, but his efforts were still rejected by the courts.  Crowell's recantation was ultimately corroborated in 1989 when DNA test results proved that the semen found in Crowell's underwear on the night of the alleged rape was that of her boyfriend.  Dotson's exoneration and release came four years after the victim recanted.  Had DNA evidence been unavailable, the courts would have continued to hold Dotson in prison, believing Crowell's trial testimony was true and her recantation was

---

[17] Alexandra Gross and Samuel Gross, *Witness Recantation Study:  Preliminary Findings* at 2 (May 2013), available at:
http://www.law.umich.edu/special/exoneration/Documents/RecantationUpdate_5_2013.pdf

[18] National Registry of Exonerations, Gary Dotson, available at:
http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3186 (last visited March 12, 2016); Armbrust, *supra* n.13, at 89.

false.

Other DNA exonerations have followed the same pattern.  In 1985, Jerry Watkins was convicted of the murder of an eleven year-old girl based on circumstantial evidence and the testimony of a jailhouse informant, Dennis Ackaret.[19]  Ackaret testified at trial that Watkins confessed to him when they were in a holding cell together.  Two years later, Ackaret swore in a court filing that he had learned of the details of the crime not from Watkins, but from investigators.  The Indiana courts rejected the recantation and affirmed Watkins' conviction.  In 2000, DNA evidence proved Watkins was innocent.  Watkins was released from prison thirteen years after Ackaret's recantation.

In 1999, Clarence Elkins was convicted of murdering his mother-in-law and raping his six-year-old niece.[20]  The niece identified Elkins at trial, pointing him out in the courtroom.  Elkins was convicted.  In 2002, the niece recanted her testimony to a defense investigator, and Elkins filed a motion for a new trial.  Elkins offered a videotaped deposition of the niece recanting her testimony, but the court found the recantation lacked credibility.  The judge believed that the niece had recanted under pressure from her family and found that, in her recantation testimony, the child was hesitant and seemed unsure of her answers.  The judge contrasted the recantation testimony with the original trial testimony and found that the child's demeanor at trial was much more consistent with a witness telling the truth.  Three years later, DNA testing proved Elkins was innocent and the niece's recantation was, in fact, the truth.

The sources of error that lead to wrongful convictions exist whether or not there is DNA evidence to later conclusively prove that the conviction was wrong.  When a court is faced with a defendant claiming innocence who raises recantation evidence—as opposed to DNA evidence—the court should analyze the case for sources of error known to contribute to wrongful convictions in other cases.  The court should look for evidence that corroborates the recantation,

---

[19] Armbrust, *supra* n.13, at 91.

[20] *Id.* at 97.

including the circumstances that gave rise to the initial false statement.[21]

**B.    Courts should consider a recantation in context when assessing its validity.**

Recantation evidence may be indicative of innocence.[22]  The Ninth Circuit, in *Jones v. Taylor*, held that a court faced with recantation evidence must consider the recantation "in addition to [the witness's] trial testimony and in the context in which he recanted[.]"[23]  The *Jones* court recognized that it should consider the circumstances giving rise to the recantation, but failed to consider the circumstances giving rise to the original testimony now asserted to be false.[24]  When faced with two competing statements from a witness, the court should consider the circumstances giving rise to ***each*** statement to determine which of the two should be given more weight.  When the circumstances include improper interrogation tactics, the original testimony is suspect.

**1.    Interrogation methods are a source of error known to result in false evidence and wrongful convictions.**

Improper interrogation methods are a known source of error in wrongful conviction cases.  In 15-20% of the first 200 DNA exoneration cases, improper interrogation tactics led to

---

[21] *See, e.g., State v. McCallum*, 561 N.W.2d 707 ¶¶ 23-24 (1997) ("We agree with the court of appeals that the difficulty in this kind of case is manifest:  How can a defendant corroborate the recantation of an accusation that involves solely the credibility of the complainant, inasmuch as there is no physical evidence and no witness. . . . [T]he degree and extent of the corroboration required varies from case to case based on its individual circumstances.  Here, the sexual assault allegation was made under circumstances where no others witnessed the event.  Further, there is no physical evidence that could corroborate the original allegation or the recantation.  Under these circumstances, requiring a defendant to redress a false allegation with significant independent corroboration of the falsity would place an impossible burden upon any wrongly accused defendant.  We conclude, under the circumstances presented here, the existence of a feasible motive for the false testimony together with circumstantial guarantees of the trustworthiness of the recantation are sufficient to meet the corroboration requirement.").

