FREDERICK M. BOSS
Deputy Attorney General
NICK M. KALLSTROM  #050023
SAMUEL A. KUBERNICK  #045562
Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4794
Email:  Nick.M.Kallstrom@doj.state.or.us
        Samuel.A.Kubernick@doj.state.or.us

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK E. GABLE, | Case No. 3:07-cv-00413-AC |
| Petitioner, | |
| | AMENDED SURREPLY TO PETITIONER'S REPLY |
| v. | |
| MAX WILLIAMS, | |
| Respondent. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PETITIONER'S CLAIMS ALLEGING TRIAL COURT ERROR UNDER
        *CHAMBERS v. MISSISSIPPI* ARE WITHOUT MERIT ................................... 2

        A.      Petitioner articulates an incorrect standard for reviewing claims under
                *Chambers* ........................................................................................... 2

        B.      Crouse's hearsay statements do not bear "persuasive assurances of
                trustworthiness," such that the trial court violated petitioner's due process
                rights by excluding the statements pursuant to state evidentiary law .................... 4

        C.      Any error in excluding Crouse's statements was harmless ................................ 17

III.    PETITIONER HAS FAILED TO DEMONSTRATE ACTUAL INNOCENCE ............. 18

        A.      Cappie Harden's recantation is not credible ........................................... 19

        B.      Jodie Swearingen's recantation is not new credible evidence of
                petitioner's innocence ........................................................................... 21

        C.      John Kevin Walker's recantation is not credible .................................... 26

        D.      Earl Childers' corroborated testimony precludes a finding that no
                reasonable juror would vote to convict petitioner ................................. 34

        E.      Petitioner's claim that Vierra recalled the events of January 17, 1989,
                better in 2010 than she did two decades earlier is not credible ........... 36

        F.      Petitioner's allegations against investigators are not supported by the
                record .................................................................................................. 38

IV.     CONCLUSION ............................................................................................... 43

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

# TABLE OF AUTHORITIES

## Cases

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................................................. 17

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ........................................................ passim

*Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010) ......................................................... 2

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007), *cert. denied*, 558 U.S. 1049 (2009) ................. 25

*Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012) ........................................................ 5, 17

*Dickens v. Ryan,* 740 F.3d 1302 (9th Cir. 2014) ............................................................ 7

*Doe v. Menefee*, 391 F.3d 147 (2nd Cir. 2004) ............................................................ 19

*Fry v. Pliler*, 551 U.S. 112 (2007) ....................................................................... 17

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ......................................................... 3, 4

*Jones v. Taylor*, 783 F.3d 1242 (9th Cir. 2014) ........................................................... 26

*King v. Trujillo*, 638 F.3d 726 (9th Cir. 2011) ............................................................ 25

*Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) ............................................... 5, 14, 17

*Montana v. Egelhoff*, 518 U.S. 37 (1996) ................................................................... 2

*Phillips v. Herndon*, 730 F.3d 773 (9th Cir. 2013) .......................................................... 5

*Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011) ......................................................... 11

*Schlup v. Delo*, 513 U.S. 298 (1995) .............................................................. 1, 18, 19

*State v. Lyon*, 304 Or. 221 (1987) ....................................................................... 10

*U.S. v. Jacques*, 744 F.3d 804 (1st Cir. 2014) ............................................................ 41

*United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003) ................................................. 42

*United States v. Jackson*, 540 F.3d 578 (7th Cir. 2008) ..................................................... 5

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) ..................................................... 5

*Williams v. Taylor*, 529 U.S. 420 (2000) ................................................................... 7

*Woods v. Booker*, 450 Fed. Appx. 480 (6th Cir. 2011), *cert den*, 132 S.Ct. 2751 (2012) ............ 20

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

**United States Code**

28 U.S.C. § 2254(e)(1) .................................................................................................. 5

28 U.S.C. § 2254(e)(2) ................................................................................... 6, 7, 10, 11

28 U.S.C. § 2254(e)(2)(A) or (B) ............................................................................... 6

28 U.S.C. § 2254(e)(2)(A)(i) and (ii) .......................................................................... 6

**Rules and Regulations**

FRE 804(b)(3) .............................................................................................................. 5

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

## I.    INTRODUCTION

Respondent replies to petitioner's *Reply to Response to Brief in Support of Amended Petition for Writ of Habeas Corpus* (Docket No. 114), filed with this Court on March 16, 2016. In his reply, petitioner argued claims against both the trial court and trial counsel, and argued that the procedural default of his claims should be excused through a showing of "actual innocence" under *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

With respect to both his claims for relief and his assertion of "actual innocence," petitioner relies heavily on statements given decades after the jury rendered its unanimous verdict. Some of the statements are not sworn statements, and none of the statements have been subjected to any sort of adversarial testing. As discussed below, even the post-trial statements of Randy Martinak, a former DOJ investigator, are contrary to the state-court record and are unreliable given the passage of time. As argued in respondent's *Response to Brief in Support of Amended Petition for Writ of Habeas Corpus* (Docket No. 101), and as discussed further below, there are several additional reasons—in addition to the passage of time—that the post-trial statements of petitioner's former criminal associates should be viewed with the utmost suspicion, especially given that several of their accounts have continually shifted in the years since petitioner's trial.

Given the unreliability of the record petitioner has attempted to construct in the decades since his conviction, and given the substantial evidence of petitioner's guilt that has remained intact despite that passage of time, petitioner falls far short of demonstrating, as he must in order to obtain review of his defaulted claims, that "no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Thus, for the reasons previously provided in the *Response*, as well as those further described below, this Court should decline to review any defaulted claims, deny relief on the merits of the claims that were fairly presented in state court,

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and dismiss this action with prejudice.  The Court should likewise deny petitioner's request for an evidentiary hearing.[1]

## II.    PETITIONER'S CLAIMS ALLEGING TRIAL COURT ERROR UNDER *CHAMBERS v. MISSISSIPPI* ARE WITHOUT MERIT.

The trial court excluded the unsworn hearsay statements of Johnny Lee Crouse at petitioner's trial because they did not fit within any hearsay exception under state law.  During the state-court proceedings, petitioner never argued that the Due Process Clause required their admission under *Chambers v. Mississippi*, 410 U.S. 284 (1973).  Accordingly, the claim is procedurally defaulted.  In any event, because the hearsay statements did not bear "persuasive assurances of trustworthiness," the trial court's exclusion of the hearsay statements pursuant to state evidentiary law did not violate petitioner's due-process rights under *Chambers.*

### A.    Petitioner articulates an incorrect standard for reviewing claims under *Chambers*.

Petitioner asserts that "*Chambers* establishes a fundamental constitutional principle, not mere error correction."  (CR 114, p. 52).  However, in *Chambers* itself, the Supreme Court explained that it was "establish[ing] no new principles of constitutional law[,]" and that its holding was "under the facts and circumstances of this case."  410 U.S. at 302-03; *see also Christian v. Frank*, 595 F.3d 1076, 1085 (9th Cir. 2010) (noting that *Chambers* was "an opinion that was explicitly tailored to 'the facts and circumstances of [that] case[.]'" (quoting *Chambers*, 410 U.S. at 303)).  Contrary to petitioner's assertion, the Court later described *Chambers* as "an exercise in highly case-specific error correction."  *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996) (plurality).[2]

_____

[1] However, as discussed in the initial response, to the extent that the Court intends to rely upon petitioner's recantation evidence, an evidentiary hearing should be held, where the credibility and demeanor of the recanting witnesses could be assessed by this Court and the claims in their affidavits could be subjected to adversarial testing.

[2] Petitioner characterizes the Court's description of *Chambers* in *Egelhoff* as dicta.  (CR 114, p. 52).  However, in describing *Chambers* as "an exercise in highly case-specific error correction[,]" the Court was rejecting an inmate's argument that a "*Chambers* principle" could be derived from the *Chambers* opinion.  *Egelhoff*, 518 U.S. at 52-53.  The Court then went on to

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In *Chambers*, the trial court excluded evidence that a third party (i.e., McDonald) had confessed to the crime because, unlike other jurisdictions, Mississippi's rule against hearsay did not contain an exception for statements against penal interest. The Court held that the exclusion of that evidence—when coupled with Chambers inability to cross-examine McDonald due to Mississippi's "voucher rule"—violated the due process rights of Chambers because that evidence "bore persuasive assurances of trustworthiness." 410 U.S. at 302. The particular circumstances that led the Court to conclude that McDonald's confessions "bore persuasive assurances of trustworthiness" were described at length in the previous response (CR 101, pp. 55-61) and will not be repeated here, but those circumstances included testimony from a "lifelong friend" of McDonald who testified that he witnessed McDonald commit the murder. *Id.* at 289.

In arguing for a more lenient standard of "trustworthiness," petitioner claims that the exclusion of evidence pursuant to state evidentiary rules violates due process where "there is some evidence corroborating the third-party's guilt so that the proffered evidence is not speculative or remote." (CR 114, p. 53). In support of his "some evidence" standard, petitioner cites *Holmes v. South Carolina*, 547 U.S. 319 (2006). *Holmes* does not purport to set out such a standard, and is of limited applicability to petitioner's claim under *Chambers*.

In *Holmes*, the Court considered a challenge to a South Carolina evidentiary rule that excluded a criminal defendant's evidence of third-party guilt if the State's evidence of guilt was strong. In describing the South Carolina rule, the Court explained: "If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of

---

explain that "the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Id.* at 53.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

harassment, prejudice, or confusion of the issues." *Id.* at 329.  The Court held that the South

Carolina evidentiary rule violated due process.[3]  No comparable rule is at issue here.

Crouse's statements were excluded because they were unsworn hearsay that did not fit

within any hearsay exception under state law.  *See Chambers*, 410 U.S. at 302 (noting that "no

rule of evidence has been more respected or more frequently applied in jury trials than that

applicable to the exclusion of hearsay").  Petitioner does not challenge the state evidentiary rules

under which Crouse's statements were excluded.  Instead, petitioner argues that the trial court's

exclusion of those hearsay statements violated his due process rights under *Chambers*, despite

their inadmissibility under state law.  However, petitioner does not—and cannot—cite to any

authority in which a court has held that the Due Process Clause compels the admissibility of

hearsay statements in circumstances where, as here, the declarant (i.e., Crouse) has made

multiple inconsistent statements, such that it cannot be said that the statements bear "persuasive

assurances of trustworthiness."

**B.    Crouse's hearsay statements do not bear "persuasive assurances of trustworthiness," such that the trial court violated petitioner's due process rights by excluding the statements pursuant to state evidentiary law.**

As described at length in the previous response (CR 101, pp. 38-50), Crouse's statements

to police regarding his involvement in Francke's murder were not consistent.  To briefly recap,

in his first statement, Crouse claimed to have killed his sister, but did not claim to have killed

Francke.  Instead, he stated that he observed an altercation in front of the Dome Building

involving five people, and chased one of the participants for a number of miles.  (Ex. 179,

pp. 13-49).  Next, he claimed that he killed Francke in exchange for $300,000 from a man he had

met coincidentally, known only as "Juan."  (Ex. 179, pp. 50-74).  Next, Crouse claimed that he

---

[3] *Chambers* was cited in *Holmes*, but it was cited as an example in which the Court found that "arbitrary" evidentiary rules can work a due process violation.  *Holmes*, 547 U.S. at 325.  In *Chambers*, evidence of third-party guilt was excluded because Mississippi's hearsay rule did not contain an exception for statements against penal interest and because Mississippi enforced the "voucher rule," which prevented Chambers from cross-examining McDonald.  *Id.*  No such "arbitrary" evidentiary rules are at issue here.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

confronted and killed Francke in an effort to obtain his records from the Dome Building.

