IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


FRANK E. GABLE,                                    Civil No. 3:07-cv-00413-AC

            Petitioner,                            OPINION AND ORDER

    v.

MAX WILLIAMS,

            Respondent.

NELL BROWN
Assistant Federal Public Defender
MARK AHLEMEYER
Assistant Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR  97204

ELLEN M. ROSENBLUM
Attorney General
NICHOLAS A. KALLSTROM
Assistant Attorney General
SAMUEL A. KUBERNICK
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

Attorneys for Respondent

**ACOSTA, Magistrate Judge:**

In June 1991, a jury convicted Frank Gable ("Gable") of six counts of Aggravated Murder and one count of Murder. The next month, at the conclusion of the penalty phase, the trial court sentenced Gable to life in prison without the possibility of parole. Gable has been serving his life sentence since that time.

Gable filed this habeas corpus petition under 28 U.S.C. § 2254 in March 2007 and amended his petition in March 2014 to add a claim of actual innocence. Although he exhausted his direct appeals and his post-conviction relief ("PCR") process, nineteen of Gable's twenty grounds for habeas relief are procedurally defaulted, but Gable urges this court to excuse his defaulted claims under the "actual innocence" standard that the Supreme Court established in *Schlup v. Delo*, 513 U.S. 298 (1995). This is a stringent standard satisfied "only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (concluding petitioner "has made the stringent showing required by this exception") (internal quotation marks omitted).

This is such a case. Gable has presented a colorable claim of actual innocence. Accordingly, the court GRANTS IN PART and DENIES IN PART Gable's Amended Petition for Writ of Habeas Corpus (ECF No. 61).[1]

## SUMMARY OF PROCEDURAL BACKGROUND

On January 17, 1989, the director of the Oregon Department of Corrections, Michael Francke, was stabbed to death. An Oregon State Hospital ("OSH") security guard discovered his body on the covered North Porch of the Dome Building, which sits on the OSH grounds in Salem,

---

[1] All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c).

Oregon. Following an extensive investigation, in April 1990, a Marion County grand jury indicted Gable on six counts of Aggravated Murder and one count of Murder.[2] Resp. Exh. 103. The trial court appointed Robert Abel and John Storkel to represent Gable.

The case proceeded to a jury trial which lasted approximately four months, beginning in March 1991 and ending in July 1991. At the conclusion of the trial, the jury found Gable guilty on all counts. Resp. Exh. 104. Following a penalty phase proceeding, the trial court sentenced Gable to life imprisonment without the possibility of parole. Resp. Exh. 104.

Gable appealed, and in a written opinion the Oregon Court of Appeals affirmed the trial court's judgment and sentence. *State v. Gable*, 127 Or. App. 320, 873 P.2d 351 (1994). The Oregon Supreme Court denied review. *State v. Gable*, 319 Or. 274, 877 P.2d 1202 (1994).

Gable then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial court denied relief. Resp. Exh. 345. Gable appealed. The Oregon Court of Appeals granted relief on one claim of ineffective assistance of trial counsel, and remanded the case to the PCR trial court to determine whether Gable suffered prejudice. *Gable v. State*, 203 Or. App. 710, 126 P.3d 739 (2006). The Oregon Supreme Court denied review of this decision. *Gable v. State*, 341 Or. 216, 140 P.3d 1133 (2006).

On remand, following a second evidentiary hearing, the PCR trial court found Gable did not demonstrate prejudice and denied all relief. Resp. Exh. 371. On appeal, the Oregon Court of

---

[2] Count I alleged that the murder was related to the performance of Francke's "official duties." Count II alleged that he was killed during an attempted first-degree robbery. Counts III and IV alleged that Francke was killed to conceal the commission of, and the identity of the perpetrator of, a first degree robbery. Counts V and VI alleged that Francke was killed to conceal the commission of, and identity of the perpetrator of, an attempted theft. Count VII alleged intentional murder.

Appeals affirmed without opinion. *Gable v. State*, 243 Or. App. 389, 256 P.3d 1099 (2011). The Oregon Supreme Court granted Gable's request for review, and in a written opinion affirmed the second PCR trial court's decision. *Gable v. State*, 353 Or. 750, 305 P.3d 85, *cert. denied*, 571 U.S. 1030 (2013).

Gable now seeks habeas corpus relief from this court. In his Amended Petition for Writ of Habeas Corpus, Gable alleges twenty grounds for relief. In his Brief in Support of the Amended Petition, Gable does not address all of the grounds for relief, but instead addresses two claims of trial-court error, several claims of ineffective assistance of counsel, and one claim of ineffective assistance of appellate counsel.

With the exception of the claim of ineffective assistance of trial counsel for failure to object at sentencing on *ex post facto* grounds, Gable's claims are procedurally defaulted. Gable contends the "actual innocence" standard established in *Schlup v. Delo*, 513 U.S. 298 (1995), excuses his procedural default. Gable also argues the default of certain ineffective assistance of trial counsel claims should be excused under *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012).

### *FACTUAL BACKGROUND*

**I.** **The State Court Proceedings**

**A.** **The State's Case at Trial**

At trial, the state contended that at approximately 7:00 p.m. on January 17, 1989, in the parking circle in front of the Dome Building, Michael Francke interrupted Gable as Gable burgled Francke's car to get "snitch papers." Under this theory, Gable lunged out at Francke from inside the car, stabbed Francke three times and inflicted the fatal blow, then ran west across 23rd Street into

the Old Salem General Hospital complex. Gable then drove north on Medical Center Drive and turned right on D Street. Meanwhile, Francke, mortally wounded, made his way back to the North Porch of the Dome Building, where he died from blood and oxygen loss after unsuccessfully attempting to open the locked porch door by punching out a window.

### 1.    The Murder and the Crime Scene

On January 17, 1989, Michael Francke attended a meeting at the Dome Building, which then housed the administrative offices of the Oregon Department of Corrections ("ODOC").[3] Tr. 7075. After the meeting ended, Francke met with several of his co-workers in his office until approximately 6:30 p.m. Tr. 8878. Francke was last seen alive by one of his co-workers just before that co-worker left for home at approximately 6:50 p.m. Tr. 7080. Francke had stated he intended to call his wife before heading home. Tr. 8878. When the co-worker left, he walked by Francke's car and did not notice anything unusual. Tr. 7080, 8882-84.

At approximately 7:07 p.m., five people going to a group counseling meeting passed by the front of the Dome Building and noticed a white car parked in front with its door standing open. Tr. 6922-23, 6927. At approximately 7:15 or 7:20 p.m., two more of Francke's co-workers left for home, and noticed as they left that the dome light was on in Francke's car. Tr. 6940-41. On further inspection, they realized that the car door was standing open, and they went back in the building to

---

[3]Due to the voluminous transcript and materials associated with this case, points not in dispute are presented in a summary fashion. "Tr." refers to the trial transcript, which is sequentially numbered in the upper right-hand corner, so no volume numbers or dates are included in the citations. *See* ECF, Docket Nos. 46 through 60. "PCR Trial Tr." refers to the transcript of the state post-conviction relief proceedings.

look for Francke. Tr. 6942-46. They were not able to locate Francke, and he did not return their calls to his pager number. Tr. 6945-46. The two co-workers then called security. Tr. 6946.

At approximately 12:42 a.m. the next morning, a security guard found Francke's body on the north portico of the Dome Building. Tr. 5956. The body could not be seen until the security guard actually climbed the steps to the north-portico entrance. Tr. 5956. The blood spatter and other physical evidence showed that Francke had climbed the steps of the north portico, unsuccessfully attempted to open the locked door by breaking a pane of glass in the door, and then died on the porch. Tr. 6516-45. At the time he died, Francke wore dark clothes, including a black overcoat. Tr. 6401-02.

The subsequent investigation and autopsy revealed that Francke died from a stab wound to his heart. The evidence showed the assailant had thrust a knife at Francke three times: one knife thrust missed Francke, but slashed his overcoat; a second knife thrust passed through Francke's left bicep as he held his arm tightly to his chest, and then slightly penetrated Francke's chest after passing through business cards in his front shirt pocket; the third knife thrust, which proved the fatal blow, entered the left side of Francke's chest and passed through his heart. Tr. 6411-6415. The fatal wound passed through Francke's chest from left to right at a downward angle (*i.e.*, "from above to below"). Tr. 6417.

Francke also had irregular jagged tears to the skin on his right hand, consistent with punching through the glass pane on the door of the Dome Building. Tr. 6411, 6416. Present around the area of Francke's left eye were a series of three abrasions or scrapes and a contusion on the orbital rim. Tr. 6406. Also present were two small abrasions or scrapes on his left forehead. Tr. 6406-07.

OPINION AND ORDER                    6

The crime scene itself provided no clues to the identity of the murderer. Thus, the state's evidence at trial centered on eyewitness testimony, circumstantial evidence, Gable's statements to police, and Gable's statements to several acquaintances, all of whom were part of a loose network of people who used or sold methamphetamine in the Salem area.

### 2. The State's Eyewitness Testimony

#### a. Wayne Hunsaker

Wayne Hunsaker, a state custodian working at OSH on the day of Francke's murder, testified that he left work at approximately 7:00 p.m. that evening. Tr. 6869. As he walked from the north end of the Dome Building toward his car in the North Parking Lot, he "heard some sound of somebody being hurt." Tr. 6881. He described it as a "surprised, hurt sound like somebody had been hurt," and "Just – kind of like somebody had their breath knocked out. Kind of surprised. Kind of ugh, kind of a grunt sound."[4] Tr. 6881. After hearing the sound, Hunsaker turned around and saw two men who were about forty feet away from him. The men were facing each other, a couple of feet apart at most. Tr. 6881-82, 9176. Hunsaker watched the two men separate, the one facing west turned and moved east toward the Dome Building, and the one facing east turned and ran the opposite direction. Tr. 6882.

Hunsaker described the individual who moved toward the Dome Building as "[a]bout six feet tall, trench coat on, and that's about it." Tr. 6883. He recalled that individual was "walking like he was in a hurry. Like he was late for an appointment." Tr. 6883. Hunsaker did not see him stumble or stagger or fall, though he could see only part of the person at one point when the person crossed

---

[4]In the state's rebuttal examination, Hunsaker described the noise as a "yell." Tr. 9168, 9177.

in front of some bushes.  Hunsaker also lost sight of the person at times because he was watching both individuals, "I would be watching one, and go back and look at the other, and back and forth. When I turned to watch the one individual, the other one was out of my sight."  Tr. 6885.

Hunsaker testified the other individual was about six feet tall, about 175 pounds, with short hair, either black or dark brown, between 20 and 40 years old.  Tr. 6886.  He did not notice if the person had facial hair, but recalled he wore a beige trench coat, about knee length.  Tr. 6886. Hunsaker said that when the two men separated, this individual "took off running at full speed" until he got to the street.  Tr. 6887.  The individual "hesitated for just a moment or so, and then he kind of trotted across the street and went behind a dumpster which they were doing construction over here."[5]  Tr. 6887.

Hunsaker testified that when he saw the two men right before they separated, he did not recall whether they were standing near a car.  Tr.  6898.  He also testified that he did not see any other person, a man or a woman or anything, in the Dome Building parking circle area, or any cars coming or going.  Tr. 6898, 9173-75.

### b.    Cappie Harden

Cappie Harden testified that he also witnessed the confrontation.  At that time, Harden testified that he made his living by buying and selling cars, and by selling methamphetamine.  Tr. 8056.  Harden knew Gable, having met him at Johnny Bender's house on Hyacinth Street (also referred to in testimony as "the Hyacinth house").  Tr. 8058-60.  Harden stated that he had seen

---

[5] During his testimony, Hunsaker used two diagrams of the area to indicate that this individual turned and ran west out of the parking lot, via a driveway leading to 23rd street, and behind a generator at the old Salem Hospital.

Gable at the Hyacinth house a couple of times, and that Gable had given him a ride from that house in the past. Tr. 8058.

Harden stated that, on the day of Francke's murder, Jodie Swearingen had called and asked him to pick her up at her parents' house in Dundee, Oregon. He stated that he did so, and eventually dropped-off Swearingen at the Hyacinth house, where he saw Gable's car parked across the street. Tr. 8059-61.

Harden testified that later that same day, Swearingen called him twice, asking him to pick her up at the OSH grounds, which surround the Dome Building. Tr. 8064. Harden left to do so at approximately 6:30 or 7:00 p.m. Tr. 8064. Harden drove into the Dome Building parking circle area from 23rd Street NE, and parked.[6] Tr. 8065. He had been there only a couple minutes before Swearingen came up from behind the car; she "kind of startled" him, and got in. Tr. 8065. After Swearingen got in the car, Harden "kind of bitched her out for bugging him to come and pick her up at that time of night when [he] was busy doing things." Tr. 8066.

After Swearingen got in the car, Harden noticed an interior light come on in a car parked across from him in parking circle front of the Dome Building. Tr. 8066. Harden testified that he saw the light in that car come on so he didn't leave right away, and "I seen [Gable] get into the car." Tr. 8068. He decided to "stick around and see what [Gable] was up to." Tr. 8069. Harden said he knew it was Gable because he recognized his face. Tr. 8069. He did not see anyone else with Gable. Tr. 8069. Harden testified that once Gable was in the car, he could not see him because Gable closed the car door and the dome light went off. Tr. 6089.

---

[6] As with Hunsaker, Harden demonstrated his route of travel to the jury on a diagram. Tr. 8065.

Harden testified that he then saw another gentleman, who looked "like a businessman," approach the car. Tr. 8069. Harden testified: "He walked up to the car then and that's when I heard him yell, you know, 'Get out.' 'Hey, what are you doing in my car.' And he started running towards the car." Tr. 8070. Harden testified, "That's when I seen [Gable] come out of the car and stab the man one time in the chest. And that's all I seen." Tr. 8070. Harden explained that he didn't see anything else because he was busy hot-wiring his car to start it and get out of there. Tr. 8070. He did not see Gable or the other individual after that point.

Harden then took Swearingen to his house, and told her "to shut up and forget what she ever seen." Tr. 8071. When asked why he did not immediately report the incident to the police, Harden said "I don't call the police," because "I'm not a rat." Tr. 8071.

### c.      Jodie Swearingen

Jodie Swearingen testified at trial as Gable's witness. On direct examination, Swearingen testified that she was not at the OSH grounds on January 17, 1989, that she did not call Harden to come give her a ride from the Dome Building, that she had not seen Gable break into anyone's car, and that she had not seen Gable stab Francke. Tr. 9329. On cross-examination, however, Swearingen made a series of admissions that conflicted with this testimony.

On cross-examination, Swearingen confirmed Harden's testimony that she had called Harden on January 17, 1989, to pick her up from her parents' home in Dundee, and that she eventually ended up at the Hyacinth house later that night. Tr. 9340-41. Swearingen agreed that she had previously testified before the grand jury, under oath, that "Shorty [Harden] brought [her] over to the Benders [the Hyacinth house] that night and dropped [her] off and [she] hooked up with Frank Gable at the

Benders and ultimately wound up at the Dome Building that night[.]" Tr. 9367. Swearingen agreed that she told the grand jury that "she drove in Frank Gable's car over to the Dome Building," and that "he was there to get snitch papers[.]" Tr. 9367. Swearingen agreed that she testified to the grand jury that her job was "to keep a lookout" from where Gable left her "basically standing in front of a tree that was immediately in front of the north portico porch area." Tr. 9368-69.

Swearingen agreed she told the grand jury that while standing there, she heard the door of the porch open up, and "wound up seeing a big tall man walk down the steps and across the grass and approach [a] white car that was in the parking circle that night." Tr. 9369. She admitted telling the grand jury that she "saw Frank Gable get into a struggle with this big tall man near that white car that night[.]" Tr. 9369. Swearingen agreed when asked, "[i]sn't it true that you indicated that Shorty [Harden] at some point in time shows up and that you run over, get in his car, and then the two of you take off." Tr. 9369. Finally, Swearingen agreed she told the grand jury that "the last time [she] saw Frank Gable basically that night [he] was running away from the Dome Building while [she] and Shorty [Harden] were driving away[.]" Tr. 9369. Throughout her cross-examination, Swearingen repeatedly testified that although she made these statements to the grand jury, they were all lies.

### d.    Earl Childers

Earl Childers testified that he knew Gable because Gable would help him procure methamphetamine. Tr. 7746. Childers stated that as a condition of his parole, he attended an Alcoholics Anonymous meeting that ended at 6:30 p.m. Tr. 7751. He stated that he would generally walk home from the meeting, typically passing the OSH grounds on his route home at approximately 7:00 p.m. Tr. 7749-51.

Childers testified that on January 17, 1989, as he was walking home, he saw Gable driving away from the state hospital grounds between 6:30 and 7:00 p.m.  Tr. 7754-55.  He stated he remembered the date because the day after that his wife, who worked on the OSH grounds, was upset because she had to walk to her car at night near the location where Francke had been killed.  Tr. 7749, 7756.  Childers said he recognized Gable's car, identifying it as "a gold Supra with black louvers on the back window."  Tr. 7798.  He saw that Gable was alone in the car, and saw that Gable was wearing sunglasses, noting that it was not unusual for Gable to wear sunglasses at night, as he "wore them all of the time."  Tr. 7755, 7798-99.  Childers testified he tried to get Gable's attention because he had some drugs he wanted to trade, but that when he "waved and yelled and whistled at him," Gable "just continued on going."  Tr. 7756.

Childers stated that when he saw Gable a day or two later, he asked Gable why he had not stopped and given Childers a ride.  Gable did not respond to the question and, according to Childers, Gable "just said forget I ever saw him there.  Just forget it.  So I forgot it."  Tr. 7757.

### 3.  Circumstantial Evidence Linking Gable to the Murder

#### a.  Mark Gesner

Mark Gesner was an associate of Gable; Gesner had introduced Gable to Childers, and the two shared the same network of friends.  Tr. 7974-77.  Gesner sold weapons and methamphetamine to Gable, and the two had disposed of equipment used to manufacture methamphetamine in the past.  Tr. 7976-77, 7982-83.

