FREDERICK M. BOSS
Deputy Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General
NICK M. KALLSTROM  #050023
SAMUEL A. KUBERNICK  #045562
Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4794
Email:  Benjamin.Gutman@doj.state.or.us
         Nick.M.Kallstrom@doj.state.or.us
         Samuel.A.Kubernick@doj.state.or.us

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FRANK E. GABLE,<br><br>      Petitioner,<br><br>v.<br><br>MAX WILLIAMS,<br><br>      Respondent. | Case No. 3:07-cv-00413-AC<br><br>RESPONDENT'S MOTION TO STAY AND MEMORANDUM IN SUPPORT OF MOTION TO STAY |

# TABLE OF CONTENTS

I.    INTRODUCTION AND PRAYER FOR STAY .................................................. 1

II.   CERTIFICATE OF CONFERRAL ............................................................... 1

III.  BACKGROUND .................................................................................... 1

IV.   ARGUMENT ....................................................................................... 2

    A.    Standard for Ordering a Stay ......................................................... 2

    B.    Respondent is either likely to succeed on appeal, or has a "substantial case on the merits." .............................................................................. 4

        1.    The trial court's exclusion of Johnny Crouse's statements to investigators as inadmissible hearsay did not violate petitioner's due process rights under *Chambers* ............................................ 4

        2.    Trial counsel was not constitutionally ineffective in declining to move for the admission of Crouse's hearsay statements under the federal constitution .................................................................. 15

        3.    Petitioner failed to establish "cause and prejudice" under *Martinez* to excuse the default of his claim against trial counsel ........................... 18

        4.    Petitioner failed to establish "actual innocence" under *Schlup* to excuse the default of his claims against the trial court and his trial counsel ................................................................................. 20

        5.    Not all of the witnesses or potential witnesses that the Court referred to as 'recanting' actually recanted, and the *Opinion and Order* does not account for the timing, context, or other nuances associated with the recantations or partial recantations ........................... 21

            a.    Cappie Harden ........................................................... 21

            b.    Jodie Swearingen ....................................................... 22

            c.    Earl Childers ............................................................. 24

            d.    Mark Gesner .............................................................. 24

            e.    John Kevin Walker ...................................................... 25

            f.    Daniel Walsh .............................................................. 26

            g.    Other recanting witnesses .............................................. 27

        6.    Aside from the recantations, other evidence in the record would permit a rational finder of fact to find petitioner guilty ........................... 28

    C.    The Second and Fourth Hilton Factors Do Not Warrant Release ....................... 29

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

        1.      The State would be irreparably harmed absent a stay ............................... 29

        2.      The public interest favors a stay ................................................................. 30

    D.    In the alternative, if the court grants Petitioner's release, it should impose conditions of supervision, and it should still stay that portion of the judgment regarding retrial ...................................................................................... 31

V.    CONCLUSION ...................................................................................................... 33

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

# TABLE OF AUTHORITIES

**Cases**

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .............................................................. 14

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ..................................................... 21

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .......................... 4, 5, 6, 9, 10, 13, 16, 17, 18, 19

*Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010) .............................................. 10, 16

*Clark v. Arnold*, 769 F.3d 711 (9th Cir. 2014) ........................................................ 17

*Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012) ................................................. 6, 17, 18

*Decker v. Persson*, 2015 WL 7069662 (D. Or. 2015) ............................................... 32

*Dobbert v. Wainwright*, 468 U.S. 1231 (1984) ........................................................ 21

*Fairchild v. Norris*, 51 F.3d 129 (8th Cir. 1995) ..................................................... 20

*Franklin v. Duncan*, 891 F. Supp. 516 (N.D. Cal. 1995) .............................. 29, 30, 31

*Green v. Georgia*, 442 U.S. 95 (1979) ........................................................... 5, 17, 19

*Hall v. Paramo*, 734 Fed. Appx. 519 (9th Cir. 2018) ............................................... 27

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................................. 21

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................................... 3, 29, 30

*House v. Bell*, 547 U.S. 518 (2006) ................................................................. 20, 28

*Jones v. Taylor*, 763 F.3d 1242 (9th Cir. 2014) .......................................... 20, 21, 26

*Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) ......................................................... 20

*Lorentsen v. Hood*, 223 F.3d 950 (9th Cir. 2000) .................................................... 28

*Lowry v. Lewis*, 21 F.3d 344 (9th Cir. 1994) ........................................................... 17

*Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) ........................................ 5, 17, 18

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................................. 2, 4, 18

*Montana v. Egelhoff*, 518 U.S. 37 (1996) ............................................................... 16

*Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011) ................................................... 13

*Rodney v. Filson*, 916 F.3d 1254 (9th Cir. 2019) .................................................... 18

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................... 4, 20, 22

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

*State v. Lyon*, 304 Or. 221 (1987) ......................................................................... 13

*Stein v. Wood*, 127 F.3d 1187 (9th Cir. 1997) .......................................................... 3

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................... 15, 17, 18, 19

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) ............................................... 9

**Statutes**

O.E.C. 804(3)(c) .......................................................................................................... 4

**United States Code**

28 U.S.C. § 2254(e)(1)) ............................................................................................. 17

28 U.S.C. § 2254(e)(2) ............................................................................................... 13

**Rules and Regulations**

Fed. R. App. Proc. 23(c) ............................................................................................. 2

Fed. R. Civ. P. 23 ........................................................................................................ 3

Fed. R. Civ. P. 62 ........................................................................................................ 2

Fed. R. Evid. 804(b)(3) ............................................................................................... 9

L.R. 7-1(a) ................................................................................................................... 1

**Constitutional Provisions**

28 U.S.C. § 2254(e)(1) ............................................................................................... 6

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

## I.    INTRODUCTION AND PRAYER FOR STAY

On April 18, 2019, this Court granted petitioner's writ of habeas corpus and ordered that petitioner be "released from custody unless the State of Oregon elects to retry him within 90 days of that date." (Electronic Case Files (ECF) #168, p. 94). Respondent will be filing a notice of appeal to the Ninth Circuit Court of Appeals on or about May 15, 2019. As explained below, this Court should grant a stay because: (1) petitioner is serving life imprisonment without the possibility of parole, so his term of custody will not expire; (2) respondent has a "strong likelihood" of success or a "substantial case on the merits;" (3) respondent will be irreparably harmed absent a stay; and (4) the public interest weighs in favor of petitioner remaining incarcerated during the appeal.

In the alternative, if the Court orders petitioner's release during the pendency of the appeal, the Court should grant the conditions of release requested below, and stay that portion of the Judgment requiring the State to commence retrial, until the resolution of the appeal.

## II.    CERTIFICATE OF CONFERRAL

Pursuant to LR 7-1(a), counsel for respondent has conferred with counsel for petitioner. Petitioner **OPPOSES** this motion to stay, but would not oppose the motion if petitioner is released pending appeal.

## III.    BACKGROUND

The factual and procedural background is well known to the Court and the parties, and is thoroughly set out in the Opinion and Order (ECF #168), as well as in the parties' prior substantive pleadings. In brief, following a multi-week jury trial, petitioner was convicted of six counts of aggravated murder, based on the January 17, 1989 murder of Michael Francke. At the time of his death, the victim was the director of the Oregon Department of Corrections.[1] The evidence at trial included testimony from several acquaintances and associates of petitioner, to

---

[1] For ease of reading, respondent does not include citations in the background section.

Page 1 -    RESPONDENT'S MOTION TO STAY AND MEMORANDUM IN SUPPORT OF MOTION TO STAY

whom he had made various incriminating statements; statements petitioner made to police throughout the course of the murder investigation; and other circumstantial evidence.

Following an unsuccessful direct appeal and post-conviction relief proceedings, petitioner sought habeas relief from this Court, acknowledging that many of his claims were unexhausted and procedurally defaulted.

In its written Opinion and Order, the Court granted relief on two unexhausted and procedurally defaulted claims: (1) that the trial court "violated [petitioner's] rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by excluding evidence of third-party guilt," and (2) that petitioner's trial attorneys were ineffective by failing "to present legal support, including citation to federal law, in support of admitting evidence of third-party guilt." (ECF #168, pp. 68-69). Acknowledging that those claims were unexhausted and now procedurally defaulted, the Court concluded that the defaults should be excused based on "gateway" actual innocence, and, with respect to the ineffective assistance of trial counsel claim, under *Martinez v. Ryan*, 566 U.S. 1 (2012). As previously noted, the Court entered its Opinion and Order (ECF #168) on April 18, 2019, ordering that petitioner "shall be released from custody unless the State of Oregon elects to retry him within 90 days." The Court entered its Judgment on that same date. (ECF #169).[2]

Respondent now respectfully requests that the Judgment be stayed pending appeal.

## IV.    ARGUMENT

### A.    Standard for Ordering a Stay

Respondent requests that this Court grant a stay pursuant to Federal Rule of Civil Procedure 62 so that petitioner will remain in custody, and the State of Oregon will not be required to pursue possible retrial, while the Ninth Circuit considers respondent's appeal of this Court's grant of the writ of habeas corpus. Federal Rule of Appellate Procedure 23(c) provides

---

[2] The Court denied relief on the remaining claims, but granted a certificate of appealability on all of the denied claims. (ECF #168, p. 94; ECF #169, pp. 1-2).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

that while a decision ordering the release of a prisoner is under appellate review, the prisoner shall be released from custody unless the judge rendering the decision, the Court of Appeals, the Supreme Court, or a judge or Justice of either court "otherwise orders." *Stein v. Wood*, 127 F.3d 1187, 1190 (9th Cir. 1997) (the district court retains concurrent jurisdiction over the custody of a habeas petitioner while the case is on appeal). Rule 23 therefore creates a presumption that a state prisoner should be released from custody pending appellate review of a habeas writ. *Hilton v. Braunskill*, 481 U.S. 770 (1987).

This presumption, however, can be overcome. This Court has broad discretion in determining whether the judgment granting habeas relief should be stayed pending appeal. *Hilton*, 481 U.S. at 775. In exercising this discretion in habeas proceedings, courts are guided by the traditional standards governing stays of civil judgments. *Id.* at 774. These factors are: (1) whether the state has made a strong showing of a likelihood of success on appeal; (2) whether the state will be irreparably harmed absent a stay; (3) whether the issuance of a stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies. *Id.* at 776-77. Once the state establishes "a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits," continued custody is permitted if the second and fourth factors militate against release. *Id.* at 778.

