**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRANK E. GABLE,<br>            *Petitioner-Appellee/*<br>            *Cross-Appellant*,<br><br>            v.<br><br>MAX WILLIAMS,<br>            *Respondent-Appellant*<br>            *Cross-Appellee.* | Nos. 19-35427<br>        19-35436<br><br>D.C. No.<br>3:07-cv-00413-<br>AC<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
John V. Acosta, Magistrate Judge, Presiding

Argued and Submitted February 7, 2022
Portland, Oregon

Filed September 29, 2022

Before:  Richard A. Paez and Jacqueline H. Nguyen,
Circuit Judges, and John R. Tunheim,* District Judge.

Opinion by Judge Nguyen

---

* The Honorable John R. Tunheim, United States District Judge for
the District of Minnesota, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's grant of habeas relief vacating Frank Gable's conviction for the murder of Oregon Department of Corrections Director Michael Franke, in a case in which another man, John Crouse, had confessed multiple times to the murder and nearly all the witnesses who directly implicated Gable have, since trial, recanted.

Gable's federal habeas petition asserted various claims, including constitutional violations based on the trial court's exclusion of Crouse's confession. The constitutional claims are procedurally defaulted because Gable failed to raise them in state court as required.

The panel held that Gable's procedural default is excused under the "actual innocence" exception set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). The panel wrote that Crouse's detailed and compelling confessions, when considered with the recantations of nearly all the State's key witnesses, are more than sufficient to satisfy *Schlup*'s standard, as it is more likely than not that no reasonable juror would have convicted Gable in light of the new evidence.

The panel therefore evaluated on the merits Gable's claim that the trial court violated his Sixth and Fourteenth Amendment rights by excluding evidence of Crouse's guilt. Writing that the state court's application of the Oregon evidence rules was incomplete and almost certainly wrong,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the panel held that even assuming the state court's application of its evidentiary rules was correct, the exclusion of Crouse's confessions nevertheless violated Gable's due process rights. The panel noted that Crouse's confessions have strong indicia of reliability, were corroborated by other evidence including non-public facts that only a participant to the crime would know, and were undoubtedly critical to Gable's defense. Because Gable's defense was eviscerated by the trial court's ruling, the panel concluded that the error had a substantial and injurious effect or influence in determining the jury's verdict.

The panel did not reach remaining issues raised in the State's appeal or Gable's cross-appeal.

**COUNSEL**

Benjamin Gutman (argued), Solicitor General; Frederick M. Boss, Deputy Attorney General; Oregon Department of Justice, Salem, Oregon; for Respondent-Appellant/Cross-Appellee.

Nell Brown (argued) and Mark Ahlemeyer, Assistant Federal Public Defenders; Office of the Federal Public Defender, Portland, Oregon; for Petitioner-Appellee/Cross-Appellant.

Janis C. Puracal and Aliza B. Kaplan, Forensic Justice Project, Portland, Oregon, for Amicus Curiae Forensic Justice Project.

## OPINION

NGUYEN, Circuit Judge:

More than thirty years ago, Oregon Department of Corrections Director Michael Francke was murdered in front of his office building. Investigators followed a tangled web of leads for over a year before a tip led them to Frank Gable, who was charged and convicted of the murder, and sentenced to life imprisonment without the possibility of parole. Because no physical evidence was found, the State's case rested exclusively on witness testimony. Gable has steadfastly maintained his innocence.

The facts on appeal are extraordinary.[1] Since trial, nearly all the witnesses who directly implicated Gable have recanted. Many explain they intended to frame Gable after hearing he was a police informant. They attribute their false testimony to significant investigative misconduct, which the State—remarkably—does not dispute. As Gable's expert explained, the investigators used widely discredited polygraph and interrogation techniques as a "psychological club" to elicit the statements against Gable. The prosecution then built their entire case on that tainted foundation. The State's error was compounded by the trial court's refusal to allow evidence that another man, John Crouse, had confessed multiple times to the murder. Crouse's confession

---

[1] The case has generated wide public interest, particularly in Oregon, and was the subject of at least one "unsolved murder"-style podcast. For decades, alternate theories about the case have proliferated, fueled by the underlying belief by many who closely follow the case, including the victim's own brothers, that someone else killed Francke. There is less agreement on who or why.

was particularly compelling because he gave details of the crime that were not publicly known.

After exhausting his state court appeals, Gable filed a federal habeas petition asserting various claims, including constitutional violations based on the trial court's exclusion of Crouse's confession. Gable's constitutional claims are procedurally defaulted because he failed to raise them in state court as required. Thus, we cannot consider the merits of these claims unless the *Schlup v. Delo* "actual innocence" exception to procedural default applies. 513 U.S. 298 (1995). Under *Schlup*, Gable need not prove that he is "actually innocent." Instead, we examine Gable's new evidence against the entire record and determine whether it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. If the answer is yes, then *Schlup* opens a procedural gateway through which Gable passes to have his constitutional claims heard on the merits.