[22] *See Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2001) (citing *Schlup*, 513 U.S. at 327).

[23] *Jones*, 763 F.3d at 1248.

[24] *Id.*

false confessions.[25]  These interrogation methods have been long-studied in the context of false

confessions, and researchers are now beginning to address the same concerns when

interrogations lead to false testimony from independent witnesses.[26]  Psychologists have done

extensive research into the methods of interrogation and the use of psychological techniques that

may result in eliciting false testimony.[27]

### (a)    Background on Interrogation Methods Used on Suspects

From the late nineteenth century through the 1930s, police used "third-degree" methods

of interrogation in which officers inflicted physical or mental pain and suffering on suspects to

elicit confessions and other information.[28]  The methods ranged from direct physical assaults

(e.g., simulating suffocation by putting the suspect's head in water; beatings; kicking) to indirect

suffering (e.g., prolonged confinement; deprivation of sleep; threats of harm).[29]  Experts found

that the methods resulted in large numbers of coerced false confessions.[30]

From the 1930s to the 1960s, the "third-degree" method of interrogation declined and

was replaced by psychological interrogation techniques.[31]  Psychological interrogation is the

---

[25] Saul M. Kassin et al., *Police-Induced Confessions:  Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 4 (2010) (hereafter "*Police-Induced Confessions*").

[26] Danielle M. Loney et al., *Coercive Interrogation of Eyewitnesses Can Produce False Accusations*, Journal of Police and Criminal Psychology (February 2015); Timothy E. Moore, *Shaping Eyewitness and Alibi Testimony with Coercive Interview Practices*, The Champion (October 2014).

[27] Kassin, *Police-Induced Confessions*, *supra* n.25; Saul M. Kassin et al., *Interviewing Suspects: Practice, Science, and Future Directions*, 39 LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 15 (2010) (hereafter "*Interviewing Suspects*"); Gisli H. Gudjonsson, *Psychological Vulnerabilities During Police Interviews.  Why are They Important?*, 15 LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 161 (2010).

[28] Kassin, *Police-Induced Confessions*, *supra* n.25, at 6.

[29] *Id.*

[30] *Id.* (citing Wickersham Commission Report (1931).  National Commission on Law Observance and Law Enforcement (1931).  *Report on Lawlessness in Law Enforcement*. Washington D.C.:  U.S. Government Printing Office)).

[31] Kassin, *Police-Induced Confessions*, *supra* n.25, at 6.

norm today in the United States, despite the United States Supreme Court's recognition in *Miranda v. Arizona* that these methods are inherently coercive and "created for no purpose other than to subjugate the individual to the will of his examiner."[32]  The *Miranda* court found that, although not involving physical intimidation, the interrogation environment "carries its own badge of intimidation" that "is equally destructive of human dignity."[33]

This is equally true of witnesses as it is of defendants.  Indeed, where witnesses are threatened with prosecution or other harms if they do not cooperate (i.e., provide the information police want), there is no difference in status.[34]  The witness is interrogated as though he were the offender.[35]  Researchers have astutely remarked:  "If coercive interrogation procedures can get people to surrender their own autonomy, how difficult can it be to coerce nonsuspects to implicate a suspect and by doing so cooperate with law enforcement?"[36]

### (b)    Problems with Specific Interrogation Methods

Social scientists have isolated a number of problems arising from psychological interrogation methods, among them the following:

1.  Prolonged interrogation can exacerbate distress and heighten the need to extricate

---

[32] 384 U.S. 436, 457, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[33] *Id.*

[34] *See*, *e.g.*, F.E. Inbau, J.E. Reid, J.P. Buckley, B.C. Jayne, *Criminal Interrogation and Confessions* 336-37 (2013) (5th ed.) (In this training manual for law enforcement, authors write: "Whenever a witness or other prospective informant refuses to cooperate because he is deliberately protecting the offender's interests or because he is antisocial or antipolice, an investigator should seek to break the bond of loyalty between the witness and the offender or *accuse the witness of the offense and proceed to interrogate the witness as though he were actually considered the offender. . . . When all other methods have failed, the investigator should accuse the subject of committing the crime (or of being implicated in it in some way) and proceed with an interrogation as though the person was, in fact, considered to have involvement in the crime.*  A witness or other prospective informant, thus, faced with a false accusation, may be motivated to abandon his efforts to protect the offender or to maintain antisocial or antipolice attitudes.") (emphasis added).