(Tr. 9522, 9543).  Next, Crouse claimed that he committed the murder during the course of a car

burglary.  (Ex. 179, pp. 94-116).  Next, Crouse recanted.  (Tr. 9547).  Next, Crouse requested to

speak with officers to recant his recantation.  (Ex. 179, pp. 144-54).  Next, Crouse stated that he

declined a $10,000 cash offer from prison officials to kill Francke.  (Ex. 179, pp. 155-248).

Next, Crouse stated that he assisted the actual killer in concealing the murder, helping him to

bury his clothes, among other things.  (*Id.*).  Finally, when his claims could not be corroborated,

Crouse denied any involvement in Francke's death, acknowledging that all of his stories were

false.  (Ex. 179, pp. 249-90); c*f. Phillips v. Herndon*, 730 F.3d 773, 777 (9th Cir. 2013) ("There is

no dispute that [a third party] gave three conflicting and contradictory versions of the murder,

nor was it unreasonable for the California Court of Appeal to conclude that these statements

rendered [the third party]'s own inculpatory statement unreliable.").[4]

Based on the sheer number of accounts that Crouse provided, his statements could not be

considered to bear "persuasive assurances of trustworthiness" on par with the statements at issue

in *Chambers*, or any of the other cases cited by petitioner.  *Cf. Lunbery v. Hornbeak*, 605 F.3d

754, 761 n. 3 (9th Cir. 2010) (noting that hearsay statements of third-party were "completely

consistent" with murder evidence); *Cudjo v. Ayers*, 698 F.3d 752, 766 (9th Cir. 2012) (presuming

to be correct under 28 U.S.C. § 2254(e)(1) the state court's finding that a third-party confession

---

[4] As discussed in the initial response (CR 101, p. 51), because Crouse gave so many inconsistent statements, Crouse's hearsay statements would likely have been insufficiently trustworthy to fit within the hearsay exception for statements against penal interest even if Crouse had been unavailable to testify, as that hearsay exception requires.  *Cf. United States v. Moore*, 651 F.3d 30, 81 (D.C. Cir. 2011) (excluding third-party murder confession under FRE 804(b)(3) where "the details of [the third party]'s story vary significantly in each of the four accounts he gave, and he denied killing [the victim] both before and after claiming that he did.  Other circuits have held that such contradictions can alone render an otherwise admissible statement untrustworthy."); *United States v. Jackson*, 540 F.3d 578, 589-90 (7th Cir. 2008) ("[A] lot of corroboration would be needed to admit the [conflicting] hearsay statements of an incredible and untrustworthy declarant.").  Of course, the standard of trustworthiness is necessarily higher when arguing, as petitioner does here, that the Due Process Clause mandates the admission of evidence despite its inadmissibility under state law.

Page 5 -    AMENDED SURREPLY TO PETITIONER'S REPLY
NMK/7901387-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

was "probably true" and was given "under circumstances providing substantial assurances that the confession was trustworthy").

In arguing that the trial court violated petitioner's due process rights by excluding Crouse's hearsay statements, petitioner relies primarily on evidence that was not before the trial court.[5]  As discussed in the previous response (CR 101, pp. 63-64), that evidence cannot be considered in this proceeding to support petitioner's *Chambers* claim because petitioner has failed to establish that such evidence is admissible under 28 U.S.C. § 2254(e)(2).  In his reply, petitioner argues that he diligently presented "the central Crouse evidence" (much of which was presented by the State), but he offers no explanation as to why he failed to offer the evidence he now seeks to rely upon in this habeas proceeding.  (CR 114, p. 65).  He argues that his newly presented evidence "meets the § 2254(e)(2) standard, if it applies," but does not explain why, other than to argue that he was "hamstrung by ineffective attorneys[,]" again without further elaboration.  (CR 114, p. 65).  However, that argument does not address the requirements of 28 U.S.C. § 2254(e)(2)(A) or (B).[6]  Moreover, "[a] petitioner's attorney's 'fault' is generally attributed to the petitioner for purposes of § 2254(e)(2)'s diligence requirement."  *Dickens v.*

---

[5] Petitioner faults respondent's chronology in the initial response for not including Randy Martinak's description of "the emotional interview where Crouse broke down and asked the female investigator, McLaughlin, to leave the room before he confessed, and the FBI polygraph[.]"  (CR 114, p. 58).  In the initial response, respondent attempted to summarize the evidence that was actually before the trial court to respond to petitioner's claim against the trial court.  Evidence of the "emotional interview"—at least as it has recently been described by Martinak in Pet. Ex. C, p. 65 and Pet. Ex. I, pp. 4-5—was not before the trial court.  Martinak testified before the trial court that he asked McLaughlin to leave at one point during his interview with Crouse.  (Tr. 9524-26).  However, as discussed further below, his recent accounts of that incident as set out in petitioner's exhibits differ substantially from his contemporaneous report and trial-court testimony.  The polygraph was not presented to the trial court either.  The interviews discussed in respondent's response were the interviews presented to the trial court.  (Tr. 9562-63).

[6] For evidence in support of petitioner's habeas claims to be admissible under § 2254(e)(2), petitioner must demonstrate, *inter alia*, that his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;" or "a factual predicate that could not have been previously discovered through the exercise of due diligence[.]"  28 U.S.C. § 2254(e)(2)(A)(i) and (ii).  Petitioner has not attempted to establish either prerequisite to the admission of his newly-presented evidence.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*Ryan,* 740 F.3d 1302, 1321 (9th Cir. 2014) (citing *Williams v. Taylor,* 529 U.S. 420, 437-40 (2000)).  Because petitioner has failed to carry his burden that his newly presented evidence is admissible under 28 U.S.C. § 2254(e)(2), this Court should not consider the evidence in connection with petitioner's *Chambers* claim.

In any event, even if the evidence that was not before the trial court is considered, Crouse's hearsay statements do not bear "persuasive assurances of trustworthiness," such that the trial court violated petitioner's due process rights by excluding them pursuant to state evidentiary law.

First, petitioner relies on Randy Martinak's recent accounts of an "emotional interview where Crouse broke down and asked the female investigator, McLaughlin, to leave the room before he confessed[.]"  (CR 114, p. 58).  Martinak's recent account is described in an investigative report prepared by petitioner's investigator (Pet. Ex. C, p. 65) and more thoroughly recounted in a recent email written by Martinak (Pet Ex. I, pp. 4-5) that is quoted at length in petitioner's reply at pages 49-52.  Of course, Martinak's recent account was not before the trial court.  Perhaps more importantly, Martinak's recent account differs substantially from both his trial testimony and his own contemporaneous report of the emotional interview.

In the recent account contained in petitioner's exhibits, Martinak states that Crouse first told him the story about observing an altercation in front of the Dome Building and then chasing one of the assailants on foot.  Martinak told Crouse he did not believe the multiple-assailant story because it "would have only left time for one stab wound" and "that the victim had more than one wound[.]"[7]  (Pet. Ex. I, p. 4).  After expressing his disbelief as to Crouse's first story, Martinak states that he told Crouse that stabbing a person was "up close and personal."  (*Id.*).  At that point, Martinak states that Crouse began to tear up and asked the other investigator, Kathy McLaughlin, to leave the room.  (*Id.*).  After she left, Martinak states that Crouse began to cry,

---

[7] That Francke had been stabbed more than once was a detail that investigators had kept from the public.  (Pet. Ex. D, p. 17).

Page 7 -    AMENDED SURREPLY TO PETITIONER'S REPLY
NMK/7901387-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and then described breaking into Francke's car and stabbing Francke when Francke interrupted the car burglary.  (*Id.* at 4-5).  According to petitioner's recent investigative report, Martinak "described this initial confession to him as very genuine, explaining that Crouse was crying, snotty-nosed, with his head in his hands, saying 'it was a mistake . . . an accident that went bad.'"  (Pet. Ex. C, p. 65).

Martinak's contemporaneous report (dictated on April 6, 1989) describes a similar confession scenario, but the car-burglary story is absent.  In the report, Martinak similarly stated that he told Crouse that "the use of a knife against a person was a personal crime," and that "the person would have difficulty killing a person with just one stroke of a knife."  (Ex. 179, p. 295).  Thereafter, Crouse became "tearful" and requested McLaughlin to leave the room.  (*Id.* at 296).  Similar to Martinak's recent account, Crouse began to cry after McLaughlin left.  (*Id.*).  However, contrary to Martinak's recent account in petitioner's exhibits, Martinak did not, at that point, report that Crouse delivered a "very genuine" confession that he killed Francke during the course of a car burglary.  Instead, Crouse claimed that he killed Francke, but stated that he "would lay out the whole story" once Captain Forbes came to the interview room.  (*Id.*).  When Forbes arrived, Crouse told the story about him killing Francke because "Juan" agreed to pay him $300,000 and had already provided $1,500 as a down payment.  (*Id.* at 297).  With respect to the stabbing, Crouse stated that he surveilled Francke's car; attacked Francke as Francke was placing something inside his car; and then ran in a "southeasterly direction" before returning to the scene, pushing Francke against the car, and running westbound.  (*Id.*).  According to Martinak, "When Crouse explained the stabbing, he became very emotional.  He cried heavily. He looked at me and said that he was sorry that it happened."[8]  (*Id.* at 299).

---

[8] Later in the interview, Crouse changed his story in regards to the stabbing, telling Martinak "that he made contact with Francke, and started a verbal confrontation in order to get up enough nerve to stab Francke[,]" and that they "wrestled around for a while before Crouse stabbed Francke."  (Ex. 179, p. 301).  However, Martinak does not reference the car-burglary story at any point in his report.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Martinak's trial testimony was similar to his contemporaneous report. Martinak testified that he told Crouse he did not believe the story about him chasing the assailant by foot and discussed "how personal it was to stab somebody," which "seemed to bother him[.]" (Tr. 9525). McLaughlin was present, but Crouse told Martinak that he wanted "someone he could trust." (Tr. 9525). When Forbes later arrived, Crouse told them "he had been paid to kill Michael Francke[,]" having "been offered three hundred thousand dollars by an individual dressed in a three piece suit[.]" (Tr. 9525-26). Martinak testified that "[o]n the next day he was brought back over and again interviewed at which time he talked about confronting Michael Francke to get his records back." (Tr. 9526). With respect to Crouse's eventual "car clout" story, Martinak testified that "the first indications were written discussions that I saw in regards to that."[9] (Tr. 9544).

Thus, based on Martinak's contemporaneous report and trial testimony, the emotional interview where Crouse broke down and asked the female investigator, McLaughlin, to leave the room before he confessed did not relate to Crouse's eventual car-burglary story. Rather, it was Crouse's murder-for-$300,000 story that Martinak now remembers as being "very genuine." (Pet. Ex. C. p. 65). According to Martinak's trial testimony, Crouse told the murder-for-$300,000 story after asking McLaughlin to leave the room; then waited for a day before stating that he killed Francke to obtain his Dome Building records; then landed on the car-burglary story in subsequent "written discussions." (Tr. 9544). Thus, Martinak's recent account of Crouse's teary-eyed confession does not further petitioner's argument that Crouse's various statements bear "persuasive assurances of trustworthiness" because Martinak's contemporaneous report and

---

[9] Crouse's written account of the car-burglary story is located at Exhibit 179, pp. 91-92. In that account, Crouse claims that, after he brandished the knife, Francke told Crouse "that he [Francke] was not worry about it so I [Crouse] tried to run from him then he jump on and I had the knife in my hand." (Ex. 179, p. 91). After stabbing Francke in the heart, Crouse claims that he "went at him again[.] [A]s I did I told him that he was not going to call anyone and he was looking at me and he said you will not get away[.]" (Ex. 179, p. 91).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

trial testimony demonstrate that the recent account he has set out in petitioner's exhibits is inaccurate.