On January 18, 1989, Gesner learned from a news flash on television that Francke had been killed outside the Dome Building.  Tr. 7984.  Gesner recalled that on the previous night Gable had

arrived at his house as he worked in his garage. Gesner testified: "[Gable] drove up to the house, the garage door was open . . . and [Gable] got out of the vehicle, came up and asked if I could get rid of something for him. And he said where no one else could find it. And I said, yeah, sure. No biggie, you know." Tr. 7986. Gesner explained that Gable then retrieved a bag from his car: "He want back out to the car and brought in a bag, a plastic bag. And I said just set it in the corner and I'll take care of it in the morning. And I said what is it? And he said don't worry about it, I'll tell you later." Tr. 7987 Gesner recalled that Gable appeared to be "[a] little nervous" and "sweaty," and that he took off "very fast which was unusual: he left right away. Usually, he sticks around for awhile, but he was in a hurry, apparently, and left right away." Tr. 7988.

When Gable dropped off the bag, Gesner assumed it contained "meth stuff again, stuff we're destroying from the laboratory." Tr. 7988. However, after learning that Francke's body had been discovered near the Dome Building, a location in close proximity to where Gesner knew Gable frequently picked up his wife from work, Gable's "nervous attitude made [Gesner] think, well, what is it in the bag." Tr. 7990. Gesner was concerned enough that he put on gloves to avoid leaving fingerprints on the bag and went to check it out. Tr. 7990. He testified he could tell from lifting the bag that it was not glassware; rather, it felt like "cloth through [the bag], you know, something cloth." Tr. 7990. Gesner ultimately decided to throw the bag in a river at a nearby park. Tr. 7991.

Gesner testified that when he got to the park, he opened the bag and put some rocks in it to weigh the bag down. Tr. 7991. He did not inspect the contents of the bag, and could not recall what he saw when he opened the bag other than "some type of a shirt maybe[.]" When he tried to squeeze the air out of the bag, however, he said he said it felt like the cloth was wrapped around some

cylindrical object that would not bend, . . . basically, like something rolled around something hard[.]"
Tr. 7991. Gesner testified that he threw the bag into the river, and left after he saw the bag go under
the water. Tr. 7993. He said Gable asked him the following day whether he had gotten rid of the
bag, and Gesner told him that he had. Tr. 7995. Gesner testified that he did not ask Gable anything
more at that time. Tr. 7995.

### b.    Janyne Vierra Gable

The state also presented testimony from Gable's wife, Janyne Vierra Gable (referred to
hereafter as "Janyne" to avoid confusion).[7] Janyne testified she worked as a nurse at OSH, and that
Gable would drive her to and from work each day. Tr. 7684, 7702. She testified that on January 17,
1989, she was not feeling well, and left work at noon. Tr. 7727-28. Gable gave her a ride home.
Tr. 7727. She stated that she slept that afternoon, and awoke just before dark and made dinner. Tr.
7728-29. Janyne testified that Gable was not home that night, and that she did not see him until the
following morning about 6:25 a.m. Tr. 7729. Gable had the car, and Janyne remembered being mad
because she thought she would be late for work. Tr. 7729-30. She had not seen Gable since
"probably around one o'clock in the afternoon" the day before. Tr. 7730.

Gable gave Janyne a ride to work the morning of January 18, 1989. Tr. 7730. When they
saw several police officers around the Dome Building, Janyne remembered Gable's reaction: "Yeah.

---

[7] Gable filed a pretrial motion to exclude his statements to Janyne, asserting marital privilege
under OR. REV. STAT. § 40.255. Resp. Exh. 220. Shortly before Janyne testified, Gable's
trial counsel asked to be "heard on the issues of marital privilege outside the presence of the jury." Tr.
7640. At Gable's trial, Janyne did not testify regarding any admissions Gable made to her
concerning the Francke homicide.

He was nervous. I assumed because of the density, high concentration of police in the area." Tr. 7731.

Janyne testified that approximately a month before Francke's murder, she recalled Gable giving her a list of names and asking her to access the computer system at OSH to determine "whether any of the people on this list of names were informants or classified in any particular way." Tr. 7723. Janyne testified that she ultimately declined to do so because of the security measures needed to gain access to the information. Tr. 7724.

Janyne testified that Gable would frequently carry knives, "[a]nything from kitchen knives down to old timer pocket knives." Tr. 7709. She stated he would carry them either "[u]p his coat sleeve or down the back of his pants." Tr. 7712. Janyne said she would often find her kitchen knives missing, and "tried to talk [Gable] into taking my cheap kitchen knives instead of my good kitchen knives." Tr. 7711. She gave Gable a six-inch knife manufactured by Chicago Cutlery in December 1988, but testified that she had not seen that knife since she gave it to him. Tr. 7717-18.

### 4. Gable's Statements to Other Associates and Acquaintances

#### a. Linda Perkins

Linda Perkins was the mother of one of Gable's friends, Theresa Ross. Tr. 7946. Ross was the live-in girlfriend of Randy Studer, who was Janyne's brother and Gable's brother-in-law. Tr. 7946-47.

Perkins testified that she drove Ross from Ross's apartment to work each morning. Tr. 7949. She testified that on January 18, 1989, she arrived at Ross's apartment, and that about fifteen minutes after she got there, Gable arrived. Tr. 7950-51. Perkins said Gable appeared "extremely nervous."

Tr. 7951. Although he was typically "nice and neat" Perkins testified that he looked "out of the ordinary" that morning, dirty, unshaven, and with his hair uncombed. Tr. 7951. Perkins explained: "[h]e was shaky, just jerking, and nervous acting. And kept looking out the window like every sound he heard or even in between sounds that he heard, he kept looking out the window as if – I got the impression he was afraid someone was chasing him or following him." Tr. 7951.

Perkins said she asked Gable what was wrong, and Gable responded, "Nothing." Tr. 7952. When Ross persisted, Gable responded, "I fucked up . . . I fucked up big time this time." Tr. 7952. Perkins testified that when she asked what Gable meant, "he said, 'Well, I'll put it to you like this, you will be reading about it in the papers.'" Tr. 7952.

Later that morning, as she drove Ross to work, Perkins heard on the radio that Francke's body had been discovered. Tr. 7953. Perkins said that when she asked Ross whether Gable had been talking about Francke, Ross discounted that possibility, telling Perkins that Gable was "full of bullshit." Tr. 7967-68.

Perkins testified that approximately a week-to-ten days after that she spoke with Gable on the telephone, and that Gable "told me that if I opened my mouth I was a dead mother fucker." Tr. 7953. Perkins also recalled a prior "rather heated discussion" with Gable because she was aware he had been providing Ross and Studer with illegal drugs. Tr. 7967.

### b.    John Kevin Walker

John Kevin Walker was a methamphetamine dealer who frequently sold methamphetamine to Gable. Walker testified that, on the night Francke was murdered, he recalled listening to his police scanner at a friend's house and hearing about "some stuff go[ing] down over by the State

Hospital grounds[.]  Tr. 8167-69.  He recalled "[a]nd that was the only night than I can recall ever hearing that much radio traffic at once."  Tr. 8169.

Walker testified that on January 18, 1989, Gable called Walker, sounding agitated.  Tr. 8171. Walker said he went to Gable's apartment later that night to sell Gable methamphetamine.  Tr. 8172. When Walker arrived, they went into Gable's bedroom to conduct the drug deal.  Walker testified that, once in the bedroom, the following exchange occurred:

> [Gable] asked me if I had heard the news, and I said what news?  And he said, "About that guy over there at the State Hospital grounds."  And I said, "Yeah, he got shot or something."  And [Gable] said, "Well, that's not exactly what happened, but it's close enough.  I stuck him."

Tr. 8173.  After that exchange, Walker said that Gable threatened him:  "And then he was like, you know, tweaked or something and he just goes, you know, kind of in a sad way, I'm sorry, you, if you tell on me, I'm going to have to kill you and kill your family."  Tr. 8175-76.

Walker testified that he initially took Gable's threat with a "grain of salt" because it "wasn't characteristic of [Gable] to do something like that to me."  Tr. 8176.  However, Walker testified that he noticed a change in Gable's behavior, that he became "[r]eal edgy.  Like I say, on edge.  Like a tweaker's edge."  Tr. 8177.  Walker said that he became more concerned, explaining, "As time goes on more and more things get found out.  And the more I found out, the – the less I wanted to be around him."  Tr. 8176.

Walker admitted that when he was first questioned by police, he did not tell police about Gable's admissions.  Tr. 8179.  He cited his fear of some of the people with whom Gable associated, and "the fact of the rat jacket that gets attached any time you talk to the police about anything."  Tr. 8179.

### c. Daniel Patrick Walsh

Daniel Patrick Walsh lived in the same apartment complex as Studer and Ross, and made his living selling methamphetamine. Tr. 7931-32. Walsh testified that in February or March of 1989, Walsh was "sticking a knife into a tree." Tr. 7933. He said Gable walked up and asked where Walsh got the knife, and Walsh told Gable he bought it from Jerry Paul Baker. Tr. 7934. Walsh testified that Gable said he "had given that knife to Jerry Paul Baker, and that that was the knife that he used to kill Michael Francke." Tr. 7934. Walsh said he did not take Gable seriously at the time: "I just kind of laughed because he was pretty strung [sic] on drugs then and stuff, and so was I, and I didn't pay any attention about it really all that much." Tr. 7934.

Walsh testified that sometime in the summer of 1989 he allowed Gable and his wife, Janyne, to move into Walsh's apartment. Walsh described an encounter with Gable during that time:

> [I]n the process of while he was staying at my house him and Doug Stritchfield were arguing and fighting back and forth. I guess Doug had shot at Frank, called Frank a snitch and a rat, and Frank had made a comment about killing Doug. I just kind of snickered about it at the moment and stuff and he went into, "Well, you remember Michael Francke," were his exact words, and I just kind of tried not even paying attention to him, you know I just pretty well much was on drugs and stuff, went into about how he went about killing him and stuff.
>
> * * *
>
> He said that that is what would happen to Doug Stritchfield. He had said that he had been jock-boxing and the car had the car door open, and that he was laying across the seat and that Mr. Francke come up along to – up on him, and he had lunged out into Mr. Francke. Didn't say whether he was out of the car or in the car, lunged into his body and stuff stabbing him repeatedly and that he had fled across the parking lot.

Tr. 7936-37. Walsh testified that after Gable described the stabbing, he threatened Walsh: "[H]e grabbed my chin and said if you ever say a word of this to anybody, I'll kill you and your family." Tr. 7937.

Walsh also admitted that he did not initially tell police about Gable's statements. Tr. 7938. He said that he feared for his family and "didn't want to have a snitch jacket on me." Tr. 7938.

### d.    Earl Childers

As noted above, Childers testified that he saw Gable driving away from the State Hospital grounds on January 17, 1989. Childers also testified that, a couple of months later, he and Gable were talking about a woman, Shelli Thomas, with whom Gable had a "close association." Tr. 7759. Thomas's "boyfriend was coming back from California and he had a habit of beating her up." Tr. 7759. Childers testified that Gable then stated "that if he had any problems with [the boyfriend] he would just stick him." Tr. 7759. According to Childers, "And I asked him why would you do that and [Gable] said, well, it won't be the first time. And we let it go at that." Tr. 7759.

Childers testified that he was arrested in May 1989, and that after serving some time in prison he transitioned to a minimum-security release center. Tr. 7760. Childers testified that he walked way from the release center in July 1989 and went to stay at Mark Gesner's house until he was arrested again two weeks later. Tr. 7761-62. Childers said that sometime during that two weeks Gable visited Gesner's house. Tr. 7763. Gesner was not home at the time, and Childers and Gable "started hashing over old times" and doing methamphetamine together. Tr. 7764. Gable told Childers that police "questioned him on the Francke investigation and then subsequently released him because they had nothing on him." Tr. 7764. Childers then testified:

> We just kind of bantered it back and forth while we were waiting for [Gesner]. And at one point when I came out of the bathroom after doing the crank I asked him if he had done it, and he just kind of gave me a smile he gets on his face and didn't say yes or no, kind of insinuated more yes than more not – no.

Tr. 7765.

Childers testified that once Gesner arrived home, Gable, Childers, Gesner, and Gesner's girlfriend walked over to look at a house that they believed "was ripe for a burglary." Tr. 7765. They ultimately decided not to burglarize the home, and walked back to Gesner's house. Tr. 7765. Once back there, Childers asked Gable if he could borrow some clothes, explaining that he did not have any because he was "on escape status" and Gesner's clothes did not fit him. Tr. 7766. Childers said Gable agreed to loan Childers some clothes, and that as they walked to Gable's apartment to get the clothes, they began to discuss the Francke homicide:

> We just kind of talked about things and the subject came up again about the – the Francke killing, and we bantered it back and forth and I asked him again if he did it and he told me he had done it. He said that he killed him. And I asked him, well, why? And he said that he was burglarizing the car, going through some cars and he was in Francke's and he got caught and he ended up sticking the guy. And I told him, I said, you're shitting me, you stuck him over a car burglary? He said he [Francke] was going to take me in and I [Gable] didn't want to go back to prison.

Tr. 7767. Childers testified that Gable said he "stuck him three or four times" in the chest and that Francke "was a cock sucker and now he would always be a cock sucker." Tr. 7768.

### e.    Mark Gesner

As noted above, Gesner testified that on the night of the murder Gable asked Gesner to dispose of a bag. Gesner also testified that on the walk back from the house he, Childers, and Gable were considering burglarizing, Gesner asked Gable about the bag:

> We were basically talking about this house going there, but in the course of the conversation I think I brought up, well, what was in the bag?  You said you would tell me later.  And he said it was the stuff that I was wearing the night of the murder.  And I said what murder?  And he said the Michael Francke murder.  And I dropped it right there because then [Gesner's girlfriend] and [Childers] were starting to get close enough they could hear us talking again, so I stopped talking about it.

Tr. 7999.

Gesner testified that he and Gable talked about Francke's murder a second time, when Gable visited Gesner's house again.  Gable "was bragging about, you know, saying I killed Michael Francke, and I said don't even talk about that kind of stuff."  Tr. 8000.  Gesner testified that Gable made that statement in front of Gesner's girlfriend, and Gesner told Gable, "Don't tell anybody that even if you didn't do it or did do it, don't tell anybody that.  Don't talk about something like that.  That's how you get busted."  Tr. 8000.

### 5.    Gable's Statements to Law Enforcement Investigators

Police first spoke with Gable in May 1989, after receiving a tip that Gable knew something about the Francke homicide.  Tr. 7165-67.  When asked whether he remembered anything about the Francke homicide, Gable replied that he first learned about the murder on January 18, 1989, when he drove his wife to work at OSH.  Tr. 7170.  He said that he did not know who had killed Francke. Tr. 7171.  Gable reported that, on the day of the murder,"he was sleeping the whole day."  Tr. 7171.

Approximately one month later, in June 1989, Gable spoke with police again after he had agreed to work as an informant for the Keizer police.  Tr. 7229-31.  Gable had been arraigned on unrelated charges in Coos County, and a Keizer police officer drove him from Coos County back to Keizer.  Tr. 7232.  As they drove back, they discussed, among other things, the Francke homicide.  Tr. 7234-35.  The Keizer police officer commented that Gable looked like the composite drawing

of the suspect that had been printed in the newspaper, and Gable responded that the police had already questioned him a "couple days" after the murder because "he was on the grounds the day it happened." Tr. 7235. Gable told the officer that the police had ruled him out as a suspect. Tr. 7235.

Following up on the previous tip, police later contacted Gable for an additional interview about the Francke homicide. Gable agreed to meet with police on September 13, 1989, in Coos County. Tr. 7255-56. Police picked him up from his step-father's residence in Coos County and drove him to the police station. Tr. 7256, 7258-59. There, Gable spoke with Detective Fox of the Oregon State Police ("OSP"). When Fox first told Gable that he wanted to discuss the Francke investigation, Fox said Gable's "initial reaction were words to the fact of [sic] I wondered when you sons of bitches were going to try to hang this on me." Tr. 7269. Fox explained to Gable that it was his choice whether to speak with him, and that he would not be punished if he declined to do so. Tr. 7269. Fox asked Gable if he had ever told anyone that he was involved in the homicide, and Gable stated that he had not. Tr. 7270. Fox testified that Gable did tell Fox, however, that "he was running with a couple by the name of John and Kelly," and had "pointed out the Dome Building and said that's where Michael Francke was killed." Tr. 7270-71. Gable stated that he did not know where he was the night of the murder. Tr. 7271. Gable requested another interview. Tr. 7271.

On September 15, 1989, OSP Detectives Bain and Berning drove to Gable's step-father's house to speak with Gable. When the detectives drove up, Gable said "Well, I knew you guys were coming." Tr. 7281. He asked if there were more officers and jokingly said that he thought the officers "were going to take me down at gunpoint." Tr. 7281. The officers explained that they were

not going to take him down and just wanted to speak with him; Gable agreed and they drove to the Coos Bay Police Department to talk with him. Tr. 7282, 7284.

Gable was advised of his *Miranda* rights and spoke with OSP Detective Fred Ackom. Gable told Ackom that he did not stab Francke and did not have any information about the Francke homicide. Tr. 7293. Ackom asked Gable what he was thinking when Ackom asked him certain questions. When asked what he was thinking when asked whether he stabbed Francke, Ackom said Gable replied, "'I was thinking I was joking around with my wife and I told her I killed Michael Francke.'" Tr. 7293. When asked what he was thinking when asked whether he was involved, Ackom testified that Gable replied, "I was thinking that people in the joint would think I was a big guy. I wasn't even around at the time. I was home with my wife and friends at the time. I swear to God on a stack of bibles that I didn't do it." Tr. 7293.

Gable stated that he needed to use the restroom. Tr. 7294. When he left for the restroom, Gable told Detective Bain that "he liked Detective Ackom better than he liked Detective Fox" and Bain thought that Gable "appeared to be in a good mood." Tr. 7284. However, when Gable returned from the bathroom, he leaned against a wall "and began to weep openly, sobbing, making sounds." Tr. 7294. Ackom put his hand on Gable's back and told Gable: "'Frank, it's all right. Get it out. Whatever it is.' He just kept saying over and over, 'I just know they're going to roast me or fry me for this.'" Tr. 7294.