In *Hilton*, the Supreme Court noted that "[s]ince the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." *Id.* at 777. Accordingly, the Court considered other factors, including the flight risk of the prisoner and the danger to the public. *Id.* The Court also considered the state's interest in continuing custody and rehabilitation, noting that the state's interest is "strongest when the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served." *Id.*

Finally, the Court noted that, although the interest of the habeas petitioner in release pending appeal is "always substantial," *Id.* at 777, the petitioner, unlike a pretrial arrestee, "has

RESPONDENT'S MOTION TO STAY AND MEMORANDUM IN SUPPORT OF MOTION TO STAY

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

been adjudged guilty beyond a reasonable doubt by a judge or jury, and this adjudication of guilt has been upheld by the appellate courts of the state." *Id.* at 779. Although a district court's opinion has held that the judgment of conviction is "constitutionally infirm," that decision could be "overturned on appeal before the state must retry the petitioner." *Id.* Thus, when ruling on a motion to stay the judgment, courts can consider "the dangerousness of a habeas petitioner as part of its decision whether to release the petitioner pending appeal." *Id.*

As explained below, those factors weigh in favor of an order staying this Court's judgment pending the outcome of the appeal.

**B.** **Respondent is either likely to succeed on appeal, or has a "substantial case on the merits."**

On appeal, respondent intends to argue that habeas corpus relief should have been denied with respect to petitioner's claims that the trial court's exclusion of Johnny Crouse's statements to investigators as inadmissible hearsay violated his due process rights, as described in *Chambers v. Mississippi*, 410 U.S. 284 (1973), as well as petitioner's claim that trial counsel was constitutionally ineffective in declining to present that basis for the admission of the statements. Further, respondent intends to argue that this Court erred in concluding that petitioner had established a basis to excuse the procedural default of those claims under *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Schlup v. Delo*, 513 U.S. 298 (1995).

**1.** **The trial court's exclusion of Johnny Crouse's statements to investigators as inadmissible hearsay did not violate petitioner's due process rights under *Chambers*.**

At trial, petitioner, based on State evidentiary law, sought to admit the hearsay statements of Crouse to investigators as statements against his penal interest. To do so, petitioner had the burden of demonstrating, *inter alia*, that Course was "unavailable" to testify and that "corroborating circumstances clearly indicate[d] the trustworthiness of [Crouse's] statement[s]." OEC 804(3)(c). Ultimately, the trial court concluded that Crouse was available to testify, having previously testified that he had not killed Michael Francke. (Tr. 9511). Thus, the Court ruled

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

that his hearsay statements were not admissible and that his testimony that he had not killed Michael Francke was not relevant at petitioner's trial.  (Tr. 9511).  This Court has since concluded that the trial court's ruling violated petitioner's due process rights under *Chambers*, in part because Crouse's hearsay statements "bore persuasive assurances of trustworthiness[.]" (ECF #168, p. 76).  That ruling was in error.

In *Chambers*, the Supreme Court considered a trial court's suppression of a third-party's confessions because, at the time, Mississippi had no hearsay exception for statements against *penal* interest; such statements were only admissible if they were against the declarant's *pecuniary* interest.  410 U.S. at 299.  The third-party had confessed to the murder of a police officer to three different close friends or acquaintances in separate settings.  *Id.* at 292-93.  Those confessions occurred within a day of the crime and were *consistent* with each other.  *Id.*  Those confessions were also *consistent* with a subsequent sworn confession.  *Id.* at 287.  There was no dispute that the third-party had been in the vicinity of the crime; one witness saw the third-party immediately after the shooting with a pistol in his hand; and a "lifelong friend" of the third-party testified that he saw the third-party shoot the officer.  *Id.* at 289.  The Court concluded that, "under the facts and circumstances of this case[,]" the third-party confessions "bore persuasive assurances of trustworthiness[,]" such that their exclusion deprived the defendant of a fair trial. *Id.* at 302-03.

Subsequent cases cited by this Court have similarly required evidence of third-party guilt to bear "persuasive assurances of trustworthiness" before federal due process will compel the admission of that evidence, despite its inadmissibility under state evidentiary law.  *See Green v. Georgia*, 442 U.S. 95 (1979) (*per curiam*) (explaining that the third-party confession by a person who had been jointly indicted for the same murder was made "spontaneously to a close friend[,]" and the "evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of [the third party] and a capital sentence."); *Lunbery v. Hornbeak*, 605 F.3d 754, 761 n. 3 (9th Cir. 2010) (noting that hearsay statements of third-party were "completely consistent"

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

with murder evidence); *Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012) (presuming to be correct under 28 U.S.C. § 2254(e)(1) the state court's finding that a third-party confession was "probably true" and was given "under circumstances providing substantial assurances that the confession was trustworthy").

Here, Johnny Crouse's statements to investigators did not have sufficient assurances of trustworthiness under *Chambers*, such that federal due process compelled their admission into evidence despite their inadmissibility under state law. The Court relied heavily on the fact that Crouse claimed to have committed the murder on multiple occasions to multiple persons in April 1989. (ECF # 168, pp. 68, 76). But as explained in respondent's prior briefing (at ECF # 101, pp. 38-50), although Crouse did admit to killing Francke on multiple occasions to multiple people, each of those confessions were inconsistent, rendering his hearsay statements less trustworthy—not more trustworthy.

First Crouse repeated a claim he had previously told investigators in February 1989: that he had observed five Hispanic individuals attack an individual, and chased one of those individuals for three and one-half miles. (Tr. 9535-37). Crouse told investigators that he had known Francke, having spoken with him during a previous term of incarceration. (Ex. 179, p. 294-95).

Later that day, Crouse claimed that a person named "Juan," who was wearing a three-piece suit, had offered him $300,000 to kill Francke. (Tr. 9538-42; Ex. 179, p. 51-56, 296-97). According to Crouse, "Juan" wanted Francke dead because his brother had been killed in a New Mexico riot.[3] (Ex. 179, p. 57). In a confession in which he "became emotional" and "cried heavily," Crouse said that he had killed Francke after receiving a $1,500 down payment from

---

[3] By the time Crouse spoke with investigators, a Salem-area newspaper, the *Statesman Journal*, had reported, *inter alia*, that Francke had been attacked near his car in front of the Dome Building; that he had been stabbed in the heart; that no murder weapon had been located; that the assailant had fled west; and that Francke had previously worked in corrections in New Mexico prior to coming to Oregon. (Pet. Ex. D, pp. 16-18).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

"Juan," attacking Francke as he exited the Dome Building, stabbing him with an upward motion and then fleeing east towards Park Street. (Tr. 9538-42; Ex. 179, pp. 297-99).

The next day, Crouse abandoned the murder-for-hire account, instead claiming that he stabbed Francke after confronting him as he exited the Dome Building and demanding that Francke give him his records from within the Dome Building. (Tr. 9522, 9543). Crouse gave officers a similar account in writing on that date, which explained that after Crouse demanded from Francke "everything on me that they have[,]" Francke hit him and attempted to run away, but that Crouse was able to stab him in the arm, stomach, and then "about three more times before I stabbed Mike F. in the heart at down way." (Ex. 179, pp. 76, 93).

Later that day, Crouse abandoned that account. (Tr. 9544). He then provided another written account, in which he claimed that Francke had approached him while he was in a car. (Ex. 179, pp. 75, 91). Crouse wrote that, "I did know the man when I look at him and told him that we could work it out[.]" (*Id.* at 91). Crouse wrote that Francke then punched him, a struggle ensued, and that he then stabbed Francke in the heart. (*Id.*). According to Crouse, "when I got him in the heart he said what are you doing [sic] he got up and was trying to get back to the door and I went at him again[.] [A]s I did I told him that he was not going to call anyone and he was looking at me and he said you will not get away." (*Id.*).

Crouse had told investigators that he had previously confessed to killing Francke to his brother. (Ex. 179, p. 75). Later that day, the investigators allowed petitioner to call his brother, and recorded that conversation. During the call, Crouse twice asked his brother leading questions in an attempt to get his brother to recall his supposed previous confession, but his brother could not recall any such prior confession. (Ex. 179, pp. 83-84, 87 ("You see, I don't remember that part.")). He then told his brother that he had stabbed Francke in the heart, the arm, and "in the stomach a time or two." (*Id.* at 88).

Later that evening, Crouse told the investigators that, during his altercation with Francke, "Francke [had] knocked him down and he came up, grabbing his knife, and stabbed him." (*Id.*

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

at 77).  According to Crouse, Francke then responded:  "'I won't die and you won't get away with this.'"  (*Id.*).  Crouse stated that he then fled towards Park Street (i.e., to the east of the Dome Building).  (*Id.*).

The investigators then took Crouse to the Dome Building Grounds.  (*Id.*).  While at the Dome Building grounds, Crouse again stated that, following the stabbing, he fled towards Park Street (i.e., towards the east).  The investigator recalled in his police report, "Writer further observed that it appeared Crouse was trying to lead officers away from the direct area of where the crime was known to have occurred.  At this point, writer advised Crouse that he was not telling the truth and he became very angry."  (*Id.* at 77).

Once at the patrol office, Crouse provided a new account, summarized in a police report that the Court quotes at length in its opinion.  (ECF #168, p. 41-42 (quoting Ex. 179, pp. 78-79)).  During that interview, Crouse claimed to have stabbed Francke in the heart and in the stomach with his left hand.  (Ex. 197, p. 95).  He stated that he also "got" Francke on the hands and forearm, clarifying that he believed he inflicted a "slice" to Francke's hands and forearm, as opposed to a stabbing.  (Ex. 197, p. 96).  Notably, contrary to his claim at the Dome Building grounds, Crouse stated that he fled to the west after stabbing Francke.  (*Id.* at 96-97).  He stated that he returned to his apartment, cleaned the knife, washed his boots, soaked his pants, and burned his shirt in the alley.  (*Id.* at 97, 100).  Crouse also claimed that a knife that had been previously seized by police was the knife he had used to kill Francke.  (*Id.*).