Below, the district court excused Gable's procedural default under *Schlup* and, on the merits, found that the state trial court violated Gable's due process rights by excluding evidence of third-party guilt under *Chambers v. Mississippi*, 410 U.S. 284 (1973). The district court granted Gable's petition and vacated his conviction. We agree with the district court's evaluation of the record, which is dramatically different than the one presented to the jury. What we now know, and the jury did not, is that the testimony of the State's main witnesses was irreversibly tainted by coercive investigative techniques, and that another man gave compelling confessions on multiple occasions. On the merits, we hold that Gable's due process rights were violated by the exclusion of Crouse's confession. We affirm.

## I.  Factual Background

### A.  The Murder of Michael Francke

On January 17, 1989, Oregon Department of Corrections Director Michael Francke was stabbed to death on the Oregon State Hospital ("OSH") grounds in Salem, Oregon. Francke was last seen alive around 6:45 p.m. near his office inside the Dome Building.  Between 7:05 and 7:20 p.m., several people saw Francke's car door standing ajar in the front parking circle.  A security guard found his body at 12:40 a.m. outside the north portico of the building, where Francke died from a stab wound to the heart.

The murder weapon was never found, and the police had no other physical evidence tied to any suspect.  In the fall of 1989, investigators received a tip that a local man named Frank Gable was involved, and Gable was charged with Francke's murder in April 1990.

### B.  The State's Trial Evidence

Gable's four-month jury trial began in March 1991.  The State of Oregon's theory was that around 7:00 p.m. on the night of the murder, Francke was leaving work when he caught Gable trying to steal "snitch papers" out of his car. Gable stabbed Francke three times and fled on foot before driving away.  Meanwhile, Francke stumbled back to the north portico where he bled out.  The State suggested Francke died fifteen or twenty minutes after the stabbing— by 7:15 or 7:20 p.m.—when co-workers saw his car door open but could not find him.

The prosecution relied solely on witness testimony. Wayne Hunsaker, a custodian at OSH, told the police that, around 7:00 p.m., he saw two men in what appeared to be an

altercation, but he could not identify either one. Hunsaker heard a grunt, "like somebody had their breath knocked out," and saw two men facing each other in the parking circle in front of the Dome Building. One man matching Francke's description headed briskly towards the building, while the other man—six feet tall, 175 pounds, aged 20–40, short brown or black hair, wearing a tan trench coat—ran west down the driveway, across 23rd Street, and behind a generator at the hospital. Hunsaker saw no other people or cars. In January 1989, a local newspaper published a map of Hunsaker's account and the crime scene:



All the witnesses who incriminated Gable knew him through Salem's underground drug scene—Gable was a methamphetamine user and dealer with a criminal record, as were most of the State's witnesses. The only direct eyewitness against Gable was Cappie "Shorty" Harden, who testified that he saw Gable stab Francke when Harden was at the Dome Building picking up his girlfriend, Jodie Swearingen. Five other witnesses claimed Gable

incriminated himself.  Earl Childers testified he saw Gable driving near the murder scene, and that Gable admitted to stabbing Francke while they were doing methamphetamine. Mark Gesner testified that Gable asked him to dispose of a bag of clothes the night of the murder.  John Kevin Walker claimed Gable confessed the next day during a drug sale, and Daniel Walsh said Gable confessed while high a few months later.  Linda Perkins told the jury that the morning after Francke's death, Gable admitted that he "fucked up big time" and they would "read[] about it in the papers."  Gable's then-wife, Janyne Vierra Gable ("Janyne"), testified that she was home alone with her daughter the night of Francke's murder while Gable stayed out with the car.

Law enforcement officers testified as to what Gable said during numerous police interviews.  Gable consistently denied killing Francke or knowing who did.  But Gable admitted he may have speculated about the high-profile case to his friends, and that he frequently wore a tan trench coat, which matched the coat worn by the man Hunsaker saw running.

In one interview, Gable said: "[m]y mind keeps saying you did it, you did it, you did it, and all of the time I know I didn't."  In another confusing exchange, Gable said there were "only two people who know who killed Francke, Francke and God."  The detective noted that Francke could not know because he was dead, and Gable looked puzzled and responded: "Well, there are only two people who know Francke—yeah, me and God."  He then added: "I'm going to go to the end of the trial saying I didn't do this. . . . I'll go to heaven saying it and all those mother fuckers will go to hell for lying."

Gable had no alibi.  Gable's police interviews did not begin in earnest until September 1989—eight months after

Francke's death—by which time he claimed that his memory of dates was fuzzy from heavy drug use.  Gable was never certain of his whereabouts that night, but he believed he was home with his wife hosting a party.  When pressed for another alibi, Gable said he could have been out with a friend doing or selling drugs.

At trial, Gable tried to present evidence that John Crouse confessed to murdering Francke, but the court excluded it under state evidence rules.[2]  Gable presented testimony from Jodie Swearingen, Harden's teenaged girlfriend. Swearingen refuted Harden's testimony that they saw Gable stab Francke.  When the State impeached Swearingen with her grand jury testimony, which had corroborated Harden's story, she claimed the police pressured her to lie to the grand jury.  Gable also called his landlady at the time, who testified that the Gables hosted a loud party on the night of Francke's death, and she had served them an eviction notice the day after because of it.  Inexplicably, Gable's counsel did not use this evidence to challenge Janyne's claim that she was home alone all night with her daughter.