[35] *Id.*

[36] Moore, *supra* n.26, at 35.

oneself from the situation.  Psychologists explain that, "under stress, people seek desperately to affiliate with others for the psychological, physiological, and health benefits" associated with fundamental human needs for social support.[37]  Sleep deprivation can increase the susceptibility to influence and impair decision-making abilities.[38]  Interrogations that last for many hours with the subject in isolation increases anxiety and the incentive to escape by capitulation to interrogators.[39]  The Court in *Miranda* recognized that this type of interrogation method "exacts a heavy toll on individual liberty and trades on the weakness of individuals."[40]

2.  The interviewer's presentation of false evidence can alter a subject's perceptions, beliefs, and memories.  The use of false evidence during interrogation is a controversial tactic, and not all interrogation trainers approve of the ploy.[41]  The United States Supreme Court has recognized that deception can induce involuntary confessions, although the Court has never prohibited such tactics.[42]  The danger of using false evidence is that people start to distrust their own memories when confronted with trusted (albeit false) evidence.[43]  The "proof" heightens the subject's anxiety level, inhibiting concentration and diminishing cognitive capacity.[44]

---

[37] *Id.* (citing B.N. Uchino et al., *The Relationship Between Social Support and Physiological Processes:  A Review With Emphasis on Underlying Mechanisms and Implications for Health*, 119 PSYCHOLOGICAL BULLETIN 488 (1996)).

[38] *Id.* at 45.

[39] *Id.*

[40] *Miranda*, 384 U.S. at 455.

[41] Kassin, *Police-Induced Confessions*, *supra* n.25, at 12.

[42] *See*, *e.g.*, *Miranda*, 384 U.S. at 455 n.24.

[43] Kassin, *Interviewing Suspects*, *supra* n.27, at 45.

[44] Moore, *supra* n.26, at 37.  Experiments have confirmed the increase in false confessions after the introduction of false evidence.  In one study, researchers accused college students typing on a keyboard of causing the computer to crash by pressing a key they were earlier instructed to avoid.  Kassin, *Interviewing Suspects*, *supra* n.27, at 45.  The students were, in fact, innocent and initially denied pressing the key.  In some sessions, a knowing participant declared that she witnessed the subject hitting the forbidden key.  The false evidence nearly doubled the number of students willing to sign a written confession, from 48 to 94 percent.  Other studies have replicated the same effect.

3.  Subjective questioning can alter memory or give subjects an easy way to capitulate. In a psychological interrogation, the police officer does most of the talking, especially in the early part of the interrogation.[45]  The officer may deliberately or inadvertently convey details that alter the subject's version of events.[46]  Courts across the country, including in Oregon, have begun to recognize the very real impact of suggestive questioning on witness memory.[47]  Even when a subject does not come to "remember" details of which he was not previously aware, that subject can easily adopt new information "leaked" through the interrogation as a way to escape that interrogation.[48]

Law enforcement agencies in other parts of the world, including England, have moved away from the highly-confrontational interrogation approach and, instead, developed a more objective, inquisitorial approach aimed at fact-finding rather than just obtaining confessions.[49] The "PEACE" model describes the five distinct parts to that approach—preparation and planning, engage and explain, account, closure, and evaluate—which was developed through a collaboration of police officers, psychologists, and lawyers.[50]  Police officers using the PEACE model "never resort[ ] to threats, promises, and intimidation, or the kind of maximization and minimization tactics through which threats and promises are often implied."[51]

Social scientists suggest that the ill-effects of psychological interrogation methods may

---

[45] Moore, *supra* n.26, at 35.

[46] *Id.*

[47] *See, e.g.*, *State v. Lawson*, 352 Or. 724, 743, 291 P.3d 673 (2012) ("The way in which eyewitnesses are questioned or converse about an event can alter their memory of the event.  The use of suggestive wording and leading questions tend to result in answers that more closely fit the expectation embedded in the question.  Witness memory can become contaminated by external information or assumptions embedded in questions or otherwise communicated to the witness.").