Martinak's failure to accurately remember which story Crouse told during his teary-eyed confession after McLaughlin left the room is understandable given that the events occurred over 25 years ago and that Crouse gave multiple accounts in which the details were constantly shifting.[10]  But the new and inaccurate account that Martinak describes in petitioner's exhibits highlights the dangers of relying on accounts given decades later, as opposed to the trial testimony.  Throughout his briefing, petitioner relies extensively on Martinak's recent account, but Martinak's recent account glosses over the many inconsistencies in Crouse's various stories and completely omits some of Crouse's stories, such as the murder-for-$300,000 story. Martinak's recent accounts should be inadmissible under 28 U.S.C. § 2254(e)(2).  To the extent that they are considered at all, they should be afforded little weight.  Crouse's interviews were extensively documented at the time, and many of them were recorded and transcribed.  Martinak testified consistently with those records and transcriptions.[11]  That record is more reliable than Martinak's memory of the events approximately 25 years later.

Petitioner also relies on a polygraph examination in which Crouse was determined to be truthful when he denied that he lied when he told police that he stabbed Francke and denied that he "ma[d]e up that story about you using a knife to defend yourself against Mr. Francke[.]"  (Pet. Ex. H, pp. 3-4).  First, the polygraph was not presented to the trial court, nor could it have been. *See State v. Lyon*, 304 Or. 221, 223 (1987) (holding that polygraph tests are inadmissible in Oregon even when admissibility has been stipulated by the parties).  Therefore, the polygraph examination should not be considered in connection with petitioner's *Chambers* claim.

---

[10] Indeed, as Martinak stated in his email:  "I do not remember all the details of Crouse's statements, but they are in my written reports[,]" and "I can't recall exactly where in the interviews (there were at least three) some of the things were mentioned."  (Pet. Ex. I, pp. 5-6).

[11] As he does with other witnesses in this case, petitioner relies heavily on Martinak's account given years later, but urges this Court to disregard portions of Martinak's trial testimony.  *See e.g.*, CR 114, p. 61.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

§ 2254(e)(2); *see also Rhoades v. Henry*, 638 F.3d 1027, 1035 n. 6 (9th Cir. 2011) (explaining that polygraph results were "irrelevant" with respect to the habeas petitioner's *Chambers* claim "because polygraph results are inadmissible under Idaho law absent a stipulation."). Second, even if it is considered, an earlier polygraph examination also determined Crouse to be truthful when he denied killing Francke and denied that he "in any way knowingly participate[d] in the killing of Michael Francke[.]" (Pet. Ex. H, p. 1-2). Given that Crouse was determined to be truthful both in asserting and in denying involvement in Francke's death, the polygraph does not confer "persuasive assurances of trustworthiness" on Crouse's statements under *Chambers*, especially when considered in light of the multiple inconsistent stories that Crouse told police.

Petitioner relies on Crouse's parole records, contending that they "placed him at the scene." (CR 114, p. 56 n. 41). Again, these records were not before the trial court, and should be excluded under § 2254(e)(2). Even if considered, they do not place Crouse "at the scene." The parole records indicate that Crouse signed in at the parole office at 4:40 PM, and his parole officer estimated that he left approximately an hour later, between 5:30 and 5:45 PM. (Pet. Ex. H, p. 83). Thus, he left his parole office over an hour before the murder occurred. Besides Crouse's inconsistent statements, there is no evidence as to where Crouse went thereafter. In arguing that Crouse's statements bear "persuasive assurances of trustworthiness" because he was "at the scene," petitioner must rely on Crouse's untrustworthy statements.[12]

Petitioner relies on Crouse's criminal history. (CR 114, p. 63). Again, this history was not before the trial court, and should not be considered. § 2254(e)(2). As noted in the initial response, Crouse's criminal history does not corroborate Crouse's varying statements as to the Francke murder any more than it corroborates Crouse's statement to police that he killed his sister. (Ex. 179, p. 42). Petitioner counters that Crouse's statement regarding his sister "need

---

[12] The evidence cited by petitioner to place Crouse "at the scene" is significantly less reliable than the evidence in *Chambers* that placed McDonald at the scene of the crime. In *Chambers,* there was eyewitness testimony from, among others, a "lifelong friend" who not only placed McDonald at the scene of the crime, but also saw McDonald commit the murder. *Chambers*, 410 U.S. at 289.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

not be true for Crouse's confession to be true." (CR 114, p. 57 n. 43). However, the fact that Crouse was telling police that he had killed more than one person—neither of which has been corroborated—undercuts petitioner's claim that Crouse's statements regarding the Francke murder bear "persuasive assurances of trustworthiness."

Petitioner argues that Crouse's statements should be considered trustworthy because they "dovetail" with Hunsaker's account, which he contends is "identical" with respect to "the location and orientation of the victim and the killer, the sound Francke made when stabbed, and the routes each used to leave the parking lot." (CR 114, p. 56, 62). First, with respect to the location of the victim and the killer, petitioner fails to identify which Crouse statement he is relying upon. (CR 114, p. 62). When Crouse told the car-burglary story on April 5, 1989, officers took him to the Dome Building, but a contemporaneous report indicates that Crouse "lead officers away from the direct area of where the crime was known to have occurred." (Ex. 179, p. 77).

Petitioner also fails to identify which statement he is relying on with respect to the sound that Francke made when he was stabbed. Hunsaker testified that the sound he heard was as if a person "had their breath knocked out." (Tr. 6881). However, when Crouse eventually told the car-burglary story, he said that after he stabbed Francke, Francke then stated: "I won't die and you won't get away with this." (Ex. 179, p. 77). Later that day, Crouse shortened Francke's response to the stab to a simple: "'My God.'" (Ex. 179, p. 95). Neither of those accounts is "identical" to the Hunsaker account, and because petitioner provides no citation, it is not clear from petitioner's reply what Crouse statement he is talking about.

Moreover, the altercation that Crouse described during his car-burglary account was not consistent with what Hunsaker saw. Hunsaker said that he heard the sound of a person being hurt, and then watched the two men quickly separate. (Tr. 6881-88). In contrast, Crouse described a drawn-out fight, in which Francke punched Crouse ("He nearly knocked me out"), Francke caused Crouse to drop his knife, and Francke then punched Crouse again in the back of

Page 12 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

the head as Crouse retrieved the knife.  (Ex. 179, pp. 95-96).  In the earlier written version of the car-burglary account, Crouse stated that he "went at [Francke] again" after stabbing him in the heart, telling him that "he was not going to call anyone[,]" and Francke then responded that "you will not get away."  (Ex. 179, p. 91).

Finally, petitioner fails to identify which statement he is relying upon with respect to the route that Crouse claimed to have used to flee from the Dome Building.  As noted above, prior to the car-burglary story—during his tearful confession to Martinak—Crouse claimed to have fled in a "southeasterly direction," only to return to the scene to push Francke against his car before heading west.  (Ex. 179, p. 297).  When he eventually switched to the car-burglary story, Crouse initially said that he fled towards Park Street (i.e., towards the east).  (Ex. 179, p. 77).  While at the Dome Building grounds, he stated that he "ran on westward on the driveway."  (Ex. 179, p. 3).  However, while at the Dome Building Grounds, he also told the officers that he fled toward Park Street (i.e., towards the east), with the officer noting that "[t]his was the opposite direction in which he had earlier stated he ran."  (Ex. 179, p. 77).  Later, in response to a leading question during a recorded interview, Crouse agreed that he fled to the west. [13]  (Ex. 179, p. 96-97).

Thus, even after Crouse switched to the car-burglary story, the record does not support petitioner's claim that Crouse's statements "dovetail" with Hunsaker's testimony.  Crouse continued to be inconsistent when discussing his supposed car burglary.  Further, as Martinak testified at trial, the person that Hunsaker saw running from the scene of the crime was wearing clothing that was "totally different" than the clothing Crouse claimed to have been wearing on the night of the murder.  (Tr. 9552).  Like the other details, Crouse's statements as to what he was wearing on the night of the murder continually shifted as he told the car-burglary story.  After describing the car-burglary account, Crouse claimed to have a "flashback" as to what he

---

[13] The route the assailant was believed to have taken from the Dome Building had been reported in the *Statesman Journal*.  (Pet. Ex. D, pp. 16-17).  The diagram of the escape route in the newspaper is at page 28 of petitioner's brief.  (CR 74, p. 28).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

was wearing, claiming that he also wore a blue sweatshirt that got blood on it. (Ex. 179, pp. 111-12). He claimed he "didn't worry" about the blood, explaining that "the blood dried and I seen it and I said ah heck[.]"[14] (Ex. 179, p. 112). Of course, as petitioner stipulated at trial, subsequent testing revealed there was no blood on the sweatshirt. (Tr. 9564, 9566). When viewed in conjunction with Hunsaker's testimony, it cannot be said that Crouse's shifting statements as to various issues bear "persuasive assurances of trustworthiness," such that the trial court violated petitioner's due process rights by excluding Crouse's unsworn hearsay statements pursuant to state evidentiary law.

Petitioner contends that Crouse's statements were consistent with the physical evidence. They were not. During the car-burglary story, Crouse stated that he stabbed Francke in the stomach, but Francke was not stabbed in the stomach. (Tr. 9552-53). He stated that he stabbed Francke five times, but Francke was not stabbed five times. (Ex. 179, p. 75; Tr. 9566). Petitioner dismisses Crouse's inability to correctly state where or how many times he stabbed Francke as "quibbl[ing]," but his inability to do so necessarily render his statements less trustworthy, such that their admission is not required under *Chambers*. Certainly, Crouse's statements are not "completely consistent" with the murder evidence, as was the case in *Lunbery*. 605 F.3d at 761 n. 3.

During the car-burglary story, Crouse also stated that he cut Francke on his forearms and his hands, but Francke was not cut with a knife on his forearms and hands—and certainly not both arms and both hands. (Ex. 179, pp. 95-96; Tr. 9566). At trial, petitioner stipulated to that fact.[15] (Tr. 9566). Now, petitioner contends that the medical examiner never determined

---

[14] In earlier statements to police, Crouse claimed to have set fire to the only item of clothing that had blood on it, a flannel shirt that Crouse claimed to have worn under his green jacket. (Ex. 179, p. 70).

[15] At trial, petitioner stipulated that "the pictures from the autopsy do not substantiate Mr. Crouse's version of five stab wounds including the right forearm, the stomach, and the wounds on both arms and hands." (Tr. 9566). Petitioner faults respondent's brief for relying on facts recited by the prosecutor at trial. (CR 114, p. 60). Although the prosecutor was prepared to prove the truth of her statements, petitioner instead stipulated to those facts. (Tr. 9564-66). Petitioner cannot now argue that the trial court erred in relying on his own stipulations.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

whether the injuries to Francke's right hand could have been caused by the assailant's knife.

(CR 114, pp. 60-61).  But the medical examiner testified as follows:

> "[T]here were no characteristic defense type injuries on his body.  The only exception to that would be the wound through the left bicep area. . . .  But there is nothing on the backs of his hands and forearms.  Nothing on the left hand.  We have these glass caused injuries on the right hand.  Nothing that I would identify as a typical defense type injury."

(Tr. 6427).  Regarding the injuries to Francke's right hand, the medical examiner testified that "these are all typical of one sticking their fist through glass[,]" and that the injuries to his right hand were "sustained when he punched out the window pane."[16]  (Tr. 6410-11).

Crouse told officers that they had seized the knife that he had used to kill Francke. (Ex. 179, p. 116).  However, at trial, Martinak testified that the knife that had been seized did not share the "general class characteristics" of the knife used to kill Francke.  (Tr. 9554-55). Petitioner now urges this Court to disregard Martinak's trial testimony because the parties' experts disagreed as to the precise general class characteristics of the knife that killed Francke. (CR 114, p. 61).  However, the parties agreed at trial that it was not Crouse's knife that killed Francke.  Indeed, at trial, petitioner stipulated that the Crime Laboratory processed the knife that Crouse claimed to have used to kill Francke, found no blood on it, concluded that it was "not consistent with the class characteristics of the knife they identified as the weapon that killed Michael Francke[,]" and concluded that the "knife was not consistent with the clothing or the stab cuts in the business cards."[17]  (Tr. 9565).