Later that evening, at approximately 9:00 p.m., Bain spoke further with Gable. At that point, Gable appeared upset, "like he had been crying." Tr. 7303. Bain asked Gable whether he was still willing to talk, and Gable stated that he was. Tr. 7303. Bain again advised Gable of his *Miranda*

rights.  Tr. 7304-05.  Bain initially tried to calm down Gable, and spoke with him about his background.  Tr. 7307-08.  Bain asked Gable whether he remembered where he had been on the night of the murder.  Gable stated that he had picked up his wife from work at 3:30 p.m. on January 17 and then "stayed with his wife that night all evening."  Tr. 7309.  Gable told Bain that "in fact, they had a party at the apartment, and there were approximately between twenty and thirty people at this party."  Tr. 7309.  Bain told Gable that was good and that he was "going to go back and check with your wife, make sure that she can verify your story[.]"  Tr. 7309.  He also asked Gable for the names of any of the persons at the party.  Tr. 7309.  Gable was unable to give a single first name, telling Bain "[w]e don't use names like you do."  Tr. 7309.

Gable's wife Janyne was being interviewed simultaneously in another room at the police station.  Tr. 7312.  At around 10:00 p.m., Bain left to speak with the detective interviewing Janyne, and noted there were "conflicts" between what she was telling police and what Gable was saying to them.  Tr. 7311-12.  After speaking with the detective interviewing Janyne, Bain went back into the interview with Gable and asked:  "Well, Frank, did you ever tell anybody that you killed Michael Francke?"  Tr. 7313.  Gable responded, "I don't think I ever told anybody I killed Francke."  Tr. 7313.  Based on his conversation with the detective interviewing Janyne, Bain placed Gable under arrest for assaulting Janyne.  Tr. 7317.

Gable was transported to the Coos County Jail, and during the transport he talked about killing himself.  Tr. 7338.  After learning this, Ackom decided to re-contact Gable and went to the jail at approximately 12:30 a.m. on September 16, 1989.  Ackom again advised Gable of his *Miranda* rights, and he again agreed to speak with police.  Tr. 7343-44.  When Ackom told Gable

he was there because he heard Gable was contemplating suicide, Gable "gave out a light chuckle and said that he wasn't really contemplating suicide." Tr. 7346. Ackom told Gable he was just as interested in finding out that Gable did not commit the murder as he was in finding out that he did. Tr. 7348. Ackom again asked Gable about possible alibis for that night, and Gable stated that he was with his friend, Kris Warilla, or that he was at home with his wife and friends. Tr. 7349-50.

At one point during the conversation, while they were discussing possible locations of the knife that killed Francke, Gable said, "'Hey man, whenever you ask me a question about this,' he says, 'My mind keeps saying you did it, you did it, you did it, and all of the time I know I didn't." Tr. 7351-52. Ackom said he didn't understand, and asked, "You mean that part of you is saying you did it? You killed Michael Francke, and the other part is saying you did it – didn't." Gable replied, "'Yeah, it's like the back part of my brain' – gestures with his right palm to the back of his head – 'says I did it, and front part of my brain says I didn't." Tr. 7352. When Ackom told Gable that if he did it, he would remember it, Gable stated, "It doesn't matter if I said yes I did it or no I didn't. They're going to fry me for this.'" Tr. 7352. Ackom asked Gable whether he thought the State had enough evidence to charge him, and Gable responded, "'yeah, they probably do. I don't know, man. It doesn't matter. I will stick to this story until the end. I know you want me to make a great big hero out of you' – there was a large smile on his face, 'but I just can't. I can't man. I don't think they have anything.'" Tr. 7352.

Ackom testified that he and Gable discussed how God would view the murder, and Gable said he believed that God would forgive the murderer. Tr. 7353. Then Gable said, "Yeah, but I'm not saying I did it. I'll go to the end of the trial saying that, Fred. There are only two people who

know who killed Francke, Francke and God." Tr. 7353. Ackom reminded Gable that Francke was dead, and "Gable – with a puzzled look on his face like he was thinking about what I said, he said, 'Well, there are only two people who know Francke – yeah, me and God.'" Tr. 7353. Then, Ackom testified, Gable "puts his arms on the table in front of him like this, he leans forward like he realized what he had said, put his face down on his arms like this, he turns and talks out – looks out of the corner of his eye at me. I was on the left side of him, he says, 'Yeah. Yeah. Me and God.'" Tr. 7353-54. When Ackom told Gable he had made a Freudian slip, Gable disagreed and stated, "'I'm going to the end of the trial saying I didn't do this. I'll be talking to God all the way. I'll go to heaven saying it and all those mother fuckers will go to hell for lying.'" Tr. 7354.

Another officer entered the room and asked Gable to consent to the search of his mother-in-law's house where it was believed Gable had stored some of his belongings. Tr. 7356. Gable withheld consent, explaining: "'My mother-in-law hates me. She will probably say every fucking knife in the place belongs to me so they can pin this on me.'" Tr. 7356. Gable said he did not want to talk to police any further, and that he wanted a lawyer. Tr. 7356. The interview ended.

Later that day, Gable was taken to a local hospital to have blood and hair samples taken pursuant to a search warrant. Tr. 7364. An officer escorting Gable testified that the doctor who was going to take the samples remarked to a nurse "that he wanted to follow the procedure closely or some attorney would get the guy – and the only guy around being [Gable] – off." Tr. 7365-66. According to the officer, immediately after the doctor said that, Gable said, "'No lawyer in the world could get me off.'" Tr. 7366. Shortly after that, when the doctor remarked to the nurse that Gable was up for murder, the officer testified that Gable stated "'I wasn't fucking arrested for murder.'"

Tr. 7366. Approximately a minute later, Gable started "crying, very much, uncontrollably and turned very pale." Tr. 7366.

Although Gable had invoked his *Miranda* rights at the conclusion of the September 16, 1989, interview, on November 3, 1989, he asked to speak with Detective Bain or any of the other detectives because "he had information concerning the Francke case." Tr. 7454, 7457. Bain, Ackom, and Sergeant Salle went to the Coos County Jail and spoke with Gable for approximately five and one-half hours. Tr. 7505.

Detective Bain testified that Gable wanted to discuss a newspaper article which reported that Mike Keerins had stated that Gable admitted to him that Gable had killed Francke. Tr. 7460. Gable stated that "this isn't what happened, that the opposite was what had happened." Tr. 7460. Gable "'thought that Mike Keerins was a smart guy and that he came forward to the police and made statements about [Gable] prior to [Gable] coming to the police and making statements about his suspicions of Mike." Tr. 7528.

Gable stated that he had thought more about the night of January 17, 1989, and he first said that he was "positive" that he was with Kris Warilla. Tr. 7464, 7466. He stated that he and Warilla had sold methamphetamine at the "AM/PM store," and then went to dig through dumpsters for clothing and antiques. Tr. 7465. He stated that they then stayed at Warilla's home, until he picked up his wife to take her to work the next morning. Tr. 7465. At one point, Bain told Gable that Warilla had "made the statement to police that [Gable] had stabbed the guy. Tr. 7513. After that, Gable said he was less certain that he was with Warilla on the night of the murder and that he could have been with Shelli Thomas, at home, or up in Portland. Tr. 7529.

During the November 3, 1989 interview, Gable confirmed that he had made statements to his friends that related to Francke's murder. He denied that he had told his friends that he had stabbed Francke, but he acknowledged, "'I might have made some stupid statements. I might have been involved in some funky statement that may have been perceived wrong.'" Tr. 7487. He stated that he hoped to work with police to clear those statements up. Tr. 7487. He stated that he could not remember whether he told his wife that he knew what happened to Francke, and said that if he had made such a statement, he had merely offered his opinion about what happened. Tr. 7470.

At certain points during the interview, Bain testified that Gable stated he did not believe that any of his associates had told police that he had admitted to them he committed the murder. He believed Janyne to be the only person who would have made any such statements to police. Tr. 7512.

Detective Salle testified that during the course of the interview Gable stated he owned a tan trench coat. Tr. 7536. Gable stated that "'if someone mentioned [Gable] in a trench coat that that's the coat they would have been talking about because he wore it all around." Tr. 7536.

Detective Salle testified that Gable confirmed his relationship with several of the witnesses who would later testify against Gable. When asked to name a good male friend of his at the time of the murder, Gable named Gesner, noting that he was Gable's main connection for methamphetamine. Tr. 7533-34. Gable explained that Walker introduced him to Gesner during the course of a drug deal. Tr. 7470. Gable described Childers as a "pretty good guy" and that "he wouldn't talk to the police if he knew some information about [Gable]." Tr. 7535. Gable said he did not know

Swearingen until July 1989. Tr. 7556-57. When asked if she could have seen him on January 17, 1989, Gable "said, 'well, she probably could have, but I don't know where I was." Tr. 7556.

At the conclusion of the November 3, 1989, interview, Gable agreed that police could come back and talk with him again, and asked them to check on his wife for him because he had not heard from her. Tr. 7561.

On December 22, 1989, Ackom spoke with Gable again. After advising Gable of his *Miranda* rights, Ackom asked Gable whether various people could have seen him stab Francke in front of the Dome Building. Tr. 7564. Each question was in the form of "Did [individual's name] see you stab Michael Francke in front of the Dome Building." Tr. 7565-66. Ackom said during the questions that Gable "maintained a – perfect eye contact, he looked right at me. He had a big toothy grin like he was really anticipating listening to the questions." Ackom testified that when he asked Gable, "Did Jodie Swearingen see you stab Michael Francke in front of the Dome Building?" Gable "kind of leaned back in his chair, he crossed his arms, he looked down, his pupils looked down to the left." Tr. 7566. On the other names, Gable "gave no response whatsoever." Tr. 7566. Ackom started to name people from a second list, and Gable interrupted him and said, "'That Jodie gal, the bitch is saying she saw me run from the scene, isn't she?'" Tr. 7566.

Ackom then turned to the subject of Gable's whereabouts on January 17, 1989. Gable confirmed that he knew a "John and Kelly" who lived on Hyacinth Street. Tr. 7567. Ackom asked whether Gable could have been at that house on January 17, 1989, and "[h]e said he was going there every night, four or five nights in a row over the 17th. He very well could have been there on the night of the 17th. He was taking dope deals to the Hyacinth Street house." Tr. 7567. Ackom asked

if Swearingen had been there on the 17th and he said she very well could have been there, but he didn't meet her until July 1989. Tr. 7568. Then Gable said he could have met Swearingen earlier than July, as early as March or February. Tr. 7569.

In the course of describing the people who may have been at the Hyacinth Street house, Ackom said Gable "just out of the clear blue and it didn't mean much to me at the time, but he said if anyone would have seen me that night I would have been wearing dark sunglasses. Hey Fred – he said, 'Hey, Fred, I'll tell you one thing, if anyone would have seen me that night, I would have been wearing dark sunglasses. I always wore dark sunglasses, day or not.'" Tr. 7569-70.

Ackom returned the next day, December 23, 1989. Ackom testified that "[Gable] wanted to know what [Janyne] was saying about him. She keeps telling us things, that he killed Michael Francke, that it's just not true. He didn't kill anyone. Stated he wanted to help us." Tr. 7575. Ackom testified that Gable "wanted to know about the eye witnesses he says – that says they saw him kill Michael Francke." Tr. 7575. Gable stated, "'I know it's that Jodie gal, isn't it? She is saying she saw me running from the scene, isn't she?" Tr. 7575-76. Gable also stated that he used to work at a warehouse near the Dome Building, that he knew exactly where Michael Francke's office was. At the conclusion of the interview, Gable said, "'Well, nobody saw me because I didn't kill the guy.'" Tr. 7576.

Ackom interviewed Gable again on January 21, 1990. Tr. 7576. Ackom told Gable that police had people who were saying that Gable was at the scene and saw him and what he did. Ackom described Gable as becoming "very nervous and popping his neck and moving all around." Tr. 7578. Gable told Ackom he "didn't want to hear it and he got up and ran out of the room." Tr.

7579.  Out in the hallway, Gable just kept saying he didn't want to hear this, and "All we had was a bunch of zeros talking."  Tr. 7579.

On April 8, 1990, Gable was arrested at the Coos County Jail for the murder of Francke.  Tr. 7594-95.  At the time of his arrest, he was advised of his *Miranda* rights and given a copy of the indictment, which included a list of the witnesses who appeared before the grand jury.  Tr. 7595-96, 7603.  While en route to the Marion County Jail, the police stopped at a patrol office in Florence, and at the Lane County Jail.  OSP Detective Glover spoke to Gable, "'Frank, I said, 'do you realize that we have a witness than can place you at the scene?  That saw you drive away from the scene on to D street and then head up to Park Street and turn left?'"  Tr. 7604.  Gable responded, "'Oh, Earle told you that, didn't he.'"  Tr. 7604.  When asked how he knew it was Earle, Gable said, "'Well, I knew that Earle worked – his wife worked over there at the hospital.'"  Tr. 7604.  When asked, out of all the names on the witness list that Detective Glover gave him, how he picked Earle's name as the one who saw Gable driving away from the Dome Building, Gable said, "Well, just lucky, I guess."  Tr. 7613.

Gable also confirmed the meeting described by Childers and Gesner during which they said Gable admitted to killing Francke.  Tr. 7604.  Gable told Glover that Childers had just walked away from the Corrections Division Release Center; that Gable met with Childers at Gesner's residence; that he and Childers took a "hit of dope" before Gesner got home; that Gesner eventually arrived at the residence; that he, Childers, Gesner, and Gesner's girlfriend then walked from Gesner's house to a house that they were considering burglarizing; and that they ultimately decided not to burglarize the house.  Tr. 7604-06.  Gable further confirmed that after they walked back to Gesner's residence,

he and Childers walked to Gable's residence to get some clothing for Childers because he "needed a shirt." Tr. 7606-07. Gable denied he admitted to Childers that he killed Francke: "'No. I didn't tell him that.'" Tr. 7607.

Glover testified that toward the end of the interview another officer, OSP Sergeant McCafferty, told Gable he believed Gable killed Francke. Tr. 7612-13. Gable said, "'maybe so, maybe not.'" Tr. 7613. Detective Glover said, "You're going to take this to the grave with you, aren't you?" and Gable responded, "'You bet I am.'" Tr. 7613. Gable requested an attorney, and the interview concluded. Tr. 7613.

On April 9, 1990, Gable was arraigned at the Marion County Courthouse. Before his hearing, Gable waited in the basement of the courthouse. Tr. 7629. Detective Ackom was with Gable for two or three minutes, but did not ask him any questions. Tr. 7630. Ackom testified that Gable spoke to him:

> He was shaking his head from side to side, he said, "You have got the wrong guy, Fred. I don't know why these people are saying these things about me. I wish I could tell you I could say things about them. I wouldn't do that. I'm not a rat. The best I can do for you, Fred, is I might have been driving by that night and Jodie and Shorty saw me."

Tr. 7630. That was all Gable said, and they went upstairs. Tr. 7630.

### B. The Defense Case at Trial

Defense counsels' intended central defense theory focused on third-party guilt; specifically, that John Crouse, who in April 1989 had confessed to murdering Francke three months earlier, committed the murder. Tr. 8467-68. The state moved *in limine* to exclude defense evidence that others, including Crouse, committed the murder. Tr. 5864-65, 8466. As discussed in more detail

below, Crouse later denied committing the murder and invoked his Fifth Amendment rights on all subsequent questions.  Tr. 9487-89.

The defense pursued other avenues of attack.  Through cross-examination of the state's witnesses, the defense attempted to discredit the thoroughness of the crime scene investigation, suggesting that the crime scene was compromised, and that evidence might have been lost when, for example, nearby dumpsters were emptied before being searched.  *See, e.g.*, Tr. 5978-80, 6049-54, 6069-70, 6088, 6112, 6142-43, 6464.  The defense also presented the testimony of experts who criticized the State's crime scene investigation.  Tr. 9595-9653, 9665-68.

The defense also sought to undermine the state's theory of when and where the attack occurred, in part, through testimony that numerous people in the Dome Building vicinity at 7:00 p.m. saw nothing suspicious, and also through the testimony of other people who saw suspicious things later in the evening.  Tr. 9059-9101, 9282-99, 9306-12, 9461-74.  Rather than cross-examine the state's witnesses who were present in and around the Dome Building on the night of the murder, the defense recalled most of them, and called several others, in its case.  Tr. 8662-8747, 8877-8941, 9163-9211.

The defense also re-called some of the law enforcement witnesses who testified for the state to talk about the duration and coercive nature of certain of their numerous interrogations of Gable.  Specifically, the defense brought out the carefully planned long interrogation that took place in April 1990 as Gable was transported from Coos Bay to Salem for arraignment on the murder charges.  Tr. 8662-8747.

The defense also sought to undermine the credibility of the state's key witnesses, doing so primarily through collateral evidence. Tr. 8477-8661, 8751-8867. The defense also presented Jodie Swearingen's testimony. As previously discussed, Swearingen recanted her grand jury testimony and swore at trial that her grand jury testimony was untrue.

The defense did not file an alibi notice, but presented witnesses in an attempt to establish that Gable was at the home of acquaintance Shelli Thomas around the time of the murder. Tr. 8553-60, 9392-9416. The state refuted this evidence through cross-examination and in its rebuttal case, using telephone records and presenting other evidence to show that although Gable likely had been at Thomas's house in late January 1989, his visit did not occur on January 17, 1989. Tr. 9800-9809.

Finally, the defense called an expert forensic pathologist. The expert testified that the murder weapon likely was a pocket knife having either a serrated or unserrated blade that could have been as short as 3-4 inches long and less than 5-6 inches long, because it did not pierce both lungs. The expert testified that the Chicago Cutlery knife could not have been the murder weapon because of its blade thickness, and because it did not have a hinge that would have accounted for a "half moon" shaped notch on the fatal wound. Tr. 9656-9775.

The defense rested without calling Gable to testify. Tr. 9791. On June 27, 1991, the jury returned a guilty verdict against Gable on six counts of Aggravated Murder and one count of Murder.