The details of Crouse's confession did not remain consistent for twenty-four hours.  The next day, Crouse claimed to have had a "flashback," recalling that he had also worn a dark sweatshirt, which he claimed had blood on the left sleeve that he had not washed off.  (*Id.* at 111).  However, he again confirmed that a hunting knife seized by the police was the knife used to commit the murder.  (*Id.* at 116).  He stated again on April 9, 1989, that the knife seized by police was the murder weapon.  (*Id.* at 138).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

About a week later, Crouse recanted, denying that he had killed Francke. (Tr. 9547). On April 13, 1989, Crouse recanted his recantation, again claiming that he had killed Francke. (Tr. 9547). Later, in June 1989, Crouse again denied having killed Francke, but claimed that prison officials had offered him $10,000 to do so, displaying the cash in a briefcase. (Ex. 179, p. 182). Although he declined the supposed offer from the prison officials, Crouse claimed that he helped the man that had actually killed Francke bury his clothes. (*Id.* at 224). The state police dug in the area Crouse had identified, but were unable to locate any clothing. (Tr. 9549, 9565).

Later, in November 1989, Crouse denied any involvement in Francke's death, explaining that he had learned the circumstances of Francke's death from the investigators: "[The investigators] told me everything about the murder. I know where Michael Francke was stabbed. I know where Michael Francke was cut. I know where the body was. I know where his car was. I didn't know none of that when they brought me over there the first time. None of it. They just took me in there and they talked to me, five hours, before a tape was even put on." (Ex. 179, pp. 268-69).

Given the numerous, shifting accounts of his alleged involvement in the murder, Crouse's statements do not have sufficient assurances of trustworthiness to require admission under *Chambers* in contradiction of state evidentiary rules. To be sure, Crouse stated several times that he killed Francke, but his account changed significantly with nearly every new statement. Federal courts have held ever-shifting third-party confessions to be insufficiently reliable to be admitted under the hearsay exception for statements against penal interest. *See United States v. Moore*, 651 F.3d 30, 81 (D.C. Cir. 2011) (excluding third-party murder confession under FRE 804(b)(3) where "the details of [the third party]'s story vary significantly in each of the four accounts he gave, and he denied killing [the victim] both before and after claiming that he did. Other circuits have held that such contradictions can alone render an otherwise admissible statement untrustworthy."). And indeed the standard for trustworthiness must necessarily be

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

higher where a federal court rules that a state's application of its evidentiary rules violates due process. *See Christian v. Frank*, 595 F.3d 1076, 1085 (9th Cir. 2010) (noting that "the Supreme Court of the United States . . . heavily stressed that it was the 'trustworthiness' of the evidence at issue in *Chambers* that compelled its admissibility.").

In concluding that Crouse's statements "bore persuasive assurances of trustworthiness," in addition to pointing to the fact that Crouse made them "multiple times after the murder" to "different people and in different contexts and circumstances," the Court also concluded that "other evidence in the case corroborated his self-incriminating statements." (ECF #168, p. 76). The "other evidence" available did not provide persuasive assurance that Crouse's statements were trustworthy.

First, Crouse told investigating officers several times—including during the April 6, 1989 statement that this Court has found sufficiently persuasive—that the hunting knife investigators had seized was the knife he had used to kill Francke. (Ex. 197, pp. 97, 116, 138). However, during the state-court proceedings, Martinack (one of the investigators) testified that the general class characteristics of that knife were not consistent with the knife that caused Francke's wounds. (Tr. 9555). Indeed, although the State was willing to present additional evidence that the knife was also not consistent with the cuts to Francke's clothing, petitioner stipulated to that fact at trial. (Tr. 9565-66). In its opinion, this Court omits any discussion of the knife identified by Crouse—an inconsistency that renders Crouse's statements significantly less trustworthy.

Second, as Martinak testified at trial, the person that Hunsaker saw running from the scene of the crime was wearing clothing that was "totally different" than the clothing Crouse claimed to have been wearing on the night of the murder. (Tr. 9552). Like the other details, Crouse's statements as to what he was wearing on the night of the murder continually shifted as he told the car-burglary story. After describing the car-burglary account, Crouse claimed to have a "flashback" as to what he was wearing, claiming that he also wore a blue sweatshirt that got blood on it. (Ex. 179, pp. 111-12). He claimed he "didn't worry" about the blood, explaining

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

that "the blood dried and I seen it and I said ah heck[.]"[4] (Ex. 179, p. 112). As petitioner stipulated at trial, subsequent testing revealed there was no blood on the sweatshirt. (Tr. 9564, 9566). The Court does not address this inconsistency either.

Third, the Court found Crouse's statements trustworthy because he "recalled striking Francke with the knife in the arm and chest, a description consistent with the knife wounds Francke suffered." (ECF #168, p. 67). But it was common knowledge that Francke had been stabbed in the chest, that fact having been extensively reported in newspapers in this high-profile case. (*See e.g.*, Pet. Ex. D, pp. 16-18). And Crouse's description of the wounds he caused to Francke's arm was not consistent Francke's wounds. In the version of events this Court has relied upon, Crouse stated that he slashed Francke on the hands and forearm. (Ex. 197, p. 96). But the medical examiner testified:

> "[T]here were no characteristic defense type injuries on his body. The only exception to that would be the wound through the left bicep area. . . . But there is nothing on the backs of his hands and forearms. Nothing on the left hand. We have these glass caused injuries on the right hand. Nothing that I would identify as a typical defense type injury."

(Tr. 6427). Indeed, at trial, petitioner stipulated that the pictures from Francke's autopsy do not substantiate Crouse's statements that he caused injuries to Francke's forearms or hands. (Tr. 9566). Further, in the statement relied upon by this Court, Crouse claimed to have stabbed Francke in the stomach. (Ex. 179, p. 78). But Francke was not stabbed in the stomach. (Tr. 9553). Thus, contrary to this Court's finding, Crouse's description of the injuries he inflicted on Francke was not "consistent with the knife wounds Francke suffered."

Fourth, the Court found Crouse's statement trustworthy because he described "the angle at which he stabbed Francke." (ECF #168, p. 67). In the version this Court relies upon, Crouse stated that he stabbed Francke "[a]t a down position." (Ex. 179, p. 95). But the Court does not

---

[4] As noted above, in a statement upon which this Court relies, Crouse claimed to have set fire to the only item of clothing that had blood on it, a flannel shirt that Crouse claimed to have worn *under* a green jacket. (Ex. 179, p. 70).

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

account for the fact that Crouse had given an opposite account the day before, gesturing to investigators that he had stabbed Francke in an *upward* motion. (Tr. 9538-39).

Fifth, the Court found Crouse's statement trustworthy because he "gave a reasonably accurate physical description of Francke." (ECF #168, p. 67). But Crouse stated that he had spoken with Francke during a previous term of incarceration. (Ex. 197, p. 294-95). According to Crouse, he had asked Francke to be transferred from the Oregon State Penitentiary to a work camp, and Francke had told him to speak with his counselor. (*Id.*). Thus, that Crouse could give a "reasonably accurate physical description of Francke," confers little credibility to Crouse's multiple accounts.

Sixth, the Court points to "the route" that Crouse said he took to leave the scene after his altercation with Francke. (ECF #168, p. 67). However, as demonstrated above, Crouse consistently stated that he fled east from the scene, towards Park Street, which was not consistent with Hunsaker's account. (Ex. 179, p. 297). Indeed, even on April 5, 1989, after he had shifted to the car-burglary account, Crouse claimed to have fled to the east towards Park Street. (*Id.* at 77). Investigators then took Crouse to the Dome Building grounds, where he again told them that he had fled to the east. (*Id.*). One investigator wrote, "At this point, writer advised Crouse that he was not telling the truth and he became very angry." (*Id.*). It was only after that confrontation that Crouse settled on the claim that he had fled to the west. (*Id.* at 96-97). The Court does not address Crouse's previous accounts of running to the east, or why his later, diametrically-opposed claim should be considered reliable.

Seventh, the Court considers one of the car-burglary accounts that Crouse gave on April 5, 1989, reliable because, after he shifted to the car-burglary account, Crouse repeated that account to his brother. (ECF #168, p. 68). However, Crouse's call to his brother merely reveals another inconsistency in Crouse's statements to investigators. Crouse told investigators that he had previously told his brother that he had killed a man a few days after he had killed Francke, claiming to have described Francke to his brother as "a big guy in corrections." (Ex. 179, p. 75,

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

153).  However, during the phone call, when Crouse asked his brother leading questions in an

apparent attempt to have his brother confirm that previous admission, his brother twice

responded that he did not recall such an admission, the second time telling Crouse: "You see, I

don't remember that part."  (*Id.* at 83-83, 87).  Thus, although Crouse was apparently attempting

to corroborate his most-recent statements to investigators in his phone conversation with his

brother, he was unable to do so.  Contrary to the Court's finding, Crouse's statements to his

brother do not support the reliability of Crouse's car-burglary account.

Eighth, the Court points to a polygraph examination, in which the polygrapher concluded

that Crouse was "not deceptive" when he denied that he had lied when he told police that he had

stabbed Francke.  (ECF #168, p. 68).  But in an earlier polygraph examination, Crouse was

deemed truthful when he denied killing Francke or "in any way knowingly participat[ing] in the

killing of Michael Francke[.]"  (Pet. Ex. H, p. 2).   However, the polygraphs were not presented

to the trial court, nor could they have been.  *See State v. Lyon*, 304 Or. 221, 223 (1987) (holding

that polygraph tests are inadmissible in Oregon even when admissibility has been stipulated by

the parties).  Therefore, they should not be considered in connection with petitioner's *Chambers*

claim against the trial court or his counsel.  *See* 28 U.S.C. § 2254(e)(2); *see also Rhoades v.*

*Henry*, 638 F.3d 1027, 1035 n. 6, 1037 (9th Cir. 2011) (explaining that polygraph results were

"irrelevant" with respect to the habeas petitioner's *Chambers* claim "because polygraph results

are inadmissible under Idaho law absent a stipulation[,]" and "whether the [third-party who

confessed] did (or did not) pass the lie detector test would have made no difference because it

wasn't admissible anyway.").

Ninth, the Court found Crouse's statements reliable because, once he turned to the car-

burglary account, he told investigators that he broke into Francke's car because there was "stuff"

in the car.  (ECF #168, p. 66).  However, after Crouse had shifted to the car-burglary account, it

is difficult to conceive of another reason he could have provided for breaking into the car, other

than to steal it or to obtain "stuff" inside the car.  And—although there were specific items in the

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

car that Crouse might have mentioned, such as the car phone, which were not common in 1989—Crouse provided no indication as to what types of "stuff" prompted him to break into the car. (Ex. 179, p. 94). Thus, nothing about that statement lends "persuasive assurances of trustworthiness" to his account.