Finally, Gable tried to undermine the State's case by suggesting the crime scene was compromised and evidence was lost.  Gable's counsel questioned officers about coercion, attacked the State's timeline, and tried to impeach the State's witnesses as criminals, drug dealers, and addicts.

On June 27, 1991, the jury found Gable guilty on six counts of aggravated murder and one count of murder.  The

---

[2] The defense also planned to present evidence of another suspect, Tim Natividad, who died before trial.  Only Crouse is at issue in this appeal.

court sentenced Gable to life imprisonment without the
possibility of parole.

## C. Post-Conviction Proceedings

The Oregon Court of Appeals affirmed his convictions
on direct appeal. *State v. Gable*, 873 P.2d 351 (Or. Ct. App.
1994). Gable's appeals moved up and down the state
appellate courts until they were exhausted in 2013. *Gable v.
State*, 305 P.3d 85 (Or. 2013), *cert. denied*, 571 U.S. 1030
(2013).[3] Gable did not raise the federal constitutional claims
that we address here.

In March 2014, Gable filed an amended federal habeas
petition in the District of Oregon asserting twenty claims for
relief under 28 U.S.C. § 2254. Nineteen of Gable's claims
are procedurally defaulted because he failed to raise them in
state proceedings. Gable argued, among other things, that
default is excused for "actual innocence" under *Schlup v.
Delo*.

Gable offered new evidence of witness recantations,
expert testimony, and third-party guilt. At arguments in
November 2016, the parties agreed the district court could
assess Gable's *Schlup* evidence on the written record without
an evidentiary hearing. In April 2019, after reviewing
thousands of pages of evidence, the district court excused
Gable's procedural default under *Schlup*. On the merits, the
district court granted the petition on two claims, including a
violation of Gable's due process rights by excluding

---

[3] *See State v. Gable*, 877 P.2d 1202 (Or. 1994); *Gable v. State*,
126 P.3d 739 (Or. Ct. App. 2006); *Gable v. State*, 140 P.3d 1133 (Or.
2006); *Gable v. State*, 256 P.3d 1099 (Or. Ct. App. 2011).

evidence of another man's guilt.  Gable's petition was denied on all other grounds.

The district court ordered Gable released from custody unless the State retried him within 90 days, but in June 2019, the court stayed the deadline pending appeal.  The State appeals the district court's order, and Gable cross-appeals the denial of relief on a separate claim of ineffective assistance of trial counsel.[4]

## II.  Standard of Review

We have jurisdiction under 28 U.S.C. § 1291.  We review a district court's grant of a habeas petition de novo, and its factual findings and credibility determinations for clear error.  *Jones v. Taylor*, 763 F.3d 1242, 1245 (9th Cir. 2014).  We assess whether a petitioner satisfies *Schlup* based on a de novo review of the whole record, *see Stewart v. Cate*, 757 F.3d 929, 938–39 (9th Cir. 2014), making "a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard," *House v. Bell*, 547 U.S. 518, 539–40 (2006) (cleaned up).

## III.  Discussion

### A.  The *Schlup v. Delo* Exception to Procedural Default

Gable concedes that his federal constitutional claims are procedurally defaulted because he failed to exhaust his state court remedies by presenting those claims to the state court. *See Peterson v. Lampert*, 319 F.3d 1153, 1155–56 (9th Cir. 2003) (en banc).  Therefore, we may consider the merits of

---

[4] Because we affirm on Gable's due process claim, we do not reach the remaining issues raised on appeal or the cross-appeal.

his claims only if he can show that his procedural default is excused by an exception—in this case, a showing of "actual innocence" under *Schlup v. Delo*.

A compelling claim of innocence opens the *Schlup* procedural "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." 513 U.S. at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). A petitioner must show that it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (quoting *Schlup*, 513 U.S. at 327). To do so, he must offer "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 324). "New" evidence under *Schlup* does not actually have to be newly discovered. *See Larsen v. Soto*, 742 F.3d 1083, 1093–94 (9th Cir. 2013). Rather, we assess any evidence that is "newly presented," as in "not presented at trial." *See Sistrunk v. Armenakis*, 292 F.3d 669, 672 n.4 (9th Cir. 2002) (en banc). We then consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Lee*, 653 F.3d at 938 (citing *House*, 547 U.S. at 538) (internal quotations omitted). This includes evidence "alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328 (internal citation and quotations omitted).

*Schlup* is demanding, and cases satisfying it have "typically involved dramatic new evidence of innocence." *Larsen*, 742 F.3d at 1095–96. But while the evidence must "convincingly undermine the State's case" and our

"confidence in [the] conviction," a *Schlup* claim is "procedural, not substantive." *Id.* at 1096 (cleaned up). It "does not require absolute certainty about the petitioner's guilt or innocence." *Lee*, 653 F.3d at 938 (quoting *House*, 547 U.S. at 538) (internal citations omitted).

The record in successful *Schlup* claims is rarely cut and dry. Witness recantations are generally viewed with suspicion, as they are "easy to find but difficult to confirm or refute[.]" *Jones*, 763 F.3d at 1248 (internal citations omitted). To measure a recantation's likely effect on a juror, we consider its context, the circumstances and timing of the recantation, the original testimony and evidence, and the credibility and testimony of other witnesses. *See id.*; *Schlup*, 513 U.S. at 332.