[48] Moore, *supra* n.26, at 35.

[49] Kassin, *Interviewing Suspects*, *supra* n.27, at 40, 46-47.

[50] *Id.* at 40.

[51] *Id.* at 47.

be even more pervasive in witness interrogations, as opposed to suspect interrogations.[52]
Witnesses are subjected to the same anxiety-producing techniques that cause suspects to search
desperately for escape.  Implicating another in the crime may be that means of escape and has
few, if any, negative consequences for the witness who is then commended by police for his
cooperation.

Courts should not be surprised when the witness later recants.  And courts should not
reject the recantation because recantations do not appear conclusive the way that DNA evidence
does.  Discounting recantations that come after the use of improper interrogation methods
incentivizes those methods to secure convictions.

2.      **The interrogation methods, here, undermine the reliability of the initial
testimony and support the reliability of the witnesses' recantations.**

Mr. Gable has offered a number of recantations of witnesses who testified at trial or
grand jury.  The witnesses have each said that his or her testimony was the result of police
pressure or offers of incentives—the very tactics that researchers have said can result in false
testimony.  The Court should consider the recantations here in light of the interrogation tactics
that have produced false testimony in cases of known wrongful conviction.  The Court should
also consider that the sheer number of independent, unrelated witnesses alleging false testimony
as a result of police pressure in this case is further evidence to corroborate the recantations.

(a)      **Repeated Use of Polygraph Examinations**

A number of witnesses in this case initially denied any knowledge about the murder, but
changed their stories during interrogations in which the witnesses were repeatedly subjected to
polygraph examinations and told the tests proved that they were lying.  Swearingen, a minor, was
subjected to 23 polygraph examinations on 13 days.  Several of the examinations were
administered on the same day.  Studer was subjected to eight polygraph examinations, including,

---

[52] Moore, *supra* n.26; Loney, *supra* n.26.

on one occasion, three in one day.  Harden was subjected to seven polygraphs, and four of them occurred over a span of just five days.  Walsh was subjected to three polygraphs and testified that he felt like the police were trying to "brainwash" him.  Keerins initially denied any knowledge about the murder, but changed his story to protect his brother and was later subjected to four polygraph examinations to confirm the false testimony.  Walker was subjected to four polygraph examinations and told that the tests proved that he was lying about whether Mr. Gable confessed to him yet the tests were inconclusive about whether Walker himself participated in the murder.  Walker changed his story in response to the polygraph examination, then recanted that story in a lengthy interview in 1993.  Several of the witnesses confirmed in his or her recantation that police said that the tests showed they were lying when they were, in fact, telling the truth.  Dr. David Raskin stated in his affidavit that the police failed to use proper polygraph testing protocols, increasing the risk of eliciting false information from witnesses.[53]

The use of false polygraph evidence has been linked to wrongful convictions in other cases.  In 1986, Dennis Halstead was convicted of rape and murder after his co-defendant, John Kogut, confessed to the crime and implicated Halstead.[54]  Kogut was polygraphed three times and then interrogated for more than 18 hours, during which police told him that he failed the lie detector test.  Kogut ultimately signed a confession, settling on a version of the facts that had changed five times before.  Halstead spent 17 years in prison before his conviction was overturned in 2003 after DNA evidence proved he was innocent.  Kogut's conviction was ultimately overturned two years later, and the court specifically found that Kogut's confession after the polygraphs was contradicted by DNA and other forensic evidence.  The use of misleading evidence, like false polygraph results, can result in false testimony.[55]

---

[53] Affidavit of David C. Raskin, Ph.D [Dkt. No. 77].

[54] National Registry of Exonerations, Dennis Halstead, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3273 (last visited March 12, 2016).