---

[16] On cross examination, when asked whether it was possible that some of the injuries to the right hand could have been caused by something else, the medical examiner explained that "[a]nything is possible[,]" but stated that "[e]very injury I see there can be explained by putting his hand through glass."  (Tr. 6453).  He explained that "a knife makes a cutting type injury with sharp margins.  Many of these wounds have ragged margins.  They are abrated and scraped.  They have pieces of skin missing.  This is not what you would see with a knife."  (Tr. 6450).

[17] After switching to the car-burglary account, Crouse's story as to the sheath in which he carried the knife changed as well.  To explain why no blood would have been on the knife's sheath, Crouse initially claimed to have cleaned the knife's sheath with a toothbrush after killing Francke.  (Ex. 179, pp. 107-08).  In a later interview, he claimed to have two sheaths for the knife, claiming that he "switched 'em every few days[.]"  (Ex. 179, p. 138).  The officers later told Crouse that the second sheath was not where he told them it would be.  (Ex. 179, p. 149).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In sum, Crouse told multiple stories over the course of several months regarding his purported involvement in Francke's death. Even during the short time period during which Crouse claimed to have killed Francke during the course of a car burglary, the details (e.g. where the crime occurred, how Francke responded to the stabbing, how the altercation played out, what Crouse wore, which direction Crouse ran) were continually shifting, and much of the physical evidence did not support Crouse's statements to police. Petitioner argues that this Court should focus on one version of Crouse's car-burglary account, pointing primarily to Martinak's recent submissions as support for that version as opposed to the record created at the time of Crouse's statements. He argues this Court should focus on that version to the exclusion of Crouse's other varying accounts because the version of the car-burglary account that petitioner now advances "was the confession believed by the State's investigating officers." (CR 114, p. 58). To be sure, the investigating officers attempted to corroborate Crouse's varying claims—including the car-burglary account—but that investigation did not indicate that a particular version was necessarily believed by investigating officers. The officers investigated all of Crouse's varying claims, at one point renting a back hoe because Crouse claimed to have buried the true killer's clothes. (Tr. 9549). Of course, in the end, Crouse was never charged in Francke's death.

Petitioner has not cited to any case or other legal authority to support his argument that, in evaluating whether Crouse's hearsay statements bear "persuasive assurances of trustworthiness" under *Chambers*, this Court should focus on one version of the car-burglary account, without taking into account the other varying statements that Crouse gave to investigating officers. In short, when considering all of the facts and circumstances, Crouse's varying hearsay statements were simply not sufficiently trustworthy, such that the Due Process Clause mandated their admission at trial under *Chambers*, despite their inadmissibility under state evidentiary law.[18]

---

[18] As discussed in the previous response, because petitioner's claim under *Chambers* is without merit, trial and appellate counsel were not ineffective for declining to raise the claim and petitioner was not prejudiced by their decision not to do so. (CR 101, pp. 81-85).

Page 16 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

**C.      Any error in excluding Crouse's statements was harmless.**

Petitioner urges this Court to grant relief on his *Chambers* claim without determining whether any trial court error in excluding Crouse's hearsay statements had a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  (CR 114, p. 63-64 n. 45).  However, precedent from both the Supreme Court and Ninth Circuit make it clear that any trial court error under *Chambers* must be evaluated under the *Brecht* standard before federal habeas relief may be granted.

In *Fry v. Pliler*, 551 U.S. 112 (2007), the Ninth Circuit had decided that a state court had unreasonably applied *Chambers*, but concluded that the error was harmless under *Brecht*.  *Id.* at 115-16; *see also Fry v. Pliler*, 209 Fed. Appx. 622 (2006) (unpublished).  On review, the Supreme Court assumed that the state court had unreasonably applied *Chambers* (as the Ninth Circuit had previously concluded) and held that "the Ninth Circuit was correct to apply the *Brecht* standard of review in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial."  *Id.* at 116, n. 1, 120.  Other Ninth Circuit opinions cited by petitioner apply *Brecht* before granting relief under *Chambers*.  *See e.g.*, *Lunbery*, 605 F.3d at 762 (applying *Brecht*); *Cudjo*, 698 F.3d at 768-70 (applying *Brecht*).  Thus, before this Court may grant relief on petitioner's *Chambers* claim, he must demonstrate that any trial court error under *Chambers* had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637-38.  Petitioner cannot make such a showing.

In arguing that the admission of Crouse's hearsay statements would have "made a difference," petitioner assumes that the jury would have only been presented with the version of the car-burglary account that petitioner now supports largely with Martinak's recent submissions.  However, the jury would never have learned of the car-burglary account as Martinak now describes it because, as explained above, that account did not exist until 2014 and 2015 when Martinak spoke with petitioner's investigator and drafted the recent email.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

However, the jury would have learned that Crouse told investigating officers multiple fantastic stories, including the murder-for-$300,000 story that Crouse told during his teary-eyed confession to Martinak after asking McLaughlin to leave the room.  As discussed above, even after Crouse eventually turned to the car-burglary account, the jury would have learned that the details of his account were continually shifting, including the clothes that he wore and the direction he ran from the murder.  The jury would have learned that the physical evidence did not match Crouse's account, including where and how many times Francke was stabbed.  The jury would have learned that Crouse later told police that prison officials had approached him with a briefcase containing $10,000 to kill Francke.  The jury would have learned that Crouse told police he buried the actual killer's clothes.  The jury would have learned that Crouse's varying claims could not be corroborated.

In arguing that he was prejudiced, petitioner attempts to analogize this case to *Chambers* (CR 114, p. 64), but ignores that the excluded McDonald confessions in *Chambers* were both consistent and fully corroborated by the other evidence, including testimony a "lifelong friend" of McDonald who watched him commit the murder.  Unlike Crouse, McDonald did not make repeated inconsistent and unsubstantiated claims.

At trial, the jury learned that Crouse confessed to killing Francke (Tr. 7478-79), but the jury did not learn that Crouse told several different accounts and several different versions of the car-burglary account.  Under these circumstances, petitioner cannot demonstrate that the exclusion of Crouse's hearsay statements regarding several different accounts of his purported involvement in the Francke murder had a "substantial and injurious effect or influence in determining the jury's verdict."

## III.    PETITIONER HAS FAILED TO DEMONSTRATE ACTUAL INNOCENCE.

To excuse the procedural default of his claims, petitioner argues that he is "actually innocent" under *Schlup v. Delo*, 513 U.S. 298 (1995).  To establish a "credible" claim of actual innocence under *Schlup*, petitioner must "support his allegations of constitutional error with new

Page 18 -  AMENDED SURREPLY TO PETITIONER'S REPLY
NMK/7901387-v1

*reliable* evidence . . . that was not presented at trial." *Schlup*, 513 U.S. at 324. The burden is on petitioner to prove that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327; *see also id.* at 333 (O'Connor, J., concurring) ("[A] petitioner does not pass through the [innocence] gateway . . . if the district court believes it more likely than not that there is *any* juror who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt." (emphasis added; internal citations omitted)); *Doe v. Menefee*, 391 F.3d 147, 173 (2nd Cir. 2004) (Sotomayor, J.) ("If the court finds that even one juror might reasonably vote to convict, the court must find that the petitioner has failed to establish his actual innocence."). Here, when the unreliability of the recantations presented in this case is considered in conjunction with the testimony of Childers, Gesner, and Perkins, who have not recanted their trial testimony; petitioner's failure to establish a reliable alibi despite his repeated attempts to do so; petitioner's incriminating statements to Vierra (which were not presented to the jury); and petitioner's incriminating statements to the investigators, petitioner has failed to make the extraordinary showing required by *Schlup* to excuse the procedural default of his claims.

> ### A.    Cappie Harden's recantation is not credible.

Before he was polygraphed, Cappie Harden implicated both petitioner and Swearingen in the murder of Francke, telling police that Swearingen had "told him that she had seen Frank Gable kill someone and that she was scared." (Pet. Ex. E, p. 59). After a single polygraph examination, Harden implicated himself, telling police the same basic account that he would later tell the jury. (Pet. Ex. E, p. 60).

As discussed in respondent's initial response, although Harden gave the police inconsistent statements prior to revealing that he had witnessed the murder, Harden explained that he did so because he was "not a rat," that he "didn't want to be involved[,]" and was "reluctant to tell the State Police [he was] at the scene of a murder[.]" (Tr. 8071-72, 8146). Through extensive cross examination, Harden's inconsistent statements were presented to the

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

jury that convicted petitioner, and during that cross examination Harden repeatedly admitted that he had initially lied to police, explaining:  "I lied a lot about what I did, but not what I seen that night.  I did see Frank Gable stab Michael Francke."  (Tr. 8124).

As petitioner argued in his initial brief, members of Francke's family believe that Timothy "Rooster" Natividad killed Francke.  (CR 74, p. 126).  In 2005, after receiving $1000 from Kevin and Patrick Francke—a payment facilitated by a person running a website "devoted to proving Gable's innocence"—Harden gave an account to the *Portland Tribune* that implicated Timothy "Rooster" Natividad.[19]  (Exs. 393-94).  Harden claimed that Natividad arrived at his home on the night of Francke's murder to change his clothes and clean up in in the sink. (Ex. 394, p. 3-4).  At the same time, Swearingen also implicated Natividad, claiming that before Natividad went to Harden's home, she saw Natividad running from the Dome Building grounds with blood on his clothes.  (Ex. 394, p. 3).  Thus, after receiving $1000 from the Francke brothers (Pet. Ex. K), Harden gave an account consistent with their belief as to the identity of the killer, coinciding with Swearingen's new account also implicating Natividad.  Not even petitioner appears to believe Harden and Swearingen's claims implicating Natividad, but he still argues that their recantations should be considered reliable.

In the affidavit submitted in this proceeding, signed in 2009, Harden glosses over his claims regarding Natividad, instead simply stating that he "was at home that night."  (Pet. Ex. A, p. 19).  Respondent has been unable to interview Harden and is not aware as to whether Harden continues to stand by the affidavit he signed over seven years ago.  For the reasons discussed in the initial response—including the $1000 payment—Harden's post-trial claims are simply not credible.  (CR 101, pp. 119-20, 124, 157-58); *see also Woods v. Booker*, 450 Fed. Appx. 480, 487 (6th Cir. 2011), *cert den*, 132 S.Ct. 2751 (2012) ("The recanting testimony is further discredited by the time that elapsed between [recanting witness's] trial testimony and his

---

[19] In the month before he received the $1000, Harden refused to discuss the Francke murder, stating that he "wouldn't talk because he was tired of being called a 'rat' for testifying against Gable."  (Ex. 392, p. 3).  Thus, the $1000 appears to have been influential.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

recanting testimony, and the possibility that he may have received money transfers in exchange for his [recanting] testimony") (alterations added).  Indeed, if his post-trial account concerning Natividad were true, Harden surely would have asserted it when questioned by police, as the account removes him from the scene of the crime.  In short, Harden's post-trial claims do not constitute new *reliable* evidence upon which no reasonable juror would vote to convict.

> ### B.    Jodie Swearingen's recantation is not new credible evidence of petitioner's innocence.

In October 1989, before Swearingen ever underwent a polygraph examination, she told people at the Hillcrest School that she was present when petitioner killed Francke.  (CR 101, p. 115-16).  These statements were not made in response to police questioning, and Swearingen had no apparent motive to lie when she made these statements.