### C.  The Penalty Phase

On July 2, 1990, the penalty phase began for the jury to determine whether or not to impose the death penalty. The court instructed the jury under an amendment to the Oregon death penalty statute that became law after the date of Francke's murder. The two sentencing options available

at the time of the crime were life with the possibility of parole or death, but the amendment provided a previously-unavailable third option: life without the possibility of parole. Resp. Exh. 363, pp. 9-10. Gable's attorneys did not inform him that he had a right to challenge the application of the amended statute to his case on *ex post facto* grounds, and they did not object to its application; in fact, they affirmatively requested that the jury be instructed under the new law.

The jury rejected the death penalty by a vote of two in favor and ten against, but found insufficient mitigating circumstances to warrant a sentence of life with the possibility of parole. As a result, the trial court sentenced Gable to a term of life in prison without the possibility of parole. Tr. 10526.

### D.     Direct appeal

Gable appealed, alleging the trial court erred in: (1) denying Gable's motion to suppress certain of his statements to law enforcement in violation of the Constitution's Fifth Amendment; (2) excluding evidence of John Crouse's confession under Oregon evidentiary rules; and (3) applying the amendments to the Oregon death penalty statute in violation of the Constitution's *Ex Post Facto* Clause. Resp. Exh. 106. In 1994, the Oregon Court of Appeals affirmed the trial court's judgment in a written opinion. *State v. Gable*, 127 Or. App. 320, 873 P.3d 351 (1994). In the opinion, the court of appeals found Gable never invoked his Fifth Amendment rights, declined to discuss the exclusion of the Crouse evidence, and declined to address the *ex post facto* issue because it was unpreserved. *Id*. Later that same year the Oregon Supreme Court denied Gable's petition for review, in which he raised the same issues. *State v. Gable*, 319 Or. 274, 877 P.2d 1202 (1994) (Unis, J., would have granted review).

**E.     State Post-Conviction Relief Proceedings**

In July 1995 Gable filed a PCR action in Marion County Circuit Court.  The PCR court appointed Ken Hadley to represent Gable, and Hadley eventually filed a Third Amended PCR Petition.  The petition contained various allegations that both trial and appellate counsel provided ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.  As relevant here, the petition included a claim of trial counsels' ineffectiveness in failing to object on *ex post facto* grounds to the trial court's penalty phase jury instructions that included the life without possibility of parole option.  Resp. Exh. 155, p. 4.

In May 2000 the PCR trial court held a three-day trial and the parties submitted their respective post-trial closing memoranda.  On January 2, 2001, in a 104-page judgment, the PCR trial court denied all relief.  Resp. Exh. 345.

Gable raised six issues on appeal, including a claim that the PCR trial court erred by finding that trial counsel was not ineffective and that Gable had waived his *ex post facto* rights by a totality of the circumstances.  Resp. Exh. 357, p. I.  In 2006, the Oregon Court of Appeals issued a written opinion denying relief on all issues except this one.  *Gable v. State*, 203 Or. App. 710, 126 P.3d 379 (2006).

On that issue, the court of appeals concluded that the PCR trial court erred "in finding that Gable had waived any objection, based on *ex post facto* protections, to the submission of the 'true life' sentencing option to the jury."  *Id*. at 726.  The court of appeals further concluded that trial counsel had "failed to exercise reasonable professional skill and judgment" by "failing to confer with Gable regarding any waiver of the *ex post facto* objection" to the true life sentence option.  *Id.* at 726.

The court of appeals explained, however, that this conclusion did not compel granting post-conviction relief. Instead, the court of appeals vacated the PCR judgment and remanded the case to the PCR trial court because that court had "never determined whether Gable was prejudiced by his attorneys' default," and the PCR trial court was to make a finding on that issue in the first instance. *Id*. at 727, 735. Later that same year, the Oregon Supreme Court denied Gable's petition for review on the remaining issues. *Gable v. State*, 341 Or. 216, 140 P.3d 1133 (2006).

On remand, the PCR trial court conducted a hearing limited to deciding whether Gable suffered prejudice because of trial counsels' failure to advise him of his *ex post facto* rights, and failure to raise an *ex post facto* objection to submission of the true-life sentencing option to the jury. Resp. Exh. 371. In December 2006, the PCR trial court issued a judgment denying PCR relief. Resp. Exh. 371.

Gable appealed the second PCR court's ruling. In June 2011, the Oregon Court of Appeals affirmed the second PCR court decision without opinion. *Gable v. State*, 243 Or. App. 389, 256 P.3d 1099 (2011). In 2013, the Oregon Supreme Court granted Gable's request for review and denied relief in a written decision. *Gable v. State*, 353 Or. 750, 305 P.3d 85, *cert. denied*, 571 U.S. 1030 (2013).

## II. Other Evidence Not Presented at Trial, Including Evidence of Third-Party Guilt

As noted previously, the defense made an offer of proof at trial seeking to admit evidence of a third-party's, John Crouse's, guilt. Tr. 9514-58. The trial court did not permit the defense to introduce this evidence. Tr. 9511.

On February 15, 1989, two detectives first interviewed Crouse after he informed his parole officer that he had information about the Francke homicide. Resp. Exh. 179, p. 13. Crouse told the detectives that on January 17, 2019, he visited his parole officer and left for home a little after 6:00 p.m. Resp. Exh. 179, p. 21. Crouse said that as he was walking home he observed a commotion by the Dome Building, and that he saw four or five guys together. Resp. Exh. 179, p. 27, 31. He said he saw them "drop some guy," and then four of them ran toward a car and the other one took off running. Resp. Exh. 179, p. 27. He said the man that took off running was a Mexican, that the man threw something in a parking lot as he ran, and that Crouse chased the man for about three and a half miles, but was unable to catch him. Resp. Exh. 179, p. 31. Crouse denied any involvement in Francke's death, though he knew from newspaper accounts that Francke had been killed by a knife, and knew Francke had been the head of the corrections department in New Mexico before moving to Oregon. Resp. Exh. 179, pp. 38-39.

On April 4, 1989, DOJ Investigator Randy Martinak and OSP Detective Pecyna interviewed Crouse, who had just been arrested on an unrelated assault charge. Tr. 9537.[8] For the first hour of the interview, Crouse again talked about the five assailants. Tr. 9537. When Martinak told Crouse he did not believe his account, Crouse changed his story; this time, he said a man named "Juan" had approached him to "take care of Francke for $300,000." Resp. Exh. 179, p. 51.

Crouse described receiving a $1,500.00 down payment from Juan, standing across the street from the Dome Building smoking and waiting Francke to emerge, and that when Francke came out of the Dome Building and was getting in his car, Crouse stabbed him once or twice. Tr. 9540-41.

---

[8] Martinak's testimony was in the form of an offer of proof outside the presence of the jury at trial.

Crouse gave additional details about the stabbing and the aftermath. Resp. Exh. 179, pp. 51, 64, 67, 70; Tr. 9541-42. In particular, when asked where Francke was stabbed, Crouse said, "In the heart." Resp. Exh. 179, p. 299. Crouse said he stabbed Francke at least twice and thought he had cut Francke's arm once. Resp. Exh. 179, p. 299.

Later that day, Crouse changed his story again. Resp. Exh. 179, p. 300-01. Crouse stated that he made contact with Francke, started a verbal confrontation in order to get up enough nerve to stab Francke, that Francke grabbed him and they wrestled around for awhile before Crouse stabbed Francke. Resp. Exh. 179, p. 301. Crouse stated he struck Francke at least once with his fist, and that he stabbed Francke when it appeared he was going to lose the fist-fight. Resp. Exh. 179, p. 301. Crouse said he would be more comfortable with writing out what happened, and the interview ended. Resp. Exh. 179, p. 301.

The next day, April 5, Martinak again interrogated Crouse. Resp. Exh. 179, p. 75. Crouse asked everyone else to leave room, and then described to Martinak how Crouse had stabbed Francke about five times and didn't know all of the areas, but knew it was "at least one in the heart, on a downward motion, and that he thinks maybe that he stabbed him in the right arm, and it was not just a slice as described in the day previous." Resp. Exh. 179, p. 75.

After this brief conversation, Crouse was allowed to call his brother Larry Crouse, and agreed to have the conversation tape-recorded. During the course of the conversation, as reported by Martinak, Crouse asked his brother if he remembers a prior telephone conversation when Crouse admitted to killing Francke. Resp. Exh. 179, p. 76. Crouse further admitted that first when the

incident started out "it was just a freak accident," and "that it had turned out to be more than he had intended it to be." Resp. Exh. 179, p. 76.

Later that day, Crouse agreed to accompany detectives to the Dome Building to view the scene. Resp. Exh. 179, p. 77. At one point, when Crouse turned and began to walk away, Martinak grabbed Crouse by the shoulder. Resp. Exh. 179, p. 77. Crouse immediately became very hostile and squared off against Martinak in a fighting stance and made threats toward Martinak. Resp. Exh. 179, p. 77. On the way back to the patrol office from the Dome Building, Crouse told the officer who was driving that Crouse "didn't like to have someone touch him like that," and then said something like, "he [Crouse] didn't have a knife, but he would do with what he had." Resp. Exh. 179, p. 77.

Upon returning from the crime scene, detectives again interrogated Crouse. Resp. Exh. 179, p. 78. Crouse modified his story, this time saying that on the night of January 17 he had walked by a car and saw some stuff in it, and took a piece of wire and got into the car. Resp. Exh. 179, p. 94. Crouse did not know whose car it was. Resp. Exh. 179, p. 94. He was only in the car for a few minutes when "a lone man grabbed him and said come with me." Resp. Exh. 179, p. 94. Crouse said he came up out of the car and was scared and then furious. Resp. Exh. 179, p. 94. When he tried to jerk away, the man hit Crouse. Resp. Exh. 179, p. 94. Crouse described the man as between 6' and 6'3" tall, and between 170 and 200 pounds, and "cock strong." Resp. Exh. 179. p. 99. Crouse described swinging at the man and trying to stab him in an effort to get free, but when this did not stop the man, Crouse decided to aim for the chest. Resp. Exh. 179, p. 95.

A detective summarized the results of this interrogation as follows:

While at the patrol office, Crouse indicated he did not wish to talk with Det. Martinak any further, as he did not like the way Det. Martinak had grabbed his shoulder. The writer explained to John Crouse that it appeared to writer that this had set him off and made him very angry, as it possibly had on the same night of January 17,1989, when Michael Francke had touched him at Francke's vehicle. John Crouse agreed with writer and agreed to resume talking with Det. Martinak and the writer. At this point, also, Crouse agreed to give complete details indicating he wanted to get past the point he is having trouble with, referring to "the black wall".

At approximately 8:50 PM, date [sic], a tape recorded interview was conducted. John Crouse was advised the conversation was being recorded and agreed to the taped interview. John Crouse was also asked if he understood the constitutional rights he was advised earlier, and stated that he did understand and was giving this statement of his own free will. At this point, Crouse indicated that on January 17, 1989, he walked up to the car and took a piece of wire and used it to unlock the locked door. He then advised that he was grabbed by a lone man and at that point turned "furious". At this point, he grabbed his knife, after being struck by this person. At this point, Crouse advises that he cannot remember exactly all the spots that he hit him. He did indicate, however, that he was going at his chest when he hit Crouse's arm, causing him to hit in his heart. Then he pulled back, this person stated, "My God". Crouse then indicated he looked at him for a moment, then took off running down the driveway, indicating westbound, and looked back to see if anyone was chasing him. He further indicated he kept running until he got down to approximately 17th Street.

John Crouse further describes how he believes that he had stabbed Francke in the stomach and possibly cut his arms and hands, because he had been swinging at him and trying to stab him, trying to get him off from fighting him. At one point, John Crouse describes how he was almost knocked out when he was struck by Michael Francke. Crouse further indicated that at one point he decided that maybe if he had struck Francke in the chest, it would slow him down. He describes how he stabbed him in the heart from a downward position. He was using his left hand, keeping his right hand free for power in case he had to strike him. John Crouse goes on to describe how he remembers getting Francke in his hands and upper forearm area. He further describes how he had cut him on his right arm, but could not remember if he hit him up any further on his arms.

* * *

Crouse indicated that he did not know that it was Michael Francke until the next morning. Crouse further indicated in the taped interview that he remembered

Michael Francke possibly wearing glasses, but he was not sure if he hit a pair of glasses when he struck Michael Francke.

Resp. Exh. 179, pp. 78-79.  The report writer described Crouse's demeanor as follows:

> It should be noted that writer observed John Crouse to give this last statement a lot smoother than previous statements he had given.  It appeared that it was spontaneous and smoothly spoken.  He had no hesitation in answering questions, as he did in earlier statements, which appear to be untruthful, either in part or in whole.

Resp. Exh. 179, p. 79.

On April 9, Detective Glover interviewed Crouse.  Tr. 9547.  During that interview, Crouse recanted his prior confessions and denied that he had killed Francke.  Tr. 9547.

On April 13, 1989, Crouse asked to speak with Martinak and Pecyna to recant his recantation. Crouse explained that he told Detective Glover he had not killed Michael Francke because Glover was new as far as interviewing Crouse, and "he thought he would have a ray of hope to get away with it."  Resp. Exh. 179, p. 142.  He further indicated to Martinak and Pecyna that he "could not live with getting away with the Francke murder."  Resp. Exh. 179, p. 142.  When asked whether the truth was that he did kill Michael Francke, Crouse replied that the he didn't know it was Francke until the next day.  Resp. Exh. 179, p. 146.  When asked how he hit Francke during the confrontation, Crouse described it as "a round house with my right hand, it would be in the left side of his face."  Resp. Exh. 179, p. 148.  During the April 13 interview, Crouse also described the wire he used to enter Michael Francke's vehicle.  Resp. Exh. 179, p. 142.

On April 19, 1989, an FBI polygrapher examined Crouse.  Resp. Exh. 179, p. 10-12.  Crouse told the polygrapher that he had just broken into an automobile when the owner, who turned out to be the victim, tried to grab Crouse and hold him for the police.  Resp. Exh. 179, p. 11.  Crouse said

he fought with Francke, and finally when he could not get away, he pulled out a knife and stabbed

Francke. Resp. Exh. 179, p. 11. Crouse said all the other stories he told police were lies, except for

the last story when he admitted to stabbing Michael Francke. Resp. Exh. 179, p. 11. The

polygrapher described the questions posed to Crouse and his responses, along with the polygrapher's

conclusions, as follows:

> A) Did you lie when you told the police        no
> that you stabbed MR. FRANCKE?
>
> B) Did you make up the story about you using   no
> a knife to defend yourself against
> MR. FRANCKE?
>
> It is the examiner's opinion that Mr. Crouse was not deceptive to these
> questions. Because of the very serious nature of the incident, Mr. Crouse was given
> a second exam utilizing another polygraph technique wherein he was asked the
> following relevant questions:
>
> C) Did you lie to the police when you told     no
> them that you stabbed MR. FRANCKE?
>
> D) Did you make up that story about you        no
> attacking MR. FRANCKE?
>
> The examiner believes that Mr. Crouse was not deceptive to these questions,
> and he was being truthful when describing his role in his final statement to the police.

Resp. Exh. 179, p. 12.

On June 15, 1989, Crouse again was interviewed. This time, Crouse denied killing Francke,

but claimed to have played a role in concealing the murder. Resp. Exh. 179, pp. 158, 161-62.

Crouse described a conspiracy among ODOC corrections officials to kill Francke, and claimed he

knew the person who actually committed the murder. Resp. Exh. 179, p. 197.

On November 29, 1989, the state provided Crouse with immunity, agreeing not to prosecute him for hindering prosecution based on "[a]ny false statements that Mr. Crouse may have made in the course of previous interviews concerning the Michael Francke homicide." Resp. Exh. 179, p. 289. On November 30, 1989, Crouse gave a final interview to OSP Detective William Pierce. Crouse stated that he did not kill Francke, and that his prior statements concerning his involvement in Francke's death were "false statements." Resp. Exh. 179, p. 268. Crouse said he had "no involvement" in Francke's death, and that he learned several of the circumstances of Francke's death only during the course of his interviews with Martinak and Pecyna. Resp. Exh. 179, p. 268-69. Crouse also denied any knowledge of who killed Francke. Resp. Exh. 179, p. 277.

When asked if he would be willing to talk to investigators further, he replied, "I have immunity from this. The only thing I don't have immunity for is direct involvement in the Michael Francke case." Resp. Exh. 179, p. 289.

## III. New Evidence

### A. Recantations

#### 1. Michael Keerins

In late September 1989, the Task Force received information that Keerins and his brother (Kris) had been involved in the murder. Pet. Exh. E, p. 65-94; *see also* Pet. Appx. A, p. 4 (discussing investigation of Michael Keerins' brother, Kris, as a person of interest to the investigation in January and February 1989); *see generally* Resp. Exhs. 299-300. The Task Force had previously interviewed Keerins in May 1989, just after Gable allegedly confessed to him, but at that time Keerins did not mention Gable's confession. Resp. Exh. 299, p. 24-25. When

interviewed in September, Keerins this time told the Task Force that Gable made a jailhouse

confession to him when they were incarcerated together in May. In exchange for his testimony

against Gable, Keerins negotiated a transfer back to Oregon from the out-of-state prison where he

was housed. Pet. Exh. E, pp. 91, 315; Pet Exh. A, p. 98; Pet Exh. D, p. 135.

Keerins testified before the grand jury, and was one of the witnesses designated by the state

for trial as "material," but he did not testify at trial. Keerins, was, however, the first witness to

directly implicate Gable.

Gable now presents an affidavit from Keerins in which he admits he lied, making up the

jailhouse confession to deflect suspicion from his family and for personal gain, and because he had

learned Gable was a "snitch for Keizer P.D." Pet. Exh. A, p. 97-99. In the affidavit, Keerins states,

"I told the Oregon State Police and the Grand Jury that eventually indicted [Gable] for Mr. Francke's

murder that [Gable] confessed to me while we were housed together at the Marion County Jail in

1989. This was untrue." Pet. Exh. A, p. 97.

### 2. Cappie Harden

As discussed above, Harden testified at trial that he witnessed the murder; he said that he

drove into the parking lot at the North Dome to pick up Jodie Swearingen, and saw Gable lunge out

of Francke's car and stab him. Gable submits an affidavit from Harden recanting his testimony. Pet.