Finally, the Court does not consider Crouse's statements to investigators in the context of other outlandish statements that Crouse made to law enforcement during the course of discussing the Francke homicide. For example, during the course of one such conversation, Crouse told his parole officer that he had prevented eleven instances of rape "because I'm out and about at night and I know what to look for." (Pet. Ex. H, p. 105). He told investigators that he had killed his sister, but there is no information in the record to support that claim. (Ex. 179, p. 42). In his final interview with investigators, Crouse admitted that he told investigators a lot of "stories," but did not know why. (*Id*. at 286). But he explained that, as he spoke with the investigators, he learned several of the circumstances of Francke's death, which he was able to later incorporate into his accounts. (*Id.* at 268-69).

In summary, Crouse appears to have had a penchant for telling "stories," regardless of whether they were inculpatory or exculpatory, and he gave several differing accounts of his own involvement in Francke's death, some of which bordered on the absurd. As demonstrated above, the "other evidence" available—including the knife that Crouse provided to investigators—did not corroborate his varying accounts. Given the foregoing, respondent has a "substantial case on the merits" in its appeal of this Court's ruling that Crouse's unsworn hearsay statements bore "substantial assurances of trustworthiness," such that the Due Process Clause mandated their submission to the jury, despite their inadmissibility under state evidentiary law. Indeed, respondent is aware of no prior case that has so concluded on facts similar to those here.

Further, in addressing harmlessness under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Court fails to address that, at petitioner's trial, one of the investigators testified that Crouse had been a suspect and had confessed to killing Francke, but that his confessions could not be

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

corroborated and that he had recanted. (Tr. 7478-79). As discussed in prior briefing, the abbreviated form in which this evidence was presented allowed the jury to learn that someone other than petitioner had confessed to the murder, allowing petitioner to argue that someone other than him had committed the murder. (ECF #101, pp. 70-71). But if Crouse's unsworn hearsay statements had been admitted, the jury would have also learned that Crouse gave multiple accounts of his involvement, including his implausible murder-for-hire schemes. When considering Crouse's multiple accounts of his involvement, or lack thereof, in Francke's murder, the more the jury learned about his statements to investigators, the less likely it would have been to credit anything he said. The Court erred in concluding that the exclusion of those details had a substantial and injurious effect or influence in determining the jury's verdict.

2. **Trial counsel was not constitutionally ineffective in declining to move for the admission of Crouse's hearsay statements under the federal constitution.**

The Court concluded that petitioner was entitled to habeas corpus relief "on his claim that trial counsel was ineffective in failing to present appropriate legal support, including citation to federal law, in support of the admission of evidence of third party guilt." (ECF # 168, p. 78).

To establish a claim of ineffective assistance of counsel, petitioner was required first to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The Supreme Court has explained that "[j]udicial scrutiny of counsel's performance must be highly deferential[,]" and that "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Here, the Court did not perform any analysis on *Strickland*'s performance prong. And at the time of petitioner's trial in the summer of 1991, trial counsel would not have been deficient by not arguing that the federal constitution mandated the admission of Crouse's unsworn hearsay statements, despite their inadmissibility under state evidentiary law.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

As noted above, in *Chambers*, the Court explained that its decision was limited to the facts and circumstances before it:

> "[W]e establish no new principles of constitutional law.  Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.  Rather we hold quite simply that under the facts and circumstances of this case the ruling of the trial court deprived Chambers of a fair trial."

410 U.S. at 302-03.  Indeed, after petitioner's trial, the Court described its decision in *Chambers* as "an exercise in highly case-specific error correction."  *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996) (plurality); *see also Christian*, 595 F.3d at 1085 (noting that *Chambers* was "an opinion that was explicitly tailored to 'the facts and circumstances of [that] case[.]'" (quoting *Chambers*, 410 U.S. at 303)).

The facts here differ substantially from that fact-specific case.  As discussed above, in *Chambers*, the third-party confessions were made to three different persons within a day of the murder, and each of those confessions were consistent with each other and with a subsequent sworn confession.  410 U.S. at 287, 292-93.  The confessions were also corroborated by, *inter alia*, the eyewitness testimony of a "lifelong friend" of the third party who had confessed.  *Id.* at 289.  Thus, in *Chambers*, there were several markers of reliability, such that the Court concluded that the third-party confession bore "persuasive assurances of trustworthiness." *Id.* at 302.  As demonstrated above, Crouse's varying confessions were not consistent with each other, nor were they corroborated by other evidence with anything approaching the eyewitness testimony of the "lifelong friend" in *Chambers*. [5]

Although the Court does not explain the authority trial counsel should have relied upon in 1991, the Court includes within its discussion of the claim against trial counsel two Ninth Circuit

---

[5] The third-party confession excluded during the penalty phase of a trial in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) was similarly reliable, as that confession had been made spontaneously to a close friend and had already been utilized to obtain a murder conviction and sentence of death against the third-party declarant.  The State was unable to charge, much less convict Crouse on the basis of his inconsistent and unsubstantiated confessions.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

decisions—*Lunbery* and *Cudjo* (ECF #168, pp. 74-78). Of course, both of those decisions were decided approximately two decades *after* petitioner's trial. Thus, trial counsel cannot be faulted for failing to rely upon them. *See e.g.*, *Clark v. Arnold*, 769 F.3d 711, 727 (9th Cir. 2014) (explaining that *Strickland* does "not expect counsel to be prescient about the direction the law will take" (internal quotation marks omitted)); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) ("[A] lawyer cannot be required to anticipate [the court's] decision in [a] later case, because his conduct must be evaluated for purposes of the performance standard of *Strickland* 'as of the time of counsel's conduct.'" (quoting *Strickland*, 466 U.S. at 690)).

Further, even if *Lunbery* and *Cudjo* had been available to trial counsel, neither are analogous to the circumstances here—that is, neither involved multiple and inconsistent third-party confessions in which the details of the confession were in a constant state of flux. *See Lunbery*, 605 F.3d at 761 n. 3 (involving one out-of-court confession that was "completely consistent" with the murder evidence); *Cudjo*, 698 F.3d at 755 n. 2, 762-63 (involving one out-of-court confession which the state court found was "probably true" and was "given under circumstances providing substantial assurances that the confession was trustworthy," findings to which a federal habeas court must defer under 28 U.S.C. § 2254(e)(1)). Given that *Chambers* and *Green* were readily distinguishable, and *Lunbery* and *Cudjo* did not yet exist, trial counsel was not ineffective in declining to press a constitutional claim he could have reasonably concluded was not supported in the existing case law.

Under *Strickland*, petitioner was also required to demonstrate prejudice—i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. But for the reasons discussed above, trial counsel could not have established that Crouse's unsworn hearsay statements bore "persuasive assurances of trustworthiness," a predicate to compelling their presentment to the jury under *Chambers* despite their inadmissibility under state law.

Accordingly, in addition to failing to prove that trial counsel performed deficiently, petitioner

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

also failed to prove prejudice. At a minimum, respondent has a "substantial case on the merits" in its appeal of this Court's ruling that trial counsel rendered ineffective assistance of counsel.

### 3. Petitioner failed to establish "cause and prejudice" under *Martinez* to excuse the default of his claim against trial counsel.

The Court concluded that petitioner had established "cause and prejudice" to excuse the procedural default of his claim against his trial counsel under *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF #168, pp. 80-82). To do so, petitioner was required to demonstrate, *inter alia*, that "he had no counsel during his state collateral review proceeding or that his counsel during the proceeding was ineffective under the standards of *Strickland* [full citation omitted.]" *Rodney v. Filson*, 916 F.3d 1254, 1259 (9th Cir. 2019). As with the evaluation of trial counsel's performance at trial, in evaluating PCR counsel's performance during the PCR proceedings, "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The Court failed to do that here.[6]

Petitioner filed a petition for post-conviction relief in July 1995, which was subsequently amended by his PCR counsel three times, with the operative third-amended petition having been filed in November 1998. (Exs. 117, 155). The judgment denying relief was entered in January 2001. (Ex. 345). During that time period, the Ninth Circuit cases that the Court relies upon, *Lunbery* and *Cudjo*, were not available to PCR counsel, both having issued nearly a decade after his PCR proceedings had concluded. And, as discussed above, in *Chambers*, the Supreme Court had explicitly limited its decision to the facts and circumstances of that case, explaining that it was establishing "no new principles of constitutional law." 410 U.S. at 302-03. Indeed, by the time of the PCR proceedings, a plurality of the Supreme Court had rejected the notion that

---

[6] Indeed, the Court's opinion contains no analysis on *Strickland*'s performance prong with respect to PCR counsel. (ECF #168, p. 81 (describing PCR counsel's performance as "deficient," but providing no analysis to support that conclusion)).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

a "*Chambers* principle" could be derived from the case, instead describing *Chambers* as "an exercise in highly case-specific error correction." *Egelhoff*, 515 U.S. at 52.

As discussed above, neither *Chambers* nor *Green* involved confessions that were constantly changing in dramatic fashion. Indeed, even when Crouse settled on the car-burglary account, the details were in a constant state of flux, including the manner in which his altercation with Francke unfolded, the direction he ran from the altercation, and the clothes he was wearing. And neither *Chambers* nor *Green* involved confessions that were, in some instances, flatly contradicted by the physical evidence. As noted above, Crouse identified the knife he had used, but the parties agreed at trial that Crouse's knife was not consistent with the knife that had killed Francke. (Tr. 9555, 9565-66). Given the record and the case law that then existed, PCR counsel was reasonable in not arguing that *Chambers* mandated the admission of Crouse's unsworn hearsay statements at petitioner's trial, and that trial counsel was not constitutionally ineffective in declining to make that argument. In other words, PCR counsel would not have been unreasonable in concluding that *Chambers* was a fact-specific case that would have been distinguishable on several fronts, and that trial counsel's representation did not fall below "an objective standard of reasonableness" in making that same judgment.

Finally, for the reasons discussed above, petitioner failed to establish that Crouse's unsworn hearsay statements possessed "persuasive assurances of trustworthiness," a predicate to compelling their admissibility under *Chambers* despite their inadmissibility under state evidentiary rules. Thus, even if PCR counsel had asserted a claim that trial counsel was ineffective in declining to cite *Chambers* when moving for the admission of Crouse's hearsay statements, there is not a reasonable probability that the result of the PCR proceedings would have been different. Again, respondent has a "substantial case on the merits" in its appeal of this Court's ruling that PCR counsel was ineffective under the standard of *Strickland*.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

**4.** **Petitioner failed to establish "actual innocence" under *Schlup* to excuse the default of his claims against the trial court and his trial counsel.**

This Court also concluded that, under *Schlup*, petitioner had "made a colorable showing of actual innocence sufficient to excuse procedural default." (ECF #168, p. 68). As explained below, respondent has a "substantial case on the merits" in its appeal of this ruling.