Evidence of third-party guilt can also satisfy *Schlup* if it is sufficiently reliable, supported by other evidence, and casts serious doubt on the petitioner's guilt. *See, e.g., House*, 547 U.S. at 540–41, 548–52. For example, we excused procedural default in *Carriger v. Stewart*, based on the petitioner's evidence of a recanted third-party confession. 132 F.3d 463, 465–66 (9th Cir. 1997) (en banc). The petitioner's new evidence showed that the state's lead witness, Dunbar, framed him for crimes that Dunbar committed himself. *Id.* at 466–67. Then in a post-trial proceeding, Dunbar confessed to lying about the petitioner after he was confronted with his documented history of framing others in his own crimes. *Id.* at 465, 467, 470–72. Shortly thereafter, in yet another hearing, Dunbar recanted, and the state court denied the petitioner relief after finding Dunbar's trial testimony more reliable. *Id.* at 472–73.

On habeas review, we reversed. We concluded that although not unassailable, Dunbar's detailed confession was more consistent with the record than his trial testimony or

recantation. *Id.* Some direct evidence still pointed to the petitioner, *id.* at 466, 470, but Dunbar's confession raised enough doubt as to the petitioner's guilt to meet *Schlup*'s demanding standard, *id.* at 478–79; *see also Larsen*, 742 F.3d at 1087–91, 1096, 1098–99 (finding *Schlup* satisfied when post-trial witnesses convincingly claimed they saw another man commit the crime, even though police officers testified at trial they believed they saw the petitioner do it). *But see Smith v. Baldwin*, 510 F.3d 1127, 1145–46 (9th Cir. 2007) (en banc) (finding *Schlup* not met when the co-defendant confessed to being the sole shooter in a home-invasion murder because there was still direct evidence that the petitioner was an accomplice).

Ultimately, *Schlup* demands a holistic review of all the new evidence against the full record. *See Lee*, 653 F.3d at 938. Our task is to make "a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (citing *House*, 547 U.S. at 538).

## B. Gable's Evidence of "Actual Innocence" under *Schlup*

Gable argues that his evidence—witness recantations and third-party guilt—is sufficient to pass through the *Schlup* gateway. We discuss each in turn.

### 1.

In the thirty years since trial, nearly all the witnesses who incriminated Gable have recanted. These recantations must be viewed in the context of significant—and uncontested—allegations of misconduct by the investigators who coerced the witnesses into making false statements against Gable.

Gable presented the opinion of David C. Raskin, Ph.D, an expert in experimental psychology and human psychophysiology who researches and trains law enforcement on polygraph techniques. Dr. Raskin explained how the "[t]he techniques used in this case suggest that the police were using polygraphs as a psychological club in order to elicit statements from witnesses." All the recanting witnesses were polygraphed multiple times. During these sessions, the investigators confronted the witnesses with their purported results in real-time, accused them of "lying when they were actually truthful by not giving the desired responses," fed them information, and polygraphed them again until their stories were deemed "truthful." The coercive effects of these procedures were exacerbated by "abusive and frightening" interrogation techniques—threats of prosecution and prison, threats concerning the witnesses' children and families, or promises of rewards. It bears repeating that the State does not dispute or attempt to defend the tactics used by the investigators in this case.

### *Informant: Michael Keerins*

The focus on Gable began when Michael Keerins, who was being interviewed as a suspect in September 1989, said that Gable had admitted to killing Francke during a botched car burglary. Shortly after the interview, the media reported Keerins' story, identified Gable as the lead suspect, and revealed that Gable had worked as a local police informant.

Keerins recanted on the eve of trial and did not testify. In a 2012 affidavit, Keerins explained that he had falsely accused Gable because he and his brother were suspects, and he had heard Gable was a snitch. Keerins claims he, Jodie Swearingen, and Cappie Harden set Gable up.

### *Alleged Eyewitnesses: Harden and Swearingen*

Cappie Harden, the only eyewitness who testified that he saw Gable stab Francke, recanted in 2005 and again in 2009. At trial, Harden testified he was outside the Dome Building picking up Swearingen when he saw Gable climb into Francke's car. When a man matching Francke's description approached the car and yelled, Gable stabbed him once in the chest.

In his recantations, Harden swore that his trial testimony was fabricated. Initially, in late 1989, Harden had truthfully told the police he was not a witness. But after he was repeatedly questioned, polygraphed, threatened, and told that Gable had informed against him, Harden decided to frame Gable.

Swearingen, as discussed above, recanted before trial and testified for Gable, but she was impeached with her grand jury testimony. In two 2010 affidavits, Swearingen reaffirmed that neither she nor Harden saw the crime, and she lied to the grand jury only after tremendous pressure by investigators. Swearingen was particularly vulnerable because she was at that time a teenage drug addict with a juvenile record. Yet the investigators polygraphed her 23 times—the most polygraph tests that Dr. Raskin had ever seen given to one person—and interviewed her 12 times. During these sessions, the investigators repeatedly threatened her with criminal repercussions until she accused Gable. Swearingen also justified incriminating Gable because she, like some of the other witnesses, believed Gable was a "rat." In exchange for her grand jury testimony, Swearingen was given immunity.