[55] In another exoneration case, Johnnie Savory was convicted of a double murder in 1977 after

### (b)    Use of Incentives

A number of witnesses in this case were offered incentives to testify against Mr. Gable, even though the witnesses initially denied having any information about the crime.  Studer was facing a ten-year sentence on an unrelated offense when he was offered a suspended sentence with one year at the Marion County work release center in exchange for testimony implicating Mr. Gable.  Walsh had an unrelated criminal case pending that "went away" after he agreed to implicate Mr. Gable.  Police also paid for travel, hotel, and food expenses in exchange for assistance from Walsh.  Harden told other inmates that he was to receive money in exchange for implicating Mr. Gable.  Keerins was promised a transfer to Oregon from an Idaho prison in exchange for implicating Mr. Gable, which, according to Keerins, was "very important" to him. Police also promised Walker that he would not be arrested on outstanding warrants if he cooperated during the interview.

As some commentators put it, "when the criminal justice system offers witnesses incentives to lie, they will."[56]  Former Assistant and Associate Attorney General and current Senior Ninth Circuit Judge Stephen S. Trott has written extensively about the dangers of "using rewarded criminals or witnesses."[57]  Indeed, 45.9% of the first 111 death row exonerations since 1970 involved false testimony from incentivized witnesses, and such testimony is the leading

---

he confessed to the crime following 20 hours of police interrogation and two polygraph examinations in one day.  Savory recanted his confession, and independent witnesses recanted their testimony implicating Savory.  The court rejected those recantations.  DNA test results finally proved Savory's innocence in 2015, after he spent nearly 30 years in prison.  *See* National Registry of Exonerations, Johnnie Savory, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4630 (last visited March 12, 2016).

[56] Armbrust, *supra* n.13 (citing Rob Warden, *The Snitch System:  How Snitch Testimony Sent Randy Steidl and Other Innocence Americans to Death Row* 2 (2004)).

[57] Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L.J. 1381 (1996).

cause of wrongful convictions in capital cases, most of which do not involve DNA evidence.[58]

The same problem exists in non-capital cases.  In 1987, Christopher Abernathy was convicted of first-degree murder, aggravated criminal sexual assault, and armed robbery after an acquaintance, Allen Dennis, told police that Abernathy admitted to kidnapping, raping, and stabbing a 15-year-old girl.[59]  More than 15 years later, Dennis recanted his testimony and revealed that police promised him lenient treatment on some unrelated minor charges and also gave him $300 to buy clothes for court.  In 2014, DNA testing excluded Abernathy as the perpetrator, and Abernathy was finally released in 2015—twenty eight years after Dennis falsely implicated him in exchange for police favors.[60]

Prosecutors, too, have recognized the weight of recantations that come from witnesses who were incentivized to incriminate the defendant.  In 2013, David Ranta was exonerated of murder after a key prosecution witness recanted and prosecution investigators discovered that police had allowed the witness, who was in jail facing unrelated charges at the time, permission to leave jail, smoke crack cocaine, and have sex with prostitutes in return for implicating Ranta.[61]  The Kings County Conviction Integrity Unit did not oppose Ranta's motion to vacate the conviction, and Ranta was exonerated.[62]

---

[58] *Id.*

[59] National Registry of Exonerations, Charles Abernathy, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4640 (last visited March 12, 2016).

[60] In another exoneration case, Quedillis Ricardo Walker was wrongfully convicted after a witness, Sarah Dunbar, implicated Walker in a murder.  Dunbar later admitted that she lied in exchange for leniency on unrelated charges.  DNA tests proved Walker's innocence after he served 12 years in prison.  National Registry of Exonerations, Quedillis Ricardo Walker, available at:  http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3712 (last visited March 12, 2016).

[61] National Registry of Exonerations, David Ranta, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4127 (last visited March 12, 2016).

[62] *Id.*

### (c)    Threats of Charges

Several witnesses in this case implicated Mr. Gable only after police threatened them or their family members with the murder charge.  It does not appear that those witnesses were suspects when they were threatened with charges.  Swearingen testified in her recantation that she was afraid she would spend the rest of her life in jail if she did not tell the police what they wanted to hear, and she was granted immunity for the murder charge in exchange for implicating Mr. Gable.  Harden was threatened with the murder charge and told that police would put a "snitch jacket" on him and send him to prison.  Keerins was not threatened with the murder charge himself, but implicated Mr. Gable to protect his brother from charges.  Walker said in his recantation that he thought police were suggesting during interrogations that he would be charged with the murder, if not Mr. Gable.