Petitioner now argues that "in context, it is not clear that these statements were about Gable at all[.]"  (CR 114, p. 26).  Swearingen has never taken the position that she was talking about someone else, and the context indicates that Swearingen was talking about petitioner when she made her statements to the Hillcrest employees.

Swearingen was first interviewed by police in late September 1989 at her home in Dundee, Oregon.  (Pet Ex. E, pp. 204-07).  During those initial interviews, Swearingen told police that petitioner had confessed to killing Francke.  (Pet. Ex. E, p. 207).  However, she "gave a spontaneous utterance to the effect that there were no witnesses to the Francke homicide, then she refused to address the issue further."  (Pet. Ex. E, p. 207).  After those interviews, Swearingen absconded from her probation and retained an attorney.  (Pet. Ex. E, p. 210).  When she was brought back into custody in mid-October 1989, she told police that she was "fearful for her safety."  (Pet. Ex. E., p. 209).  Swearingen admitted that she was with petitioner on the evening that Francke was killed, explaining that she was at a park with petitioner before he walked towards the State Hospital grounds that were nearby.  (Pet. Ex. E, p. 209).  Swearingen then requested her attorney; the interview was terminated; and Swearingen was transported to the Hillcrest School.  (Pet. Ex. E, pp. 210-11).  It was in that context that Swearingen volunteered

Page 21 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

several statements to the employees at the Hillcrest School before she ever admitted to police that she had witnessed the murder.

Swearingen told one Hillcrest employee that she was nervous that she was an "accomplice or an accessory to murder," and that the murder she was referencing "happened in Salem and that Michael Francke was the murder victim." (Tr. 9353). She told another employee that "Frank Gable killed Michael Francke[,]" that he was hired to do so, and that she "was nearby, possibly in a car." (Tr. 9348). According to another employee:

> "[Swearingen] advised she was standing on the grass about 50 feet away from the car and that the car door was ajar. She inferred that there were two guys at the scene plus Michael Francke. [Swearingen] told her that, 'they' were by the open car door and that Michael Francke and an individual were scuffling when Michael Francke fell to the ground. [Swearingen] told her that the guy turned around with a bloody knife in his hand and that [Swearingen] didn't see him use the knife. [Swearingen] advised that after the guy turned around with the bloody knife in his hand, 'they' split. [Swearingen] told her that [Swearingen]'s boyfriend was involved and that [Swearingen] was scared to death."[20]

(Pet. Ex. N, p. 6). Of course, with the exception that petitioner had been hired, those volunteered statements are consistent in many respects with other evidence in this case, including the testimony of Harden, the admissions by petitioner to other witnesses, and the fact that concerns regarding Francke's welfare first arose amongst his coworkers because his car door was ajar.

Swearingen has since admitted that she made the statements attributed to her by the Hillcrest employees—both in interviews with defense investigators and during her trial testimony. (*See e.g.* Ex. 183, pp. 115-18; Tr. 9348, 9350-52). She has never claimed that she was referencing someone other than petitioner when she made those statements. To be sure, Swearingen has since claimed that she was lying when she made those statements to the Hillcrest

---

[20] Petitioner argues that Swearingen's reference to her boyfriend was a reference to Scritchfield, but the record is not clear on that point. Swearingen described Harden as her boyfriend at the time of Francke's murder, and both of them testified that they had a sexual relationship. (*See e.g.*, Pet. Ex. E, p. 382; Tr. 8120, 9327).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

School employees, but neither Swearingen nor petitioner has offered a persuasive reason as to why she would tell such lies at a time when she had no motive to do so.[21]

Petitioner relies largely on statements that Brenda Davis (a juvenile lodged at Hillcrest) attributed to Swearingen to suggest that her statements were about someone other than petitioner. (CR 114, p. 27). However, in contrast to the statements Swearingen made to the Hillcrest employees, Swearingen denied making the statements attributed to her by Davis. According to Davis, Swearingen stated that Doug "Munchie" Scritchfield "was out on a temporary pass and that Doug got Francke's blood on his clothing." (Pet. Ex. N, p. 4). Swearingen later told defense investigators that she did not make those statements to Davis, and that her discussions with Davis were benign and related to petitioner: "What happened, what was said about that is, we were talking about Gable. How, you know, 'Oh, yeah, he's so cute' and this and that and [inaudible]." (Ex. 183, p. 115). Swearingen also recalled discussing with Davis a bloody cut that Scritchfield had on his hand, which was apparently related to a burglary that he had committed. (Ex. 183, pp. 121-22; Ex. 184, p. 153). But Swearingen stated that she did not discuss the Francke murder with Davis. (Ex. 183, p. 116).

After making the statements to the Hillcrest employees, Swearingen underwent a polygraph examination in November 1989, in which she stated that she saw petitioner stab Francke on the Dome Building Grounds. (Pet. Ex. E, pp. 357-58). The results of that initial polygraph examination did not show her to be deceptive. (*Id.*). Thereafter, in December 1989, her attorney negotiated an immunity agreement, under which Swearingen would not be prosecuted for any crimes in an adult court, and was subject only to the crime of hindering prosecution in juvenile court. (Ex. 254).

---

[21] Petitioner has since argued that Swearingen told lies about petitioner in an effort to protect Timothy Natividad. (CR 74, p. 51). As discussed in the initial response, that rationale makes little sense because Natividad had died months before Swearingen spoke with the Hillcrest employees.

NMK/7901387-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

After receiving that immunity, Swearingen set out to deceive investigators. Indeed, in her first polygraph examination after signing the immunity agreement in January 1990, she wore a "bulky quilted sweatshirt" with the expectation that it "would probably [be] difficult to test her wearing such a garment." (Pet. Ex. E, p. 362). She also altered her breathing during the polygraph examination, and lied to investigators that she did not have a t-shirt on underneath her sweatshirt, which would have been more conducive to the polygraph examination. (Pet. Ex. E, p. 362). Contrary to her previous statements, she then denied that she had seen anyone kill Francke, denied that she was on the state-hospital grounds when Francke was killed, and denied that anyone had talked with her about their participation in the Francke killing.[22] (Pet. Ex. E, pp. 361-62).

Thereafter, Swearingen provided police with a number of different statements implicating petitioner in Francke's murder, and petitioner highlights those inconsistent statements in his briefing, noting that many of her statements to police were inconsistent with Harden's account of the murder.[23] To be sure, some of those inconsistencies—such as the particular time phone calls were made, the direction Harden's car was facing at the Dome Building, what petitioner was wearing that night, what direction they drove after the murder—could easily be attributable to the fact that both Harden and Swearingen were heavy methamphetamine users who were

---

[22] In his briefing, petitioner claims that on January 16, 1990, a day in which Swearingen denied any involvement in the Francke murder, police interviews lasted "all day." (CR 114, p. 28). Although Swearingen underwent a polygraph examination in the morning and was retested in the evening, the record does not support petitioner's suggestion that Swearingen was interviewed continuously from 10:05 AM to 8:45 PM. (Pet. Ex. E, pp. 360-74; Pet. Ex. N, pp. 1-2). Moreover, Swearingen was advised of her constitutional rights and investigators consulted with her attorney prior to conducting the polygraphs.

[23] Although Swearingen told police many differing accounts, petitioner misstates the record with respect to some of Swearingen's statements. Petitioner claims that Swearingen told police that she twice walked to a payphone to call Harden, which was 15-20 minutes away from the Dome Building grounds. (CR 114, p. 16-17 (citing Pet. Ex. E, p. 228)). Swearingen did not tell police that she twice walked to a payphone to call Harden, and it is not clear where petitioner derives the 15-20 minute timeframe from. (Pet. Ex. E, p. 228). Harden testified that Swearingen called him twice, but he did not state when these phone calls occurred, stating that he finally left his home at 6:30 or 7:00 to pick her up. (Tr. 8064).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

being asked about these details nearly a year after the murder occurred.  In other instances, Swearingen told investigators she lied to protect Harden, explaining that she "did not want to get Shorty involved because he and I were there."[24]  (Pet. Ex. E, p. 217, 379).

However, the jury that convicted petitioner heard Swearingen admit that she had repeatedly lied to police regarding her activities on the night of the murder, telling "varying stories to the State Police" over the course of months as to her knowledge of the Francke homicide.  (Tr. 9366).  Similarly, Harden admitted to the jury that he repeatedly lied when describing his activities on the night of the murder.  (Tr. 8078-8145).  That Swearingen and Harden lied to police is not new evidence.  *See King v. Trujillo*, 638 F.3d 726, 730-31 (9th Cir. 2011) (holding that affidavit from witness that he was so intoxicated on the night of murder that he had no memory of the crime did not qualify as "new" evidence supporting an actual innocence claim where the witness's professed lack of memory was fully litigated in the criminal trial); *Cooper v. Brown*, 510 F.3d 870, 964 (9th Cir. 2007), *cert. denied*, 558 U.S. 1049 (2009) (evidence known to defense at time of criminal trial "may not be the basis of an actual innocence claim").  Despite Harden and Swearingen's failure to consistently describe to police their own activities on the night of the murder, the jury found petitioner guilty.

Swearingen's testimony that she was not present when Francke was killed was inconsistent with her own prior statements, her attorney's apparent belief that an immunity agreement was necessary, and her statement to George Russel Talley after she had absconded.  Her testimony that petitioner was not involved in Francke's murder was inconsistent with the statements she had previously volunteered to the Hillcrest employees when she had no apparent motive to lie.  The jury could have reasonably credited that evidence despite her previous

---

[24] Petitioner argues that Swearingen's account as to Harden's involvement in the night's activities changed due to a meeting between the two of them.  Petitioner ignores Swearingen's testimony, in which she states that although she was in the same room with Harden, police officers were present and told her that she could not discuss the case with Harden.  (Tr. 9333). Detective Pierce similarly testified that he supervised the meeting, and they were not permitted to discuss the case.  (Tr. 9426-27).

Page 25 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

inconsistent statements to police and her recantation at trial. As discussed in the previous response, Swearingen's account in this proceeding—that she was with Natividad on the night of the murder (Pet. Ex. A, pp. 26-27)—is not new *reliable* evidence that would cause all reasonable jurors to alter their verdict.

**C.    John Kevin Walker's recantation is not credible.**

With his reply, petitioner submits an affidavit of John Kevin Walker, contending that the newly presented affidavit renders Walker's recantation credible. It does not. As noted in the initial response, Walker first recanted in a 1993 interview with an investigator hired by petitioner's then-wife, Karen Steele. In a 2005 interview with the *Oregonian*, Walker discounted his recantation, stating that he was a heavy methamphetamine user at the time of the 1993 interview, that he could not remember making the statements he made in that 1993 interview, and that statements made in that 1993 interview were not true. (Ex. 391, p. 14). Since 2005, Walker has reversed course again. In his newly-presented affidavit, Walker explains that he has reviewed his trial testimony, his 1993 interview, and the *Oregonian* article from 2005. (Pet. Ex. J, p. 4). He does not deny the statements he made in his trial testimony in 1991, to the investigator in 1993, or to the *Oregonian* in 2005, but claims that only his statements in 1993 are accurate. He does not explain why he discounted his 1993 interview in 2005, or how he remembers statements today that he could not remember in 2005. In short, Walker's recantation—which he discounted in 2005 and has since reaffirmed without explanation—is not the type of new, reliable evidence upon which all reasonable jurors would rely upon to acquit petitioner. *See Jones v. Taylor*, 783 F.3d 1242, 1248 (9th Cir. 2014) ("[r]ecanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial") (internal citation omitted).

At trial, Walker testified that, on the day after the murder, petitioner asked him whether he had "heard the news" about the "'guy over there at the State Hospital grounds[,]'" and then

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

told Walker that he had "'stuck him.'" (Tr. 8173). Walker testified that, after that admission, petitioner held a .357 handgun that Walker had previously sold him and told Walker "don't tell on me, Kevin, or I'll have to kill you and kill your family." (Tr. 8173). Petitioner offers several reasons why this testimony should be disbelieved and his subsequent recantations should be believed. Those reasons are not persuasive.