Exh. A, p. 19. In it, Harden states, "I did not see [Gable] on the night that Michael Francke was

murdered. I was at home that night. I was not at the Dome Building and I did not pick Jodie

Swearingen up there. I did not see [Gable] stab Michael Francke." Pet. Exh. A, p. 19.

Harden explains the reason he gave false testimony at trial as follows:

I was contacted by the Oregon State Police on numerous occasions in connection with the Michael Francke murder investigation starting in late 1989. I was incarcerated at the time. I was told that [Gable] had informed against me previously. The police questioned and polygraphed me many times[.] I initially told the truth, which was that I was not an eyewitness to the Francke murder. However, after the police threatened me and my family I eventually adopted the false story to which I testified at Grand Jury and trial.

Pet. Exh. A, p. 19.

### 3.    Jodie Swearingen

As noted above, Swearingen testified to the grand jury that she was an eyewitness, along with Cappy Harden, to Francke's murder. At trial, she recanted that testimony, and denied that she had witnessed the murder. Through cross-examination, however, the state was able to elicit the testimony she gave the grand jury, thus corroborating Harden's testimony.

Gable submits two affidavits from Swearingen. In one, Swearingen states that she gave the following truthful testimony at Gable's trial: "I was not on the Oregon State Hospital grounds on January 17, 1989. I did not see [Gable] stab Michael Francke. I did not meet [Gable] until after the Francke murder. I met [Gable] during the summer of 1989. [Gable] never told me that he killed Michael Francke. If called to testify in a re-trial of this case, I would testify as I did at the original trial." Pet. Exh. A, p. 25.

In both affidavits, Swearingen explains the chain of events that led up to her telling the Task Force and testifying to the grand jury that she was an eyewitness. She felt police had already made up their minds that she was involved and would not believe anything she said that would convince them otherwise, and she felt the officers forced, coerced, and intimidated her to make statements that were either not true, partially true, or told out of context. Pet. Exh. A, p. 22. Police told her that her

and Harden's stories were a lot alike, but that they "needed to be closer. 'Your story has to jive with [Harden's] and the Grand Jury has to believe it.'" Pet. Exh. A, p. 22.

Swearingen describes the interrogation techniques used by police during multiple polygraph examinations. She says she would tell them the truth and they would say she was lying, and that when she told them what they wanted to hear, they said she was telling the truth, when in fact it was a lie. Pet. Exh. A, p. 23. The Oregon State Police interviewed her for several hours at a time, and polygraphed her "one, two, and even three times a day[,]" "over all hours of the day." Pet. Exh. A, p. 23. She also states that the Oregon State Police took her to the crime scene, and that "[m]ost of the facts I remember today, are facts that were told to me by the Oregon State Police." Pet. Exh. A., p. 26.

### 4. John Kevin Walker

Walker testified that Gable confessed to him in private the day after the murder. Roger Harris, an investigator hired by Gable's then-wife, interviewed Walker about his testimony. Pet. Exh. A, p. 36-38. During the course of the interview, Walker stated that during the initial police interrogations and the first polygraph examination, he told police the truth. After the police told him his truthful statements were lies and led Walker to believe he was being investigated as a possible accomplice to the murder, Walker lied to satisfy the police and to "save [his] own butt." Pet. Exh. A, p. 52. Walker was on parole at the time, and explained that he would have done "anything" to stay out of prison. Pet. Exh. A, p. 55. Walker said he also lied because he believed Gable had "snitched" on him by providing information to police which led to Walker and Gesner's arrests. Pet. Exh. A, p. 71.

Finally, Walker said, the police repeatedly interrogated and polygraphed him, causing him to gradually change his story in response to the polygraph results police reported to him. Walker stated that he told the truth at the first polygraph, but the polygrapher told Walker he did not believe Walker was truthful, that the case was serious, and that "if you don't start cooperating . . . you're going to be standing on the curb with [Gable] . . . Get on the bus now, or stand on the curb with [Gable], and you can go down with him." Pet. Exh. A, p. 46.

Walker admitted that he lied under oath during Gable's trial. He stated that Gable never confessed to the murder in his presence, and never told Walker that he "stuck" anyone. Pet. Exh. A, p. 37-38.

### 5. Daniel Walsh

Walsh testified at trial that Gable twice confessed to the murder, first in February or March 1989 when Walsh and Gable were talking about a knife Walsh purchased from Jerry Paul Baker, and then again several months later after an argument between Gable and Doug Stritchfield. Gable submits an affidavit from Walsh in which Walsh recants this testimony. Pet. Exh. A, p. 80. In the affidavit, Walsh avers that Gable never confessed to him and never threatened Walsh or his family. Pet. Exh. A, p. 81.

Walsh explains the investigative procedures which led to his testimony at trial:

When I was first interviewed in September of 1989, I truthfully told the Oregon State Police investigators that [Gable] never mentioned anything about the Michael Francke murder to me. However, in March of 1990, I was subjected to several consecutive days of aggressive police questioning and several polygraphs. At first, when I tried to maintain my earlier true statements, the police yelled at me and said that I was lying and that the polygraph results showed I was lying. The police asked me questions about topics I knew nothing about. I felt that the police were trying to brainwash me. I felt extreme pressure to incriminate [Gable]. Eventually, I told the

> police what I thought they wanted me to say:  that [Gable] had confessed to me the
> details of the murder.

Pet. Exh. A, p. 80-81.  Walsh also stated that he received benefits for his testimony:  the state paid

for him to travel between Oregon and Ohio and covered the cost of hotel and food, that he was given

immunity for past and present crimes, and that charges against him in Ohio "went away."  Pet. Exh.

A, p. 81.

Gable also submits an affidavit from Cheryl Lowery, who was married to Walsh at the time

of the murder and Gable's trial.[9]  Lowery states:

> Years after he testified for the prosecution at [Gable's] trial, Dan Walsh admitted to
> me that he lied during his testimony and falsely implicated [Gable] in the murder of
> Michael Francke.  I asked Dan why he lied.  Dan Walsh told me that he lied and
> implicated [Gable] in the Francke murder because he was angry with [Gable].  In
> particular, Dan was angry because he felt [Gable] took advantage of us when he lived
> with us and had us drive him from Salem to Coos Bay at our expense.

Pet. Exh. A, p. 84.

### 6.    Earl Childers

Childers testified at trial that he saw Gable in the vicinity of the Dome Building on the night

of the murder.  Childers also testified that Gable confessed to him.  Gable submits an affidavit from

Childers in which Childers now states, "[Gable] never told me that he killed Michael Francke."  Pet.

Exh. A, p. 94.  Childers also states that, while he is certain he saw a car he believed was Gable's, it

could have been similar, and that he is not certain Gable was in the car.  Childers further states, "I

was pressed (or pressured) by the Oregon State Police.  They were angry when I wouldn't tell them

---

[9] Lowery testified as a defense witness at Gable's trial.  She said Gable never confessed to her and was always nice to her family, that Walsh never mentioned that Gable threatened their family, and that she left Walsh because he was a drug addict.  Tr. 8477-82.

what they wanted to hear and when I refused to take a polygraph.  They made me call my attorney

in front of them and didn't give me any privacy."  Pet. Exh. A, p. 95.

### 7.    Randy Studer

After Linda Perkins told the Task Force that Gable had confessed during a conversation that included Perkins, Gable, Studer, and Ross, Studer initially denied to the Task Force that Gable had confessed. Studer eventually corroborated Perkins's story and testified to it before the grand jury. However, Studer recanted on the eve of trial and the state did not call him as a witness. Gable submits an affidavit from Studer stating that Studer gave an untrue statement to the Oregon State Police that Gable confessed to murdering someone on the morning of January 18, 1989. Studer states that, if called to testify in a re-trial, he would testify that Gable never confessed to him that he murdered Michael Francke, that he is not aware of any involvement by Gable in the murder, and that Studer previously lied to the Oregon State Police. Pet. Exh. A, p. 31.

Studer states that he was first interviewed by police in September 1989, and at that time he told the truth, specifically, "that [Gable] never told me he was involved in the murder of Michael Francke." Pet. Exh. A, p. 29. Studer states he maintained his truthful story through numerous police interviews throughout 1989. Pet. Exh. A, p. 30. Studer explains why he changed his story:

8.    During this time, the Oregon State Police administered numerous polygraph examinations. It did not seem to matter what answers I gave. When I told the truth during the examinations (*i.e.*, that [Gable] had never confessed to me), the examiner concluded that I was lying. It was not until I later changed my story to a lie implicating [Gable] in the murder, as described below, that the polygraph examiner concluded I was truthful.

9.    Over time and under the pressure of police interrogation and polygraphs, I made the following statements that were untrue. First, I conceded that it was possible that, because I was using drugs, I was unable to recall [Gable's] confession although I knew [Gable] had never confessed to me. Second, I falsely told the Oregon State Police that Doug Stritchfield had not only confessed to the murder but had also implicated [Gable].

10. The Oregon State Police continued to insist that I confirm Ms. Perkins's story that [Gable] had confessed to me. I felt that they were shoving this theory down my throat.

11. In January 1990, I was charged with a serious offense. The District Attorney and Oregon State Police threatened me with a ten-year prison sentence. However, they offered me a suspended sentence with one year at the Marion County work release center if I testified against [Gable].

12. Facing this significant prison sentence, I did not feel that I had any choice but to agree to testify. I accepted the plea offer. I told the police what they wanted to hear. Specifically, I told the Oregon State Police that on the morning of January 18, 1989, [Gable] had confessed to murdering someone the previous evening. This statement was untrue. Nevertheless, the Oregon State Police conducted a polygraph examination and concluded the statement was truthful.

Pet. Exh. A, pp. 30-31.

### 8. Theresa Ross

Like Studer, Ross was not called to testify at trial. Also like Studer, Ross initially told the Task Force that she never heard Gable confess and that Studer never told her that Gable confessed, a statement which was deemed "truthful" during a polygraph examination. Pet. Exh. E, pp. 331-32. In February 1990, however, in an interview just after police confirmed Ross's involvement in a serious sexual abuse case involving a minor, Ross told police that she not only now remembered that Gable came to her house around the time of the Francke murder, but also that he said, "I fucked up, I've done all the time I'm going to do. I'm not going back in." Pet. Exh. E, p. 142.

Gable now submits an affidavit from Ross, in which she states: "[Gable] never confessed to me or in my presence that he was involved with the murder of Michael Francke." Pet. Exh. A, p. 33. Ross also states that "Linda Perkins, my mother, never heard [Gable] confess to the murder

of Michael Francke. She got involved because she likes to have her name in the limelight." Pet. Exh. A, p. 33.

### B.    Scientific Evidence

In addition to the recantations described above, Gable submits scientific evidence in the form of the affidavit of David C. Raskin, Ph.D., who has conducted and published extensive scientific research in human psychophysiology. Pet. Exh. B. Dr. Raskin has conducted laboratory and field research on polygraph techniques for the detection of deception, has taught university and applied courses about polygraph techniques, has trained government and law enforcement polygraph examiners, has published extensively on polygraph techniques, and has served as an expert witness in approximately 250 criminal and civil cases in federal and state courts in the United States and elsewhere. Pet. Exh. B, p. 1.

Dr. Raskin reviewed the multitudinous polygraph examinations which took place in the investigation of this case and concluded: "[i]t is abundantly clear that polygraph testing procedures conducted in this investigation were fundamentally and seriously flawed." Pet Exh. B, p. 16. Dr. Raskin noted that problems in administering the tests, such as examiners confronting witnesses and repetition of tests, were pervasive. Pet. Exh. B, p. 5, 11. Further, he noted that the polygraph test formats employed have been shown in scientific studies to be invalid, and that the American Polygraph Association views them as unreliable. Pet. Exh. B, p. 4-5. According to Dr. Raskin, the Task Force improperly used polygraphs as a "psychological club . . . to elicit statements from witnesses." Pet. Exh. B, p. 16-17.

Dr. Raskin opines that the investigator's actions were highly likely to produce false polygraph results and, ultimately, false witness statements. According to Dr. Raskin, the problems with the polygraphs "were greatly exacerbated by investigators coercing examinees to create false statements," which happened through the provision of "information to examinees what [investigators] wanted them to state, telling [subjects] that they were lying when they were actually truthful by not giving desired responses, abusive and frightening interrogations, serious threats of prosecution and prison, threats concerning their children and families, promises of rewards, and actual rewards." Pet Exh. B, p. 16. Dr. Raskin concludes that, "[a]s a result, the unethical and flawed polygraph testing procedures combined with improper and coercive interrogations appear to have provided the means to shape their statements in order to obtain false testimony from the examinees." Pet. Exh. B, p. 16.

## IV.   Hearing on Gable's Petition

On November 22, 2016, the court conducted a hearing on Gable habeas corpus petition ("Hearing"). At the outset of the Hearing, the court stated the issues the parties were to address, to include:

> [T]he necessity and propriety of an evidentiary hearing on the issue of excusing procedural default, whether based upon *Schlup v. Delo*, 513 U.S. 298, 1995, or *Martinez v. Ryan*, 132 S. Ct. 1309, 2012. In particular, the parties should address the need for the Court to make witness credibility determinations; the logistics of conducting an evidentiary hearing, if necessary, including the need to secure the appearances of witnesses at such a hearing, and petitioner's presence; and, finally, whether the DNA test results would need to be discussed as part of any evidentiary hearing.

(Transcript of November 22, 2016 Oral Argument (ECF No. 165)(hereafter "Hrg. Tr.") 4. Gable's attorneys made these responses to this question:

MS. BROWN: . . . [O]ur position is that there does not need to be an evidentiary hearing because the evidence in the record before the Court now gives the best information about the credibility of the recantations versus the credibility of the trial testimony, and it's looking through the lens of the investigation that produced the recanted trial testimony which we claim was false. . . . .

THE COURT: So let me interrupt, please, and just make this observation: With respect to the question in the minute order, the necessity and propriety of an evidentiary hearing, your first response is we don't need a hearing at all.

MS. BROWN: We don't need a hearing at all if Your Honor agrees with us that the record before the Court establishes innocence under Schlup because that would then excuse the default on each and every claim that is defaulted.

(Hrg. Tr. 8-9.)

In its response to this question, the state pointed out that under controlling precedent, the court first had to determine whether the new evidence Gable presented was reliable; because, based on the record, if it was not, the inquiry ended there and no hearing should be conducted. (Hrg. Tr. 16-19.) The court and the state's attorney then engaged in this exchange:

MR. KALLSTROM: [W]e believe, on the existing record, the Court can find that these recantations are not credible and that petitioner has failed to meet his burden under *Schlup* [v. *Delo*, 513 U.S. 298, 327 (1995)].

THE COURT: If I find that petitioner has met his burden under *Schlup*, then do you agree or disagree that I can make my review on the existing record without a hearing?

MR. KALLSTROM: Your review of the actual innocence?

THE COURT: Yes.

* * * *

THE COURT: . . . My point is I – I would like to get your response to the question I asked Ms. Brown of whether we need a hearing, an in-court hearing, at all, or whether everything can be done on paper.

MR. KALLSTROM:  Our position is that – that you can find these recantations to be not credible on the existing record.

(Hrg. Tr. 19, 21.)

Accordingly, the court then heard counsels' arguments regarding the reliability of Gable's new evidence and its effect, if any, that evidence would have on a reasonable jury.[10]

## DISCUSSION

**I.**      **Colorable Claim of Actual Innocence to Excuse Procedural Default**

### A.      Legal Standards

A procedurally defaulted claim may be heard on the merits if the petitioner demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice, meaning that "'a constitutional violation has probably resulted in the conviction of someone who is actually innocent.'"  *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  In asserting actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup*, 513 U.S. at 324.

A court considering whether a petitioner has established actual innocence in light of that "new reliable evidence" must consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not."  *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (internal quotation marks omitted).  An actual innocence analysis "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard;" in other

---

[10] During the Hearing, Gable's attorneys illustrated portions of their analysis of the evidence with a Power Point presentation.  (ECF No. 163 and attachments 1 and 2.)

words, the federal court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538-39 (internal quotation marks omitted). A court must assess the "likely impact" of the new reliable evidence on "reasonable jurors in light of the complete record." *Lee*, 653 F.3d at 945.

When evaluating a claim under *Schlup*, the court is not limited to considering only admissible evidence. Rather, "a habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327). As Judge Kozinski explained in his dissenting opinion in *Carriger v. Stewart*, 132 F.3d 463, 485-86 (9th Cir.1997) (en banc), in evaluating a claim of actual innocence, a habeas court is required to posit a hypothetical jury that is entitled to consider both admissible and inadmissible evidence, so long as the inadmissible evidence is reliable.

To apply the actual innocence exception, a court must conclude that, "in light of all of the evidence, 'it is more likely than not that no reasonable juror would have found [the petitioner] guilty beyond a reasonable doubt.'" *United States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013) (quoting *Schlup*, 513 U.S. at 327). This is a particularly exacting standard, one that will be satisfied "only in the extraordinary case." *House*, 547 U.S. at 538 (internal quotation marks omitted). Indeed, cases where the *Schlup* standard has been satisfied have "typically involved dramatic new evidence of innocence." *Larsen v. Soto*, 742 F.3d 1083, 1096 (9th Cir. 2013). However, because a *Schlup* claim is, by definition, accompanied by "an assertion of constitutional error at trial," the petitioner's

conviction "may not be entitled to the same degree of respect as one . . . that is the product of an error-free trial." *Schlup*, 513 U.S. at 316.

## B. Analysis

Upon careful review of the voluminous record in this case and considering all of the evidence, both old and new and with due regard for its reliability, the court concludes that Gable has made a colorable showing of actual innocence sufficient to overcome his procedural default. Although the evidence presented at trial in 1991 resulted in a guilty verdict, the court concludes that it is more likely than not that no reasonable juror would find Gable guilty in light of the totality of all of the evidence uncovered since that time, particularly the newly presented evidence of witness recantations.

At the outset, the court recognizes that "[a]s a general matter, 'recantation testimony is properly viewed with great suspicion.'" *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) (quoting *Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting from denial of certiorari)); *see also Herrera v. Collins*, 506 U.S. 390, 417 (1993) (explaining that "motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations).