In asserting actual innocence, a petitioner must "support his allegations of constitutional error with new *reliable* evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324 (emphasis supplied). In assessing the reliability of the petitioner's new evidence, "the reviewing court 'may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" *Jones v. Taylor*, 763 F.3d 1242, 1247 (9th Cir. 2014) (quoting *Schlup*, 513 U.S. at 332).

To meet the standard under *Schlup*, it is not sufficient merely to show that a reasonable doubt exists in the light of new evidence. *See Schlup*, 513 U.S. at 329 (explaining that "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses[.]) Rather, the burden is on the petitioner to prove that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327; *see also Fairchild v. Norris*, 51 F.3d 129 (8th Cir. 1995) (standard not satisfied where "at least one juror, acting reasonably and properly instructed," would have convicted the petitioner).

The Supreme Court has explained that an inquiry under *Schlup* requires "a holistic judgment about '*all the evidence*' . . . and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House v. Bell*, 547 U.S. 518 (2006) (citations omitted) (emphasis supplied). As this Court noted, a district court must assess the "likely impact" of any new reliable evidence "on reasonable jurors in light of the *complete record*." *Lee v. Lampert*, 653 F.3d 929, 945 (9th Cir. 2011) (emphasis supplied).

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Here, in concluding that petitioner had met his burden under *Schlup*, this Court focused "particularly [on] the newly presented evidence of witness recantations." (ECF #168, p. 58). The Court recognized that "[a]s a general matter, 'recantation testimony is properly viewed with great suspicion.'" *Jones*, 763 F.3d at 1248 (quoting *Dobbert v. Wainwright*, 468 U.S. 1231 (1984) (Brennan, J., dissenting from denial of certiorari)). Indeed, the Ninth Circuit has explained that "'[r]ecanting testimony is easy to find but difficult to confirm or refute'" because "'witnesses forget, witnesses disappear, [and] witnesses with personal motives change their stories many times, before and after trial.'" *Jones*, 763 F.3d at 1248 (quoting *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (Kosinski, J., dissenting)).

Based on the "cold record" that was before the Court (Tr. of 11/22/16 Oral Argument, p. 9), and as explained below, the new recantation evidence that petitioner provided is not sufficient to establish that no reasonable juror would have convicted petitioner.[7]

> **5.** **Not all of the witnesses or potential witnesses that the Court referred to as 'recanting' actually recanted, and the Opinion and Order does not account for the timing, context, or other nuances associated with the recantations or partial recantations.**

> **a.** **Cappie Harden**

The Court credits the affidavit of Cappie Harden. In his affidavit, Harden claims that, contrary to his trial testimony, he did not witness petitioner stab Francke, and gave that account to police because the police polygraphed him many times and issued unspecified threats to both him and his family. (Pet. Ex. A, p. 19). However, as explained in prior briefing (ECF #101, pp. 121-24), Harden implicated petitioner in Francke's murder before he was ever polygraphed,

---

[7] At the November 22, 2016 hearing, respondent agreed that the Court could find the "recantations to be *not credible* on the existing record." (Tr. of 11/22/16 Oral Argument Hearing, p. 21; emphasis added). Respondent argued—and continues to argue—that, in this particular case, the Court cannot properly assesse the reliability of the recantation evidence without providing respondent with an opportunity to cross-examine the recanting witnesses. (*Id.* at 80). *Cf. Herrera v. Collins*, 506 U.S. 390 (1993) (explaining that "motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.").

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

stating that Jodie Swearingen had told him she had witnessed it. (Pet. Ex. E, p. 59). After a single polygraph, Harden gave police the same basic account to which he would later testify. (Pet. Ex. E, pp. 59-60). At trial, Harden testified that he was not threatened by police; instead, he testified that he initially lied to police because he did not want to be considered a "rat." (Tr. 8072). The Court's opinion omits the foregoing.

Further, the Court fails to acknowledge that Harden did not recant his trial testimony until 2005, *after* he was paid $1,000 by Patrick Francke. (Pet. Ex. K). As petitioner notes in his briefing, members of the Francke family "have come to believe that a Keizer drug dealer named Timothy 'Rooster' Natividad killed Francke." (ECF #74, p. 126). In his 2005 recantation, after receiving the $1,000 from Patrick Francke, Harden implicated Natividad in Francke's murder. (Ex. 393-94). Although this substantial cash-payment unquestionably relates to the reliability of Harden's recantation, the Court omits any discussion of this relevant factor.

As respondent argued in his briefing, Harden's belated recantation after receiving $1,000 does not constitute new "reliable" evidence, as contemplated under *Schlup*. But, at a minimum, the Court should have allowed respondent an opportunity to cross-examine Harden about the recantation, where Harden could at least identify the alleged threats that caused him to implicate petitioner, and explain the role that the $1,000 payment played in his recantation.

### b. Jodie Swearingen

The Court credits the affidavits of Jodie Swearingen. However, that Swearingen recanted her grand-jury testimony that she saw petitioner in a struggle with Francke on the Dome Building grounds is not new evidence. (Tr. 9368-69). She told the jury that she had been pressured by police to make that statement, but the jury apparently rejected that claim. (Tr. 9360-61).

The jury had good reason to do so. The Court omits from its opinion Swearingen's statements to employees at her Hillcrest school, made before she was ever subjected to a polygraph examination and when she had no apparent motive to lie. In those statements, she told

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

employees that she was concerned that she was either an accomplice or an accessory to murder and that petitioner had killed Francke. (Tr. 9348-53). She told one employee that she was about fifty feet away from the car where Francke was killed; that Francke's car door was ajar; that there were two men at the scene in addition to Francke; that one of the men stabbed Francke, although she did not see the knife; and that after she saw the bloody knife, "they split." (Tr. 9350-51). After making those statements, Swearingen took a polygraph—with her attorney and a private polygraph examiner hired by her attorney present—in which she stated that she saw petitioner stab Francke. (Pet. Ex. E, pp. 356-57). There were no consistent deceptive responses when she was asked whether her statement was true. (*Id.*). It was after *those* statements—and after her attorney obtained an immunity agreement in which the State of Oregon agreed not to prosecute her as an accomplice—that Swearingen began to offer wildly varying accounts in response to police questioning. But a reasonable juror could credit the basic account she gave to the Hillcrest employees, when she had no apparent motive to lie. Indeed, the jury apparently did so.

In the affidavit submitted here, Swearingen now claims that, on the night of Francke's murder, she was with Natividad, who asked her to throw a bag in a dumpster that night. (Pet. Ex. A, pp. 26-27). The Court omits this portion of Swearingen's account from its opinion, but it is relevant that Swearingen began to implicate Natividad at the same time as Harden, shortly after he was paid $1,000 in 2005. (Ex. 394). As explained in previous briefing, if their accounts regarding Natividad were true, Swearingen and Harden had no reason not to provide them to police during the investigation. There was no need to protect Natividad—as he had already died by the time investigators spoke with Harden and Swearingen—and their accounts involving Natividad removed them from the scene of the murder. Given their implausible Natividad account—first delivered over a decade after petitioner's trial following a $1000 payment to Harden—a reasonable juror could discount the recanting affidavits that Swearingen and Harden have submitted here.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

### c.    Earl Childers

At trial, Earl Childers testified, *inter alia*, that he saw petitioner driving from the state-hospital grounds on the night of the murder and that petitioner later told him to "forget" that Childers had ever seen him that night.  (Tr. 7754-77).  Childers also testified to an instance in which petitioner admitted to having killed Francke after they had been together at Mark Gesner's house and had all gone together to look at a house they were considering burglarizing. (Tr. 7765-67).  According to Childers, petitioner stated that he was "going through some cars and he was in Francke's and he got caught and he ended up sticking the guy."  (Tr. 7767).

The Court credits the Childers affidavit submitted by petitioner, in which he states that he was "pressed" by investigators, who "were angry when I wouldn't tell them what they wanted to hear and when I refused to take a polygraph."  (ECF #168, pp. 49-50, 61).  However, the Court fails to acknowledge anywhere in its opinion that after signing that affidavit, Childers signed a subsequent affidavit in which he stated that he did not believe that the affidavit upon which this Court relies "accurately reflect[ed] my statements, recollections, or observations."  (Ex. 387, p. 2).  Indeed, in his subsequent affidavit, Childers stated that the testimony he gave at petitioner's trial was truthful.  (Ex. 387, p. 1).

Childers gave the account to which he testified before he ever submitted to a polygraph. (Pet. Ex. E, pp. 28-33).  Further, his account was corroborated by the testimony of Gesner, who also testified that petitioner admitted to killing Francke on the night they had all gone to look at a house they were considering burglarizing.  (Tr. 7998-8000).  A reasonable juror could credit the account of Childers, given before he ever submitted to a polygraph, to which he testified under oath, and to which he stands by today.

### d.    Mark Gesner

In its opinion, the Court refers to Mark Gesner as a recanting witness.  (ECF #168, p. 59). The record does not support that finding.  In 2005, Gesner told the *Oregonian* that he stood by

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

his trial testimony. (Ex. 391, p. 14). He similarly told an investigator that he stood by his testimony in 2015. (Ex. 389).

At trial, Gesner testified that, on the night of the murder, petitioner asked him to dispose of a bag. Several months later, Gesner asked petitioner about the contents of the bag, and petitioner told him that "it was the stuff that [petitioner] was wearing the night of the murder." (Tr. 7999). When Gesner asked him "what murder," petitioner responded "the Michael Francke murder." (*Id.*). Gesner dropped it at that point, because Gesner's girlfriend at the time and Childers were getting "close enough that they could hear [petitioner and Gesner] talking again." (*Id.*).

Gesner further testified that he and petitioner spoke about the murder another time when petitioner was at Gesner's house. Petitioner was "bragging" about having killed Francke, and Gesner told him not to "talk about that kind of stuff." (Tr. 8000). According to Gesner's testimony, petitioner talked about the murder in front of Gesner's then girlfriend, and Gesner told him not to "tell anybody that even if you didn't do it or did do it, don't tell anybody that. Don't talk about something like that. That's how you get busted." (*Id.*).