### *Alibi Witnesses: Janyne and Walker*

Two other recanting witnesses now give Gable a loose alibi. In 2010, after seeing a copy of their January 1989 eviction notice, Gable's former wife Janyne recalled that she and Gable hosted a group of friends the night of Francke's murder, which included trial witnesses John Kevin Walker and Mark Gesner. This directly contradicts her trial testimony that Gable was out all night. In 1993 and again in 2015, Walker admitted that he and Gesner were at the party with Gable at his home that night as well, recanting his trial testimony that he did not see Gable until the next day.

### *Circumstantial Witnesses: Walker and Walsh*

Walker and Daniel Walsh, who both testified that Gable had confessed to them, have also since recanted. Walker admitted in 1993 and 2015 that Gable did not confess, and that Keerins and Gesner had admitted to him that they lied about Gable too. Similarly, Walsh recanted his testimony in 2011. Walsh testified at trial that Gable, while "strung" out on drugs, admitted he had stabbed Francke after he caught him "jockey-boxing" the car. Walsh now claims Gable never confessed. Walsh's recantation is supported by Sheryl Lowery, Walsh's partner at the time. She stated in a 2011 affidavit that after the trial, Walsh told her his trial testimony was false.

Walker and Walsh describe similar experiences with the investigation. When they were first interviewed by the police in September 1989, they both truthfully said they knew nothing about Francke's killing. But like Swearingen and Harden, both were pressured into accusing Gable after they were repeatedly polygraphed and challenged with their results. Walker was also threatened with criminal prosecution for Francke's murder and an unrelated weapon

charge.  He believed Gable snitched and got him and Gesner arrested in a drug raid, so they retaliated.

In urging us to dismiss these recantations as unreliable, the State ignores the significant impact the investigative misconduct likely had on its witnesses.  As Dr. Raskin explains, the polygraph testing and interrogation methods in this case "provided the means to shape" each witness' statement into false testimony about Gable.  The State is of course correct that police misconduct and Gable's guilt are not mutually exclusive.  But in Gable's case, nearly every witness now claims their testimony was false *because* of the police misconduct.  We evaluate the recantations through this lens.  Additionally, the witnesses' recantations bear strong indicia of reliability such that their trial testimony is fatally undermined.

Each witness had compelling motivations to respond to police pressure.  Nearly every recanting witness negotiated benefits in their own criminal cases in exchange for their statements against Gable, and several were warned that *they* were suspects.  Given Swearingen's age, vulnerability, and juvenile record, it is more than plausible that she was coerced by the dozens of polygraph tests and threats.  In contrast, none of the witnesses has an obvious reason to perjure themselves on Gable's behalf now.  *See Larsen*, 742 F.3d at 1098 (noting that the state did not explain why a witness would risk criminal consequences by perjuring himself for the petitioner's benefit in a *Schlup* inquiry).

Next is the timing.  As of September 1989, no key witnesses had implicated Gable.  But after Keerins' false story and the revelation that Gable was an informant went public in October 1989, the witnesses were pressed into incriminating Gable as the lead suspect.  In contrast, the recantations occurred years apart: three were before trial,

and the others came in 1993, 2005, 2010, 2011, 2012, and 2015.

The recantations also overlap in consistent ways. Swearingen and Harden were together that night, and each independently swears that they did not see Gable commit the crime. Walker has claimed since 1993 that he, Keerins, and Gesner lied to frame Gable; Keerins now admits it, adding that he, Swearingen, and Harden "set up Gable." Janyne and Walker verified that the Gables hosted a party the night of the murder that Gesner and Gable also attended.

Critically, Harden and Swearingen's recantations align with the evidence much more than their prior statements. Hunsaker, the custodian who saw two men fighting and was the only neutral eyewitness, did not see anyone else at the scene. But according to Swearingen's grand jury testimony, she was standing in front of the building when Francke and Gable's altercation began, and she ran past them, through the parking circle, to Harden's car in the driveway. Harden then allegedly drove west down the same driveway Hunsaker saw the suspect run down on foot. Had Swearingen and Harden really been at the scene in front of the Dome Building, Hunsaker would have seen them.

The State argues that even if we credit every recantation, there is enough evidence remaining to convict Gable. But without its key witnesses, the State's case against Gable is threadbare, at best. Nothing directly pinpoints Gable in the murder. Only three witnesses have not fully recanted their trial testimony, but they have been thoroughly impeached. Earl Childers, who testified that he saw Gable driving near the crime scene and that Gable confessed to him once while they were doing methamphetamine, is now unsure of either fact. Mark Gesner, who testified that Gable drove to his house on the night of Francke's murder and asked him to

dispose of a bag of his clothes, has been impeached by Walker, who says Gesner told him he lied about Gable, and by Walker and Janyne, who both swear that Gesner was at Gable's house that night.