The ability to leverage the threat is self-explanatory:  a witness under intense police pressure may implicate another to save himself.  In 1978, Joseph Sledge was convicted of the murders of two women in Elizabethtown, North Carolina.[63]  At trial, the most critical evidence for the prosecution was the testimony of the two prison inmates—Herman Baker and Donnie Sutton—each of whom testified that Sledge confessed to them in prison.  Sledge was convicted and sentenced to consecutive terms of life in prison.  Thirty-five years later, in 2013, Baker recanted his testimony.  Baker earlier said he had implicated Sledge because police threatened to charge him with the murder unless he cooperated.  In 2015, Sledge was finally exonerated after DNA tests proved his innocence.[64]

---

[63] National Registry of Exonerations, Joseph Sledge, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4627 (last visited March 12, 2016).

[64] In another exoneration case involving kidnapping and rape in 1986, four men were convicted after police pressured a witness into implicating the men in the crime by threatening the witness with the charge and offering him leniency on an unrelated charge.  The four men were proved innocent through DNA testing in 2001.  *See* National Registry of Exonerations, Marcellius Bradford, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3039 (last visited

In another case of false witness testimony, the Governor of Missouri issued a full pardon to a defendant who was wrongfully convicted as a result of a witness who was threatened with charges by police.[65] Johnnie Lee Wilson was convicted of murder in 1987 after Gary Wall gave a recorded statement saying that Wilson had confessed to the crime. Wall also passed a polygraph examination. Two years later, Wall recanted, saying that the police threatened to put him in jail if he did not implicate Wilson and promised him a reward if he did. Missouri Governor Mel Carnahan conducted an independent investigation and issued a full pardon in 1995, finding Wilson innocent.

Courts in other cases have recognized a federal constitutional violation when police exert "improper influence" over exculpatory witnesses by subjecting those witnesses to threats, intimidation, and fear to produce inculpatory testimony.[66] It has yet to be decided whether the same rule applies to neutral witnesses subjected to the same tactics.

In several of the exoneration cases discussed above, the exonerees were lucky enough to have biological evidence available to prove their innocence. Several of those DNA exonerees, however, also had recantation evidence that seems to have been ignored or discounted. Recantation evidence should be considered for what it represents: evidence that something went wrong. When coupled with evidence of conduct proven to be a source of error in other wrongful convictions, that recantation evidence must be given serious consideration to support a claim for

---

March 12, 2016).

[65] National Registry of Exonerations, Johnny Lee Wilson, available at: http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3454 (last visited March 12, 2016).

[66] *See*, *e.g.*, *U.S. v. Juan*, 704 F.3d 1137, 1141-42 (9th Cir. 2013) ("We have often stressed the 'imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights.' Violating this duty by bullying a prosecution witness away from testimony that could undermine the government's case is no less distortive of the judicial fact-finding process than improperly meddling with the testimony of a defense witness. Regardless of whose witness is interfered with, the constitutional harm to the defendant is the same—the inability to mount a fair and complete defense.") (citations omitted).

actual innocence.  Recantation evidence like that presented in this case is deserving of further judicial review to determine how interrogation tactics may have affected the defendant's conviction.

## IV.  CONCLUSION

*Amicus* OIP asks this Court to consider the recantations, whether by affidavit or at an evidentiary hearing, in light of the circumstances giving rise to the recantation as well as the circumstances giving rise to the testimony now asserted to be false.  Specifically, OIP requests the Court consider the specific interrogation techniques used on independent witnesses who initially denied any knowledge of the murder and have now confirmed that their trial or grand jury testimony implicating Mr. Gable was false and came only as a result of police interrogation tactics.  The court should determine whether the interrogation tactics that lead to the initial testimony is evidence that undermines the reliability of that initial testimony and supports the reliability of the later recantations of these independent, unrelated witnesses.

DATED:  March 16, 2016

OREGON INNOCENCE PROJECT


By  s/ Janis C. Puracal_____
    Steven T. Wax (OSB #850120)
    Email:  wax@oregoninnocence.org
    Aliza B. Kaplan (OSB #135523)
    Email:  kaplan@oregoninnocence.org
    Janis C. Puracal (OSB #132288)
    Email:  puracal@oregoninnocence.org
    Oregon Innocence Project
    P.O. Box 40588
    Portland, OR 97240
    (503) 768-7321
    Attorneys for *Amicus Curiae*
    Oregon Innocence Project