First, Walker claims that his initial statements to police were truthful. (Pet. Ex. J, p. 2 ¶ 4). Petitioner argues that, despite Walker's initial truthful statements, officers continued to question him because they had "appl[ied] Reid Method techniques now known to amount to junk science, [and] decided that Walker had more information." (CR 114, p. 10). The record does not support petitioner's argument.

In his initial statements to police, Walker told police that, during the first part of January 1989, he "quit hanging around [petitioner] and felt he could no longer trust him." (Pet. Ex. E, p. 257). However, police decided to question Walker further when they reviewed phone records showing that repeated phone calls were placed from Walker's workplace to petitioner's home on the day of the murder and the day after the murder.[25] (Pet. Ex. E, p. 260-61). Thus, Walker's initial statements to police that he "quit hanging around" with petitioner in January 1989 were not accurate. Indeed, even in his 1993 recantation, Walker does not make the claim that he was no longer "hanging around" with petitioner in January 1989, belying petitioner's argument that Walker's "recantation is corroborated by his initial statements to the Task Force[.]" (CR 114, p. 23).

Further, the record does not support petitioner's speculation that police questioned Walker after his initial statements because of "Reid Method techniques" that petitioner fails to identify. Instead, the record indicates that Walker was questioned further because his initial

---

[25] Although phone calls were placed between Walker's workplace and petitioner's residence on the day of the murder (i.e., January 17, 1989), Walker was not certain in his recantation that he had actually spoken with petitioner: "I could have had conversations with God for all I know. I don't know." (Pet. Ex. A, p. 57).

Page 27 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

statements to police were contradicted by the phone records. Walker's claim in his newly-presented affidavit that he was initially truthful with the police is contrary to his trial testimony, his 1993 recantation, and phone records compiled during the police investigation.

Second, petitioner asserts that Walker's testimony was shaped by the polygraph examinations, arguing that "Walker's story morphed from no confession—to a plan to commit a murder in the future—to a post-murder confession and threat." (CR 114, p. 10). That argument is incorrect. To be sure, during the polygraph sessions, investigators attempted to determine from Walker whether he knew if there had been a plan to kill Francke. However, despite those polygraph sessions, Walker did not state that there was such a plan.

After the first polygraph (Feb. 22, 1990), Walker stated that petitioner had talked about taking out "dude man," but explained that petitioner "never talked about Michael Francke in those terms[,]" and "was always talking like that, and never used names."[26] (Pet. Ex. E, p. 406; Ex. 287, p. 10). After the second polygraph (March 3, 1990), Walker denied that petitioner made certain statements *before* the Francke murder (as suggested by the polygraph questions), but stated that *after* the Francke murder, petitioner said he was paid to take out "dude man," used the word "corrections" in connection with the person he had killed, and mentioned that guns "were probably a possible payment."[27] (Pet. Ex. E, p. 410-11). However, Walker reiterated that he was uncertain as to what petitioner was talking about: "[Petitioner] told him that he had a job to do

---

[26] Several of petitioner's associates told police or defense investigators that petitioner would make similar statements. For example, Mickey Goss told defense investigators that petitioner would talk about "taxing" other people, explaining that "'big talk'" is "common but rarely materializes." (Ex. 291). Dan Walsh recalled an incident in which petitioner arrived at an apartment, started waving an assault rifle around, and ranting that he was going to kill someone. (Pet. Ex. E, p. 270). According to Walsh, petitioner "did not say who he wanted to kill, only that it was someone important." (Pet. Ex. E., p. 270). His wife, Janyne Vierra, told police that petitioner "told me that he has hurt people, roughing them up to collect old debts." (Ex. 386, p. 15). Petitioner told police that he "bragged about being the 'taxman,' (a term meaning one who uses force to collect)," but claimed that he "only collected in a peaceful manner." (Ex. 292, p. 429-30).

[27] In his brief, petitioner asserts that Walker stated that petitioner told him *before* the murder that he was paid to take out "dude man." (CR 114, p. 13). Petitioner misstates the record.

Page 28 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

and that it involved doing the dude man of the joint or for the joint. [Walker] was not sure. [Walker] stated that [petitioner], when he was using crank, often mumbled and was hard to understand." (Ex. 287, p. 10). Walker eventually reviewed all of the police reports for defense investigators and again reiterated his uncertainty: "I do not know FOR SURE what the payment was if there was one at all." (Ex. 288, p. 3) (emphasis in original).[28] Thus, although Walker discussed statements by petitioner about which he was uncertain during the course of the polygraphs—explaining that petitioner "was always talking like that"—the polygraphs did not shape his statements, and he did not tell police that petitioner had described a plan to kill Francke before the murder.[29]

Walker was not similarly uncertain with respect to petitioner's confession after the murder, and the scenario that Walker described—in which petitioner admitted to killing Francke and then threatening Walker while in petitioner's bedroom—would not have been known to investigating officers before Walker described the scenario. As noted above, Walker reviewed the police reports for a defense investigator and disputed parts of those reports, including particular details of petitioner's confession. (Ex. 288). For example, the police reports indicated that when petitioner threatened Walker, petitioner *pointed* a .357 handgun at Walker. (Ex. 287, p. 11). In his review of the police reports, Walker disputed that statement, explaining: "Never ever did Frank point that weapon at my head or at any other part of my body." (Ex. 288, p. 7). Instead, as Walker testified at trial, petitioner merely held the gun as he made the threat.[30] (Tr. 8175). However, Walker did not dispute that petitioner had told him he had "stuck" the guy

---

[28] Walker's corrections to the police reports are at Respondent's Exhibit 288. In those corrections, Walker makes corrections to the police reports page by page, identifying each page by its Bates stamp.

[29] Petitioner argues that the State "sanitized" Walker's testimony by not presenting these statements. (CR 114, p. 12). The State appropriately declined to present statements by Walker about which he was admittedly uncertain.

[30] In his affidavit, Walker claims that he testified that petitioner pointed the gun at him. (Pet. Ex. J, p. 1). Walker apparently misremembers his testimony. Consistently with his correction of the police report, Walker did not testify at trial that petitioner pointed the .357 handgun at him when petitioner threatened him.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

at the hospital grounds. (Ex. 288). That Walker would dispute particular details of the confession contained in the police report—but maintain that the confession itself happened—enhances the credibility of Walker's trial testimony.

Third, Walker claims in his recantation that he never sold petitioner the .357 handgun, and contends in his affidavit that petitioner "did not even own the gun that I described in my testimony." (Pet. Ex. A, p. 52; Pet. Ex. J, p. 1). However, Walker told police about the .357 handgun that he sold petitioner—and would later describe in his sworn testimony—before he ever submitted to a polygraph examination or implicated petitioner in the Francke murder. (Pet. Ex. E, p. 261). Police would never have known of Walker's sale of the gun had Walker not told police about it, and he offers no explanation as to why he would fabricate such a sale. Walker's affidavit is not credible.

Fourth, petitioner argues that "Walker indicated that Robert Cornett (and possibly Mickey Goss) also overheard the confession, but the Task Force could not corroborate this so it was omitted from the trial testimony." (CR 114, p. 13). Petitioner's argument misstates the record. Walker did not tell police that Cornett (and possibly Goss) overheard the confession. Walker told police that petitioner confessed to him while he and petitioner were in petitioner's bedroom. He explained that Cornett was in the apartment at the time—but not in the bedroom—and believed that either Goss, Janyne Vierra, or someone else must have been in the apartment as well "because Robert Cornett and Frank Gable did not trust each other and he could not have imagined Frank Gable taking he (Walker) into a bedroom and leaving Cornett alone in the living room of the apartment." (Ex. 287, p. 12).

Fifth, Walker claims that he was initially truthful when questioned by police, but changed his story after implicit police threats. (Pet. Ex. J, p. 2). As noted above, phone records demonstrated that Walker's initial statements to police were false. And Walker explained in his testimony why he did not initially implicate petitioner. First, Walker simply did not want to help the police solve the murder, testifying that "if [the police] want to find it out, they can find it out

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

themselves. I'm not going to help them." (Tr. 8179). Second, Walker explained that "the rat jacket gets attached any time you talk to the police about anything." (Tr. 8179). Indeed, after Walker cooperated, he was "labeled a rat" and was assaulted while incarcerated, resulting in a "broken cheek bone" and a "broken eye bone" that required surgical repair. (Tr. 8182, 8203).

Despite the broken facial bones, petitioner argues that this explanation for Walker's initial reluctance to implicate petitioner is "hollow." (CR 114, p. 4). Petitioner argues that because many of the witnesses—including Walker—were willing to implicate petitioner in low-level drug or firearm offenses, their trial court testimony regarding their concern about being labeled a "rat" in connection with the Francke murder is not credible. (CR 114, p. 4). That argument ignores reality. Of course, implicating petitioner in a low-level methamphetamine deal was drastically less consequential than implicating him in the high-profile murder of a senior prison official. As the injuries that Walker sustained demonstrate, being labeled a "rat" in connection with the Francke murder was a genuine concern that many of petitioner's associates testified they considered when police came to speak with them.[31]

Walker now contends that he implicated petitioner because he was concerned about being charged in the murder, claiming that Detective Fox told him to "get on the bus now" or be left standing "on the curb" with petitioner. (Pet. Ex. A, p. 46; Pet. Ex. J, p. 2). As an initial matter, the police reports do not indicate that Detective Fox was involved in the questioning of Walker.[32] Further, after the initial polygraph, investigators had excluded Walker as a participant in the murder, and the police questioning after that initial polygraph did not suggest Walker's

---

[31] Also corroborative of Walker's concerns for his safety was his reluctance to testify as to where he and his family were living at the time of trial. Prior to trial, Walker's attorney wrote the trial court a letter, requesting that his address and telephone number not be disclosed. (Tr. 858). The State also explained to petitioner's trial counsel that "Mr. Walker is fearful for his safety and does not want his address or phone number released." (Ex. 254, p. 28 (letter from district attorney to trial counsel dated March 4, 1991)). When pressed by petitioner's trial counsel on cross examination, Walker eventually admitted he was "residing out of state with my mother and sister." (Tr. 8187).

[32] Both Detective Fox and Detective Pierce have since died. Thus, they cannot be contacted to respond to Walker's allegation.

Page 31 -  AMENDED SURREPLY TO PETITIONER'S REPLY
NMK/7901387-v1

involvement in the murder.  (Pet. Ex. E, p. 409).  Walker's claim that he implicated petitioner because he feared being charged in the murder is not credible.

Regarding other potential charges, Walker testified before the jury that the State had assured Walker's attorney that it would not prosecute Walker for non-person crimes that he disclosed, including crimes relating to the possession of drugs and weapons.  (Tr. 8183; Ex. 254).  Despite the State's agreement not to prosecute Walker for those non-person crimes, the jury apparently believed Walker's testimony and voted to convict petitioner.

Sixth, in his recently submitted affidavit, Walker now claims that he testified against petitioner in part because he would "be in the running for some of the reward money[.]"  (Pet. Ex. J, p. 4).  This claim is inconsistent with Walker's own prior recantation in 1993, in which Walker stated that the State gave him "[n]o consideration, no promises of a reward, no promises of leniency in a sentence, um, in fact they made sure that I had got my sentence . . . I was sentenced before the trial."  (Pet. Ex. A, p. 73) (emphasis in original).  His trial testimony was similar:  "I got no deals.  No consideration."  (Tr. 8183).  This is another of Walker's claims in his recent affidavit that lacks credibility.