In *Jones*, the Ninth Circuit found the petitioner did not meet *Schlup's* actual innocence standard because there was no evidence to corroborate the truth of the witness recantations. Moreover, the circumstances of the recantations persuaded the court that they were insufficient to prove the petitioner's innocence. Specifically the recantations all came from the petitioner's family

members, which reduced their weight and reliability, and all three witnesses came forward with changed stories at approximately the same time, and years after trial. *Jones*, 763 F.3d at 1249.

The circumstances of the recantations here differ materially from the circumstances of the *Jones* recantations. Here, none of the recanting witnesses are related to Gable, but instead were merely acquaintances of Gable in the drug and criminal world of Salem over two decades ago; they have no personal relationship with Gable today. To the contrary, many of the recanting witnesses had an antagonistic relationship with Gable at the time of their testimony, including Walker and Gesner, who both believed Gable's cooperation with police had led to their own arrests, and Childers, who claimed Gable owed him money.

Moreover, the recantations in this case did not all occur at the same time, long after trial, without explanation, but occurred at different times following Francke's murder, and were accompanied by explanations. Indeed, both Studer and Swearingen recanted their stories about Gable's involvement *prior* to trial. Witnesses said that Harden, Walker, and Keerins had also admitted prior to trial that their testimony against Gable would be false. Tr. 8543-50, 8563-66, 8582-84, 8594-96, 8613-18, 8520-27. Although she did not testify at trial, Gesner's girlfriend told police before trial that Gesner admitted that he lied to police by implicating Gable. Pet. Exh. E, pp. 446-49. Walker provided a detailed recantation in the 1993 interview. Pet. Exh. A, p. 86.

Most of the various recantations also share a common theme: the use of similar coercive interrogation tactics and polygraph examinations to secure their incriminating statements. Cappie Harden says, "The police questioned and polygraphed me many times[.] I initially told the truth, which was that I was not an eyewitness to the Francke murder. However, after the police threatened

me and my family I eventually adopted the false story to which I testified at Grand Jury trial." Pet. Exh. A, p. 9.

In an affidavit prepared at the time of Gable's PCR proceedings (which she recently re-affirmed), Jody Swearingen describes being interviewed several hours at a time and being subjected to polygraph examinations one, two, and even three times a day. Pet. Exh. A, p. 23. She relates that during the polygraph tests, the police were "telling me which tests they felt were right and which were wrong. . . . I would tell them the truth and they would say I was lying. I told them what they wanted to hear, and they said that I was telling the truth when in fact it was lie." Pet. Exh. A, p. 23.

Studer relates a similar experience. Despite his initial statement in September 1989 that Gable never told Studer he was involved in the murder, Oregon State Police continued to question Studer throughout October, November, and December of 1989, and again in Spring 1990. Pet. Exh. A, p. 30. As Studer describes it:

> During this time, the Oregon State Police administered numerous polygraph examinations. It did not seem to matter what answers I gave. When I told the truth during the examinations (*i.e.*, that [Gable] had never confessed to me), the examiner concluded that I was lying. It was not until I later changed my story to a lie implicating [Gable] in the murder . . . that the polygraph examiner concluded I was truthful.

Pet. Exh. A, p. 30.

Daniel Walsh's affidavit reveals a similar experience. When first interviewed in September 1989, he states he truthfully told the investigators that Gable never mentioned anything about the Francke murder to him. Pet. Exh. A, p. 80. However, in March 1990 investigators subjected him to "several consecutive days of aggressive police questioning and several polygraphs." Pet. Exh. A, pp. 80-81. Walsh's description of these examinations mirrors the other witnesses' descriptions:

At first, when I tried to maintain my earlier true statements, the police yelled at me and said that I was lying and that the polygraph results showed I was lying. The police asked me questions about topics I knew nothing about. I felt that the police were trying to brainwash me. I felt extreme pressure to incriminate [Gable]. Eventually, I told the police what I thought they wanted me to say: that [Gable] had confessed to the details of the murder.

Pet. Exh. A, p. 81.

Finally, Earl Childers says he "was pressed (or pressured) by Oregon State Police. They were angry when I wouldn't tell them what they wanted to hear and when I refused to take a polygraph." Pet. Exh. A, p. 95.

These witnesses' descriptions of the tactics used during their respective interrogations and polygraphs not only parallel and support one another, they also raise a material question, according to Dr. Raskin, about the reliability of the results obtained through those tactics. Dr. Raskin analyzed the records of the police interrogations and concluded that the Task Force's concerted use of "guilt-presumptive" interrogation practices, along with its improper use of polygraphs, was highly likely to, and did, produce false testimony. Pet. Exh. B, pp. 5-6. Dr. Raskin's opinion provides additional evidence to corroborate the truth of the witnesses' respective recantations.

Dr. Raskin identified the interrogation technique the Task Force employed as the "Reid Method," which is designed to use psychological coercion to influence the witness's cost-benefit analysis. Pet. Exh. B, pp. 5-6. The technique applies stress and pressure to the witness "to weaken the [person's] resistance [to confession] by increasing the anxiety associated with denial and reducing the anxiety associated with confession." Pet. Exh. B, p. 5. Such "[c]oercive interrogation techniques increase the likelihood of eliciting false information from a subject." Pet. Exh. B, p. 5.

The same processes also can be expected to produce false testimony by incentivizing witnesses. Pet. Ex. B, p. 8.

Dr. Raskin also reviewed the polygraph examinations administered in the case. First, Dr. Raskin noted that most of the polygraph examinations described in the reports he reviewed employed test protocols that have been shown to be invalid or are not approved by the American Polygraph Association and the Federal Government. Pet. Exh. B, p. 4. These included the "Yes-No" protocols where the examinee answers the same question twice, one time 'Yes' and the other time 'No[,]'" the Statement Verification protocol "where the examinee made a statement and was tested on the truthfulness of the statement[,]" the Reid General Series protocol or Relevant-Irrelevant Test, which includes only relevant and irrelevant questions but no comparison questions, and the Peak-of-Tension test where the examinee "is asked a question and presented with a series of alternative answers . . . [t]he examiner tries to determine the correct alternative by looking for the item with the strongest polygraph reaction." Pet. Exh. B, p. 4.

In addition to the use of invalid test protocols generally, Dr. Raskin's review also identified four serious problems with the administration of the individual examinations which increased the risk of error. First, "[a] polygraph should not be conducted if the subject has been interrogated that day, including if the subject is interrogated during the pre-test." Pet. Exh. B, p. 5. Second, "[i]f an examiner confronts the examinee and accuses the examinee of lying, the examiner is no longer acting as an objective professional, but rather as an adversary. This tends to make examinees believe they are not being treated fairly . . . [and] [a] different examiner should conduct any additional testing." Pet. Exh. B, p. 5. Third, "[t]he more a person is tested, the less reliable are the results of the repeated testing." Pet. Exh. B, p. 5. Fourth, "[r]epeated testing of the same individual combined with

confrontations and interrogations increases the risk that the person will provide a statement that the person feels the examiner wants to hear, even if it is not accurate." Pet. Exh. B, p. 5.

Applying these principles here, Dr. Raskin noted that each of the material witnesses was polygraphed multiple times in a single day or multiple times over the course of several days. Pet. Exh. B, p. 11 n.19. Investigators polygraphed Swearingen twice in one day on six different occasions, and three times in a single day on a separate occasion; and during one period of time ten times in five days, and on two other occasions three times over course of two days. Pet. Exh. B, pp. 11-12 n.19. Investigators polygraphed Gesner and Studer three times each in a single day, and Walsh, Childers, Keerins, and Harden twice in a single day. Pet. Exh. B, p. 12 n.19. At one point, Harden took four polygraphs over the course of five days.

Specifically as to Swearingen, Dr. Raskin noted that investigators gave her 23 polygraphs in 12 separate sessions, and that she was "administered multiple polygraphs on at least 7 different days." Pet. Exh. B, p. 12. On numerous occasions, investigators "confronted" her with supposed defective responses. Pet. Exh. B, p. 12. For example, Swearingen was polygraphed nine times by Detective Ackom between January 16 and 19, 1990. Pet. Exh. B, p. 12. Ackom confronted her, telling her that she was lying and that he "knew" the truth about certain facts, such as when and how she arrived in Salem on the day of the murder, and that she was at the Dome Building. Dr. Raskin explains the difficulty with this technique:

> These "known" facts appear to have resulted from Ackom's reliance on flawed polygraphs. First, Ackom stated that an earlier "confirmatory [polygraph] test showed that the subject [Swearingen] was, in fact, an eye witness to the murder." Even putting aside that the test was invalid, it is unethical for an examiner to state that a confirmatory polygraph test establishes a fact. Second, Ackom's belief in how and when Swearingen arrived in Salem were based on two Peak of Tension tests that were used as if they were so-called "silver bullets" that could establish the truth of

collateral details. No competent examiner would rely on the accuracy of such tests. Despite her earlier statements to the contrary, Swearingen eventually adopted Ackom's version of these events. Further polygraphs and interviews with Swearingen appeared to have been directed at conforming the details of her statements to match those being elicited from Cappie Harden.

Pet. Exh. B, p. 12.

With regard to the number of times Swearingen was polygraphed, Dr. Raskin states, "I have never seen this many tests administered to one person in the 43 years I have been working in this field." Pet. Exh. B, p. 15. Dr. Raskin opined that the pattern of interrogation and confrontation combined with the sheer number of tests would have produced flawed polygraph results for Swearingen. Pet. Exh. B, p. 15. "The more a person is [polygraph] tested, the less reliable are the results of the repeated testing." Pet. Exh. B, p. 15.

Dr. Raskin described similar flaws in the polygraph examinations of the other witnesses. During his first two polygraphs, Gesner denied any knowledge about the Francke murder or that Gable had confessed to him. Pet. Exh. B, p. 12. Dr. Raskin explains that once Ackom "confronted" Gesner with polygraph results suggesting Gesner was at the scene of the crime and participated directly in killing Francke, Gesner changed his story and claimed Gable confessed to him. Pet. Exh. B, p. 12. Gesner changed his story and claimed Gable had confessed, but continued to deny any other involvement. Pet. Exh. B, p. 12. Ackom polygraphed Gesner again and confronted him about being deceptive about helping Gable dispose of evidence, to which Gesner responded that he had verbally told Gable how to dispose of clothing and a gun, but didn't participate personally. Pet. Exh. B, p. 12-13. Finally, after another polygraph followed by Ackom confronting again, Gesner said that

Gable had given him a bag of evidence which Gesner threw off a bridge into the Willamette River. Pet. Exh. B, p. 13.[11]

Dr. Raskin concluded that the polygraph testing procedures the investigators used were "fundamentally and seriously flawed." Pet. Exh. B, p. 16. Coercive interrogation tactics exacerbated these problems and, as a result, "the unethical and flawed polygraph testing procedures combined with improper and coercive interrogations appear to have provided the means to shape their statements in order to obtain false testimony from the examinees." Pet. Exh. B, p. 16.

The witnesses' recantations are further supported by other evidence in the record. As Gable's lawyers pointed out at the Hearing, Harden and Swearingen both claimed to have been at the scene together and witnessed Francke's murder, but their respective accounts of the altercation significantly conflicted. For example, they could not agree whether they were together in Harden's car or separate at the time of the altercation (*compare* Tr. 8065-68 *with* Tr. 9329, 9367-69), and could not agree on where they went after witnessing the altercation (*compare* Tr. 8071 (the two went to Harden's house) *with* Tr. 9340-41, 9367 (the two went to the Hyacinth house)).

Both Harden's and Swearingen's accounts conflicted with Wayne Hunsaker's testimony, the only witness the investigators interviewed who appeared to be objective and unbiased, because he did not know Gable or any of the other witnesses. For example, Harden said that from his car, he saw the assault occur directly next to Francke's car and described seeing Gable lunge out of the car at Francke; Hunsaker did not see Harden's car or any other car near the altercation. Tr. 6989, 8070.

_____

[11] Dr. Raskin also discusses how other witnesses – Harden, Studer, Walker, and Walsh – all changed their statements after they each experienced similar polygraphing techniques and confrontations. Pet. Exh. B, pp. 12-14.

Hunsaker testified that other than the two men he described (Francke and his assailant), Hunsaker did not see anyone else in the area. Tr. 6898, 9169-70, 9173-94.

If Harden's trial testimony is credited, Gable would have run from the scene directly past Harden's blue Mustang as Harden attempted to hot-wire the car to start it, yet Hunsaker makes no mention of seeing or hearing the Mustang driving out of the parking lot as he watched the assailant flee. Tr. 8070. Similarly, from her location as a "look-out" on the OSH grounds, Swearingen's testimony would have her running past the altercation to get to Harden's car, yet she makes no mention of having done this and, again, Hunsaker testified he did not see anyone else.[12]

Finally, there is the matter of the evidence of third-party guilt. Specifically, the investigators' interview of John Lee Crouse on April 5, 2019, less than three months after the murder. As described above, Crouse's detailed account of his altercation with Francke is notable for its specificity and because, where the record exists to corroborate it, his account is consistent with the physical evidence, Hunsaker and other witnesses' testimony, and Francke's physical characteristics.

For example, Crouse explained he decided to burgle a car, which turned out to be Francke's, when he walked by and "saw stuff in it." Francke's car in fact contained many items at that time. State workers who walked by Francke's car after the altercation had occurred testified they saw the car door standing open, and inside were clothes, books, and other things "strewn" in the back, as well as a car phone mounted on the dash in the vehicle.

---

[12] At the Hearing, Gable's lawyers used a Power Point presentation that included diagrams of the OSH grounds, and which visually illustrated and compared Hunsaker's, Harden's, Crouse's, and Swearingen's positions at the time of the murder, according to their respective accounts. *See* ECF Nos. 163-1, pp. 6-20, 23-35; 163-2, pp. 1-34.

Crouse also described the altercation in detail, including how he used the knife, where on Francke's body he stabbed Francke, how he did it, and the angle at which he stabbed Francke. Crouse recalled striking Francke with the knife in the arm and chest, a description consistent with the knife wounds Francke suffered. Crouse also said he hit Francke a "round house" punch with his right hand to the left side of Francke's face, an act that corresponds to the abrasions on Francke's left occipital region and forehead, abrasions that remained unexplained at trial.

Crouse also gave a reasonably accurate physical description of Francke. He described the individual he encountered as 6' to 6'3" tall and about 170 pounds, which is consistent with Francke's actual height and weight of 6'3", 200 to 210 pounds. Crouse also described Francke's apparent – and surprising to Crouse – strength, which Crouse cites as the reason he ultimately decided to pull out his knife. Crouse describes Francke punching him with enough force that he almost knocked out Crouse, an amount of strength consistent with other witnesses' descriptions of Francke's physical characteristics. Finally, the route Crouse said he took to leave the scene after the altercation matches the precise route Hunsaker saw one of the individuals take, including down to the detail of running down the driveway to a point near a large generator.

There is no evidence in the record that Crouse had any connection whatsoever with Gable, Swearingen, Harden, or any other member of the group of Gable's acquaintances. Yet, less than three months after Francke's murder, before any witness accounts emerged which described the altercation, Crouse knew a plethora of physical details about events immediately before, during, and immediately following the altercation that he could not have known unless he killed Francke.

The court recognizes that, like many other witnesses in this case, Crouse gave conflicting stories and ultimately recanted his confession to investigators, but at least four facts support the

reliability of Crouse's confession. First, the investigator's contemporaneous notes taken of Crouse's interview indicate that, unlike with the other stories he related about the incident, when Crouse confessed about the attempted car break-in and ensuing altercation he appeared "spontaneous and smoothly spoken[,]" and "had no hesitation in answering questions, as he did in earlier statements," which had appeared to be untruthful. Resp. Exh. 179, p. 79. Second, the only neutral polygrapher to examine Crouse found him not deceptive in answering "no" when asked whether he lied to police about stabbing Francke. Resp. Exh. 179, p. 10-12. Third, in an April 5, 1989, telephone call to his brother, Crouse confessed to having killed Francke and described how the altercation unfolded, consistent with his April 5, 1989 confession to Martinak. Resp. Exh. 179, p. 76. Fourth, Crouse admitted to the murder on five separate occasions to four different people in April 1989: once to Martinak on April 4, once to Martinak on April 5, once to his brother on April 5, once to Martinak and Pecyna on April 13, and once to the FBI polygraph examiner on April 19. Resp. Exh. 179, p. 10-12.

In sum, upon consideration of all of the evidence, both old and new, and with due regard to its reliability, the court concludes that Gable has made a colorable showing of actual innocence sufficient to excuse procedural default. In light of the totality of the evidence, including the newly presented evidence, the court concludes it is more likely than not that no reasonable juror would find Gable guilty beyond a reasonable doubt of the crimes charged. Having reached this conclusion, the court considers Gable's underlying constitutional claims.

## II. Exclusion of Evidence of Third-Party Guilt

Gable alleges the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by excluding evidence of third-party guilt. Gable

further alleges he was denied the effective assistance of trial counsel under the Sixth and Fourteenth Amendments when his trial attorneys failed to present legal support, including citation to federal law, in support of admitting evidence of third-party guilt.

Because the two issues are inextricably intertwined, and because of the procedural posture of the claims, the court considers them together. Moreover, because neither claim has been adjudicated on the merits in state court, review in this court is *de novo*. *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

### A.    The State Court Proceedings

At trial, Gable sought to admit the hearsay statements of Crouse admitting to the murder as statements against Crouse's penal interest. To do so under Oregon evidence rules, Gable had the burden of demonstrating, *inter alia*, that Crouse was "unavailable" to testify and that "corroborating circumstances clearly indicate[d] the trustworthiness of [Crouse's] statements." OR. EV. C. 804(3)(c).