In addition to the statements described above, Gesner also told the investigator in 2015 that he did not "want to be involved in the case and was concerned that he could be prosecuted for hindering prosecution or destruction of evidence." (*Id.*). Ultimately, however, Gesner "stated that the testimony that he eventually gave at trial was truthful," and he stood by that testimony. (*Id.*). Thus, contrary to the Court's finding, Gesner is not a recanting witness, and his trial testimony implicating petitioner does not support petitioner's "actual innocence" argument.

### e.    John Kevin Walker

In the Opinion and Order, the Court also refers to John Kevin Walker as a recanting witness. (ECF # 168, p. 47). At trial, Walker—a methamphetamine dealer who frequently sold his product to petitioner—testified that, on January 18, 1989 (the day after Francke's murder), petitioner told Walker that he "stuck" Francke. (Tr., 8173). Petitioner then threatened to kill

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Walker and his family if Walker told anyone about petitioner's admission. (*Id.*, pp. 8175-76). Walker acknowledged that he did not initially tell this to the police, because he was scared of some of petitioner's associates, and was concerned about a "rat jacket." (*Id.*, p. 8179).

Next, in 1993, Walker was interviewed by Roger Harris, an investigator who had worked for petitioner's trial defense team in 1990 and 1991.[8] (Pet. Ex. A, p. 36). In that interview, Walker told Harris that he had "lied under oath during [petitioner's] criminal trial," stating, among other things, that Walker's testimony that petitioner told Walker he "stuck" Francke was false. (*Id.*, p. 37). Walker also told Harris that he saw petitioner at petitioner's residence on the night of the murder, between 6:00 p.m., and 11:00 p.m. (*Id.*).

Thereafter, however, in 2005, Walker was interviewed by staff from the *Oregonian*, and said that he "couldn't recall making the statement" about seeing petitioner on the night of the murder, and that "in any event it wasn't true." (Ex. 391, p. 14). Walker also told *Oregonian* staff that he was a "heavy meth user at the time of the 1993 interview." (*Id.*). Finally, about ten years later, in a subsequent affidavit that Walker signed in 2015, he deviated from the 2005 *Oregonian* article, and claimed that the information that he provided during the 1993 interview with Harris "is accurate and truthful," and "any statements to the contrary are untrue. (Pet. Ex. J, p. 4). Given Walker's shifting accounts, which the Court does not fully address, his purported "recantation" does not support petitioner's actual innocence argument, and his situation is a quintessential example of why recantation evidence is, as a general matter, inherently unreliable. *See Jones*, 763 F.3d at 1248 ("As a general matter, recantation testimony is properly viewed with great suspicion.") (internal alteration and citation omitted).

### f.    Daniel Walsh

As described in respondent's prior pleadings, Walsh testified about two detailed scenarios in which petitioner confessed to him about Francke's murder. (Tr. 7933-37). While he provided

---

[8] Harris was hired by Karen Steele, an attorney that petitioner married during the course of his trial. (Exh. 391, p. 14).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

an affidavit recanting his trial testimony, that affidavit was signed in 2011, approximately

20 years after he testified.  (Pet. Exh. A, pp. 80-82).  There is no explanation provided for this

significant delay, either in the affidavit itself or in the Opinion and Order.  The lack of any

explanation for the lengthy delay between Walsh's 1991 trial testimony implicating petitioner—

and the 2011 affidavit recanting that testimony—renders the recantation particularly suspect.

*See Hall v. Paramo*, 734 Fed. Appx. 519 (9th Cir. 2018), *cert den*, 139 S.Ct. 1294 (2019)

(finding witness's recantation not credible in part because it "was signed almost four years after

the trial concluded, but did not explain the reason for [the] delay") (alteration added).

In addition to the timing of Walsh's recantation, there are other reasons to question its

reliability.  When Walsh was asked by an investigator in 2015 about his trial testimony, he told

that investigator that he was not questioned by the prosecution at petitioner's trial.  (Ex. 390,

pp. 3-4).  Even though his testimony consisted of approximately 20 pages of the trial transcript,

Walsh, in 2015, told the investigator that he only answered three questions at trial, and suggested

that the trial transcript may have been fabricated.  (*Id*., p. 4).  Walsh also told the investigator

that, even though he "had testified that he was not under the influence while he was on the stand,

he actually was under the influence while he was testifying."  (*Id*.).  The Opinion and Order does

not account for either the timing of Walsh's 2011 recantation, or the statements he made in 2015

about his trial testimony.

### g.      Other recanting witnesses

The Opinion and Order discusses other recanting, or partially recanting, witnesses as part

of the reason for the "actual innocence" conclusion, including Michael Keerins, Randy Studer,

and Theresa Ross.  (ECF # 168, pp. 44-45, 51-53).  While all three of them made statements to

law enforcement implicating petitioner in Francke's murder, none of them testified at petitioner's

trial.  Although the Court appears to find these recantations persuasive, the Opinion and Order

does not discuss the timing of the recantations, all of which were made two decades after

petitioner's trial, with no explanation for the delay.  (Pet. Ex. A, pp. 29-31, 33-34, 97-102).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Moreover, the Opinion does not discuss the context of the original statements made by Keerins, Studer, and Ross, or the context of the recantations, as described in more detail in respondent's prior substantive pleadings. (ECF # 101, 153). For those additional reasons, respondent has a "substantial case on the merits" regarding the Court's "actual innocence" determination.[9]

**6.   Aside from the recantations, other evidence in the record would permit a rational finder of fact to find petitioner guilty.**

In addition to the above-described issues with the reliability and credibility of the recantations—issues that the Opinion does not appear to account for much less resolve—there is significant other evidence of petitioner's guilt in the record. For example, as explained above, Gesner did not recant. Petitioner himself made several incriminating statements to law enforcement officers. Another trial witness, Linda Perkins, who overheard petitioner confessing to the murder, did not recant. (Resp. Ex. 388). Petitioner also made a number of incriminating statements to his then wife Janyne Vierra, including telling her about three or four months after Francke's murder that he "stuck the guy at the hospital." (Resp. Ex. 386). Vierra has not recanted those statements. (*Id.*, p. 4). Furthermore, testimony from Wayne Hunsaker— described in respondent's prior pleadings—was additional circumstantial evidence of petitioner's murder of Francke. (ECF # 101, p. 4).

Assessing all of the evidence presented at trial, and all of the new evidence, a reasonable juror could still find petitioner guilty of Francke's murder. Stated differently, the new recantation evidence did not establish that no reasonable juror could have determined that petitioner was guilty. *See House*, 547 U.S. 518, 537-38 (in assessing actual innocence, habeas court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial"); *Lorentsen v. Hood*, 223 F.3d 950, 954 (9th Cir. 2000) (petitioner "bears burden of

_____

[9] Additionally, for the reasons discussed in respondent's prior substantive pleadings (ECF # 101, 153), the Opinion places too much emphasis on the police interrogation/polygraph issues.

NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

proof" on issue of actual innocence, and "must show not just that the evidence against him was weak, but that it was so weak that no reasonable juror would have convicted him") (internal citations and quotations omitted). Thus, respondent has a strong likelihood of success on appeal on the argument that petitioner has not demonstrated actual innocence, or, at the very least, a "substantial case on the merits" regarding that argument. For that reason, the Court should grant respondent's motion to stay.

### C. The Second and Fourth Hilton Factors Do Not Warrant Release.

As previously noted, when the State can establish that it has a "strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits," the habeas court looks to the second and fourth factors to determine whether continued custody is proper. *Hilton*, 481 U.S. at 778. The second factor asks whether the State will be irreparably harmed without a stay, and the fourth inquires into where the public interest lies. *Id.* The Court may consider the possibility of flight, the risk to the public by the release, and the State's interest in continuing custody and rehabilitation. *Id.* at 777; *Franklin v. Duncan*, 891 F. Supp. 516, 519 n.4 (N.D. Cal. 1995).

#### 1. The State would be irreparably harmed absent a stay.

The State would be irreparably harmed absent a stay of the requirement that it "elect to retry" petitioner within 90 days. The Ninth Circuit is unlikely to decide the case within 90 days of the April 18, 2019 judgment. "It makes little sense for the State to be required to immediately conduct a [] trial if there is any possibility the trial could be mooted by a reversal of this Court's order on appeal." *Franklin*, 891 F. Supp. at 520. If a stay is not granted, the State would be forced to appoint new counsel and possibly undergo the expense of a potentially unnecessary criminal trial, which would quite possibly result in a conviction for aggravated murder. Based on the evidence in this record, a retrial reasonably could result in petitioner's conviction for aggravated murder.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

In addition, the State's interest in continuing custody and rehabilitation is also an appropriate factor to consider in determining possible injury to the State. *Franklin*, 891 F. Supp. at 520-21. "The argument in favor of continued custody "will be strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served." *Hilton*, 481 U.S. at 777. Absent this Court's decision granting relief, petitioner would continue serving life imprisonment, without the possibility of parole. (Resp. Ex. 101). Thus, the remaining sentence to be served is long, and the State has a strong interest in continuing custody.

### 2. The public interest favors a stay.

The public interest also favors a stay of retrial. "[A] possibly unnecessary retrial, with two verdicts, could contribute to a burden on the participants in the trial and a lack of public confidence in the judicial system." *Franklin*, 891 F. Supp. at 521. Because petitioner still faces a lifetime of imprisonment if the Ninth Circuit reverses this Court, he may be a flight risk. (Resp. Ex. 101). *See Id.* ("Murder is an extremely serious charge which by its nature would seem to pose a heightened risk of flight"). If petitioner is released while the case is pending Ninth Circuit review and flees from the jurisdiction, the State's interest in having its laws enforced and the guilty punished will be hindered if the appeal is successful.

At the time of petitioner's trial, petitioner was "part of a loose network of people who used or sold methamphetamine in the Salem area." (ECF # 168, p. 7). He had also spent several years in prison prior to Francke's murder, had unsuccessfully undergone drug treatment, was married to Vierra, whom he regularly beat severely, and was not working regularly. (Tr. 10098, 10241-44, 10252-57). At that time at least, he appears to have lacked the sort of enduring community ties and connection to Oregon that would make it unlikely for him to flee if released pending the appeal. Nothing suggests that, in the many years since his convictions, petitioner has developed ties to any community in Oregon that would act as an incentive for him to remain to await a possible retrial.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

Furthermore, petitioner represents a danger to the community. A jury found that petitioner killed Francke by stabbing him multiple times. Accordingly, "in terms of danger, [petitioner] may be viewed analogously to a pretrial detainee charged with" several counts of aggravated murder. *Franklin*, at 521. Admittedly, the murder occurred approximately thirty years ago. However, prior to Francke's January 1989 murder, petitioner had a violent criminal history. Among other things, he committed robberies in Coos County in both 1979 and 1984. (Tr. 10092-99, 10132). The 1979 robbery, which petitioner committed with another person, was armed. The 1984 robbery was violent as well. The victims of both of those crimes testified at the penalty phase of petitioner's trial, and the victim of the 1984 robbery, in particular, was still traumatized by what petitioner did to her. (Tr. 10118-121). The 1984 robbery is what led to petitioner's prior incarceration. (Tr. 10097).