That leaves only Linda Perkins, who testified that Gable admitted he did something bad the morning after the murder, but the other two people present during Gable's alleged admission deny her story. Randy Studer is one of them. Notably, Studer claims that like the others, he told the police the truth in the fall of 1989—that the conversation with Gable and Perkins did not happen. But after repeat polygraphs and threatening interrogations, he was pressured to falsely accuse Gable in his grand jury testimony. Studer recanted before trial and did not testify, and to this day maintains that Perkins made up her story.

The State relies on *Jones v. Taylor*, which is factually inapposite. To start, in *Jones* we assessed a freestanding claim of actual innocence, which requires a petitioner to "affirmatively prove that he is probably innocent"—a much higher showing than *Schlup*. 763 F.3d at 1246–47 (internal citation omitted). Further, the recantations in *Jones* were uncorroborated and suspiciously timed, *id.* at 1249, whereas the recantations here are corroborated and spaced apart.

Gable's evidence is also markedly different from another case relied on by the State, *Lee v. Lampert*. In *Lee,* we found expert testimony questioning the reliability of a child assault victim's police interview insufficient to satisfy *Schlup* because it did not negate the victim's unrepudiated trial testimony or statements against the petitioner. 653 F.3d at 943–44. In contrast, here, each witness has recanted, and Dr. Raskin's unchallenged testimony explains how they were led astray. This is likewise a far cry from *Sistrunk v. Armenakis*, where new evidence was insufficient because it

merely cast doubt on prosecution witnesses but did not undercut other separate evidence against the petitioner. 292 F.3d at 676–77. Gable does much more here—he casts serious doubt on the entire foundation of the State's case.

In short, no reasonable juror could ignore the heavy blow to the State's evidence given the significance of the recantations. The affidavits show how undisputed investigative misconduct paved the way for a string of criminal associates to turn on Gable to help themselves. The recantation evidence alone presents a compelling claim of "actual innocence" under *Schlup*, but Gable does not rely on that alone.

## 2.

The jury never learned that before Gable was a suspect, John Crouse had confessed to the crime several times, over many months, revealing details that had not been made public.

A few weeks after the murder, in February 1989, Crouse told his parole officer—unprompted—that he had information about Francke's death. Initially, Crouse said he saw a group of men beating up another man outside the Dome Building. Crouse then claimed a man named Juan paid him $300,000 to murder Francke.

But his most detailed and compelling confession came in April 1989. According to Crouse, he was walking by the Dome Building on the night of January 17, 1989, when he decided to break into a car. Francke caught him in the act and tried to detain him. Resisting, Crouse hit Francke in the face and stabbed him before fleeing on foot.

Critically, Crouse included key details that were consistent with the evidence but not yet public, like the number and type of wounds Francke suffered. He claimed he stabbed Francke three times: in the heart, arm, and torso. Although Francke was stabbed through the left bicep, and not the right forearm like Crouse said, Crouse accurately identified his other injuries: he said he slashed Francke's arms and hands, and hit Francke on the left side of his face and eyeglasses.[5] Crouse also admitted he wore a tan jacket, which matches Hunsaker's description of the fleeing assailant's coat. Finally, Crouse said Francke cried out when Crouse stabbed him, so Crouse pulled back and ran away, which aligns with Hunsaker hearing a noise, seeing two men face each other, and then watching them separate.

Crouse repeated his confession three more times to family members in the police's presence. After his confession, Crouse asked to call his brother and agreed to have their conversation recorded. Crouse confessed again to his brother, stating that he might face the death penalty. Crouse then called his mother and confessed again. Finally, officers brought in Crouse's girlfriend, and he tearfully confessed to her too.

Crouse recanted at least twice, first in April 1989 before he retracted his recantation days later. In June 1989, Crouse claimed he was involved in a high-level Oregon Department of Corrections conspiracy where state officials tried unsuccessfully to hire Crouse to kill Francke and prevent him from exposing their prison drug operation. Then in late November 1989, the State offered Crouse immunity from

---

[5] Francke had tears on his hand and forearm and bruising and an abrasion on his left eye and forehead.

prosecution for "false statements" made to the police.[6] Unsurprisingly, Crouse took the out, claiming no knowledge of Francke's death and disavowing his prior confessions.

The fact that Crouse "confessed without immunity and overwhelmingly against his own penal interest" is "a strong indicator of reliability." *Carriger*, 132 F.3d at 475. Crouse's "botched burglary" confession is far more consistent with the evidence than his recantations.[7]  The State offers no explanation of how Crouse was able to reveal accurate details about Francke's wounds known only to the police or a participant in the crime.  In contrast, Crouse's alternative story about a group of men jumping someone outside the Dome Building cannot be squared with the State's theory of one killer.  Nothing in the record corroborates Crouse's murder-for-hire or government conspiracy confessions either.

Again, even assuming some doubt about Crouse's involvement in the murder, Gable need not prove Crouse's guilt beyond a reasonable doubt.  Rather, the question under *Schlup* is whether Crouse's confessions undermine *Gable's* guilt.  *See Carringer*, 132 F.3d at 478–79.  Under the State's theory of a single killer, their guilt is mutually exclusive—either Gable killed Francke, or someone else did.  Crouse would have presented a more compelling choice to the jury.