Finally, Walker now claims that "in the evening hours on the night of the Francke murder, I recall being at the home Frank Gable along with [omitted material] Robert Cornett for a drug deal."  (Pet. Ex. J, p. 4).  This statement is inconsistent with Walker's statements to police, his trial testimony, and his statements to the *Oregonian* in 2005.  Walker's claim that he was with petitioner on the evening of the murder is not credible.

Although Walker was assured he would not be prosecuted for drug-related crimes (and told police he conducted a drug-transaction on January 18), Walker never told police that he was conducting a drug deal at petitioner's home in the evening hours of the murder.  Indeed, when he reviewed the police reports for defense investigators, Walker was clear that he did not see petitioner at all on January 17, writing:  "I saw [petitioner] on the 18th but am sure I did not see him on the 17th."  (Ex. 288).  Walker testified that he remembered that he did not see petitioner

Page 32 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

on January 17 because he was at his brother's birthday party that evening and, in a phone call with petitioner, told petitioner he would be at the party that night.  (Tr. 8165-66).  Although Walker now claims that he lied about his brother's birthday party, petitioner testified during the post-conviction proceedings that he remembered that Walker "was going to come in late to Salem" on the night of the murder because he "was at a sister's or brother's or one of his family members birthday party[.]"  (Ex. 253, p. 9).

Walker first claimed to be with petitioner on January 17, 1989, in his 1993 interview. During that interview, Walker did not state that he declined to tell police that he was with petitioner on January 17 because he was afraid he would be implicated in the murder, as he now claims in his affidavit.  Instead, he said that he did not tell police he was with petitioner simply because he failed to remember that fact prior to the trial.  However, he claimed he was able to remember that fact over two years after the trial, stating that "it just came to me."  (Pet. Ex. A, p. 65).  When asked whether he had ever told police he was conducting a drug deal at the home of petitioner on the night of the murder, Walker responded:

> "[Walker]:  No.  I didn't remember that.  An' all of a sudden, it just came to me. I'm sittin' there, I'm g . . . oh . . . and this is like aft . . . after the trial had taken place, and stuff.  I mean, you know, when you're going through a trial like this, you have a tendency to go over it in your mind, you know, what's . . . where you were at, or where you weren't at.

> "[Investigator]:  How do you tie that to be the same evening, and how do you know that that, uh, event was the same evening as January 17th?

> "[Walker]:  Well, let's see, this is August 6th, 1993.  I'd say, oh, I've prob'ly had two years to think about it, every single night."

(Pet. Ex. A, p. 65 (emphasis in original)).

As noted above, in 2005, Walker told *The Oregonian* in three separate interviews that he was not with petitioner on the night of the murder.  (Ex. 391, p. 14).  When he was shown a transcript of his 1993 interview, Walker "said he couldn't recall making the statement and that in any event it wasn't true.  He also said he was a heavy meth user at the time of the 1993 interview." (Ex. 391, p. 14).  As noted above, Walker has shifted course again since 2005, but

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

he does not explain why. Walker's claim that, two years after the trial, "it just came to [him]" that he was with petitioner on the night of the murder is not credible.

In sum, when viewed in conjunction with the state-court record, Walker's post-trial statements lack credibility such that not all reasonable jurors would rely on them as opposed to the testimony that Walker gave at trial, under oath and subject to cross examination.

> ### D.    Earl Childers' corroborated testimony precludes a finding that no reasonable juror would vote to convict petitioner.

Earl Childers gave the account to which he would eventually testify at trial before he ever submitted to a polygraph examination. (Pet. Ex. E, pp. 28-33). Although his memory has admittedly faded in the intervening 25 years, he stands by his trial testimony today. (Ex. 387). In his reply, petitioner makes several new arguments as to why Childers' testimony should not be believed. His arguments are not supported by the record.

First, petitioner suggests that Childers' testimony was somehow coerced, with the police having "marked him for Reid Method interrogation." (CR 114, p. 35). Petitioner does not offer any evidence that unidentified techniques were used to obtain Childers' statements to police.[33]

When police first spoke with Childers in September 1989, he denied that petitioner had admitted to killing Francke, instead suggesting that Gesner may have information for the police. (Pet. Ex. E, p. 20). When Childers spoke again with police in November 1989, he told the officers that "he was hesitant to give the information in prior interviews because of his concern about his well-being while being incarcerated[.]" (Pet. Ex. E, p. 28). Similarly, he testified at trial that the interviews in September 1989 had been conducted in the prison, in which the

_____

[33] Petitioner contends that police "marked him for Reid Method interrogation" because of a statement petitioner had given to police on November 3, 1989. (CR 114, p. 35). During that interview, petitioner told police that he saw Childers as he drove around with Chris Warilla on the night of the murder. (Ex. 292, p. 428). Petitioner does not explain why it would have been unreasonable for police to follow up on petitioner's claimed alibi. Further, the fact that petitioner admitted to seeing Childers on the night of the murder is corroborative of Childers' testimony that he saw petitioner driving as he walked near the state-hospital grounds on the night of the murder. Petitioner later told Childers to "forget" that he had seen him that night. (Tr. 7757).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

detectives "called me out to the intake center where there is inmates running around, et cetera, and it's a very, you know, bad setting." (Tr. 7801). As Childers explained, inmates "take a very hard attitude towards anyone that they believe is a snitch." (Tr. 7770). Petitioner dismisses this concern as "hollow" (CR 114, p. 4), but as Walker and Childers's experiences both demonstrate, the concern on the part of witnesses connected to this case was real and justified.[34]

In November 1989, the officers interviewed Childers outside the prison, out of the view of other inmates.[35] (Tr. 7771). At that time, Childers gave the same general account that he would later describe in his testimony. (Id.). Thus, the record does not demonstrate that polygraph examinations or unidentified police techniques caused Childers to provide his statement to police in November 1989. Rather, he had simply moved to a setting in which he felt more comfortable speaking with police. As Childers explains in his recent affidavit, he "did not alter or omit any facts during [the] interview because of police pressure, and the information I ultimately provided to police was truthful." (Ex. 387, p. 3).

Second, petitioner argues that Childers' testimony is "the product of incentives." (CR 114, p. 35). Petitioner does not identify those incentives, and the record is devoid of evidence that Childers had been provided with anything prior his giving his account to police in November 1989—i.e., the account to which he would eventually testify at trial.

Third, petitioner argues that Childers was "contaminated by exposure to media accounts" and "did not think that Gable was involved until he read of Gable's guilt in the newspaper[.]" (CR 114, p. 35-36 (citing Pet. Ex. L and Pet. Ex. D, pp. 110-12)). Although Childers stated that he initially thought the statements petitioner made regarding Francke's murder might be "bullshit" (Pet. Ex. E, p. 33), the record does not indicate that Childers reported those statements

---

[34] Like Walker, Childers required medical attention after he was in an altercation in which he been identified as a "snitch." (Tr. 7777).

[35] In his reply, petitioner contends that Childers "faced new charges" by the time he was interviewed in November 1989. (CR 114, p. 35 (citing to Pet. Ex. E, p. 28)). The citation that petitioner provides does not support his assertion, and respondent is not aware of any new charges against Childers in November 1989 since his previous interview in September 1989.

Page 35 -   AMENDED SURREPLY TO PETITIONER'S REPLY

because he was "contaminated" by the media. Indeed, before police questioned Childers, before Gable had been identified in the media, and before the Keerins account was reported in the media, Childers had told Gesner and Shaver about petitioner's confession. *Compare* the dates of Pet. Ex. E, p. 147 with Pet. Ex. L and Pet. Ex. D, pp. 108-12.

Childers' account of petitioner's July 1989 confession was corroborated in several ways. As noted above, Childers told police that he told "Gesner the next day at Gesner's house about the story Gable told me the previous evening." (Pet. Ex. E, p. 33). In September 1989, before Childers had given his account to police—and before the Keerins account was in the newspapers (Pet. Ex. L, pp. 7-10)—Shaver had similarly told police that Childers had discussed petitioner's confession, telling police: "I remember [Childers] going up to [Gesner] and telling him that [petitioner] told him that he had killed Francke." (Pet. Ex. E, p. 147). In testimony that Gesner has repeatedly reaffirmed since petitioner's trial, Gesner similarly stated that in July 1989 petitioner admitted to killing Francke as they walked to look at a house they were considering burglarizing. (Tr. 7999; Ex. 391, p. 14; Ex. 389, p. 2). Even petitioner confirmed the scenario in which he confessed, recalling that he had walked with Childers and Gesner to look at a home they were considering burglarizing. (Tr. 7605-06; Ex. 292, p. 735).

In sum, there is no evidence that Childers' testimony was the product of polygraph examinations or coercion. His testimony was corroborated in multiple ways, and Childers stands by his testimony today. Childers testimony, buttressed by the corroborating evidence, precludes a finding that petitioner is actually innocent.

### E.    Petitioner's claim that Vierra recalled the events of January 17, 1989, better in 2010 than she did two decades earlier is not credible.

With his reply, petitioner submits a new affidavit by his investigator, in which the investigator states that after Vierra reviewed the eviction notice in June 2010, she "had a better memory" of the events that occurred on January 17, 1989—apparently contending that her memory was better in 2010 than when she had spoken with police in 1989 and when she testified at trial in 1991. (Pet. Ex. M). According to the investigator, Vierra suddenly recalled in 2010

Page 36 -  AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

that she had several guests at her home that night, including Gesner and Walker.  (Pet. Ex. M).
Petitioner submits this affidavit in an apparent attempt to bolster the affidavit that Vierra signed
for petitioner in 2014, and was previously submitted in this case.[36]  (Pet Ex. A, pp. 2-4).

As an initial matter, it is simply not credible that Vierra would recall details (including
the times when petitioner and others came or went) of a particular night approximately 20 years
later better than she recalled those details at the time of petitioner's trial.  In an affidavit signed
for respondent, Vierra acknowledges that fact, explaining that she had not reviewed her
testimony prior to signing the affidavit for petitioner, but that she remembered that she "testified
truthfully and the events were relatively fresh in my mind when I testified."  (Ex. 386, p. 2).  She
explained further:  "The events are not fresh in my mind now, over 25 years later."  (Ex. 386,
p. 2).  Petitioner devotes several paragraphs in his reply to attacking that unremarkable point,
claiming that it contradicts her trial testimony.  That argument is incorrect.  In her second
affidavit, Vierra simply explains she cannot remember the precise dates of particular disputes or
who answered particular phone calls over two decades after they occurred.[37]

The investigator states that she presented Vierra with the eviction notice in 2010 (Pet.
Ex. M), but there is no indication that Vierra was informed that the eviction notice was issued on
the basis of hearsay from unknown declarants for noise that occurred after the apartment

---

[36] If Vierra recalled in 2010 that Gesner and Walker were at her house on January 17, 1989, it is
not clear why those facts would not have been included in the affidavit she signed for petitioner
in 2014.  (Pet. Ex. A, p. 2-4).

[37] Similarly, Vierra was unable to recall approximately 25 years later the date on which "one of
our neighbors got into a dispute with one of our visitors[,]" explaining that "I do not remember
when that dispute occurred, nor do I know whether Frank Gable was present when that incident
occurred."  (Ex. 386, p. 2).  To the extent that incident is intended to refer to the "plate incident,"
there is no indication in the record that Dowd got into a dispute with one of petitioner or Vierra's
visitors.  Nor is there any indication in the record that the "plate incident" or any other dispute
led to the eviction notice.  Petitioner misstates the record in that regard, referring to the
apartment manager's "testimony that the plate was thrown late at night."  (CR 114, p. 40).
However, the apartment manager never testified about the "plate incident" in any way or referred
to it in out-of-court statements, consistently stating that the noise that night came from cars,
slamming doors, and people running up and down the stairs after 11:00 PM.  (Tr. 8654; Ex. 180,
p. 23).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

manager went to bed at 11:00 PM.  (Ex. 180, p. 23).  Although the apartment manager stated that

she issued the eviction notice on the basis of noise after 11:00 PM, she acknowledged during her

testimony that she never confirmed that the noise that she heard that night was generated by

people going to and from petitioner's apartment, stating that she never looked outside.