During trial, in response to the state's motion in limine, the court held a Rule 104 hearing outside the presence of the jury to determine the relevancy and admissibility of the Crouse evidence. The defense called Crouse to the stand and asked, first, whether Crouse was represented by an attorney and whether the attorney was present at the hearing. Tr. 9487. Crouse answered affirmatively to both questions. Tr. 9487. Defendant Counsel then asked, "In [sic] January 17, 1989, did you kill Michael Francke?" Tr. 9487. Crouse answered, "No." Tr. 9847. Defense counsel then asked a series of questions, including whether Crouse had been on the OSH grounds near the Dome Building on January 17, 1989; whether on April 4, 1989, Crouse admitted to Pecyna and Martinak that he murdered Francke; and about the details of his confessions. Tr. 9487-89. In response to each

of these questions, Crouse invoked his Fifth Amendment privilege against self-incrimination.  Tr. 9487-89.

In light of Crouse's invocation of his Fifth Amendment privilege, defense counsel requested that Crouse be declared "unavailable" as a witness.  The state apparently had been prepared to stipulate to Crouse's unavailability, but Crouse's answer to defense counsel's first question changed the state's position.  Tr. 9489-90.  The state argued that Crouse, in fact, was "available" to testify because he responded "no" when asked whether he had killed Francke.

Both Crouse's attorney and Gable's defense counsel argued that Crouse did not understand defense counsel's first question and intended to invoke the Fifth Amendment from the outset.  Tr. 9490-91.  In fact, Crouse's attorney stated that Crouse had "intended to invoke his Fifth Amendment rights to that [initial] question and would invoke his Fifth Amendment rights in front of the jury." Tr. 9492.  The trial court rejected the argument, stating they could not "go back to un-ringing the bell" and that "if [Crouse] were to be called as a witness sometime before this trial ends and he were to attempt to invoke his Fifth Amendment to the same question that he has answered here this morning, I would tell him that he cannot do that.  I would tell him to answer the question.  He has previously answered it under oath."  Tr. 9497, 9505. The trial court concluded by observing: "[Crouse] knew what the question was, and he answered it.  He didn't invoke his Fifth Amendment privilege."  Tr. 9500.  Thus, as to the subject matter of the hearsay statements that defense counsel sought to admit (i.e., whether Crouse had murdered Francke), the trial court found Crouse was "available" to testify.  Tr. 9511.

The state, apparently in an attempt to prevent Gable's or Crouse's respective lawyers from introducing Crouse's confession for any purpose, first argued that because Crouse not only was

"available" to testify and denied killing Francke, any evidence the defense offered to challenge that denial could be admitted only for impeachment purposes, and could not be considered by the jury substantively. Tr. 9493. The state then argued that, in light of Crouse's denial that he killed Francke, impeachment evidence would be irrelevant in any event:

> The bottom line is [Crouse] said in this courtroom this morning under oath he did not kill Mr. Francke, and if [defense counsel] wants to go down the road in some way trying to elicit these other statements that he is taking the Fifth on, I suppose he can persue [sic] that route. But the state's position at that point is basically that they're impeachment. Because they are impeachment, they are not substantive. Because they're not substantive, the jury cannot rely on them as substantive evidence and, therefore, this man has basically told this Court today under oath what he told the Grand Jury under oath which is he – I did not kill Michael Francke, therefore, his testimony in this proceeding is irrelevant.[13]

Tr. 9495.

The defense responded that for two reasons the Crouse confession should be admitted as impeachment evidence. First, as to Crouse's denial that he killed Francke, the defense should be "entitled to impeach with inconsistent statements." Tr. 9498. Second, as to any of the other questions Crouse refused to answer based on privilege, he should be considered "unavailable" as to those issues.

The trial court initially agreed with defense counsel that Gable was "entitled to present" through police officer witnesses evidence of Crouse's confessions, to allow the jury to determine whether Crouse told the truth or lied when he denied killing Francke:

> I think you're entitled to do that through other witnesses. But if [Crouse] wants to invoke his privilege, I think given the spectrum of perjury in unsworn statements,

---

[13] Defense counsel objected to the prosecutor's characterization of Crouse's testimony before the grand jury because the grand jury proceedings were secret and not part of the record before the court.

hindering prosecution, all of those kind of things, I have to allow him to invoke his Fifth Amendment privilege if he cares to do that. . . . Certainly you can put that on by way of impeachment and the jury is going to hear it, but not as substantive evidence.

If I understand this Rule correctly, they're going to hear it and they can use all of that in determining if he is telling the truth or not if he answers that question in front of them.

Tr. 9502-03.

The state then renewed its argument that because Crouse now denied he murdered Francke,

that denial rendered irrelevant any evidence of third-party guilt:

THE PROSECUTOR: Basically, if [Crouse] is testifying as he did today under oath and as he has in the past under oath, that he did not kill Michael Francke, it's not relevant evidence to go to the jury because if you allow the Court or allow [defense counsel] to impeach, the jury cannot rely on that impeachment as substantive evidence. The trier of fact cannot rely on that as substantive evidence to render a verdict in this case, therefore, you have somebody testifying I did not kill Michael Francke, it's not relevant to the – these proceedings and, therefore, not admissible.

THE COURT: I want to get back to that as a threshold issue. You're suggesting that even calling him as a witness and putting him on the stand, if he answers that question the same that the answer is today, it's not relevant?

THE PROSECUTOR: That's my position.

THE COURT: So we never get to all of the rest of the issues because you can't impeach what he doesn't testify?

THE PROSECUTOR: Exactly.

Tr. 9508-09.

The trial court adopted the state's reasoning and excluded all evidence related to Crouse,

stating:

I think the first thing that I have to rule on is whether or not Mr. Crouse is available or not based on Rule – the 104 Rule hearing we had yesterday morning. And given

his answer to the first question that he was asked, I find that he is available as a witness.

Thereafter, having found that based again on the evidence at the hearing the answer to the question that he was asked would be irrelevant to this jury. Given that I find that the answer is irrelevant, there won't be any testimony to be presented to the jury so there won't be any need to impeach his testimony, he didn't give any testimony to the jury, the trier of the fact.

Tr. 9511. As noted previously, Gable asserted on direct appeal a claim that the trial court erred in excluding the Crouse evidence. This argument, however, relied only on state law.

**B.    Analysis**

The Sixth Amendment to the United States Constitution guarantees the right of a criminal defendant to have a public trial, to confront witnesses against him, and to obtain witnesses in his favor. *Lunberry v. Hornbeak*, 605 F.3d 754, 760 (9th Cir.), *cert. denied*, 562 U.S. 1102 (2010). These guarantees are incorporated by the Due Process Clause of the Fourteenth Amendment, binding the states. *Id*. The process due under the Fourteenth Amendment includes a right to "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). That constitutional right may be violated by the exclusion of probative admissible evidence that another person may have committed the crime. *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

In *Chambers*, the defendant sought to introduce the testimony of three different third-parties who would testify that another man had confessed to committing the murder of which the defendant had been accused. *Id*. at 298. The trial court ruled the evidence inadmissible. *Id*. at 289-93. The Mississippi Supreme Court upheld the exclusion of the evidence because it was hearsay and not

subject to exception under state evidentiary rules which, at that time, recognized only declarations against pecuniary interest, not penal interest. *Id.*

The Supreme Court determined that "under the facts and circumstances" of that case, exclusion of the evidence violated Chambers's constitutional rights. *Id.* at 303. Stating that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," the Supreme Court noted that the rejected testimony "bore persuasive assurances of trustworthiness" and that the "testimony also was critical to Chambers' defense." *Id.* at 302. The Court concluded that "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*

In *Green v. Georgia*, 442 U.S. 95, 96 (1979), during the penalty phase of a capital case the trial court excluded as hearsay a third-party account of a confession from a co-defendant. The Supreme Court held that, "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 97. The Court explained that "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Id.* (citation omitted). Accordingly, the Supreme Court held the exclusion of the evidence denied the defendant a fair trial. *Id.*

The Ninth Circuit has applied the reasoning of the *Chambers* and *Green* decisions to grant habeas relief in similar situations. In *Lunbery*, a woman was prosecuted for her husband's murder and sought to introduce evidence that the murder in fact had been committed by the partners of a drug dealer who previously lived in the couple's home. *Lunbery*, 605 F.3d at 758. The trial court excluded testimony supporting the woman's claim, finding that evidence inadmissable hearsay

without "sufficient indicia of reliability," and "prejudicial to the prosecution with only slight probative value." *Lunbery v. Hornbeak*, No. CIV S-07-1279, 2008 WL 4851858, at *17-18 (E.D. Cal. Nov. 10, 2008).

On appeal, the Ninth Circuit reversed. It held that "by the exclusion of probative admissible evidence that another person may have committed the crime," the trial court violated the defendant's right to present a defense. *Lunberry*, 605 F.3d at 760. The court noted that, "[a]s in *Chambers*, the excluded testimony here 'bore persuasive assurances of trustworthiness' and 'was critical to [the defendant's] defense." *Id.* at 761.

Likewise, in *Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012), *cert. denied*, 569 U.S. 1013 (2013), the Ninth Circuit found the trial court violated the defendant's right to present an adequate defense when it excluded evidence that another person committed the murder for which the defendant was charged. In *Cudjo*, the petitioner sought to present evidence that his brother was the true culprit, having confessed to a fellow inmate while incarcerated. *Id.* at 755-56. Because the brother invoked his privilege against self-incrimination, Cudjo attempted to call the inmate to testify about the brother's purported confession, but the state court excluded the testimony. *Id.*

The Ninth Court noted in *Cudjo* that, as in *Chambers*, *Green*, and *Lunbery*, the evidence at trial pointed to a single person committing murder, and the issue of the case was the identity of the murderer. *Id.* at 765. The petitioner in *Cudjo* "'endeavored to develop two grounds of defense': that he did not kill the victim, but that an identifiable other person did." *Id.* (quoting *Chambers*, 410 U.S. at 288-89). The Ninth Circuit concluded that the exclusion of the confession, which the California Supreme Court had determined was probably true and had occurred under circumstances

providing substantial assurances that the confession was trustworthy, violated the petitioner's right to present an adequate defense.[14]  *Id.*

As did the evidence in *Chambers*, *Green*, *Lunbery*, and *Cudjo*, in this case the evidence at trial pointed to a single person, Gable.  As did the petitioners in *Chambers*, *Green*, *Lunbery*, and *Cudjo*, in this case Gable endeavored to develop the same two grounds of defense:  that he did not kill Francke but that an identifiable other person did.  As did the identifiable other persons in *Chambers*, *Green*, *Lunbery*, and *Cudjo*, in this case the identifiable other person, Crouse, had previously confessed to the crime – and not merely once, but four separate times on four different days during a two-week period.  As did the trial courts in *Chambers*, *Green*, *Lunbery*, and *Cudjo*, in this case the trial court's application of state hearsay rules prevented Gable from presenting evidence of Crouse's confession.

Further, as in both *Chambers* and *Lunbery,* and viewed within the actual innocence framework set forth above, Crouse's statements "bore persuasive assurances of trustworthiness":  he made them multiple times shortly after the murder, he made them to different people and in different contexts and circumstances, and other evidence in the case corroborated his self-incriminating statements.[15]  The excluded evidence was critical to Gable's defense because Gable

---

[14] The California Supreme Court held that the trial court erred in excluding the evidence, but that the error was harmless because no prejudice occurred.  *Cudjo*, 698 F.3d at 759.

[15] The court acknowledges that Crouse's multiple confessions were not without contradictions and that, as did the third-party in *Chambers*, Crouse eventually recanted his confessions.  Moreover, some of the specific details of Crouse's confession appear to contradict some witness testimony, physical evidence, and even Crouse's own claims.  However, such inaccuracies or inconsistencies do not negate the validity of the trustworthiness analysis here.  *See, e.g., Cudjo*, 698 F.3d at 763 (alleged confession included details of the killing that were directly at odds with known facts that victim had been hogtied before being beaten to death).

sought to undermine the state's single-person approach by offering reliable evidence of an identifiable other person who murdered Francke. Here, much as the court in *Lunbery* concluded, "[t]he murder called out for a murderer. The trial as conducted . . . left only [the defendant] in view as the murderer." *Lunbery*, 605 F.3d at 762. In *Lunbery*, the court noted that "[a]n accused does not have an 'unfettered right' to present any evidence he or she wishes." *Id*. at 762 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). "However, as *Chambers* teaches, depending on the facts and circumstances of the case, at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Id*. (citing *Chambers*, 410 U.S. at 302).

Here, the trial court's mechanistic application of the Oregon Rules of Evidence denied Gable his federal constitutional right to present a defense. Having determined such, the court must determine whether the constitutional error was harmless. *Cudjo*, 698 F.3d at 768; *but see Chambers*, 410 U.S. at 302-303 (question whether the evidence at issue was "critical" also answered the question whether the defendant was prejudiced).

In federal habeas corpus proceedings, a harmless error analysis "requires federal courts to determine 'whether the error had substantial and injurious effect or influence in determining the jury's verdict.'" *Cudjo*, 698 F.3d at 768 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this analysis, when 'the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error . . . the petitioner must win." *Id*. (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)). Here, Gable has demonstrated that the exclusion of Crouse's statements had a substantial and injurious effect or influence in determining the jury's verdict: evidence of Crouse's confession "would have filled a major gap in the defense case, and would have

greatly increased the likelihood of the jury's entertaining a reasonable doubt of [Gable']s guilt." *Cudjo*, 698 F.3d at 769 (citation omitted).

Accordingly, Gable is entitled to habeas corpus relief on his claim that the trial court erred in excluding evidence of third-party guilt, and on his claim that trial counsel was ineffective in failing to present appropriate legal support, including citation to federal law, in support of the admission of evidence of third party guilt.

## III.   Excuse of Procedural Default Under *Martinez*

In the alternative to his argument that actual innocence excuses his procedural default in general, Gable also argues in particular that the procedural default of his ineffective assistance of trial counsel claim for failure to assert Gable's rights under *Chambers* is excused pursuant to *Martinez v. Ryan*, 556 U.S. 1 (2012).

### A.   Legal Standards

In *Martinez*, the Supreme Court held that the absence or ineffective assistance of counsel at an initial-review collateral proceeding may establish cause to excuse a petitioner's procedural default of substantial claims of ineffective assistance of trial counsel. *Martinez*, 556 U.S. at 14; *Rodney v. Filson*, 916 F.3d 1254, 1259 (9th Cir. 2019). To excuse a procedural default under *Martinez*, a petitioner must establish: "(1) that his ineffective-assistance-of-trial-counsel claim is 'substantial'; (2) that he had no counsel during his state collateral review proceeding or that his counsel during that proceeding was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984); (3) that 'the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel-claim'"; and (4) that state law requires ineffective-assistance-

of-trial-counsel claims to be raised in initial-review collateral proceedings.'" *Filson*, 916 F.3d at 1259 (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)) (additional citations omitted).

To show that his claims are "substantial" under *Martinez*, a petitioner must demonstrate that they have "some merit." *Martinez*, 566 U.S. at 14. The Court in *Martinez* defined "substantiality" by referring to the established standard for issuing a certificate of appealability: "a petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "Thus, to determine whether a claim is substantial, *Martinez* requires the district court to *review* but not *determine* whether trial or appellate counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to *determine* only whether resolution of the merits of the IAC claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them." *Northrup v. Blades*, Case No. 1:14-cv-00371-CWD, 2015 WL 5273261, at *7 (D. Idaho Sept. 9, 2015) (emphasis in original).

The *Strickland* standard requires a showing of both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id*. at 688. To establish prejudice, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

"[A] district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*." *Dickens*, 740 F.3d at 1321. As described by the Ninth Circuit in *Filson*, "[b]ecause *Martinez* requires a showing that post-conviction counsel was ineffective under the standards of *Strickland*, a petitioner who was represented by post-conviction counsel in his initial-review collateral proceeding must show not only that his procedurally defaulted trial-level IAC claim is substantial but also that there is 'a reasonable probability that the trial-level IAC claim would have succeeded had it been raised' by post conviction counsel." *Filson*, 916 F.3d at 1260 (citing *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1439 (2017)). Moreover, "[t]o demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Clabourne v. Ryan*, 745 F.3d 362, 377-78 (9th Cir. 2014), *overruled on other grds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015); *see also Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (plurality opinion noted that *Martinez* recognized that "determining whether there has been ineffective assistance of counsel often requires factual development in a collateral proceeding").

### B. Analysis

Here, the parties do not dispute that in Oregon, post-conviction review is the initial review proceeding for any claim of ineffective assistance of counsel, that in the state PCR proceeding Gable did not assert a claim of ineffective assistance of trial counsel based on the failure to assert his rights

under *Chambers*, or that, as a result, such a claim is procedurally defaulted.[16] *See Wiese v. Nooth*, ___ Fed. Appx. ___, 2019 WL 643861, at *1 (9th Cir. 2019) (noting Oregon law requiring presentment of ineffective assistance of trial counsel claims in state PCR proceedings). The only issues disputed, then, are whether the ineffective assistance of trial counsel claim arising out of the failure to assert Gable's rights under *Chambers* was substantial, and whether Gable's state PCR trial counsel was ineffective for failing to raise the claim.

Under the circumstances described above, the failure to assert Gable's rights under *Chambers* was certainly substantial. Resolution of the merits of Gable's ineffective assistance of trial counsel claim based on trial counsel's failure to advance Gable's rights under *Chambers* would be, at the least, debatable among jurists of reason. The issue is deserving enough to encourage further pursuit thereof. *Miller-El*, 537 U.S. at 336.

Because Gable had counsel in his state PCR proceeding, upon establishing that his ineffective assistance of trial counsel claim is "substantial," Gable also must show "that there is 'a reasonable probability that the trial-level IAC claim would have succeeded had it been raised' by post-conviction counsel." *Filson*, 916 F.3d at 1260 (citing *Runningeagle*, 825 F.3d at 982). Upon a "look through to what happened at the trial stage," this court concludes that Gable has demonstrated a reasonable probability exists that, absent the deficient performance of his PCR trial counsel, the result of the post-conviction proceedings would have been different. *Clabourne*, 745 F.3d at 377-78.

---

[16] The court notes that Gable did assert a claim of ineffective assistance of trial counsel in his state PCR proceedings because trial counsel "failed to develop, investigate and produce at trial evidence that . . . John Crouse was the killer of Michael Francke." Resp. Exh. 155, p. 3. Gable did not, however, allege or argue a claim that trial counsel failed to appropriately object to the trial court's exclusion of evidence of Crouse's confessions.