In addition, in September 1991, shortly after petitioner was convicted of Francke's murder, he was convicted of one felony count of Violation of Armed Career Criminal Act, in USDC No. 3:90-cr-00170-PA-1. (Att. A). As explained further below, respondent's understanding is that, should petitioner be released from ODOC custody, he will begin serving three years of supervised release on that conviction. (Att. A). Apart from the above-described robberies and federal charge, petitioner's criminal history includes first-degree forgery, and a residential burglary in 1980. (Tr. 10097).

Although respondent does not have evidence that petitioner has displayed violent or criminal conduct while in a structured prison setting, the foregoing criminal history shows that petitioner presents a danger to the public if he were to be released from prison pending appeal. Thus, it is in the public interest that petitioner remain in custody until the appeal is resolved.

### D. In the alternative, if the court grants Petitioner's release, it should impose conditions of supervision, and it should still stay that portion of the judgment regarding retrial.

If in the Court's view petitioner should be released during the pending appeal, the Court has and should exercise its authority to stay the portion of the Judgment directing the State to

Page 31 - RESPONDENT'S MOTION TO STAY AND MEMORANDUM IN SUPPORT OF MOTION TO STAY
NMK/9566710-v1

elect whether to retry petitioner within 90 days of the Court's order granting the habeas petition. *See, Decker v. Persson,* 2015 WL 7069662, at *5-6 (D. Or. 2015) (so ordering) As noted above, petitioner has a pending federal sentence from his conviction in USDC No. 3:90-cr-00170-PA-1. In that matter, petitioner received a 105-month sentence to run consecutively to his state court sentence. (Att. A). Petitioner also received 3-years of supervision following his release. (*Id.*). Respondent is of the understanding and belief that, if petitioner is released pending the appeal, he will be under federal supervision pursuant to the above-referenced federal court judgment.[10]

In addition to the terms of release required by the federal probation office and Judgment outlined in USDC No. 3:90-cr-00170-PA-1, respondent requests the Court impose the following conditions on Petitioner's release:

1. Petitioner shall not commit any offense in violation of federal, state, or local law while on release;
2. Petitioner shall appear at all proceedings as required related to this matter, either in this Court or State court, and a new trial and any related proceedings in State court, if any;
3. Petitioner shall notify this Court and respondent, in writing, before any change in address or telephone number;
4. Petitioner shall not travel internationally;
5. Petitioner shall not be permitted to travel outside Oregon without prior permission by this Court and his federal probation officer. Prior to this Court permitting petitioner to travel out of state, petitioner shall sign a waiver of extradition to Oregon; and
6. Petitioner shall agree to surrender himself to the U.S. Marshal for transport to Oregon, if required.

Respondent requests these conditions remain in effect until the mandate issues in the pending appeal, until the time for respondent to file a petition for writ of certiorari in the U.S. Supreme Court has expired, or, if respondent files a petition for writ of certiorari, until such time as the petition or any subsequent briefing on the merits are ruled upon by the U.S. Supreme Court, whichever is later.

---

[10] It is unclear to respondent if, in the event that the the Bureau of Prisons (BOP) were to determine petitioner's state court judgment was *not vacated*, if BOP would determine that petitioner should be placed into their custody to serve his federal sentence.

Page 32 -  RESPONDENT'S MOTION TO STAY AND MEMORANDUM IN SUPPORT OF MOTION TO STAY
NMK/9566710-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

## V. CONCLUSION

Based on the foregoing, the Court should grant the Motion to Stay Judgment while the Ninth Circuit considers respondent's appeal. In the alternative, if the Court orders petitioner's release, it should be under the conditions described above (including those imposed on his supervised release in USDC No.3:90-cr-00170-PA-1). Regardless of its decision regarding custody, the Court should stay that portion of the Judgment requiring the State to make any election regarding retrial, until the resolution of the appeal.

DATED May  15 , 2019.

Respectfully submitted,

FREDERICK M. BOSS
Deputy Attorney General

_s/ Benjamin Gutman_
BENJAMIN GUTMAN  #160599
Solicitor General
NICK M. KALLSTROM #050023
SAMUEL A. KUBERNICK #045562
Assistant Attorneys General
Trial Attorneys
Tel (503) 947-4700
Fax (503) 947-4794
Benjamin.Gutman@doj.state.or.us
Nick.M.Kallstrom@doj.state.or.us
Samuel.A.Kubernick@doj.state.or.us
Of Attorneys for Respondent-Appellant
Max Williams

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

FRC,TERMINATED

# U.S. District Court
## District of Oregon (Portland (3))
## CRIMINAL DOCKET FOR CASE #: 3:90-cr-00170-PA-1

Case title: USA v. Gable

Date Filed: 06/20/1990
Date Terminated: 09/27/1991

Assigned to: Judge Owen M. Panner

**Defendant (1)**

**Frank Edward Gable**
*TERMINATED: 09/27/1991*

represented by **Janet Lee Hoffman**
Janet Hoffman & Associates LLC
1000 S.W. Broadway
Suite 1500
Portland, OR 97205
503-222-1125
Fax: 503-222-7529
Email: janet@jhoffman.com
*TERMINATED: 09/27/1991*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Lawrence H. Matasar**
Lawrence Matasar, PC
621 SW Morrison Street
Suite 1025
Portland, OR 97205
(503) 222-9830
Fax: (503) 274-8575
Email: larry@pdxlaw.com
*TERMINATED: 09/27/1991*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Robert W. Reid**
Robert W. Reid, LLC
208 SW First Avenue, Suite 220
Portland, OR 97204
(503) 223-7786
Fax: (503) 227-2477
Email: breid5212@gmail.com
*TERMINATED: 01/11/1991*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| Pending Counts | Disposition |
|---|---|
| | SENTENCED 9/9/91. Dft committed custody of USBP to be imprisoned for 105 months. to be served consecutively to State of Oregon Sentence that dft is now serving. Dft remanded to CUSM, Upon release from Imprisonmt, dft shall be on supervised release fo r term of 3 yrs, Dft to Comply w/ the following additional cond 1) dft not to possess a firearm or destructive device 2) dft shall participate in a substance abuse treatmt prog as directed by the P.O. which may include urinalysis testing to determine if the dft has used drugs or alcohol. 3) dft will participate in a mental hlth treatmt prog aproved by the p.o. 4) dft shall submit to a search of his person, palce of resid or vehicle at such reasonable times and in a reasonable manner as directed by the P.O. Ord dft to pay a special assessment of $50.00 to the U.S. sgd 9/25/91 PA m 10/9/91 |
| 18:922(g)(1) Violation of ARmed Career Criminal Act (count 1) (1) | |

**Highest Offense Level (Opening)**

Felony

| Terminated Counts | Disposition |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
|---|---|
| None | |

---

**Plaintiff**

| USA | represented by | **Stephen F. Peifer** |
|---|---|---|
| | | United States Attorney's Office |
| | | 1000 SW Third Avenue |
| | | Suite 600 |
| | | Portland, OR 97204 |
| | | 503-727-1012 |
| | | Fax: 503-727-1117 |
| | | Email: steve.peifer@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|

| 06/20/1990 | 1 | INDICTMENT by AUSA STEPHEN F PEIFER. Counts filed against Frank Edward Gable (1) count(s) 1 (jlr) (Entered: 10/17/1991) |
| 06/20/1990 | 2 | Information filed for enhanced penalties pur 18 USC 924(e)(1) (jlr) (Entered: 10/17/1991) |
| 06/20/1990 | 3 | Warrant issued for Frank Edward Gable by Honorable Helen J. Frye (jlr) (Entered: 10/17/1991) |
| 06/25/1990 | 4 | MOTION for writ of habeas corpus by USA as to Frank Edward Gable for dft to appear 7/16/90 (jlr) (Entered: 10/17/1991) |
| 06/25/1990 | 5 | Writ of Habeas Corpus issued for Frank Edward Gable granting motion for writ of habeas corpus by USA as to Frank Edward Gable [4-1] for dft to appear 7/16/90 (jlr) (Entered: 10/17/1991) |
| 07/12/1990 | 6 | CJA Form 20 (Attorney Payment Voucher) by Frank Edward Gable aptg Janet Hoffman (jlr) (Entered: 10/17/1991) |
| 07/16/1990 | 7 | Rec of 1st appearance/arraignmt/det hrg. Dft advised of charges and rights. Dft waived read of indictmt. Dfts plea of NG entered. ORD setting trial before Judge Panner on 9/18/90. Ord motions in 21 days. Ord dft to be detained. (Juba) c/r Harris (jlr) (Entered: 10/17/1991) |
| 07/18/1990 | 8 | DETENTION ORDER of Frank Edward Gable by Magistrate George E. Juba (jlr) (Entered: 10/17/1991) |
| 07/25/1990 | 9 | bench Warrant returned executed as to Frank Edward Gable 7/16/90 (jlr) (Entered: 10/17/1991) |
| 08/06/1990 | 10 | MOTION to change venue by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 08/06/1990 | 11 | Mot for Additional Time to File Defense Motions (jlr) (Entered: 10/17/1991) |
| 08/06/1990 | 12 | MOTION for discovery by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 08/06/1990 | 13 | MOTION for a bill of particulars by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 08/07/1990 | 14 | MOTION for discovery by USA as to Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 08/13/1990 | 15 | Rec of ord setting dfts mot for change of venue, mot for additional time, and mot for bill of particulars for hrg on 8/27/90 at 9:30 a.m. (Panner) (jlr) (Entered: 10/17/1991) |
| 08/22/1990 | 16 | Rec of ord resetting pretrial mots hrg from 8/27 to 9/24/90 at 9:30 a.m. (Panner) (jlr) (Entered: 10/17/1991) |
| 08/27/1990 | 17 | MOTION to continue by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 09/06/1990 | 19 | Rec of ord resetting pretrial mot hrg from 9/24/90 to 10/1/90 at 9:30 a.m. (Panner) (jlr) (Entered: 10/17/1991) |
| 09/10/1990 | 20 | Rec of ord striking 9/18 trial date. A new trial date will be set at pretrial mot hrg for 10/1/90 at 9:30 a.m. (jlr) (Entered: 10/17/1991) |
| 09/20/1990 | 21 | MOTION to continue by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 09/20/1990 | 22 | MOTION to suppress identification by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 09/20/1990 | 23 | Mot for CjA Funds For Investigation (jlr) (Entered: 10/17/1991) |
| 09/20/1990 | 24 | MEMORANDUM by Frank Edward Gable in support of motion [23-1] for CJA Funds For INvestigation (jlr) (Entered: 10/17/1991) |