While Crouse confessed on the record with details known only to the killer or the police, Gable consistently

---

[6] By October 1989, the focus had shifted to Gable.

[7] Notably, the lead Department of Justice detective interviewing Crouse found his "car burglary" confession credible.  The detective was later reassigned and was no longer on the case as the investigation focused on Gable.

maintained his innocence to the police. All the witnesses who claim Gable incriminated himself to them have either recanted or are thoroughly impeachable, as discussed above.[8] In contrast, Crouse voluntarily confessed on the record, and to witnesses—his own family members, in front of the police—who were unimpeachable.

Crouse also could not offer a clear alibi. He either attended back-to-back alcohol treatment meetings with someone named Laurie, worked all night, was all over town, or stayed home. The State highlighted Gable's lack of alibi at trial, but compared to Crouse, Janyne and Walker now give Gable a stronger alibi. *Cf. House*, 547 U.S. at 550–54 (finding *Schlup* met even though the petitioner had no alibi).

Crouse's detailed and compelling confessions, when considered with the recantations of nearly all the State's key witnesses, are more than sufficient to satisfy *Schlup*'s demanding standard. We therefore hold that Gable's procedural default is excused under *Schlup* because it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Lee*, 653 F.3d at 938 (quoting *Schlup*, 513 U.S. at 327).

---

[8] Gable's statements also did not align with the evidence. For example, Childers testified that Gable said he broke into Francke's car to steal a gun and stabbed him repeatedly in the chest. Francke did not have multiple chest stab wounds.

### C.  Gable's *Chambers* Due Process Claim

### 1.

We now evaluate the merits of Gable's claim that the trial court violated his Sixth and Fourteenth Amendment rights by excluding evidence of Crouse's guilt.

The Sixth Amendment guarantees a criminal defendant's right "to have a public trial, to confront the witnesses against him and to obtain witnesses in his favor."  *Lunbery v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010).  These rights are incorporated into the due process clause of the Fourteenth Amendment, which includes the right "to a meaningful opportunity to present a complete defense."  *Id.* (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

In *Chambers v. Mississippi*, the defendant was convicted of killing a police officer.  410 U.S. 284, 285 (1973). Another man, McDonald, confessed to the killing but recanted.  *Id.* at 287–88.  The trial court allowed the defendant to call McDonald to the stand and to read his prior confession to the jury, and the state was allowed on cross-examination to elicit McDonald's recantation.  *Id.* at 289. But the court applied a state "voucher" rule to bar the defendant from challenging McDonald's recantation, and the hearsay rule to prevent the defendant from presenting McDonald's prior confessions through other witnesses.  *Id.* at 291–92, 294–96.  McDonald's confessions were excluded despite strong indicia of reliability: they were made spontaneously to close acquaintances shortly after the murder; they were corroborated by other evidence; and they were against his penal interest.  *Id.* at 300–01.

The Supreme Court held that the exclusion of McDonald's confessions and the state's refusal to allow his

cross-examination deprived the defendant a fair trial.  The
state's technical application of its evidentiary rules "plainly
interfered with Chambers' right to defend against the State's
charges."  *Id.* at 298.  "[W]here constitutional rights directly
affecting the ascertainment of guilt are implicated," rules
like hearsay "may not be applied mechanistically to defeat
the ends of justice."  *Id.* at 302; *see also Green v. Georgia*,
442 U.S. 95, 96–97 (1979) (finding a due process violation
when a co-conspirator's reliable and corroborated
confession was excluded).

**2.**

Gable sought to admit Crouse's confessions as
statements against interest, a hearsay exception for
"unavailable" declarants under Oregon Evidence Code Rule
804(3)(c), because Crouse had intended to assert his Fifth
Amendment right against self-incrimination.[9]    O.R.S.
§ 40.465(3)(c).

The State moved to exclude Crouse's confessions.  At a
hearing outside the jury's presence, Crouse answered "no"
when asked if he killed Francke.  Crouse's attorney claimed
he misunderstood; he meant to invoke his privilege against
self-incrimination and would do so if asked again.  Indeed,

---

[9] Oregon Evidence Code Rule 804(3)(c) creates an exception to the
hearsay rule where the declarant is unavailable as a witness: "A
statement which was at the time of its making so far contrary to the
declarant's pecuniary or proprietary interest, or so far tended to subject
the declarant to civil or criminal liability, or to render invalid a claim by
the declarant against another, that a reasonable person in the declarant's
position would not have made the statement unless the person believed
it to be true. A statement tending to expose the declarant to criminal
liability and offered to exculpate the accused is not admissible unless
corroborating circumstances clearly indicate the trustworthiness of the
statement."

Crouse invoked his Fifth Amendment rights on all subsequent questions, including whether he was at OSH that night or what he told the police. Gable's counsel moved to declare Crouse "unavailable." Defense counsel later recalled Crouse to the stand and asked whether he killed Francke, which Crouse refused to answer on Fifth Amendment grounds.