(Tr. 8654).  Instead, she testified that she based her conclusion on the complaints of other

tenants, but she could not recall which tenants.[38]  (Tr. 8654-55).  The apartment manager also

acknowledged that there were other tenants located around petitioner's apartment that were also

known to throw loud parties and receive visitors late at night.  (Tr. 8656-58).  As noted above, to

the extent that there is any evidence of activity at petitioner's apartment on the night of the

murder, the apartment manager made clear that activity occurred after she went to bed at 11:00

PM (Ex. 180, p. 23), which is entirely inconsistent with the timeframes set out in the affidavit

that Vierra signed for petitioner.  *See* Pet. Ex. A, p. 3 (claiming that everyone, including

petitioner, left by 8:00 or 9:00 PM).  Thus, when Vierra signed the affidavit for petitioner in

2010, she had been confronted with an eviction notice, but she apparently was not informed of

this important additional context, nor given the benefit of reviewing her statements from two

decades earlier.

### F.    Petitioner's allegations against investigators are not supported by the record.

In arguing in his reply that the recantations should be considered reliable, petitioner

makes unsubstantiated allegations against police investigators.  As noted in the previous

response, David C. Raskin, Ph.D. concluded, among other things, that investigators conducted

"coercive interrogations" of the material witnesses, in which investigators were "abusive and

frightening," issued "threats concerning their children and families," and told witnesses "that

---

[38] Of course, when petitioner discussed the eviction notice with his attorney in 1990, he did not
arrive at the alibi that he asserts in this habeas proceeding.  Instead, petitioner appeared to
dispute whether the apartment manager had an appropriate basis for the notice, explaining that the
apartment manager "had it out for [him]" because he had refused to pay for damage to a car
he had backed into that belonged to tenants that lived "across" from him and "the landlady and
them are all friends."  (Ex. 306, p. 22; Pet. Ex. G, p. 34).

Page 38 -  AMENDED SURREPLY TO PETITIONER'S REPLY
NMK/7901387-v1

they were lying when they were actually truthful."[39]  (Pet. Ex. B, p. 16).  As discussed in the

initial response, in coming to that conclusion, Raskin relied upon irrelevant and suspect

information that has never been subjected to adversarial testing.[40]  (CR 101, pp. 143-50).

Petitioner appears to distance himself from Raskin's conclusion now, arguing that respondent

"mischaracterizes Gable's argument as being that the recanting witnesses were all 'coerced' by

the Task Force[.]"  (CR 114, p. 6).  Instead, petitioner argues that investigators produced false

testimony through the use of Reid Method techniques, which he repeatedly describes as "junk

science."[41]  (CR 114, p. 6).  Again, however, petitioner fails to support his allegations with

credible evidence in the record.

　　　　First, petitioner alleges that, after taking initial statements from witnesses, investigators

selected some witnesses for further questioning through Reid Method "junk science," in which

the investigators would "detect lying in verbal responses and through body language."  (CR 114,

p. 6).  Petitioner does not cite to the record to support his allegation, but the record demonstrates

that witnesses were sometimes questioned further when their statements were not consistent with

other evidence.[42]

---

[39] As noted previously, neither Raskin nor petitioner has ever explained how Raskin determined
when witnesses were "actually truthful," or how he was able to make that determination.

[40] Petitioner argues that Raskin did not rely solely on the affidavits of Swearingen, Thomas, and
the Benders to support his conclusion that police engaged in conduct that amounted to coercion,
but petitioner points to no other evidence that would support many of Raskin's allegations,
including that police investigators were "abusive and frightening" or issued "threats concerning
their children and families."

[41] Not even Raskin describes the Reid Technique as "junk science."  Thus, it is not clear what
petitioner relies upon for that assertion.

[42] For example, as noted above, petitioner asserts that officers continued to question Walker after
his initial statement to police because they had "appl[ied] Reid Method techniques now known to
amount to junk science, [and] decided that Walker had more information."  (CR 114, p. 10).
However, as discussed above, the record demonstrates that Walker was questioned further
because he initially told police that he "quit hanging around" with petitioner during the first part
of January 1989, but phone records demonstrated that multiple phone calls had been placed from
Walker's workplace to petitioner's residence in mid-January 1989.  (Pet. Ex. E, pp. 257, 260-61).
Thus, it was not unidentified "techniques" that caused investigators to question Walker further; it
was objective evidence that contradicted Walker's prior statements.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Next, petitioner alleges that the investigators engaged in "highly confrontational" interrogations, using Reid Method techniques and pursuing the witnesses "relentlessly," such that witnesses implicated petitioner simply to put an end to the interrogation. (CR 114, pp. 6-8). Petitioner does not cite to specific interviews to support his characterization that the investigators were highly confrontational, nor does he demonstrate where the investigators improperly employed Reid Method techniques. More importantly, petitioner ignores the fact that the witnesses were repeatedly advised of their constitutional rights, and often signed a card acknowledging those rights before each interview or polygraph examination. *See e.g.*, Pet. Ex. E, pp. 260, 262, 406, 409, 413 (regarding Walker); Pet. Ex. E, pp. 42, 282, 286, 289, 293, 297 (regarding Gesner); Pet. Ex. E, pp. 415, 417, 421 (regarding Walsh); Pet. Ex. E, pp. 23, 279 (regarding Childers); Pet. Ex. E, pp. 58, 59, 61, 299, 301, 305, 307-08, 310, 312 (regarding Harden). Where the witnesses had attorneys, those attorneys were consulted prior to the interviews, and sometimes chose to be present during the interviews or polygraph examinations. *See e.g.*, Pet. Ex. E, p. 260 (Walker's attorney contacted before interview); Pet. Ex. E, p. 42 (Gesner's attorney contacted before interview); Pet. Ex. E, pp. 42, 289, 293 (Gesner's attorney present during interviews); Pet. Ex. E, p. 28 (Childers' attorney contacted before interview); Pet. Ex. E, p. 54 (Harden's attorney contacted before interview); Pet. Ex. E, pp. 60, 312 (Harden's attorney present during interviews); Pet. Ex. E, pp. 357, 361 (Swearingen's attorney present during first polygraph and consulted prior to subsequent polygraphs); Pet. Ex. E, pp. 162, 165, 167, 171-92, 193, 198, 342, 354 (Studer's attorney present during interviews and polygraph examinations); Pet. Ex. E, p. 200 (interview of Studer conducted at his attorney's office). At times, the witnesses would invoke the rights to which they had previously been advised and terminate the interview. *See e.g.*, Pet. Ex. E, p. 287 (Gesner terminating interview and requesting attorney); Pet. Ex. E, p. 304 (Harden terminating interview and requesting attorney); Pet. Ex. E, p. 210 (Swearingen terminating interview and requesting attorney); Pet. Ex. E, pp. 337-38 (Studer terminating interview and requesting attorney).

Page 40 - AMENDED SURREPLY TO PETITIONER'S REPLY

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In short, the record does not support petitioner's claim that the witnesses were pursued relentlessly and were able to end their interviews only by implicating petitioner.  The witnesses were consistently made aware of their right to terminate the interviews; their lawyers were made aware of the interviews; the witnesses were sometimes accompanied by their lawyers; and the investigators honored the witnesses' rights when the witnesses invoked them, allowing them to terminate the interviews when they decided to do so.  Petitioner never grapples with these facts when asserting that investigators pried false statements from the several persons that implicated petitioner in Francke's murder.

While failing to demonstrate that investigators employed improper techniques in their questioning of the witnesses that implicated petitioner in Francke's murder, petitioner and Raskin also misstate what the Reid Method teaches.  *See* Ex. 395, *Affidavit of Joseph P. Buckley* (addressing Raskin's description of Reid Method techniques).  Contrary to petitioner's assertions, the Reid Method does not teach investigators, among other things, to "isolate" subjects or to pursue them "relentlessly."  *Id.*  And the mere demonstration that the officers used some techniques taught by Reid would not, in itself, demonstrate that investigators overbore the will of the witnesses, rendering their statements to police involuntary.  *See e.g.*, *U.S. v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (finding that officers use of the "Reid technique," including "statements exaggerating the quality of their evidence" or "minimizing the gravity of [defendant's] offense," did not overbear the defendant and that such techniques "fall safely within the realm of the permissible 'chicanery' sanctioned by this and other courts.").  This is especially true here, where most of the witnesses interviewed by investigators, in addition to their legal counsel, had extensive experience with the criminal justice system.

Again, the thrust of petitioner's argument appears to be that the polygraph examinations were improperly coercive because, when the witnesses failed the polygraph examinations, they were informed of that fact.  As discussed in the previous response, the Ninth Circuit, among other courts, has declined to accept that argument, and petitioner does not contend otherwise.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

(CR 101, pp. 152-53 (citing cases)). Although the witnesses against petitioner would sometimes admit they had been lying after they failed a polygraph examination, at other times they held their ground despite their failure of a polygraph examination. *See e.g.*, Pet. Ex. E, pp. 307-08 (Harden determined to be deceptive when he denied being with petitioner prior to murder and when he denied that he went to the Dome Building to break into cars, but did not change his account); Pet. Ex. E, pp. 408-411 (Walker determined to be deceptive when he denied that petitioner used the word "corrections" in relation to taking "dude man out of the picture" prior to the Francke murder, but never changed his account to claim that petitioner made that statement prior to the murder); Pet. Ex. E, pp. 443-45 (Studer determined to be deceptive when he recanted grand jury testimony, but continued to maintain that his grand-jury testimony was false). These instances support the Ninth Circuit's view that the use of polygraph examinations during police questioning is appropriate and not overly coercive. *See e.g., United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) ("Whether [the police officers] confronted [the defendant] with the polygraph results makes no difference. The use of polygraph results is a reasonable means of police questioning.").

Further, it bears repeating that both petitioner and Raskin overstate the role that polygraphs played. Swearingen stated, before submitting to any police polygraph examinations, that she was with petitioner the night he murdered Francke. Harden submitted to one polygraph before delivering an account to police that was largely consistent with his trial testimony. Childers did not submit to any polygraph examinations before providing his account to police. Walsh described a detailed scenario in which petitioner admitted to killing Francke after a single polygraph that was unrelated to the scenario he eventually described to investigators. Keerins told police that petitioner had admitted to killing Francke before submitting to any polygraph examinations.

Some witnesses—such as Walker and Swearingen—were asked to submit to several polygraph examinations, but their claim that the polygraph examinations indicated they were

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

lying when they told the truth, and indicated that they were truthful when they told a lie is not credible. (Pet. Ex. A, pp. 23, 69). Although Raskin takes issue with some of the polygraph tests and procedures, he provides no basis from which all reasonable jurors would conclude that the polygraph examinations always produced incorrect results, and that the errors always cut against petitioner. Instead, even assuming that evidence of the polygraph examinations and Raskin's opinion of those examinations could be presented to the jury, it is likely that at least one reasonable juror, when learning that the testimony that the witnesses gave under oath and subject to cross examination had been confirmed by polygraph examinations—in most cases over a year before they delivered their trial testimony—would credit that testimony given at trial.

## IV.    CONCLUSION

For the reasons discussed above, this Court should deny relief on all of petitioner's claims, and dismiss this action with prejudice.

DATED December  19  , 2016.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

_____s/ Nick M. Kallstrom_____
NICK M. KALLSTROM #050023
SAMUEL A. KUBERNICK #045562
Assistant Attorneys General
Nick.M.Kallstrom@doj.state.or.us
Samuel.A.Kubernick@doj.state.or.us
Of Attorneys for Respondent

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794