Accordingly, Gable has established both cause and prejudice under *Martinez* to excuse the procedural default of claim that trial counsel was ineffective in failing to present appropriate legal support, including citation to federal law, in support of the admission of evidence of third party guilt. Because Gable has met the *Martinez* standard, he is entitled to relief on the merits of this claim, notwithstanding his procedural default.

## IV. Ineffective Assistance of Counsel – *Ex Post Facto*

Petitioner also alleges a violation of his right to effective assistance of trial counsel based upon counsel's failure to "object on *ex post facto* grounds to the trial court submitting to the jury in the penalty phase of the trial the possibility of Mr. Gable being sentenced to life without the possibility of parole." Am. Pet., p. 12 (ECF No. 61). As noted, petitioner exhausted this claim in his state PCR proceeding.

### A. Legal Standards

An application for writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and a habeas petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *See also Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir. 2004) ("Under Section 2254(e)(1), [petitioner] has the burden of rebutting the presumption that a state court's determination of the factual issues is correct by clear and convincing evidence.").

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially distinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief only "if the state court identifies the correct legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id*. at 410. The state court's application of clearly established law must be objectively unreasonable. *Id*. at 409.

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland*. *See Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that *Strickland* "has long been clearly established federal law determined by the Supreme Court of the United States"). A habeas petitioner must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must also show counsel's deficient performance prejudiced his defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id*. To show prejudice, a petitioner must demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

In making the prejudice determination, the court "must consider the totality of the evidence before the judge or jury." *Id*. at 695.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 686).

## B.     Background

At the time of the offense on January 17, 1989, Oregon law provided two sentencing options for aggravated murder: death or life with the possibility of parole (known as "ordinary life"). *Gable*, 353 Or. at 752. "Specifically, under the law in effect at the time of the offense, a jury could make findings requiring a defendant to be put to death; if it did not, the trial court was required to impose a sentence of life imprisonment with the possibility of parole after a minimum of 30 years of imprisonment." *Id*. (citing OR. REV. STAT. § 163.105(1)(e) (1987)).

Later that year, however, the Oregon legislature amended the law "to provide a third, middle option of life *without* the possibility of parole, known as 'true life.'" *Id*. (citing OR. REV. STAT. § 163.105(a) (1989)) (emphasis in original). The new law provided that "true life is the presumptive sentence if the jury does not return findings requiring the death penalty and allows the imposition

of a sentence of ordinary life only when 10 members of the jury agree that there are sufficient mitigating circumstances." *Id.* (citing OR. REV. STAT. § 163.150(2)(a); additional citation omitted).

In the penalty phase of Gable's case, the trial judge, at the request of defense counsel, instructed the jury on the basis of the new sentencing law in existence at the time of the trial. *Id.* at 753. "[T]hat is to say, the trial court instructed the jury that it had three sentencing options: death, true life, or ordinary life." *Id.* The jury determined that Gable should not be sentenced to death, but also should not be eligible for parole. *Id.* Accordingly, the trial court sentenced Gable to a term of life imprisonment without the possibility of parole. *Id.*

In his state PCR proceeding, Gable alleged trial counsel performed ineffectively in failing to "[o]bject on the grounds of Ex Post Facto the Court's submitting to the jury in the penalty phase of the trial the possibility of the petitioner being sentenced to life without the possibility of parole." Resp. Exh. 155, p. 2. The PCR trial court rejected this claim, finding that Gable had waived his *ex post facto* constitutional rights concerning the true life sentencing option. *Gable*, 203 Or. App. at 723-24.

The Oregon Court of Appeals reversed, concluding that the PCR trial court erred in finding Gable had waived any objection, based on *ex post facto* protections, to the submission of the true life sentencing option to the jury. The court of appeals reached this result because "[i]n particular, there [was] no evidence that criminal defense counsel actually conferred with petitioner regarding that matter, much less that petitioner agreed to waive the *ex post facto* objection." *Id.* at 726. The Oregon Court of Appeals found, however, that this conclusion did not compel the allowance of post-conviction relief. Instead, it remanded the case back to the PCR trial court, because "the post-conviction court never determined whether petitioner was prejudiced by his attorney's default." *Id.*

The court of appeals framed the question on remand as follows: "Specifically, if counsel had engaged in a constitutionally adequate discussion with petitioner, would petitioner then have elected to waive his objection to the submission of the "true life" option to the jury?" *Id*.

On remand, the PCR trial court stated this question and summarized Gable's testimony on the issue from the original PCR proceeding:

> THE COURT: I would be interested though, I guess, in the bottom line. And that is if we can get to that, I wonder if his position has changed. And, of course, in reviewing the case law, generally those defendants who have faced the death penalty have been prone to view that three options being presented to the jury as better than the two, and I wonder if his position is the same. Because the reason we're here is is [sic] because his testimony at the trial level when we had the [first PCR] trial in 2000 basically ran something like this.
>
> "If I had my choice, I would have said to the court, to the attorneys, that I want either death or life with the possibility of parole, and not this middle option of true life." And I am wondering whether his position remains the same today. If it's like as has happened in the past – particularly in one case – where this very issue was the same – went back, and then the defendant changed his mind and said, "Well, I really do want true life after all." And then that went up on appeal, and then they determined well, he really does have the right to – even though he argued something differently at the appellate level and won on that – prevailed – he still has the right to change his mind later and then say, "Well, I really do want that option."
>
> You said "I'm not guilty; therefore, I want death or life with the possibility of getting out – parole in essence." Is that still – well, I'll leave it to you Mr. Hadley. I am interested in whether his position changed though.

PCR Tr., Nov. 27, 2006, Vol. I, p. 15-16. The PCR court then permitted Gable to supplement the record with additional testimony on this issue, and the court, counsel, and Gable engaged in the following colloquy:

> COUNSEL: Do you understand what the Judge was just about to ask you?
>
> GABLE: Yes.

* * *

COUNSEL: Are you still wanting to go forward today and ask that your sentence be modified and that you either be given life with parole – even if you're risking a chance of facing the death penalty down the line?

GABLE: Yes.

COUNSEL: You clearly understand?

GABLE: Yes.

THE COURT: You realize the jury found against you – the original jury that heard this case in the penalty phase – found against you on three of the four questions that were presented. And you were pretty close. There was even a split verdict with regard to whether you should have, in fact, received the death penalty. At least two jurors felt that you should.

I wonder if it is – is there any reason why you would take that sort of risk – realizing that that was the result the last time around?

GABLE: Well, Your Honor, I've claimed innocence since this started – the nightmare. And I figure I'd rather just – if the State chooses to give me the death penalty, I'd rather have that instead of life without parole for a crime I didn't commit.

*Id.* at pp. 16-17.

The PCR trial court issued a detailed Judgment on Remand which incorporated the findings from the prior PCR proceeding and set forth additional findings and conclusions. Resp. Exh. 371. The court found Gable did not meet the burden of establishing prejudice. The PCR trial court noted that Gable testified at the earlier trial, as well as in an earlier deposition, and re-affirmed on remand that if counsel had informed Gable of the *ex post facto* issue, Gable would not have waived the right to exclude the true life option and would have opted to force the jury to choose between a sentence of death or life with the possibility of parole. Resp. Exh. 371, pp. 2-3. However, the trial court found Gable "was *not* a credible witness during trial of this matter and is *not* a credible witness with respect to this issue." Resp. Exh. 371, p. 4 (emphasis in original).

The PCR trial court explained Gable's failure to meet the burden of establishing prejudice as follows:

> Petitioner's stated reason for not giving the jury the "true-life" option is because Petitioner feels that since he is innocent, if the jury only had the options of death or life with parole, everyone (including the jury, the trial court, the trial counsel, and the appellate courts) would have paid closer attention to his case and would therefore somehow reach the conclusion that he is innocent. Petitioner concludes that a potential death penalty would have resulted in greater scrutiny, and yet, the death penalty was always a possibility in the case. In addition, that option obviously could not have been reached, in any event, unless the jury first concluded that Petitioner was guilty of the murder of Michael Francke. Petitioner's hypothetical reason for wanting to reject the "true-life" option doesn't make much sense under rationale [sic] analysis.

> Upon conviction of the petitioner, petitioner's trial counsel purposely elected a strategy which would give the jury a viable choice of "true-life" rather than limit the choice to only the death penalty or life with the possibility of parole. Petitioner's trial counsel were concerned that the jury would vote to impose the death penalty if the jury only had the choices of death or life with the possibility of parole.

Resp. Exh. 371, p. 3.

In finding Gable not a credible witness on this issue, the trial court noted that Gable's "position on the 'true-life' issue appears to simply be one more example of a false bravado which is a part of the character of the Petitioner and which led Petitioner to create a part of the evidence which led to his original conviction in the first instance." Resp. Exh. 371, p. 4. The court declined to speculate that some amount of prejudice resulted from the true-life option being sent to the jury, and without resorting to that speculation, found "no evidence (Petitioner's testimony is *not* credible) of prejudice resulting from the 'true-life' option being presented to the jury. . . . There is no evidence other than the Petitioner's testimony, and the testimony is simply not credible." Resp. Exh. 371, p. 4 (emphasis in original).

Although, the Oregon Court of Appeals affirmed the PCR trial court's decision on remand without opinion, the Oregon Supreme Court granted Gable's petition for review and upheld the PCR trial court's decision denying relief in a published opinion. *Gable*, 353 Or. 750. Gable argued to the Oregon Supreme Court that his sentence violated the *Ex Post Facto* Clause and that, but for the lack of proper advice from counsel, he would have received a lawful sentence. *Id*. at 762. The Oregon Supreme Court rejected this argument:

> Petitioner's argument that he was obviously prejudiced because of the unlawful sentence that resulted amounts to question-begging; it assumes the very issue in contention, namely, whether the receipt of correct advice would have made a difference to petitioner – that is to say, whether he would have waived his *ex post facto* objection anyway.
>
> That question cannot be assumed away. It is a critical issue in any post-conviction case when the claim of inadequate assistance turns on the propriety of trial counsel's advice; the court always must determine whether the receipt of correct advice would have made a difference.

*Id*. The Oregon Supreme Court concluded that Gable did not establish that the receipt of advice from trial counsel about a possible *ex post facto* objection would have made a difference in this case:

> The only evidence on that point is petitioner's assertion that he would have insisted on exercising his *ex post facto* rights and have the jury instructed on only two sentencing options. As we have noted, the post-conviction court did not believe petitioner. There is no suggestion that the post-conviction court lacked a basis in the record for making that finding as to petitioner's credibility. To the contrary, throughout the course of the post-conviction proceeding, the court detailed inconsistencies in petitioner's testimony that led it to conclude – repeatedly – that petitioner simply was not credible.

*Id*. at 763-64.

### C. Analysis

The Oregon Supreme Court's decision that Gable did not establish the outcome of the proceeding would have been different had counsel advised Gable of his *ex post facto* rights was not

objectively unreasonable. Based on the PCR trial court's determination that Gable's testimony on the point lacked credibility, the Oregon Supreme Court reasonably concluded that, if trial counsel had advised Gable of his *ex post facto* rights, trial counsel would not have requested the jury instruction including only the "true life" option at sentencing.

Gable contends that the Oregon Supreme Court applied the incorrect prejudice test in assessing his claim that trial counsel was ineffective in failing to object to the true life sentence option on *ex post facto* grounds. Gable notes he had a fundamental right to not be sentenced under an *ex post facto* law, and argues he has established prejudice because trial counsel failed to challenge the imposition of a sentence in violation of his *ex post facto* rights. For support, Gable cites Justice Walters's dissenting opinion in the case, in which she makes the same argument and provides legal analysis that bolsters his position. Gable further cites several federal courts of appeal cases holding that imposing on a criminal defendant a sentence that the law did not authorize at the time of the crime is plain error. These decisions found such an incorrect sentence prejudicial under *Strickland* if it was caused by counsel's failure to object to the unlawful sentence, and ordered remand for re-sentencing under the law in effect at the time of the crime. This argument, however, ignores *Strickland's* requirement that, in making the prejudice determination, the court must consider the totality of the evidence before the judge or jury to determine whether there is a reasonable probability that the outcome of the proceeding would have been different.

As the Oregon Supreme Court correctly noted, Gable's argument that he obviously suffered prejudice because he received an unlawful sentence, amounts to "question-begging." *Gable*, 353 Or. at 762. It does not apply *Strickland's* totality of the evidence criterion. Under the circumstances of Gable's case, many reasons exist why a defendant might have wanted to waive *ex post facto* rights.

"As petitioner's own criminal counsel explained, presenting the jury with three sentencing options instead of two could be viewed as advantageous by a criminal defendant facing the death penalty." *Id*. at 764. Indeed, in *State v. McDonnell*, 329 Or. 375, 987 P.2d 486 (1999), the Oregon Supreme Court held that the trial court erred in refusing to accept a capital defendant's waiver of an *ex post facto* objection and instruct the jury on the "true life" sentencing option. *See also State v. Rogers*, 330 Or. 282, 4 P.3d 1261 (2000) (same).

The Oregon Court of Appeals aptly described Gable's circumstances in its decision remanding the PCR case for a determination whether Gable could establish prejudice, *i.e.*, the probability that the outcome would have been different:

> Here, in the most literal sense, availability of the "true life" sentence had more than a "tendency" to affect the ultimate outcome of the prosecution – that *is* the sentence that petitioner actually received. However, the appropriate inquiry regarding actionable prejudice is considerably more sophisticated than such sophism. If petitioner would, in fact, have waived his *ex post facto* right in these circumstances (as have many similarly situated criminal defendants. . .), then petitioner was not prejudiced by his counsel's default. *That is, petitioner might have waived those protections in all events because it was to his practical, tactical benefit to do so.*

*Gable*, 203 Or. App. at 735 (emphasis added) (internal citation omitted). As the PCR trial court found, Gable's testimony that he would not have waived his *ex post facto* protections was not credible. Resp. Exh. 371, p. 4. Moreover, the Oregon Supreme Court "found no suggestion that the PCR trial court lacked a basis in the record for making that finding" as to Gable's credibility. *Gable*, 353 Or. at 763.

This court must defer to the state court's credibility finding. *Sophanthavong*, 378 F.3d at 867-68 ("because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings"), citing *inter alia Marshall*

*v. Lonberger*, 459 U.S. 422, 434 (1983) (holding that "Title 28 U.S.C. § 2254(d) gives federal habeas corpus courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state court, but not by them."). Accordingly, the Oregon Supreme Court's decision that Gable failed to establish prejudice was objectively reasonable, and this court must defer to that decision under § 2254(d). Gable is not entitled to habeas corpus relief on his claim that trial counsel was ineffective in failing to object on *ex post facto* grounds to the trial court submitting to the jury in the penalty phase of the trial the option of Gable being sentenced to life without the possibility of parole.

## V.    Freestanding Actual Innocence

Gable also alleges a freestanding claim that he is "actually innocent." The United States Supreme Court has yet to hold that a freestanding claim of actual innocence is cognizable as an Eighth or Fourteenth Amendment claim subject to federal habeas corpus review. *McQuiggen v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924, 1931 (2013); *House*, 547 U.S. at 554-55. On several occasions, however, the Supreme Court has assumed, without deciding, that such a claim may exist in capital cases. *House*, 547 U.S. at 554-55; *Herrera*, 506 U.S. at 417-19.

The Ninth Circuit has extended the "assumption" of the existence of a freestanding actual innocence claim to non-capital cases, but has consistently found that the petitioner failed to satisfy the extraordinarily high threshold necessary to support such a claim. *See, e.g., Henry v. Marshall*, 224 Fed. Appx. 635, 637 (9th Cir. 2007); *Renteria v. Curry*, 506 Fed. Appx. 644, 646 (9th Cir. 2013); *Hageman v. Hill*, 314 Fed. Appx. 996, 998 (9th Cir. 2009). In doing so, the Ninth Circuit has opined that Justice Blackman articulated the applicable threshold showing for such a claim in his *Herrera* dissent, that a petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger*, 132 F.3d at 476; *Boyde v Brown*, 404

F.3d 1159, 1168 (9th Cir. 2005); *see also House*, 547 U.S. at 555 (sequence of the Court's decisions in *Herrera* and *Schlup* "implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*"). A petitioner's burden under this standard is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. 417).

As discussed above, Gable has cast serious doubt on the state's case that he killed Michael Francke in the course of burgling Francke's car for "snitch papers." But although Gable has presented sufficient evidence of a constitutional violation that *probably* resulted in the conviction of someone who is actually innocent, Gable has not made the "truly persuasive" and "extraordinarily high" showing necessary to support a finding that he is *actually* innocent. Accordingly, habeas corpus relief should not be granted on Gable's freestanding claim of actual innocence.

## VI.   Remaining Claims Not Addressed in Gable's Brief in Support

As previously noted, Gable does not address the remaining grounds for relief alleged in his Petition for Writ of Habeas Corpus. Consequently, Gable has not sustained his burden to demonstrate why he is entitled to relief on these claims. *See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004). Nevertheless, the court has reviewed Gable's remaining claims and is satisfied that Gable is not entitled to habeas corpus relief on those claims.

## *CONCLUSION*

For these reasons, Gable's Amended Petition for Writ of Habeas Corpus (ECF No. 61) is GRANTED IN PART and DENIED IN PART. The Amended Petition is GRANTED on the bases that the trial court erred in excluding evidence of third-party guilt and that trial counsel provided ineffective assistance in failing to assert Gable's federal due process rights in the face of the trial

court's error.  The Amended Petition is DENIED on the remaining claims for relief, including

Gable's claim that trial counsel was ineffective in failing to advise Gable of his *ex post facto* rights

and in failing to raise an *ex post facto* objection to the sentencing options at the penalty phase, as

well as Gable's free-standing claim of actual innocence.

Gable shall be released from custody unless the State of Oregon elects to retry him within

90 days of the date of this order.  A certificate of appealability is GRANTED as to all grounds for

relief discussed herein on the basis that Gable has made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253(c)(2).

DATED this __18th__ day of April, 2019.

_/s/ John V. Acosta_____
John V. Acosta
United States Magistrate Judge