ATTACHMENT A, 3 of 6
Case No. 3:07-00413-AC

| | | |
|---|---|---|
| 09/20/1990 | 25 | AFFIDAVIT of Lawrence Matasar (jlr) (Entered: 10/17/1991) |
| 09/26/1990 | 26 | RESPONSE by Frank Edward Gable to motion to continue by Frank Edward Gable [21-1] (jlr) (Entered: 10/17/1991) |
| 09/26/1990 | 27 | MEMORANDUM by USA in opposition to Dfts MOt to Suppress Identification (jlr) (Entered: 10/17/1991) |
| 10/01/1990 | 28 | Rec of pretrial motions hrg. Cnsl to provide breakdown of expenses thus far in connection with defense mot for investigative expenses. Ord setting for trial Dec, 11, 1990 at 9 a.m. (Panner) c/r D. Parker (jlr) (Entered: 10/17/1991) |
| 10/24/1990 | 29 | ORDER by Honorable Owen M. Panner (cc: all counsel) Ex Parte Mot and ORd For Transcript of Pre Hrg (jlr) (Entered: 10/17/1991) |
| 11/09/1990 | 30 | MOTION to continue by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 11/13/1990 | 31 | TRANSCRIPT of 10/1/90 filed Frank Edward Gable, USA (jlr) (Entered: 10/17/1991) |
| 11/30/1990 | 32 | Rec of tel conf call. Ord resetting trial to begin 12/13/90 at 8:30 a.m. (Panner) c/r Meacham) (jlr) (Entered: 10/17/1991) |
| 12/06/1990 | 33 | Rec of ord setting change of plea hrg for 12/10/90 at 9:30 a.m. (Panner) Meacham c/r (jlr) (Entered: 10/17/1991) |
| 12/10/1990 | 34 | Rec of change of plea hrg. Dft sworn, found to be competent and plea of GUILTY now entered to Indictmt. PSR ord and case cont'd to 4/1/91 at 9:30 a.m. for impos of sentence. Ord striking 12/13/90 jury trial. (Panner) c/r Meacham (jlr) (Entered: 10/17/1991) |
| 12/10/1990 | 35 | PETITION TO PLEAD GUILTY filed. (jlr) (Entered: 10/17/1991) |
| 12/18/1990 | 36 | TRANSCRIPT of 12/10/90 Entry of Plea, filed Frank Edward Gable, USA (jlr) (Entered: 10/17/1991) |
| 12/18/1990 | 37 | CJA FORM 24 (Authorization Voucher for Transcript Payment) for Frank Edward Gable for Deborah Parker, crt rptr. (jlr) (Entered: 10/17/1991) |
| 01/02/1991 | 38 | MOTION to withdraw by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 01/07/1991 | 39 | AFFIDAVIT by Frank Edward Gable of Lawrence Matasar, cnsl (jlr) (Entered: 10/17/1991) |
| 01/07/1991 | 41 | Rec of hrg mot to withdraw as cnsl for dft. Ord granting. ANother panel atty to be aptd. (Panner) c/r Meacham (jlr) (Entered: 10/17/1991) |
| 01/11/1991 | 42 | CJA Form 20 (Attorney Payment Voucher) by Frank Edward Gable aptg Robert Reid. (jlr) (Entered: 10/17/1991) |
| 01/11/1991 | 42 | SUBSTITUTION of Attorney: ROBERT W REID replacing attorney Matazar and Hoffman (jlr) (Entered: 10/17/1991) |
| 01/16/1991 | 43 | CJA FORM 24 (Authorization Voucher for Transcript Payment) for Frank Edward Gable tfor Janet Hoffman (jlr) (Entered: 10/17/1991) |
| 03/20/1991 | 44 | MOTION to postpone sentencing date by Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 04/03/1991 | 45 | MINUTES: granting motion to postpone sentencing date by Frank Edward Gable [44-1] (cc: all counsel) Honorable Owen M. Panner Rec of Ord setting sentencing for 4/29/91 at 9:30 a.m. (jlr) (Entered: 10/17/1991) |
| 04/29/1991 | 46 | Rec of Hrg. Defer sentencing until after state court trial has been completed. Defense cnsl to ntfy court upon completion of state trial. (Panner) c/r Meacham (jlr) (Entered: |

| | | 10/17/1991) |
|---|---|---|
| 05/07/1991 | 47 | Notification of Cahnge of Address for Robert Reid (jlr) (Entered: 10/17/1991) |
| 05/30/1991 | 48 | CJA FORM 24 (Authorization Voucher for Transcript Payment) for Frank Edward Gable for Margaret Meacham, crt rptr. (jlr) (Entered: 10/17/1991) |
| 07/12/1991 | 49 | Rec of Ord setting sentencing 8/19/91 at 9:30 a.m. (Panner) (jlr) (Entered: 10/17/1991) |
| 07/26/1991 | 50 | MOTION for writ of habeas corpus by USA as to Frank Edward Gable for dft to appear 9/9/91 at 9:30 am.. (jlr) (Entered: 10/17/1991) |
| 07/26/1991 | 51 | Writ of Habeas Corpus issued for dft to appear 9/9 for sentencing (Panner) (jlr) (Entered: 10/17/1991) |
| 07/31/1991 | 52 | Rec of ord rescheduling sent for 8/19 to 9/9/91 at 9:30 a.m. (Panner) (jlr) (Entered: 10/17/1991) |
| 08/28/1991 | 53 | Mot for Credit for Time served in custody (jlr) (Entered: 10/17/1991) |
| 08/28/1991 | 54 | Mot For Downward Departure (jlr) (Entered: 10/17/1991) |
| 08/28/1991 | 55 | Mot For Concurrent Sentence (jlr) (Entered: 10/17/1991) |
| 08/29/1991 | 58 | MOTION for writ of habeas corpus ad testificandum by Frank Edward Gable for dft who has been moved to Idaho (jlr) (Entered: 10/17/1991) |
| 08/30/1991 | 56 | MOTION for writ of habeas corpus by USA as to Frank Edward Gable to appear 9/9/91 (jlr) (Entered: 10/17/1991) |
| 08/30/1991 | 57 | Writ of Habeas Corpus issued for Frank Edward Gable granting motion for writ of habeas corpus by USA as to Frank Edward Gable [56-1] to appear 9/9/91 (jlr) (Entered: 10/17/1991) |
| 08/31/1991 | 18 | MEMORANDUM by USA in opposition to Dfts Mot for Change of Venue (jlr) (Entered: 10/17/1991) |
| 09/05/1991 | 59 | U.S. SENTENCING memorandum re Frank Edward Gable (jlr) (Entered: 10/17/1991) |
| 09/06/1991 | 60 | Writ of Habeas Corpus issued for Frank Edward Gable granting motion for writ of habeas corpus ad testificandum by Frank Edward Gable [58-1] (jlr) (Entered: 10/17/1991) |
| 09/09/1991 | 62 | HABEAS CORPUS WRIT EXECUTED. (jlr) (Entered: 10/17/1991) |
| 09/13/1991 | 63 | HABEAS CORPUS WRIT EXECUTED. for appearance 9/9/91 (jlr) (Entered: 10/17/1991) |
| 09/27/1991 | 61 | JUDGMENT and Commitment issued to U.S. Marshal Frank Edward Gable (1) count(s) 1 Honorable Owen M. Panner Frank Edward Gable (1) count(s) 1. SENTENCED 9/9/91. Dft committed custody of USBP to be imprisoned for 105 months. to be served consecutively to State of Oregon Sentence that dft is now serving. Dft remanded to CUSM, Upon release from Imprisonmt, dft shall be on supervised release for term of 3 yrs, Dft to Comply w/ the following additional cond 1) dft not to possess a firearm or destructive device 2) dft shall participate in a substance abuse treatmt prog as directed by the P.O. which may include urinalysis testing to determine if the dft has used drugs or alcohol. 3) dft will participate in a mental hlth treatmt prog aproved by the p.o. 4) dft shall submit to a search of his person, palce of resid or vehicle at such reasonable times and in a reasonable manner as directed by the P.O. Ord dft to pay a special assessment of $50.00 to the U.S. sgd 9/25/91 PA m 10/9/91 (jlr) (Entered: 10/17/1991) |
| 09/27/1991 | 64 | HABEAS CORPUS WRIT EXECUTED. for appearance 9/9/91 (jlr) (Entered: |

ATTACHMENT A, 5 of 6
Case No. 3:07-00413-AC

| | | 10/17/1991) |
|------------|----|-------------|
| 10/07/1991 | 65 | HABEAS CORPUS WRIT EXECUTED. for appearance 9/9 (jlr) (Entered: 10/17/1991) |
| 10/07/1991 | 66 | HABEAS CORPUS WRIT EXECUTED. for appearance 9/9/91 (jlr) (Entered: 10/17/1991) |
| 10/07/1991 | 67 | HABEAS CORPUS WRIT EXECUTED. for appearance 7/16/90 (jlr) (Entered: 10/17/1991) |
| 10/09/1991 | 68 | Findings of fact and conclusions of law re judgment [61-1] Honorable Owen M. Panner (jlr) (Entered: 10/17/1991) |
| 03/15/1995 | | CASE FILE SENT TO THE FRC Accession number 21-95-0063 Location number X3914 Box 11 of 23 boxes (tomg) (Entered: 07/18/1995) |

| **PACER Service Center** | | |
|------------|------------|------------|
| **Transaction Receipt** | | |
| 05/14/2019 14:58:04 | | |
| **PACER Login:** | od0023:2609488:0 | **Client Code:** | 137600/137600 |
| **Description:** | Docket Report | **Search Criteria:** | 3:90-cr-00170-PA Start date: 1/1/1970 End date: 5/14/2019 |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

ATTACHMENT A, 6 of 6
Case No. 3:07-00413-AC