The State insisted, and the state court agreed, that Crouse was in fact available because he waived his privilege as to whether he killed Francke, and therefore the "statements against interest" exception did not apply. *See* O.R.S. § 40.465. Gable's counsel countered with two arguments. First, if Crouse denied killing Francke under oath, his prior inconsistent statements could be introduced as impeachment under Oregon Evidence Code Rule 607. *Id.* § 40.345. Second, Crouse was at least unavailable as to all questions for which he *did* plead the Fifth Amendment, and the "statements against interest" exception should apply to those questions.

The trial court did not grapple with either point. Instead, it ruled that Crouse's testimony denying that he killed Francke was irrelevant and thus inadmissible, because "[y]ou can't put people on the stand and say they did not kill Michael Francke." *See id.* § 40.155 (providing that only relevant evidence is admissible). "[T]here wo[uldn]'t be any need to impeach" testimony he did not give, so the Crouse evidence was excluded entirely.

The state court's application of the Oregon evidence rules was incomplete and almost certainly wrong. The court did not acknowledge that Crouse invoked his privilege on every other question, including whether he was at OSH or told the police he killed Francke, and thus was unavailable as to those issues. His hearsay statements against interest

should have been admitted under Rule 804(3)(c).  *See id.*
§ 40.465(3)(c).  We likewise question the trial court's
finding that Crouse's testimony was irrelevant in this
context.  *See id.* § 40.150 (defining "relevant evidence").

But even assuming the state court's application of its
evidentiary rules was correct, the exclusion of Crouse's
confessions nevertheless violated Gable's due process
rights.  Rather than address the substance or reliability of
Crouse's confessions, the trial court's ruling was purely
mechanistic and technical.  *See Chia v. Cambra*, 360 F.3d
997, 1003 (9th Cir. 2004) ("[W]hen a hearsay statement
bears persuasive assurances of trustworthiness and is critical
to the defense, the exclusion of that statement may rise to the
level of a due process violation." (citing *Chambers,* 410 U.S.
at 302)).

As discussed, Crouse's confessions have strong indicia
of reliability.  He confessed within months of the murder,
multiple times, in several forms, to nearly unimpeachable
witnesses and his family, with no apparent ulterior motive,
and clearly against his penal interest.  "Self-inculpatory
statements have long been recognized as bearing strong
indicia of reliability."  *Id.* at 1004.  "[R]easonable people,
even reasonable people who are not especially honest, tend
not to make self-inculpatory statements unless they believe
them to be true."  *Id.* at 1005 (quoting *Williamson v. United
States*, 512 U.S. 594, 599 (1994)); *see also* Fed. R. Evid.
804(b)(3).

Importantly, Crouse's confessions were corroborated by
other evidence, including non-public facts about the murder
that only a participant to the crime would know.  *See Chia*,
360 F.3d at 1006 ("When a defendant seeks to introduce an
out-of-court statement, the corroboration of the contents of
that statement with other evidence is a factor weighing in

favor of its reliability." (citing *Chambers*, 410 U.S. at 300));
*cf. Christian v. Frank*, 595 F.3d 1076, 1085–86 (9th Cir.
2010) (finding no *Chambers* violation when a third party's
confessions were excluded as incredible because they were
made to unreliable witnesses and contradicted by the
evidence).

Finally, Crouse's confessions were undoubtedly critical
to Gable's defense. Our decision in *Lunbery v. Hornbeak* is
particularly instructive, in which we held that the state
violated the petitioner's due process rights by excluding
evidence that a third party admitted his drug partners had
accidentally killed the victim. 605 F.3d at 761. The
admission was against the third party's penal interest, made
shortly after the murder, and corroborated by other evidence.
*Id.* Although the petitioner had also confessed (and
recanted), that fact did not negate "the prejudice flowing
from her inability to present the defense of third party
culpability." *Id.* at 762. "The murder called out for a
murderer," and excluding third-party guilt evidence left only
the petitioner "in view." *Id.*; *see also Cudjo v. Ayers*,
698 F.3d 752, 765–66 (9th Cir. 2012) (finding a *Chambers*
violation when the petitioner's brother's confession was
excluded as hearsay under state law when the murder
pointed to a single culprit and only the killer's identity was
at issue). When there is little direct evidence of the crime,
but the defendant is the only one implicated, the jurors will
wonder: "If the defendant didn't [do it], who did?" *United
States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996).

Gable's defense was innocence, but excluding Crouse
left only Gable in view. As the only suspect, Gable's cryptic
statements to the police and his meth-fueled boasts to his
friends appeared to confirm the police's focus on him at trial.
But that evidence pales in comparison to Crouse's detailed

30          GABLE V. WILLIAMS

and accurate confessions, made under circumstances that
strongly support their reliability.  We therefore hold that the
exclusion of the Crouse confessions violated Gable's due
process rights under *Chambers*.  We must grant habeas relief
if the constitutional error "had substantial and injurious
effect or influence in determining the jury's verdict." *Brecht
v. Abrahamson,* 507 U.S. 619, 623 (1993) (quoting
*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see
also Cudjo*, 698 F.3d at 768.  Here, Gable's defense was
eviscerated by the trial court's ruling.  We therefore affirm
the district court's grant of habeas relief vacating Gable's
conviction.[10]

**AFFIRMED.**

---

[10] Costs are assessed against the State.  Fed. R. App. P. 39(a)(2).